r

v

C

Munson Township Board of Zoning Appeals
Munson Town Hall
12210 Auburn Road
Munson, Ohio

July 29, 2020


Board Members Present:
Dennis Pilawa, Chairman
Joe Tomaric
Danielle Pitcock
Jim O'Neill
Tim Kearns

Paula Friebertshauser
Secretary


Sarah Lane
Court Reporter and Notary Public

- - - -

WARE REPORTING SERVICE, LLC
21860 CROSSBEAM LANE
ROCKY RIVER, OHIO 44116
216.533.7606   FAX 440.333.0745

---

1    (Meeting began at 6:32 p.m.)

2    MR. PILAWA:  Welcome to the Board of

3 Zoning Appeals' meeting for July 29th.  And as we

4 typically do, let's please start the meeting with

5 *saying* The Pledge of Allegiance.

6    (Everyone in attendance stood and recited

7    The Pledge of Allegiance.)

8    MR. PILAWA:  Let me just explain

9 briefly what it is we do in this process.  The Board

10 of Zoning Appeals is a quasi judicial board.  We act

11 in the manner of judges but in a very limited

12 authority granted by law.  We take facts as evidence

13 as presented, and we apply certain principles and

14 standards of law to those facts, and those facts to

15 those principles of law, and we reach an

16 agreement — we reach a decision, not necessarily an

17 agreement, but we reach a decision with respect to

18 the application for the variance.

19    As a practical matter, you will see that

20 there's a court reporter present.  Unlike a lot of

21 zoning boards, we make a record of all of the

22 proceedings, and I'll tell you why that's important

23 in a moment.  As a practical matter, everybody is

24 sworn in who wants to speak.  And we ask because of

25 the size of the crowd that you state your name, you

---

1 spell your last name, and you give your address, and

2 then every time you speak after that you just repeat

3 your name so that the record is clear.

4    Frankly, under these circumstances, the

5 record really needs to be clear because, you know, a

6 proceeding before a Board of Zoning Appeals is

7 essentially a trial with virtually none of the

8 formalities of a trial.  We take evidence and we

9 consider, essentially, only sworn evidence; that is,

10 the evidence that will be subject to

11 cross-examination.  In that fashion, we don't accept

12 letters and emails and somebody coming in and

13 saying, "I spoke to five of my neighbors and they

14 all agree with me."  We just don't do that.  We

15 don't think that's fair to either the applicant or

16 any of the affected property owners.  So from that

17 sworn testimony, from that record, we make a

18 decision.

19    The record is important for this reason:

20 Whether the applicant is dissatisfied with our

21 decision or one of the affected property owners is

22 dissatisfied, or, frankly, you know, anybody who

23 might be dissatisfied with our decision has the

24 right to file an appeal through the common pleas

25 court to have our decision reviewed by a judge of

---

1 the common pleas court.

2    That appeal is taken by filing a notice of

3 appeal with the common pleas court within 30 days of

4 the approval of the minutes of tonight's meeting.

5 That's essentially a 60-day period of time because

6 our meetings happen about every 30 days.  So

7 whatever happens tonight, the minutes of tonight's

8 meeting will be approved at our next meeting at the

9 end of August and the 30 days begins to run.  That

10 appeal, except in very rare situations, is heard

11 purely on the record; that is, a common pleas judge

12 is unlikely to take additional evidence.

13    I guess a word to the wise is — and I'll

14 tell you why I'm a little bit fearful of saying this

15 right now — a word to the wise is, if you have

16 anything to say you really should say it tonight or

17 you may be forever barred from saying it.  Now, with

18 that having been said, there are a lot of people

19 here, and while we want everybody to be able to

20 speak, we're here to decide a use variance.  We'd

21 ask that you keep your comments to the issues

22 relating to a use variance and what's required for a

23 use variance.

24    Just by necessity, I think we're going to

25 have to limit the amount of time everybody speaks

EXHIBIT B

except for maybe the applicant because it's their burden. So if you find that you're going to repeat something that somebody else said or a position that somebody else said, when really the essence of what you want to say is, "I oppose this variance request," or "I'm in favor of this variance request," please stand up, give us your name, we'll swear you in, and you say, "I'm opposed to this."

Now, if it's an unusual or unique reason why you're opposed to it or in favor of it, by all means tell us. But I think we really have to limit you to three or four minutes each. We're going to try to stick to that as best we can.

The common pleas court will review what's done tonight, not necessarily to see if we are right or wrong, that is whether that judge agrees with or disagrees with the decision we made, but whether we reached that decision properly and within — and lawfully within the authority that we're granted by law. Frankly, that's all I wanted to say about the appeal process, but it's really very, very important. It's really very important.

And generally I wouldn't take questions until we started talking about something of substance, but go ahead. What's your question.

MR. ZUCCARO: If our time is going to be limited and we have a prepared statement and for the interest —

MR. PILAWA: Andy. Andy. Thank you. Ask your question again.

MR. ZUCCARO: If our time is going to be limited and we have a prepared statement for the interest of brevity, can we just say we would like to have that entered into the record and give a written copy of that and then that suffices?

MR. PILAWA: Well, probably not and I'll tell you why probably not, and that is whether you're for it or against it, the person on the other side or the people on the other side really have a right to cross-examine you, to question, to test, why you're saying what you're saying.

I'm not trying to make a silly joke. That's not your statement, is it? That packet of information, that's not your prepared statement, is it?

MR. ZUCCARO: This is stuff I'm hoping to enter into the record.

MR. PILAWA: And that's fine. No, that's fine. That's why I asked that question because there will be documentary evidence that we

take. We take photographs, we take aerial maps, we take all forms of evidence that come in along with testimony. So if you have some documents that you're using in connection with your testimony, by all means, say, "I'd like to offer this into evidence."

MR. ZUCCARO: Even if it is part of my statement that I don't verbally speak, but for shortness of brevity I'll just say the rest of it's written down and provide it with the other documents?

MR. PILAWA: I don't want you to run afoul of what the Judge in the common pleas court might do. That's all. That's all. But I simply wanted everybody to know that there has to be some limit. There has to be some limit. And I'm hoping that we can all use a certain amount of reasonableness to what we say and how long we take to say it.

Does anybody else have a question? Because we really do need to get to the meeting.

MR. TURKISH: I just wanted to voice I was at the — I get what you're saying. I was at the first BZA meeting that was postponed to this and that was my question at the first BZA meeting

because I had never been to a meeting before so my question —

MR. PILAWA: I didn't recognize you under the mask. Welcome back.

MR. TURKISH: My question at that meeting was what the time limit was and the answer was that as long as we weren't repeating ourselves you can -- you used the example of a stop sign is red, a stop sign is red, a stop sign is red — there would not necessarily be a time limit, so I prepared a statement that I don't know how to present now because my statement is about 12, 13 minutes.

MR. PILAWA: Why don't we play it by ear, but at that first meeting there wasn't nearly this number of people, not nearly this number of people. And once I became aware and once the Board became aware of the fact that we were going to have this number of people, we had to do something as a practical matter. I mean, we just had to do something as a practical matter. I remember the discussion. Frankly, I remember you now and I know that you asked those same questions, but there were 12 people in the audience as well.

MR. TURKISH: So I can still submit this, what I don't speak about tonight?

MR. PILAWA: No, I want you to have the opportunity to address the issues related to a use variance, but I -- here, I can tell you straight up, we're not going to listen to people say, "I don't like what they do, what they're planning to do, and I'm against it." You know, "I think they do a lousy job"; "I think they do a good job." That's not what we're here for.

There are legal elements, there are legal principles, there are legal requirements that must be met or opposed in order for somebody to have a use variance. It's not easy. It's not at all easy. That's why we have this process.

There are legal standards that the applicant has to meet and that's what we're going to devote tonight's meeting to because that's all we can devote tonight's meeting to. That's all our authority is.

I take it you probably remember me saying this from the first meeting. We have very limited authority. All we can do is grant or deny a variance. That's all we can do, and that's why we limit the discussion to that which is necessary to establish those legal standards which are necessary to establish the entitlement to that variance.

---

MR. TURKISH: Right, but I think it revolves around the discussion for the variance. It's just lengthy.

MR. PILAWA: Okay, that's fine.

MR. TURKISH: I'll give my stuff to --

MR. PILAWA: I'm not suggesting that you do not do that, I'm just saying let's all use a little bit of reasonableness tonight. That's all we're asking for. That's all we're asking for.

Anybody else have a question before we get started? Once we get started, we're just going to get into it.

All right. The first item tonight, since we only have one case on the agenda, is the approval of the minutes of the June 17th, 2020 meeting. Is there a motion with respect to the minutes of the June 17th, 2020 meeting? That's me, Danielle, Tim, Joe, and Jim. Is there a motion?

MR. TOMARIC: Yes, there's a motion to accept the minutes as written.

MR. PILAWA: Is there a second?

MS. PITCOCK: I'll second.

MR. PILAWA: Is there any discussion? All right.

Paula, would you call the roll, please.

---

MS. FRIEBERTSHAUSER: Sure. Mr. Tomaric?

MR. TOMARIC: Yes.

MS. FRIEBERTSHAUSER: Mr. O'Neill?

MR. O'NEILL: Yes.

MS. FRIEBERTSHAUSER: Mrs. Pitcock?

MS. PITCOCK: Yes.

MS. FRIEBERTSHAUSER: Mr. Kearns? Mr. Kearns?

MR. KEARNS: Yes.

MS. FRIEBERTSHAUSER: I woke him up over there.

Mr. Pilawa?

MR. PILAWA: Yes.

Now, for what it's worth, if anybody is dissatisfied with what we did June 17th, their 30 days start to run tonight. We just approved those meeting minutes. And that's very important. Let me add one other thing. If you file your appeal on the 31st day, it won't be heard. File it on the 29th day, file it on the 20th day. Don't wait until the very end if you're dissatisfied with what we do because it won't be heard. It is, as lawyers like to say, jurisdictional, and if you don't do it in a timely fashion then the common pleas court will not

---

have jurisdiction to hear your appeal.

Well, we have a continued case tonight. It's Case 20-02, Melanie Blasko for Lake-Geauga Recovery Centers, Inc., 12700 Ravenna Road, Chardon, Ohio. There is a request to use an existing residence as a Level II recovery house in a residential district. This violates Section 401.2, the R-1 Residential District Permitted Principal Uses and Structures, a recovery house is not a permitted use.

Mr. Herringshaw, would you raise your right hand, please.

(James Herringshaw, of lawful age, was sworn in.)

MR. PILAWA: All right. Mr. Herringshaw is our zoning inspector.

MR. HERRINGSHAW: I thought I'd give -- because this process started about ten months ago, I thought I'd just give a quick -- and since we also had a continuance in January, I figured I'd just give a quick recap of how we got to where we're at and just some of the -- how it began and how it got to where we are.

It started off on October 9. I had two calls from residents that they heard that the property was purchased by Lake-Geauga Recovery

Center, and that same day I had a visit from Mike
Vatty from the fire department. The residents were
concerned for other things, but Mike Vatty was
concerned if it was also up to code, if they were
changing the use. And per that, we did send a
letter to the owner and informing them that they
would have to get a zoning permit or contact us to
see what -- if they were changing the use from what
it was, from a single-family dwelling, they would
need either a zoning permit or — we just wanted
them to contact us and see.

So in November, early November, Melanie
Blasko contacted me and — after receiving the
letter, and I assumed that they might even be a
licensed residential facility, which would be
permitted in that district and you would just need a
zoning permit for a change of use. She did not
think that they were that, a licensed residential
facility, and that they thought that the property
purchased was actually in Chardon, not Munson. And,
of course, Munson zoning regulations are different
than Chardon's.

On November 8th she then confirmed that --
on November 8th I received an email from Melanie and
she confirmed that they were not a licensed

facility, but she also asked if we would check with
our legal counsel — if I would check with our legal
counsel, regarding if they were a protected class
and if some kind of zoning superceded — or some law
or regulation that superceded zoning, and also for a
family, if they were considered a single family
under our definition of family, because they didn't
really fit that either. And then she said if our
legal representative thought that that was our legal
opinion, she wanted to know what the steps for going
for a use variance would be.

So I then forwarded on that day this email
to the prosecutor's office asking that they give us
a legal opinion on all of this. It was taking a
little while because there was a lot to look into,
and Melanie contacted me a couple of times.

On November 21st she contacted me again and
said she was going to send a letter out. I'm saying
that only because you've got a copy of a letter
there that she sent to all the residents, and she
was going to have a meeting with all the affected
property owners. So she asked our office to send
those letters to them so they could come to a
meeting on December 12th.

On December 23rd, Melanie called and she

said they wanted to come in. Even though we didn't
have an answer yet on what the legal opinion was,
she wanted to complete the variance request so they
could have it ready so it would be heard, because
the deadline for that was the end of the month in
December. In January she wanted to be able to be
heard, and if she had to have a use variance, or
come for a variance, she wanted to have it ready.

We agreed we were going to put her on hold
and not process anything until we heard back and got
that legal opinion, because if the legal opinion
came back and said, oh, there is a law that
supersedes that, then they may only need a zoning
permit or they don't need anything. I don't know.
Whatever their legal opinion was going to be, I was
going to follow.

So at the end of day, the legal opinion was
that the protected class, while they are a protected
class, that doesn't exempt them from zoning and they
didn't really fit our definition of family. So,
therefore, the use variance went forward, and when
we got to the January meeting they got the
continuance. So that's how we got to where we're at
right now, the use variance.

MR. PILAWA: Is that all?

MR. HERRINGSHAW: Yes.

MR. PILAWA: Anybody on the Board have
anything for Mr. Herringshaw? Anybody? Okay.

This is typically how we do it. We hear
from the zoning inspector who made the initial
decision, and then we hear from the applicant, and
then we open it up to the affected property owners.
That's the manner in which we'll do it tonight. So
Melanie Blasko or --

MR. GILLETTE: If I may —

MR. PILAWA: Yeah. Would you raise
your right hand.

MR. GILLETTE: I'm not going to
testify. I'm the attorney for Lake-Geauga Centers.

MR. PILAWA: I understand. We swear
everybody.

MR. GILLETTE: Okay.

(James Gillette, of lawful age, was duly
sworn.)

MR. PILAWA: Would you state your name
for the record.

MR. GILLETTE: My name is James
Gillette, and I am legal counsel for Lake-Geauga
Recovery Centers, Inc.

MR. PILAWA: Address, please.

1    MR. GILLETTE:  117 South Street in

2  Chardon.

3    MR. PILAWA:  Okay.  Good.  Thanks.

4    MR. GILLETTE:  Before Ms. Blasko

5  testifies, I'd like to make some comments concerning

6  how we got here and the reason we're here, and

7  rather than speaking to the Board with my back to

8  the audience, I'd like to move over here.

9    MR. PILAWA:  Wherever you're

10  comfortable, that's fine, just as long as everyone

11  can hear you.

12    MR. GILLETTE:  Again, I'm Jim

13  Gillette.  I'm the attorney for Lake-Geauga Recovery

14  Centers, Inc., official representatives of

15  Lake-Geauga Recovery Centers attending tonight are

16  Melanie Blasko who is the President and CEO and Van

17  Carson who is the outgoing chair of the Board of

18  Lake-Geauga.  Also here this evening are the two

19  ladies who currently reside at 12700 Ravenna Road.

20    We view the issue as follows:  Can five

21  unrelated adult women recovering from alcoholism,

22  drug addiction, or both, who are identified as a

23  protected class under state and federal law, live

24  together at 12700 Ravenna Road, a single-family

25  dwelling located in the R-1 single-family

---

1  residential district.

2    Your R-1 residential district allows

3  several principal uses.  Among them are a one family

4  single dwelling — a — one single-family dwelling,

5  a licensed residential facility as defined in Ohio

6  Revised Code Section 5123.19, and also a Type B

7  home, which apparently is a foster care home.

8    The family is defined as one or more

9  persons related by blood, adoption, guardianship, or

10  marriage, living and cooking together as a single

11  housekeeping unit, exclusive of live-in hired

12  employees.  A number of adult employees — or the

13  number of adult persons, not exceeding two, living

14  and cooking together as a single housekeeping unit

15  though not related by blood, adoption, guardianship,

16  or marriage, shall also be deemed to constitute a

17  family, exclusive of live-in hired employees.

18    So the definition allows two unrelated

19  adult individuals to reside in a single-family

20  dwelling and they are considered a family.

21    MR. PILAWA:  Mr. Gillette, is your

22  challenge tonight to the decision of the zoning

23  inspector?

24    MR. GILLETTE:  The challenge — we

25  filed a notice of appeal variance request.  That's

---

1  the only form that Munson has.  So we're appealing

2  his decision that, one, it was determined not to be

3  a single family — that the protected class was not

4  considered to be a single family and, therefore,

5  allowed to live in the house in the R-1 residential

6  district.

7    And secondly, if five unrelated adult women

8  in recovery are not considered as a family unit,

9  then they're entitled to a reasonable accommodation

10  under state and federal law.

11    MR. PILAWA:  But the only thing before

12  us is a use variance.  I don't think this is the

13  proper forum to challenge, and I think the time to

14  challenge, the zoning inspector's decision has long

15  passed.  I don't know that personally because I

16  wasn't involved at all in it, but it seems to me

17  that the challenge to the zoning inspector's

18  decision, initially, is a separate matter, separate

19  and apart from the use, and I think you know better

20  than anyone how the authority — look, what we have

21  before us is a use variance.

22    We don't have any authority to make any

23  determination about what is a family and what isn't

24  a family.  The Board of Zoning Appeals just doesn't

25  have that authority.  We do have the authority to

---

1  act on variances.

2    It wasn't my intent to interrupt you, but

3  before you got too far down one track, I just wanted

4  to make that clear.

5    MR. GILLETTE:  Well, I gave the

6  members of the Board a memorandum, and one of the

7  things that I addressed was the Board's

8  jurisdiction.  And under your zoning resolution, any

9  decisions of the zoning inspector are appealed to

10  the Board of Zoning Appeals.

11    MR. PILAWA:  Within what period of

12  time?

13    MR. GILLETTE:  So --

14    MR. PILAWA:  Within what period of

15  time, though?

16    MR. GILLETTE:  So whether or not it's

17  a variance or whether or not it's some other

18  decision by the zoning inspector, it comes to this

19  body.  Now, I have an alternative argument.

20    MR. PILAWA:  Well, here, hold on.

21  Except that's not before us.  There is nothing in

22  this application that challenges -- that says that

23  he did it wrong and that we want you to make a

24  determination that, in fact, he did it wrong.

25    What we have before us is a use variance

request, and as I understand the process — and, honestly, I've only been on this board for 20 years so maybe somebody has more experience with it than me, but that is a separate application, that is a separate appeal than the application for a use variance.

MR. GILLETTE: The only notice of appeal that we have also includes a request for a variance. So as far as the agency is concerned, Lake-Geauga is concerned, we filed an appeal to the zoning inspector's decision. Now, he denied the zoning certificate and he advised Ms. Blasko to file the notice of appeal and request for a variance.

Now, in the alternative, if you determine that it's wrong with jurisdiction and this matter is to consider a use variance, which I don't agree with, but if that's the determination of the Board, then as an alternative you have the authority to grant a use variance by granting an accommodation to the protected class.

MR. PILAWA: I understand your position, I understand your argument, I've read your memorandum. I'm still not convinced that the challenge to the — and I don't speak for the Board, I'm just one of five — I'm still not convinced that

the challenge to the zoning inspector's decision is encompassed within this application for a use variance, and I've been through it multiple times, as you might suspect, nor do I think that this is the forum for that.

But, again, I understand your position and, frankly, I think that — I'm pretty confident that the rest of the Board agrees with me.

MR. GILLETTE: Again, in the alternative, if you believe that the only issue before you is the issue of the use variance, then we also have the argument that we're entitled to a reasonable accommodation because this is a protected class.

MR. PILAWA: We're looking to hear a use variance request.

MR. GILLETTE: So continuing and addressing both our position and your position as considering a use variance in this matter, what is a protected class? Well, a protected class is defined under both federal and state law.

Under the Federal Housing Act, a protected class includes a person or people with a handicap. A handicap is a physical or mental impairment which substantially limits one or more or such person's

major life activities, and working is included as a major life activity, a record of having such an impairment, or being regarded as having such an impairment. It does not include current illegal use of, or addiction to, a controlled substance, and in this matter our protected class is not going to be currently using — or — is not going to be currently using illegal controlled substances.

This class of women has all gone through treatment programs, principle treatment program, and they have been sober for a period of time before they are admitted into the recovery house.

The Fair Housing Act prevents discrimination of the sale or rental or to otherwise make unavailable or deny a dwelling to any buyer or renter because of a handicap. A discrimination includes a refusal to make reasonable accommodations in rules, policies, practices, or services when such accompanying accommodations may be necessary to afford such person or persons an equal opportunity to use and enjoy a dwelling.

Now, this applies to governmental regulations as well as to private individuals, private landlords who rent out their property. And as a matter of fact, the statute then goes on to say

determinations by a state or local government under the discrimination section I just read shall not be conclusive and enforced in proceedings.

The Americans with Disabilities Act also plays a role in this situation. The term disability is nearly identical to the definition of a handicap under the FHA. It includes a physical or mental impairment that substantially limits one or more major life activities of an individual, but it also includes a record of such an impairment or being regarded as having such an impairment.

What does being regarded as having such an impairment mean? If the individual establishes that he or she has been subject to an action prohibited under this chapter because of an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity, this applies.

So that means if the person is considered to be a recovering alcoholic or a recovering drug addict and that's the reason for the discrimination, then that's not legal under federal law.

Under the ADA, the definition of a disability is to be construed in favor of broad coverage. It also includes persons who are

suffering from a disability that is referred to in
the statute as in remission; meaning, if the person
was actively suffering from that disability and was
not in remission it would substantially limit a
major life activity when active. Again, a major
life activity includes working.

Finally, under the Ohio Fair Housing Act, a
disability means a physical or mental impairment
that substantially limits one or more major life
activities, and there are a number of them listed
here, but it includes working, having a record of
physical or mental impairment, or being regarding as
having a physical or mental impairment.

A physical or mental impairment under the
Ohio law includes drug addiction and alcoholism. It
does not mean current illegal use of a controlled
substance or current use of alcoholic beverages, and
that's not what is proposed for this use.

The premises of 12700 Ravenna Road is going
to be available only to five unrelated adult women
who are in recovery. If they are using, they are
not going to be admitted. If they use after they're
admitted, they're going to be terminated from living
there.

Again, discrimination under the Ohio law is

a refusal to make reasonable accommodations in these
rules, and it's applicable to any local, state, or
federal restrictions regarding the maximum number of
occupants permitted to occupy housing accommodations
so long as it is reasonable.

The statute then goes on to say that
reasonable occupancy standards based on the number
and size of sleeping areas or bedrooms and the
overall size of a dwelling unit are factors to be
considered in what is a reasonable restriction
regarding the maximum number of occupants.

In this situation, the Munson zoning
resolution limits the number of unrelated adults in
a single-family dwelling to two adults, without
getting into any of those factors that the statute
suggests should be considered in determining a
reasonable number of occupants. Also, any
restrictions by the government should be interpreted
in a manner consistent with the Ohio Federal Housing
Act.

So what is recovery housing? Recovery
housing is housing that is available pursuant to the
Ohio Revised Code to certain individuals, and those
are people who are in recovery from drug addiction,
alcoholism, or referred to collectively as a

substance abuse disorder. It is not required to be
licensed as a residential facility, it is not
required to be certified as a recovery support unit
under the Ohio Revised Code, and it may not be
operated by the local Board of Mental Health and
Addiction Services. The statute does require a
certain protocol: administrative oversight, quality
standards, policies, and procedures.

Finally, the statute shall not limit a
resident's duration of stay to an arbitrary or a
fixed amount of time, meaning that the resident has
the opportunity to stay at the recovery house, to
live at the recovery house, as long as they — he or
she feels it's necessary so that they can transition
back into society.

I think it's important to consider the
similar -- permitted similar use of a licensed
residential facility in comparison with a Level II
recovery house. The Ohio Revised Code dictates
whether or not a facility has to be licensed. The
Revised Code requires a residential facility to be
licensed and specifically states that no license is
required for a recovery house.

A licensed residential facility is a
permitted use per the zoning resolution for five or

less developmentally disabled residents. Twelve
Meadows Recovery House at 12700 Ravenna Road will
provide recovery housing for five unrelated adults
in recovery. Both of these are protected classes,
yet the zoning resolution discriminates against the
protected class of those who would reside in
recovery housing. Again, is two unrelated adults a
reasonable limitation in today's society? I mean,
this would prevent three teachers —

MS. WIELAND: Jim, I'm sorry to
interrupt, but truly we are here for a use variance
on an R-1 permitted use. I'm Susan Wieland. I'm
from the prosecutor's office. I represent Munson
Township.

So I want to stay focused on what — I know
you're kind of making a comparison between a
recovery house and a licensed residential facility
and your discrimination argument; however, what's
before the BZA tonight is an application for a use
variance from one of the R-1 permitted uses. That's
what we're here for.

MR. PILAWA: Susan, we appreciate the
help. I didn't think I was going to interrupt
Mr. Gillette at this point, but he's coming close to
a point. If your position is that the resolution is

discriminatory on its face, we don't have the
authority to decide that.  We don't.  And what we
have before us is a use variance.

MR. GILLETTE:  What I'm doing is
pointing out —

MR. PILAWA:  Hold on.  Nobody on this
Board will ever stepped on any applicant who is
trying to make their case.  I don't think you're
trying to make your case for a use variance, which
is before us.

MR. GILLETTE:  Well, as I said, our
alternative argument is a reasonable accommodation,
and if you have a licensed residential facility that
allows five people of a protected class to live in
such a facility, then a reasonable accommodation, a
use variance, would be necessary to allow the five
unrelated adult women in recovery to reside in the
property at 12700 Ravenna Road.

MR. PILAWA:  I heard you say that, and
I understand that you're trying to draw that analogy
and trying to make that comparison, but I don't
think that's what's before us.  You're asking us to
use an example of another facility in order to
bootstrap your way into "This is discriminatory on
its face because of the type of facility that's

going to be used."  That's not what's before us.

MR. GILLETTE:  It's —

MR. PILAWA:  First of all, it's not
what's before us.  It may be your argument that it
should be, but it's not, and — go ahead.  I'm
sorry.

MR. GILLETTE:  Again, going back to
what I stated, if you consider this to be an
application for a use variance, then you have to
consider a reasonable accommodation to this
protected class.

MR. PILAWA:  That's only if we have
already concluded, or some court has concluded for
us, that our ordinance is discriminatory on its face
because it discriminated against that protected
class.

MR. GILLETTE:  Not necessary.

MR. PILAWA:  Oh, very much
necessarily, and I can tell you that that's for the
common pleas court or the court of appeals to
decide.  We're not going to decide that tonight.
We're not going to decide tonight -- there's nothing
before us, nor do we have the authority, to
determine that this zoning order, this ordinance, is
discriminatory on it face.

L

MR. GILLETTE:  I'm not necessarily
asking you to do that.

MR. PILAWA:  Okay.

MR. GILLETTE:  I'm saying and what I'm
suggesting is that under state and federal law you
may consider reasonable accommodation as grounds to
grant a use variance, and I'm just using a licensed
residential facility as an example.

Thank you.  I don't have anything further.

MR. PILAWA:  Before you go.

Jim, there is a 20-day period of time in
which to file an appeal of the decision of the
zoning inspector, correct.

MR. HERRINGSHAW:  20 days.

MR. PILAWA:  20 days.  Did anyone come
to you?

MR. HERRINGSHAW:  No.

MR. PILAWA:  Did anybody make an
appeal of the zoning inspector's decision within
that 20-day period of time that's set forth in —
oh, is it Article 11?

MR. GILLETTE:  We filed a notice of
appeal, request for variance.

MR. PILAWA:  I understand.

MR. GILLETTE:  I would argue that by

doing so we appealed the zoning inspector's decision
and also requested a variance as part of the same
appeal process.

MR. PILAWA:  Yeah, I don't think
that's the case.  I think they're separate.  I think
that there is a mechanism set up for the direct
appeal of his decision, and his decision alone, that
doesn't require an applicant to try to get a
variance.  Because if he's wrong at the outset,
there's no need for a variance, which is why I think
it was done that way.

MR. GILLETTE:  Well, is there a notice
of appeal form for a zoning inspector's decision?

MR. PILAWA:  Well, there's certainly
not one set out, but I don't know why anyone
couldn't just say "Notice of Appeal of Inspector's
Decision."

And, I'm sorry, I misspoke, it's 12.2.1,
and it says:  When affected by the decision of the
zoning inspector that such appeals shall be taken
within 20 days after the decision of the zoning
inspector by filing with the zoning inspector and
with the Board of Zoning Appeals, a notice of appeal
specifying the grounds of the appeal.

It doesn't say a form designated by the

township and a form designated by state law or designated by this book. It only says a notice of appeal.

MR. GILLETTE: My response to that is if the average person is going to come in and file an appeal of the zoning inspector's decision and is provided with a Notice of Appeal Request for Variance form, I think it's reasonable to conclude that that form that's being submitted is an appeal of the zoning inspector's decision and also a request for a variance.

MR. PILAWA: There's no evidence to that effect right now. There's no evidence that -- you weren't going to give evidence to that -- maybe we'll get evidence to that effect before the night is out, but I don't think on the record, as it currently exists — and the testimony from Mr. Herringshaw is that he did not receive any notice with respect to his original decision — that his original decision is before this board.

You're left with a variance request, I believe. And I understand the reasonable accommodation — your position is a reasonable accommodation needs to be made in connection with the use variance request.

MR. GILLETTE: I would ask Mr. Herringshaw a question.

MR. PILAWA: Yeah, go ahead.

MR. GILLETTE: Have you, during your tenure as a zoning inspector. ever received a notice of appeal of a decision that was not a request for a variance?

MR. HERRINGSHAW: I didn't receive one, but the Township did receive one, but it was after the fact, after the 20 days, but they did receive one, yes.

MR. GILLETTE: And when was that?

MR. HERRINGSHAW: A couple months ago. I don't -- I'm not sure of the exact date.

MR. GILLETTE: Was it before or after the request for variance and notice of appeal was filed in this case?

MR. HERRINGSHAW: Are you talking about was it before or after — say that again.

MR. GILLETTE: Was it before or after the notice of appeal request for variance filed in this case Melanie requested the use variance on December 21st.

MR. HERRINGSHAW: Are you talking was it before or after Melanie requested the use

variance in December?

MR. GILLETTE: Yes.

MR. HERRINGSHAW: I don't know.

MS. FRIEBERTSHAUSER: I'm not sure.

MR. HERRINGSHAW: They don't really come to me. They come to the office and then they go to the Trustees.

MR. GILLETTE: Okay. Thank you. We'll ask Melanie Blasko to testify.

MR. PILAWA: Sure.

(Melanie Blasko, of lawful age, was duly sworn.)

MR. PILAWA: You need to state your name for the record, spell your last name, and give your business address. if you want.

MS. BLASKO: Melanie Blasko, B-L-A-S-K-O, 9083 Mentor Avenue. I'm the President and CEO of Lake-Geauga Recovery Centers, Incorporated, a 501(c)(3) non-profit corporation.

Lake-Geauga has been providing continuous service to individuals and families with substance use disorders in Lake and Geauga County for 49 years. In using the term substance use disorders, I am referring to those suffering from alcoholism and drug addiction.

The mission statement is to promote

lifelong recovery from addiction, through prevention, education, and treatment, regardless of ability to pay, and to provide an improved quality of life through long-term recovery.

Lake-Geauga offers outpatient treatment services at its Mentor, Painesville, and Chardon offices. Outpatient services include intake, assessment, ambulatory detox, medication-assisted treatment, education, drug and alcohol individual and group counseling, gender-specific groups, dual diagnoses groups, and individual counseling, family groups, grief support groups, aftercare, relapse prevention, intensive outpatient programs, opiate recovery program, drug/alcohol testing, and mental health referrals.

Lake-Geauga operates four long-term, nonmedical residential treatment facilities. Lake House a 16-bed men's residential treatment, and Oak House a 16-bed women's residential treatment program are located in the city of Painesville. The other two residential facilities are Concord Pines, a 16-bed men's facility located in Concord Township; and Nevaeh Ridge, a facility for pregnant women and mothers with children ages five and under located in Mentor.

The treatment facilities described above are all approved and licensed by the State of Ohio and operated in compliance with the standards and certification requirements of the Ohio Department of Mental Health and Addiction Services and the Commission on Accreditation of Rehabilitation Facilities. Compliance with all applicable federal and state regulations and State of Ohio licenses are required for continued operation and financial support by funding sources.

Pursuant to the community-based continuum of care statute enacted in Ohio, each mental health and recovery services board must provide local recovery housing. The Geauga Board of Mental Health and Recovery Services works with Lake-Geauga Recovery Centers to operate recovery housing in Geauga County.

Each recovery house provides a family-living setting for adult men or women who have completed a primary substance abuse treatment program, have been clean and sober for at least 30 days, and are seeking a drug and alcohol free living environment.

A resident must be committed to a path of sobriety and recovery, participate in approved

recovery programs, obey house rules, and pay rent. Most residents are employed in the community. A recovery house, also called a sober living home, has a house manager trained by Lake-Geauga who monitors activities, offers support, and maintains resident accountability.

In 2020, Lake-Geauga had an operating budget of approximately $5,759,966. Revenue sources are the Lake County Alcohol, Drug Addiction and Mental Health Services Board, the Geauga County Board of Mental Health and Recovery Services, Medicaid, private insurance, United Way of Lake and Geauga Counties, state grants, and other sources, including donations. 82.5 percent of revenues expended in 2020 were for inpatient and outpatient treatment.

For those recovering from a substance use disorder, sober housing is a critical need upon discharge from treatment. Lake-Geauga has worked closely with local housing agencies for individuals in need of low cost, longer-term individual housing units upon completion of primary treatment. While this has benefitted some, most of the available housing does not provide the structure, support, and alcohol and drug free living environment

characteristic of a recovery house.

A recovery house promotes long-term recovery, facilitates the individual's transition into the community, and provides a safe and sober environment during the transition.

Lake-Geauga purchased the Ravenna Road property as a recovery house in September of 2019 for $258,400. The residence is 2,382 square feet, has four bedrooms with adequate closet space, two baths, an open floor plan with combined living area and kitchen, two-car garage, a long driveway which provides ample parking, located in a rural, peaceful setting, all of which make it a functional facility for use as a recovery house. No structural changes have been made or are anticipated. Landscaping was installed.

The recovery house offers a structured environment with support services. predominantly facilitated by peer providers, allowing each resident to transition from a very structured treatment environment to a more independent living situation with limited control and supervision.

Twelve Meadows, which is the name of our recovery house, will accept adult women from Lake and Geauga Counties with substance use disorders who

have been clean and sober for at least 30 days, are not a danger to themselves or others, and are able to live independently and care for their personal needs. Each resident must participate in an approved 12-step program of their choice and be active in recovery.

Admission requires submitting a complete application, interview by Lake-Geauga intake coordinator, residential treatment manager, or recovery house manager, and at least two references from the 12-step community, faith-based community, or counseling professional.

The qualifications for a house manager are: They must be able to live at the residence, they must be active in a 12-step or other recovery program for a minimum of two years, they must be substance free at all times, familiarity with 12-step programs and recovery terminology and concepts, ability to work as a team member in support of recovery house program for recovering, chemically dependent persons. Experience in residential setting preferred. They must possess a valid driver's license and individual auto insurance.

All newly hired employees at Lake-Geauga

1  Recovery Centers must submit to a drug screen and
2  the following background checks prior to employment
3  and annually thereafter:  a criminal background
4  check, Office of Inspector General, System for Award
5  Management, sex offender, inmate registry, nurse
6  aide registry, and Department of Developmental
7  Disabilities Abuser Registry.  If Ohio residency is
8  less than five years, a background check through the
9  FBI will be completed.
10      Each house manager hired by Lake-Geauga
11  completes a comprehensive orientation process which
12  includes a review of all Lake-Geauga Center policies
13  and procedures.  Each house manager meets with the
14  residential treatment manager and at least one other
15  current Lake-Geauga house manager to review policies
16  and procedures related to their job description,
17  including our Good Neighbor policy, and the review
18  of best practices being used by current house
19  managers to ensure quality, effectiveness, and
20  efficiency in an environment that is safe and
21  healthy for all tenants.  The house manager who
22  lives on site will monitor activities.
23      Conditions of admission and residency
24  include:  No use of alcohol or drugs, employment
25  prior to residency or the ability to pay rent,

1  active participation in a 12-step program,
2  attendance at five or more 12-step meetings or
3  approved faith-based meetings per week, a 12-step
4  sponsor or an established peer support person or
5  network, random drug testing, weekly attendance at
6  house meetings, compliance with outpatient treatment
7  services provided offsite, if needed, assisting with
8  the proper care and maintenance of the recovery
9  house and house chores.  The length of residence at
10  the recovery house may not be limited under Revised
11  Code 340.034.
12      MR. PILAWA:  Ms. Blasko.
13      MS. BLASKO:  Yes, sir.
14      MR. PILAWA:  When you — when
15  Lake-Geauga purchased this property, was there a
16  provision in the purchase agreement that it was
17  subject to zoning approval?
18      MS. BLASKO:  No.
19      MR. PILAWA:  There was no condition.
20  Did you work with a realtor?
21      MS. BLASKO:  Yes.
22      MR. PILAWA:  Was there any
23  investigation at all as to zoning?
24      MS. BLASKO:  We have worked with the
25  same relator -- we own and operate six recovery

1  homes, and we worked with the same realtor on all
2  five of them.  When we purchased this one, our
3  realtor was on vacation so we were working with a
4  different realtor.  It was our understanding that it
5  was Chardon, the City of Chardon.
6      MR. PILAWA:  And how did you come to
7  that understanding?
8      MS. BLASKO:  The address was Chardon
9  and --
10      MR. PILAWA:  The mailing address was
11  Chardon.
12      MS. BLASKO:  The mailing address was
13  Chardon.  And, like I said, we worked with a
14  different realtor.
15      MR. PILAWA:  Now, are any of the other
16  six homes, I think you said --
17      MS. BLASKO:  Total, yes.
18      MR. PILAWA:  — did you have to deal
19  with zoning issues in any of those?
20      MS. BLASKO:  Maybe one or two.  I
21  mean, we knew in the City of Chardon we have a men's
22  recovery house that we did, but it really wasn't a
23  zoning issue then because it was determined that
24  they were a protected class, so it didn't require
25  anything special.  But their zoning was a little

1  different in that it allowed five unrelated adults.
2  Our recovery houses have five adults.
3      MR. PILAWA:  But my point is simply --
4  not even my point.  What I'm hearing is you have
5  experience with zoning, knowing that zoning exists
6  and knowing that you have to comply with zoning, and
7  you do?
8      MS. BLASKO:  Yes.
9      MR. PILAWA:  Okay.  Thanks.
10      MS. BLASKO:  Let's see.  Flexibility
11  in length of stay allows each resident sufficient
12  time to accumulate financial resources and
13  strengthen emotional stability, enabling each woman
14  to establish a permanent, independent, and healthy
15  living arrangement.  The average length of stay is
16  nine months; however, many have stayed one year and,
17  at least one, two years.
18      Lake-Geauga will provide administrative
19  oversight and will ensure a high-quality recovery
20  house.  The Revised Code does not require a recovery
21  house to be licensed or certified.
22      MR. PILAWA:  Ms. Blasko, was this
23  property occupied when you bought it?
24      MS. BLASKO:  Yes.
25      MR. PILAWA:  So somebody was living in

it?

MS. BLASKO: Correct.

MR. PILAWA: A single family?

MS. BLASKO: Yes.

MR. PILAWA: All right. So you know that — I don't know that you know this. But one of the factors we have to consider is whether this property can be reasonably used in an economically viable manner without a variance and it was being used in an economical and viable manner before Lake-Geauga bought it.

MS. BLASKO: Was it?

MR. PILAWA: It was -- it was a residence.

MS. BLASKO: Well, I wouldn't know. How would I know that? I mean --

MR. PILAWA: Well, you just told me that somebody lived in it as a single-family residence.

MS. BLASKO: Correct, yes.

MR. PILAWA: Okay. And is your quarrel with the words "economically viable manner"? I mean, I'm not suggesting that they were paying rent or anything like that, but I'm just saying one of the things we are required to consider is may

the — in order for you to get a variance, a use variance, is whether the property can be reasonably in an economically viable manner without a variance. We need to make that determination. Are we going to get evidence of that, that it can't be use in an economically viable manner in the absence of a variance?

MS. BLASKO: There would be -- if it were limited to two women and we're — we rely on the rent for operating expenses, so if we're limited to two rather than five people, then that will affect the ongoing operations of that home.

MR. PILAWA: And the two that are there now, they're paying rent?

MS. BLASKO: One is paying rent. The other is our house manager and that's part of their arrangement of living there, that they don't pay rent.

MR. PILAWA: Okay. I just want you to be aware of the fact that while we appreciate — and I think I can speak for everybody here — that we appreciate the work that you do.

We are required to address certain legal factors and certain legal requirements, and we're looking for evidence to apply to them, and so far we

don't have it. That's all. That's my only point in telling you that, in case you wanted to —

MS. BLASKO: Do you want me to continue then or --

MR. PILAWA: I mean, sure. But if you wanted to sort of gear your presentation to the use variance that's before us, that'd be great.

MS. BLASKO: Okay.

MR. GILLETTE: Why don't you just continue with your testimony.

MS. BLASKO: From where I left off?

MR. GILLETTE: Huh?

MS. BLASKO: From where I left off?

MR. GILLETTE: Yes.

MS. BLASKO: Okay.

Currently, five to six recovery houses operated by Lake-Geauga Recovery Centers follow the National Association of Recovery Residence Standards for Recovery Residences and are currently certified by the Ohio Recovery Housing Association. Twelve Meadows was inspected and received certification as a professional organization by the Ohio Recovery Housing Association on February 10th, 2020.

The recovery houses are incorporated into Lake-Geauga Recovery Centers' established and

approved health and safety plan, risk management plan, quality improvement plan, accessibility plan, and must follow administrative policies and procedures.

Clients' rent of $85 to $95 per week and the commitment of financial support from the Geauga Mental Health and Recovery Services will meet the annual cost of operating Twelve Meadows.

In addition, a portion of Lake-Geauga Recovery Centers' fundraising proceeds and donations will be allocated to Twelve Meadows, if necessary, to offset the general operating expenses.

The Geauga County Board of Mental Health and Recovery Services as the county agency directed to provide recovery services in Geauga County submitted a grant to the Ohio Department of Mental Health and Addiction Services on benefit of Lake-Geauga Recovery Centers in the amount of $334,561. The grant funding is made on a reimbursement basis. 75 percent covered by the Ohio Department of Mental Health and Addiction Services and 25 percent covered by the Geauga County Board of Mental Health and Recovery Services.

The application must describe the facility, identify the services to be provided at the recovery

1  house, if any, the targeted population, describe
2  consumer access to the recovery house, identify
3  other available programs not on site, residents'
4  responsibilities while living in the recovery house,
5  anticipated operating expenses, and assurances of
6  compliance by Lake-Geauga Recovery Centers with the
7  Ohio Department of Mental Health and Addiction
8  Services' grant funding conditions.
9      When the Ohio Department of Mental Health
10  and Addiction Services has determined that the
11  project and operation at the recovery house comply
12  with the application and assurances, Lake-Geauga
13  Recovery Centers will be reimbursed.  If the center
14  does not provide housing for five adult women
15  recovering from substance use disorder, it will not
16  receive the grant funds.  Lake-Geauga Recovery
17  Centers cannot support the operation of Twelve
18  Meadows with only two residents.  More important is
19  the loss to five recovering women of a solid
20  structured support system to maintain sobriety and
21  to facilitate transition and return to their
22  families.
23      Lake-Geauga Recovery Centers purchased the
24  property on September 6th, 2019 for use as a
25  single-family residence for five adult women in

1  recovery from substance use disorder, a recovery
2  house.  We prepared the house for residency by five
3  adult women.  We did very minor decorating and
4  significantly improved the landscaping, but no
5  structural changes were made to the house.
6      A letter from the Munson Township Zoning
7  Inspector James Herringshaw dated October 9th, 2019
8  and sent to 12700 Ravenna Road was received at the
9  Mentor administrative office on October 28th.
10      Mr. Herringshaw advised Lake-Geauga
11  Recovery Centers that a zoning certificate may be
12  required if there is a change of use of the house,
13  and, if so, a variance was required.
14      I called Mr. Herringshaw on November 1st to
15  discuss Lake-Geauga Recovery Centers' use of the
16  property as a residence of five adult women in
17  recovery.  He told me to look at the Munson Township
18  zoning resolution and specifically pointed out Ohio
19  Revised Code 5123.19, a licensed residential
20  facility.
21      Mr. Herringshaw and I exchanged several
22  emails on November 8th.  I advised that our
23  residence is not a licensed residential facility
24  under 5123.19, which addresses housing for the
25  developmentally disabled, but is a residence for

C

1  five adult women who are recovering from substance
2  use disorder.  The women will share the home with a
3  live-in employee, a house manager.  In that email, I
4  advised Mr. Herringshaw that the women in recovery
5  who will live there are a protected class.  Five men
6  in recovery were identified as a protected class by
7  the City of Chardon when Lake-Geauga Recovery
8  Centers opened a men's recovery house in the city in
9  2015.  I requested his advice about the next steps
10  to be taken and whether a variance was required.
11      Mr. Herringshaw responded that afternoon,
12  stating that legal counsel told him that a protected
13  class does not exempt Lake-Geauga Recovery Centers
14  from the zoning requirements and requested a copy of
15  the memo from Jim Gillette to the city in 2015 when
16  he was the City of Chardon Law Director.
17      On that same afternoon, November 8th, I
18  sent Mr. Gillette's memo and a memo from Richard
19  Constantine, the Painesville Township zoning
20  inspector, who also stated that adults in recovery
21  from substance use disorder are a protected class.
22  Mr. Herringshaw forwarded to legal counsel on
23  November 11th.  I also told Mr. Herringshaw that I
24  would file a variance request if that is what he
25  recommended.

I

1  I next spoke to Mr. Herringshaw on November
2  15th.  Lake-Geauga Recovery Centers decided to
3  schedule an informational session for the residents
4  in that area surrounding our house at 12700 Ravenna
5  Road to learn more about Lake-Geauga Recovery
6  Centers and our newest recovery house.
7      The property owners in the surrounding area
8  were invited to the informational session on
9  December 12th in a letter sent on November 25th,
10  which was held at the office of the Geauga Board of
11  Mental Health and Recovery Services.  Four people
12  attended.
13      On December 23rd I went to the Munson
14  Township zoning inspector's office and filed an
15  application for a zoning certificate.  Only the
16  information in the zoning certificate application
17  was provided at that time.  I wanted to take the
18  application, review it, and complete it in my
19  office.  Mr. Herringshaw advised me that this was
20  unnecessary and insisted that I complete the
21  application at that time.  I asked if I could send a
22  letter or a statement to further explain the
23  residence for five recovering women, and he agreed.
24      The application did not request details
25  concerning the proposed use of the property, other

than it would be a recovery house. The number of
unrelated adults who will reside on the property is
not a question to be answered on the application.

    Mr. Herringshaw immediately denied the
permit. Mr. Herringshaw then instructed me to file
a notice of appeal variance request form.
Mr. Herringshaw filled in the part of the form that
requests the specific regulation from which a
variance is sought, stating "Not a permitted use,
Level II recovery house." I completed the rest of
the form with Mr. Herringshaw's assistance and later
submitted a narrative be included as part of the
variance request.

    MR. PILAWA: Did you have the benefit
of counsel during this period of time?

    MS. BLASKO: When I first talked to
Mr. Herringshaw?

    MR. PILAWA: At any time during the
time you talked to Mr. Herringshaw.

    MS. BLASKO: No.

    MR. PILAWA: Did you have counsel at
that time?

    MS. BLASKO: No, I did not.

    MR. PILAWA: Was there anybody on your
Board who's a lawyer.

    MS. BLASKO: When I first called
Mr. Herringshaw, I was surprised by the letter I
received and I was trying to find what he was
instructing me to do as far as attending meetings
here.

    MR. PILAWA: Well, do you have any
evidence for us, or maybe it's from somebody else,
that the hardship is unique to this property, that
the hardship that you claim is unique to this
property? That's one of the factors we have to
consider.

    MR. GILLETTE: Maybe I can clarify
that for the Board. 12700 is no different than any
other residential single-family dwelling in the R-1
residential district. It has no unique
topographical factors. It has been used as a
single-family dwelling in the past.

    MR. PILAWA: Well, Mr. Gillette, you
know that we have to take evidence on whether the
hardship is unique to this property. That's one of
the requirements for a use variance.

    MR. GILLETTE: I understand.

    MR. PILAWA: And you know that they
all have to be met. Unlike an area variance, a use
variance -- the use variance, these have to be met.

You also know that we need to take evidence on
whether the zoning regulations are depriving the
owners of substantial property rights. My guess is
the answer to that is no?

    MR. GILLETTE: I'm sorry?

    MR. PILAWA: Does the zoning
regulation itself deprive the owner of a substantial
property right? And my guess is the answer to that
is no, or are we going to have evidence that there
is a substantial property right that's being
deprived?

    MR. GILLETTE: Let me explain it this
way. We believe that there is a property right that
would be deprived, but if necessary this property
could be sold as a single-family residence.

    MR. PILAWA: And the problem with that
is that if we grant the variance, as you know, we
are granting a property right and it remains with
the property forever so that if Ms. Blasko told me
today that they were to use this for a period of
time and then want to sell it and only sell it to a
person who's going to use it as a single-family
residence, I would believe her. But I don't know
the people she's going to sell it to, and if they
want to use it as a halfway house and if they want

to use it as some other residential form they have
been given a property right by this Board.

    MR. GILLETTE: I agree with that.

    MR. PILAWA: And that's why we take
use variances very seriously, and that's why they're
so hard to get. I don't mean to sound preachy. You
know better than I do why the strict requirements
for use variances exists.

    MR. GILLETTE: I agree the use
variance runs with the land, but a use variance may
also include additions and restrictions as part of
the variance request, so it's not an open field
somewhere out on the beach.

    MR. PILAWA: I know it's been tried,
to put conditions on variances. I don't know how
successful that has been.

    MR. GILLETTE: Well, if that's the
grounds of your variance, the use of the property or
the basis for which it is applied, I certainly think
they're legally binding on the current owner and
those owners in the future.

    MR. PILAWA: Maybe that's a discussion
for a different day. What I'm talking about is, are
we going to receive evidence on the use variance
factors that we have to consider? Are we —

MR. GILLETTE:  As I just explained,
this particular property is no different than any
other single-family home in the R-1 residential
district.  It's been purchased by Lake-Geauga
Recovery Centers for a — as -- to be used as a
recovery house.  You have a permitted use for a
licensed residential facility per your zoning code,
and if you look at the chart that I gave you,
Exhibit 1, you'll see that the two of them are
particularly identical in terms of what the
requirements of uses are; therefore, a single — a
licensed residential facility could be used as a
single-family home but is a permitted use, so -- on
that basis.

MR. PILAWA:  I think we're talking
past each other because I view our job and what
we're required and authorized to do as very limited,
and you look at it as more expansive than I do.  But
again, this is your case.  Go ahead.  But we really
have an expectation that we're going to be hearing
evidence to meet what we're required to consider.
Go ahead.

MR. GILLETTE:  Thank you.  I'm going
to ask Ms. Blasko a few questions and have her
identify some of these exhibits here.

---

Is the premises at 12700 Ravenna Road
currently occupied?

MS. BLASKO:  Yes.

MR. GILLETTE:  And how many people are
living there?

MS. BLASKO:  Two.

MR. GILLETTE:  And they're two
unrelated adults?

MS. BLASKO:  Yes.

MR. GILLETTE:  If that property was
used as a recovery house, what would be the
consequences if a resident used alcohol, opiates, or
illegal drugs while a tenant on the property?

MS. BLASKO:  They would be violating
the rules, they would be violating the lease
agreement, and we would start eviction proceedings.
We also would help them get into services again and
help them find a place to stay.

MR. GILLETTE:  Now, the recovery house
statute requires three protocols, specifically
administrative oversight, quality standards, and
policies and procedures, including rules, house
rules, for which the residents agree to adhere.  Has
Lake-Geauga Recovery Centers adopted protocols for
each of these three areas?

---

MS. BLASKO:  Yes.  Lake-Geauga
Recovery Centers owns and operates 13 different
locations across our continuum of care.  Twelve
Meadows is just one of those 13, and so we
incorporate it into all of our administrative
policies and operations.  That would include, but is
not limited to that we are guided by a mission and
vision.  All locations and programs are incorporated
into the established and approved code of
regulations, our fiscal management policies, health
and safety policies and procedures, risk management
plan, our medical emergency plan, quality
improvement plan, accessibility plan, client rights
and grievance policy, that's for administrative
oversight.

MR. GILLETTE:  Will the house have a
policy regarding visitors?

MS. BLASKO:  The current house
guidelines, there's a few of them, there's actually
four pages of them that they're required to follow,
and I'd like to highlight and read a couple.  The
first one is our Good Neighbor policy.  To fulfill
the Lake-Geauga Recovery Centers' mission, it is
imperative that every client, employee, or volunteer
are considerate to neighbors.  Any personal conduct

---

that negatively affects our relationship with the
neighbors and the surrounding community, like
smoking in prohibited areas, loitering, loud
offensive music, rude or offensive language, parking
in non-designated areas will not be tolerated.  If
at any time any issue arises between a resident and
a neighbor, the neighbor has to be given the contact
information of the house manager.

To move into the house one must be clean
and sober for 30 days prior to admission.  Use or
possession of alcohol or drugs or returning to the
property under the influence of alcohol or drugs is
not permitted.  A violation may result in an
official procedure regarding the Ohio Tenant
Landlord law.  12-step meetings are required.
Curfew is 11:00 p.m. Sunday through Thursday, and
12:00 a.m. Friday through Saturday including
holidays.  Extended hours of curfew is at the
discretion of the house manager.

Guests are not allowed in residents' rooms
or on the second floor.  They are only allowed in
the common areas, living room, and kitchen.  All
guests must leave by 11:00 p.m. Sunday through
Thursday, 12:00 a.m. on Fridays and Saturdays.
Residents are not permitted to sit out in vehicles

```
 1   with guests past curfew.  And no overnight guests
 2   are allowed.
 3              MR. PILAWA:  The operation of Twelve
 4   Meadows is not at issue.
 5              MR. GILLETTE:  Excuse me?
 6              MR. PILAWA:  The operation of this
 7   residence is not an issue.
 8              MR. GILLETTE:  Well, I think you have
 9   to be convinced that the recovery house is not going
10   to be a flop house in reference to the variances.
11              MR. PILAWA:  I don't think that --
12              MR. GILLETTE:  What we're
13   demonstrating is that this is a professional,
14   experienced agency that has been operating drug and
15   alcohol facilities for 49 years.  They know what
16   they're doing.  And if it is allowed as a recovery
17   house in a neighborhood, there aren't going to be
18   any problems.  That's the purpose of the testimony.
19              MR. PILAWA:  I figured that you were
20   trying to tell us it was professionally run and was
21   going to be well run.  I don't see that as one of
22   the factors that we take evidence on.  We're here --
23   I don't know how to say it any other way.  Maybe I'm
24   not saying this properly.
25              MR. GILLETTE:  Oh, you --
```

```
 1              MR. PILAWA:  The use variance is a
 2   very narrow inquiry.  There are one, two, three,
 3   four, five, six, seven, eight certain factors that
 4   we have to take evidence on, and except for me
 5   asking questions we haven't gotten evidence on any
 6   of them.
 7              MR. GILLETTE:  Well, as we discussed
 8   at the opening of this session, I don't take the
 9   narrow view that you do in terms of why we're here.
10   We also feel that this an appeal of the zoning
11   inspector's decision and, therefore, I think all of
12   the testimony that's been brought up, up to this
13   point, is material and relevant to the zoning
14   inspector's decision, as well as whether or not you
15   grant the use variance.
16              MR. PILAWA:  Well, as I've already
17   said, and I think the Board agrees, that we don't
18   view this as being an appeal of the zoning
19   inspector's original decision.  We have something
20   before us that's spelled out by your folks.  You are
21   telling us what you want us to decide.  It's here as
22   a use variance.  I see nothing in here, nor have I
23   seen anything in here, that's a challenge to the
24   zoning inspector's original decision.
25              Frankly, you can put your case on however
```

```
 1   you want to put your case on, but you just can't go
 2   on and on and on about things that are simply not
 3   going to be considered by this Board.
 4              What she just testified to is the operation
 5   of the business, the operation of the home.  It has
 6   nothing to do with any of the factors we have to
 7   consider.  It just doesn't.  It just doesn't.
 8              MR. GILLETTE:  So you're -- well, I
 9   don't want to say it's hearsay; it's her direct
10   testimony.
11              MR. PILAWA:  It is her direct
12   testimony.  I agree.  I heard everything she said
13   and none of it has to do with whether the hardship
14   is unique, may the property be reasonably used in an
15   economically viable manner without a variance?  Did
16   the property owner purchase the property with
17   knowledge of the zoning restrictions?  None of that
18   applies to any to of these.
19              MR. GILLETTE:  Well, are you
20   suggesting that we not present any additional
21   testimony?
22              MR. PILAWA:  No, I'm asking you to
23   present testimony that we're required to consider in
24   connection with what we have defined to grant the
25   use variance.  That's all I'm asking you to do.  We
```

```
 1   just want to hear some testimony that relates to
 2   these eight factors.
 3              As I said earlier, I don't want people to
 4   stand up and say, "oh, this is a good thing," or
 5   "Oh, this is a bad thing."  That's all we've heard
 6   so far, in my humble opinion.  That's what we've
 7   heard so far.  I simply want to get to the use
 8   variance.
 9              MR. GILLETTE:  Well, I think we have
10   gotten to it, and at this point --
11              MR. PILAWA:  We'll, if you're
12   satisfied with the state of the record, I'm
13   satisfied with the state of the record.
14              MR. GILLETTE:  At this time, I'm not
15   going to ask Ms. Blasko any more questions.  I'm
16   going to request the admission of the Exhibits 1
17   through 11 that have been submitted as far as part
18   of the record.
19              MR. PILAWA:  Does anybody have a
20   quarrel with that?  Have we gotten those in advance?
21              MS. PITCOCK:  What is Exhibit 9?
22              MS. BLASKO:  Exhibit 9 is a camera
23   that has been installed on a tree that points at our
24   driveway.
25              MS. PITCOCK:  And then what is Exhibit
```

10?

MS. BLASKO: Exhibit 10 is a picture of the cars that park outside of our house and did so almost daily in the beginning.

MS. PITCOCK: Okay. Is that same as Exhibit 11?

MS. BLASKO: Yes. The cars parked outside of our house on Waterfowl.

MS. PITCOCK: Does anybody else have any questions on the Board?

MR. GILLETTE: Following up with what Ms. Pitcock asked you about those photographs, what's the atmosphere been like in the neighborhood between the residents — the surrounding residents and neighbors of the recovery house?

MS. BLASKO: I'm glad that we have Rosemary here to speak on that, but I do know that cars sat outside the house on the street in front of the house for days. There were large yellow signs that were put up. I know in the beginning, since it was — the whole area didn't have curtains downstairs and I was informed by the residents they'd been watching TV in the dark because they're so worried that people are always watching them, so we put curtains up. The cameras were installed. It

points to our driveway so if anybody comes or goes it will be on camera.

I know there was — at one point Rosemary drove down Waterfowl, it was right after she moved in, and anybody new to the area we want to just drive through the neighborhood and somebody stopped her and jumped out of their car and said, "You're not allowed down here." So Rosemary can tell you more about what happened. But it's disturbing what they have to put up with living in the house, living in the home on Ravenna Road.

MR. GILLETTE: Thank you.

MR. PILAWA: Okay. Anybody else on the Board have anything?

All right. I mean, I think at this time we will hear from the property owners. Do you have other evidence, testimony you want to present?

MR. GILLETTE: I was going to call Jim Adams from Geauga County Mental Health and Recovery Services.

MR. PILAWA: Okay. Is he going to speak to this use variance issue?

MR. GILLETTE: He's going to speak to his relationship with Lake-Geauga Recovery Centers and his responsibility under Ohio law for

establishing recovery houses in Geauga County.

MR. PILAWA: Okay. I'm not exactly hearing you say it relates to these factors, but go ahead and continue.

MR. GILLETTE: It won't take long.

MR. PILAWA: Okay. Thanks.

(Jim Adams was duly sworn.)

MR. PILAWA: Will you state your name for the record, spell your last name, and give your address, your business address.

MR. ADAMS: James Adams, A-D-A-M-S. The Board's address is at 13244 Ravenna Road. That's in Chardon.

MR. GILLETTE: And you're employed by Geauga County Mental Health and Recovery Service.

MR. ADAMS: I am.

MR. GILLETTE: Your position or title?

MR. ADAMS: I am the Chief Executive Officer of the Board.

MR. GILLETTE: What are your duties and responsibilities in that position?

MR. ADAMS: I have the responsibility for oversight for all the mental health and drug and alcohol prevention and treatment services that are publicly funded in Geauga County, as well as some

that are funded in other counties. We also provide for prevention and educational services.

MR. GILLETTE: Does your agency provide direct treatment services to individuals with substance abuse disorders who reside in Geauga County?

MR. ADAMS: We do not.

MR. GILLETTE: And how do you arrange for treatment services to those individuals?

MR. ADAMS: Boards across the state were set up to be contract — contract oversight with agencies, usually private nonprofit agencies that provide treatment and prevention services across the state.

MR. GILLETTE: Do you have a contract with Lake-Geauga Recovery Centers, Inc.?

MR. ADAMS: We do.

MR. GILLETTE: You heard Ms. Blasko's testimony about the services that her agency provides. Do you contract with some or all of those services?

MR. ADAMS: We do.

MR. GILLETTE: Are you familiar with the phrase community-based continuum of care?

MR. ADAMS: Yes.

MR. GILLETTE: Can you explain that concept, please.

MR. ADAMS: So community-based continuum of care represents the concept that treatment alone does not necessarily mean that people will get better, that clinical services need to be supplemented with other things.

For example, if a woman needs to have treatment services, she may need to have child care in order to get there. She may need to have transportation in order to get there. So the Continuum of care means that we have to look out for all the needs of individuals that are seeking care.

MR. GILLETTE: Now, is a community-based continuum of care incorporated into the Ohio Revised Code?

MR. ADAMS: It is.

MR. GILLETTE: And is your agency mandated to implement and administer community-based continuum of care programs in Geauga County?

MR. ADAMS: We are.

MR. GILLETTE: Under the recovery housing statute there are several — excuse me, under the community-based continuum of care statute, there are many essential elements that have to be

complied with, correct?

MR. ADAMS: Yes.

MR. GILLETTE: Is recovery housing one of those?

MR. ADAMS: It is.

MR. GILLETTE: And does your agency own and operate recovery housing?

MR. ADAMS: Only under very specific circumstances, but in general, no.

MR. GILLETTE: Are you familiar with the recovery house owned by Lake-Geauga Recovery Centers at 12700 Ravenna Road?

MR. ADAMS: I'm just familiar with the fact that it's there.

MR. GILLETTE: Did you assist or were you involved in the participation of obtaining a grant for Lake-Geauga Center in order to acquire a recovery house in Geauga County?

MR. ADAMS: We were, yeah.

MR. GILLETTE: And is that grant required to be submitted by your agency?

MR. ADAMS: It is.

MR. GILLETTE: And was that done?

MR. ADAMS: It was.

MR. GILLETTE: Was the grant awarded?

MR. ADAMS: It was.

MR. GILLETTE: What about future funding? If Lake-Geauga Center wanted future funding for recovery housing, what would be the procedure they would need to follow?

MR. ADAMS: So every agency that we contract for has certain requirements and certain levels of care that they must meet as well as quality of care standards that are both state, local, and national. And so Lake-Geauga would continue -- have to continue to meet all of those standards, as well as each agency submits a bid proposal to the Board based on the services we put out in our bid packet for the next — coming year and Lake-Geauga would presumably bid for those services.

MR. GILLETTE: Thank you. I don't have anything further.

MR. PILAWA: In your efforts to help with the grant, who is involved with those efforts?

MR. ADAMS: As in who --

MR. PILAWA: Is there anybody in that grant process that said, "Hey, zoning permits this, doesn't it?" If you're going to spend this amount of money on a house, you'd want to make sure you're

going to be able to do what you set out to do. So zoning seems to me to be a pretty significant hurdle in a situation like this.

MR. ADAMS: So when the grant is written — and these are coming from all over the state, this isn't just from our Board, this grant that's involved, they are not written for a specific property. They are written to serve this many people, if they can be residents of this geographic area, it will serve these types of needs; these are qualifications for persons to be admitted to this service. It is not specific to a particular property most of the time, and it wasn't in this case either.

MR. PILAWA: So when you get to that last step, say, "We're about ready to cut a check," you know, and this is a lot of money, are you sure you're going to go able to spend it the way you said you're going to be able to spend it? There's nobody that looks at that?

MR. ADAMS: Well, certainly the State is going to look at how they disburse funds based on how that's done. Those are the States dollars, and the Board doesn't match those dollars until the State dollars come.

So, yes, there is kind of a checklist, if
you will, in other properties that we have been
involved with where the State comes out and makes
sure that all the things are in order.

MR. PILAWA: Was this one just missed?

MR. ADAMS: I'm not involved with the
State funding, so I don't know who came out and who
did what. I do know that one of the issues they
bring up is that this is a protected class, so I
think what happens in a lot of cases is that these
variances are given, if they are zoning, because
they are a protected class because these individuals
are disabled, you know, and —

MR. PILAWA: I understand that a
reasonable accommodation must be made.

MR. ADAMS: Yeah, and you're in a
legal area beyond my scope.

MR. PILAWA: It's generally on the
basis of some reasonable accommodation being made?

MR. ADAMS: I believe so.

MR. PILAWA: Okay. Anybody else have
anything for Mr. Adams?

MR. GILLETTE: I'd like to just follow
up with Ms. Blasko for a moment.

MR. PILAWA: Sure.

MR. GILLETTE: Have you received the
money for the grant?

MS. BLASKO: No.

MR. GILLETTE: So any expenditures you
have to this point for the house have been out of
pocket by Lake-Geauga Centers?

MS. BLASKO: Correct.

MR. GILLETTE: And will Lake-Geauga
Centers receive that grant if it's unable to provide
housing for five adult women?

MS. BLASKO: No, we would not.

MR. GILLETTE: Thank you.

MR. PILAWA: Anything else?

MR. GILLETTE: I don't have any other
witnesses, but Patricia Kidd from the Fair Housing
Advocates is here.

MR. PILAWA: Like the others, this not
going to be specific to the use variance?

MR. GILLETTE: It is specific to that.

MR. PILAWA: Okay. Thank you.

MS. KIDD: Patricia Kidd, attorney,
Fair Housing Resource Center, 1100 Mentor Avenue,
Painesville, Ohio 44077.

(Patricia Kidd was duly sworn.)

MR. PILAWA: We're assuming you just

identified yourself and told the truth when you did
that.

MS. KIDD: I did. So Fair Housing
Research Center -- well, I know we are all tired,
our butts are hurting, but really, really, quick.

I've been in business for more than 20-plus
years. Our office is private enforcement for HUD.
They give us a ton of money every year to serve the
county. One of the things we have to do is we
advocate for discrimination issues, and we enforce,
we investigate, and we deal with all the information
and policymaking and insurance, basically dealing
with communities and the State.

This is not my first BZA appeal. The
reasonable accomodation request that's being asked
for under Fair Housing Act is pretty standard. It's
not unusual or unique, and this is not the first
time that we have made this request, and they have
all been subsequently granted.

And I understand your frustration.
Basically, you're saying the zoning — the
inspector, he did his job. He's like, "Yeah,
everything's great." Melanie says, "Hey, can you
make sure you're right?" He comes back and he
pretty much said, "Yeah, I think I'm right. You're

going to have to do something a little bit
different. Normally it would be a continual use
permit." Melanie says, "Well, if you can't get it
under the reason why we're asking to get it, then I
guess we'll do a conditional use permit, so we are
appealing the zoning inspector's original decision."

And then there's a procedural issue on what
was supposed to be done here and it was not. And at
the end of the day, all of that doesn't matter.
That's just to make the clock tick longer and have
less time for people to really describe about how
they feel, because the issue comes down to you have
the Federal Fair Housing Act, you also have the
State Fair Housing Act. Both of them say that you
have to grant an exception. That's what a
reasonable accommodation is.

You can have all the laws in the book that
you want, but when your laws treat disabled persons
differently than nondisabled people, under the Fair
Housing Act you have to make a reasonable
accomodation. He said, "Oh, well, this doesn't
satisfy our definition of family." You can have
five related people live there, but five recovering
alcoholics or drug addicts cannot. And that's what
it is. Your single-family, R-1, five related people

can live there, no questions asked. But you take
five unrelated recovering alcoholics or drug
addicts, members of a protected class, and all of a
sudden it's a big issues with all kinds of permits
and all kinds of appeals and all kinds of — you
know, what we're here for, a conditional use permit
or a --

MR. PILAWA: Actually, you have — the
great thing about being a lawyer is that I
understand what you're trying to do, and there are
other lawyers on this board as well who probably
also understand what you're trying to do.

MS. KIDD: Yeah, so --

MR. PILAWA: Here, let me --

MS. KIDD: — that's our exception,
right?

MR. PILAWA: Let me finish.

MS. KIDD: Well, you didn't let me
finish.

MR. PILAWA: No, well, that's because
I am in the position of judge. I get to do that.

MS. KIDD: Uh-huh.

MR. PILAWA: So what you're suggesting
to us is that we have to do it automatically because
it exists.

L.

MS. KIDD: Yes.

MR. PILAWA: That's not the case. You
know that's not the case.

MS. KIDD: Well, the law states
specifically that "thou shall," and you do know that
and --

MR. PILAWA: You know, I love being
lectured about the law. Why don't you let me finish
and I won't interrupt you.

MS. KIDD: Promise?

MR. PILAWA: What's that?

MS. KIDD: Promise?

MR. PILAWA: Excuse me?

MS. KIDD: Do you promise you won't
interrupt me if I let you finish?

MR. PILAWA: I'll tell you what, you
just go ahead and talk.

MS. KIDD: Thank you.

MR. PILAWA: You're welcome.

MS. KIDD: So the decision -- it comes
down to five related people, it's okay to live at
the house, no questions asked. But if they're
unrelated or you're a person in recovery, a member
of a protected class, you can't live there. And in
order to live here, you have to go through all these

additional jumps and hoops in order to get a
conditional use permit or a use variance in order to
stay.

What ends up happening, even though it's
not intentional, unintentionally you're now treating
persons of a protected class differently than
nondisabled individuals. You have a list that you
have to look through. The economic viability, is it
going to change the use of the property? Well, five
people who are all related having to live in a
single-family house, there is not going to be any
change here, they're not going to have extra cars,
extra driving, extra traffic.

There's not going to be anything extra in a
household of five recovering women that you're not
going to have in a household of five family members.
And you say, "Well, you know, we'll have lots of
cars. Everybody has different cars." Well, I can
say I'm the mother of five kids and we have seven
cars in our single-family house.

So there is not going be a change in the
use of the house at all. There are going to be
economic changes that are unique to this specific
property which Melanie has stated and they have
substantiated that there are a lot of grants coming.

k

This house was based on a confidential analysis and
nonprofit Board operating on five people. So now
they're down to two, although one of them has
benefits for being a house manager. But instead of
getting four, you know, the cost reimbursed so they
can stay, they don't get costs reimbursed for one.
So now it becomes the issue that this house is cost
prohibitive. Nobody that's buying a single-family
home thinks about looking to see if it's okay to
live in that single-family home.

Two, your own application doesn't even
request the number of occupants living in the home.
It doesn't even request the relation of the number
of occupants living in the home. So I can
understand that this is a strict standard that
you're enforcing, that's great, but you better be
knocking on every single-family home occupant's
house and demanding that every person that buys a
house and moves into Munson Township better prove
that they are all related by blood per the rest of
the statute, as Mr. Gillette had stated, because if
you're not doing that for everybody it is
unreasonable for you to do it here because these
houses are for recovering women. That's all I have
to say.

k

MR. PILAWA:  Are you done?

MS. KIDD:  I am.

MR. PILAWA:  Anybody have any questions for this person?

Do you have anything else?

MR. GILLETTE:  I have nothing further.

MS. SCRIBBEN:  May I speak?

MR. GILLETTE:  Did you want to make a statement?

MS. SCRIBBEN:  Yeah.

(Rosemary Scribben, of lawful age, was duly sworn.)

MR. GILLETTE:  Are you here in support for — as part of their case?

MS. SCRIBBEN:  Yes.  I'm the house manager.

MR. PILAWA:  Okay.  Would you state your name for the record, please, spell your last name, and give your address.

MS. SCRIBBEN:  Rosemary Scribben, S-C-R-I-B-B-E-N.  My address is 12700 Ravenna Road, Chardon, Ohio 44024.

MR. PILAWA:  And what would you like to say?

MS. SCRIBBEN:  I would just like to

say that I've been living at the house.  I moved into the house in February.  I'm a registered nurse and my -- I'm not going to go into my whole history here.  But I started drinking when I turned 50 after being diagnosed with Stage III cancer and my kids were gone.  My disease progressed and it progressed and it progressed to the point where I couldn't work anymore.

I was in and out of the program and my addiction was — my thinking was so messed up that nothing would stop me, no matter how sick I got.  The bottom line was, I got taken to the hospital in an ambulance in February 2017 and my liver was shutting down.  My kids sent an ambulance over.

And, of course, when you're dealing with an active alcoholic your family gets very upset with you.  Your family doesn't want to be — they don't really — they're giving you support, but they're so upset and so angry with you they don't quite know what to do.  So my family didn't let me down, thank goodness, or I would have died in my home.

The reason why I'm telling you this is I went to the hospital, they called in hospice.  I went to a nursing home, I was there for six weeks.  My liver was completely shutting down.  I was about

40 pounds heavier with water, and they told me that I wasn't going to live.  And they wouldn't give a liver to an alcoholic, of course, who was actively drinking.

So in my mind, I never thought that I was going to die because I didn't believe it had come to this.  But as I said, I was in rehab, then I went two weeks to Glenbeigh, which I worked at Glenbeigh for 22 years as a detox nurse and I'm a mental health nurse, and here it is, the disease took me.  It got ahold of me and it took me fast.

So from Glenbeigh they sent me to the Oak House.  I've been at the Oak House one other time, six years ago.  I went to the Oak House.  I had no money, I wasn't working, and they let me in by grants or however they did that.  They let me in and they allowed me to stay four months.  Three months is the longest you — usually it's the average of what you stay.  But I was allowed to stay four months because there was a new house opening up in Mentor called Eighty-Forty-One.  And so I went to that house in August.  I stayed there over a year, a year and a half longer.  If I hadn't have had that, I would still be -- I was a closet drinker.  I didn't drink at the bars.  I went home and I drank.

That's what I did.  I was happy drinking at home.

So if I didn't have this opportunity — I lost my home, I lost my car, I lost my cell phone.  I'm an RN.  I lost all these things.  So my family couldn't — could not go back to my home, had to sell it, and so ended up — and things just kept falling into place.  So they were going to open this house, and they asked me to interview and I got the house manager position.

And the thing I want to say is I know that we're talking about the use variance, but I also feel that living at the home there is some discrimination against us.  And I did look at the signs that are all around our house "Say No to Munson," and there's stories on there about houses where, I don't know, somebody said their nephew was at a house, flop house, and the dope man was coming to the door and all that kind of stuff.  So I get the impression that it's not so much even about granting the variance.  You just don't want us there.  You just don't want recovering people in your neighborhood.  And we have been harassed since we have been there to the point — Carly and I will not watch TV downstairs at night.

I have license plate numbers.  I have all

kinds of things that have happened to us, cars
parking out in the road almost five, six minutes
staring at me. I had a lady tell me that they had a
Neighborhood Watch. The signs — and the other
thing is we have anonymity, okay, and it's — Carly
and I have never had any legal problems, thank
goodness. I still have my license. But we are
protected, okay, with our program, the anonymity.
And the fact that the address is on those signs, I
can't tell you, 50, 60 cars turning in our driveway,
looking at the house. They want to see, like, who's
living at the house. And it's been disheartening.

So the bottom line is, I don't think this
whole thing is about a variance or anything. The
bottom line is you just don't want us here. And all
I want to say is, if it wouldn't be for places like
this I wouldn't be alive. I was on a liver
transplant list and I beat it.

So that's all I want to say. Thank you.

MR. PILAWA: Anybody on the Board have
anything to ask?

Mr. Gillette, is there anything else?

MR. GILLETTE: I believe that we have
concluded our testimony.

MR. PILAWA: All right. There were 27

affected property owners notified. Is there anybody
that would like to speak?

Would you mind if I do the fire chief
first? I'm getting notified by the fire chief here
that he has something to say.

(Michael Vatty, of lawful age, was duly
sworn.)

MR. PILAWA: State your name for the
record, spell your last name, and give your business
address, please.

MR. VATTY: My first name is Michael
Vatty, V, as in Victor, A-T-T-Y. I am the fire
chief of the Munson Fire Department, Incorporated.
I also reside at 12170 Country Oaks. I am also a
resident of Munson Township.

I have a prepared statement for the BZA.
First, I must begin by stating that no one from
Munson Fire Department to date has received any
formal business plan nor a description of the actual
use of 12700 Ravenna Road. That's stated and based
on what we are aware of, in line with our mission
sLALernent. We find it difficult to offer any
support to your granting of this variance.

In addition, if you hope to grant this
variance to Lake-Geauga Recovery Center, it should

then be required to apply for a new certificate of
occupancy with Geauga County asking for a change of
use. The new certificate of occupancy will be
reclassified based on the new use and the number of
occupants. Then based on this new building class,
the 2017 Ohio Fire Code applies.

The maximum occupancy allowed by the Class
will also apply and be so ordered according to us
and Munson Fire Department. To predict without
knowing what will happen, I can only interpret what
I believe the classification to be. According to
the Ohio Building Code, it would be classified an
R-4 for this to be used as a variation, basically as
a group home.

Please understand, I'm not a building
inspector; however, I can offer an example of a
similar Munson business zoned appropriately. It
began as a building previously used as a mercantile
business at — which required an architect to design
the changes to meet the Geauga County Building
Department requirements to receive the appropriate
certificates as an adult daycare. The results
determined that a fire detection system was needed,
monitored per NFPA seventy-four, and exit doors had
to be double doors to include panic hardware. This

is a requirement for the occupancy and the
classification of use for the Ohio Fire Department.
Codes are required minimums to protect those at
risk.

Munson Fire Department is only contracted
to inspect and respond. Because we are a township,
the enforcement falls to the Munson Zoning and the
Geauga County Building Department, not our fire
department. We, the Munson Fire Department,
Incorporated, are contracted to provide fire and EMS
services to every taxpaying resident and business in
Munson Township and have no enforcement of the
building code.

Munson Fire doesn't inspect residential
properties, only commercial. If the intended
occupancy of 12700 Ravenna is less than four, the
residential code applies. Munson Fire Department
cannot inspect residential dwellings. If
Lake-Geauga Recovery Centers has over five residents
living there, then we are required to inspect and
have jurisdiction to inspect.

Lake-Geauga Recovery Centers will have to
apply for a certificate of occupancy from Geauga
County, and that's the building department. The
change of use will require construction to be

brought up to meet 2017 fire code requirements. We
are also concerned about your vote because of the
inability of our being able to enforce any fire
safety violations which ultimately can impact the
safety of our residents and our community.

As a reference, a sober living group home
with transient residents has presented new
challenges to other states, but specifically in New
Hampshire. Their local fire department learned how
difficult servicing this type of home is. For those
interested, they have a podcast at
https://www.cfitrainer.net/Training/Podcast.aspx.
This was recorded in March of 2020. The podcast
addresses the code requirements for sober, boarding,
and group homes, lack of communication and lack of
cooperation to comply with the applicable codes,
trying to slip through the cracks and not be
directed. There is a 12-minute voice recording that
speaks to the concerns Munson Fire Department has in
introducing a variance which is contrary to current
zoning.

Lastly, I want to make clear Munson Fire
Department was contracted and paid for by residents
and monies collected through their property taxes.
We are concerned that Lake-Geauga Recovery Centers

will, like their property in Chardon, Ohio, 114
North Street, apply for property tax exemption as
did the Chardon property. If the Geauga County
Auditor's Office grants the exemption, the Munson
Township residents will have to bear the financial
burden for their fire and service costs while Munson
Fire Department attempts to recover transport costs
based on transient residents.

Munson Fire depends on the EMS billing to
supplement operational costs through revenue billed
for ambulance transports, which reduces tax dollars
required for providing services. Munson residents
are soft billed, while nonresidents are hard billed,
and the transient residents living at 12700 will pay
a classification billed as non-residents, placing
another burden on Munson taxpayers.

If this variance is granted, we would ask
if Lake-Geauga Recovery is willing to pay for each
staff or resident transport call and collect from
their residents our services provided. Our
collection recovery is costly and difficult for
nonresidents.

MR. PILAWA: Thank you. Anybody on
the Board have anything? Anything for the fire
chief?

MR. GILLETTE: Chief Vatty, you
referred to this business as an adult care facility?

MR. VATTY: Adult daycare.

MR. GILLETTE: Adult daycare. How
many folks are cared for at that facility?

MR. VATTY: At that one, I believe
it's 12.

MR. GILLETTE: 12?

MR. VATTY: A max of 12.

MR. GILLETTE: Is it required to be
licensed by the State, if you know?

MR. VATTY: I believe so.

MR. GILLETTE: Okay. Then you state
that if Lake-Geauga Recovery Centers has over five
residents living there that you're required to
inspect; is that correct?

MR. VATTY: Correct.

MR. GILLETTE: Does that requirement
involve any single-family residents where there are
five or more residents living there?

MR. VATTY: That -- in fire -- no.

MR. GILLETTE: Thank you.

MR. VATTY: I would like to present to
the BZA just some correspondence here to the Ohio
Basic Building Code and also the fire codes.

MR. PILAWA: Okay. We'll accept that.
Thank you.

MS. SCRIBBEN: Can I ask a question?

MR. PILAWA: Yeah, sure, you can ask a
question.

MS. SCRIBBEN: I was just wondering
if we have a fire at the house and need to be taken
out by ambulance, wouldn't our insurances cover
that?

MR. VATTY: Insurance would.

MS. SCRIBBEN: Yeah.

MR. VATTY: If you don't have
insurance, it comes back around and it's billed —

MS. SCRIBBEN: Right. I have
insurance.

MR. VATTY: — appropriately.

MR. PILAWA: I think there was
somebody who wanted to go first?

(Sarah Fetheroff, of lawful age, was duly
sworn.)

MR. PILAWA: Okay. State your name
for the record, spell your last name, and give our
address, please.

MS. FETHEROFF: Sarah Fetheroff, and
it's F, as in Frank, E-T-H-E-R-O-F-F, as in Frank,

address 12335 Waterfowl Lane. I'm a resident of Munson Township. I just gave you my address. I make this statement solely in my capacity as a resident and property owner in Munson Township for the past 21 years. Variance appeal number 20-02 must be denied by the board of zoning appeals.

Use of the structure located at 12700 Ravenna Road should be limited to it's former residential use. It's further expansion of Munson which is not residential and should be denied. Such a denial does not constitute an unnecessary hardship to Lake-Geauga Recovery Centers. The property is a century home located in a residential R-1 district. The hardship is unique to the property because LGRC did not do its due diligence in researching the building laws prior to purchasing the property.

The property is located in a residential area. The residents and families driving to work, going to required meetings, with five residents plus the house manager coming and going will drastically increase the traffic congestion on Waterfowl Lane at the entrance from Route 44. And this is already a very, very difficult busy intersection coming and going.

The zoning regulation does not deprive LGRC

of a substantial property right because LGRC purchased the property without researching the zoning laws. Ms. Blasko and I had a conversation. We used to be neighbors in Concord, so we chatted back and forth a little bit, and we had a conversation back in 2019, November of 2019. She confirmed that she thought the house was in Chardon because all the correspondence had a Chardon ZIP code. And I was like, Melanie, "You live in Concord Township, that's a Painesville mailing address." Same difference: Munson Township, Chardon. Concord Township, Painesville. LGRC has purchased multiple properties, so I really find it incredulous that Ms. Blasko didn't know that it was in Munson Township.

The property absolutely can be used in an economically viable manner without the variance. It can be sold to a family, LGRC can recoup their money and learn a valuable lesson to purchase properties in properly zoned areas. The proposed use of 12700 Ravenna Road does not compare to adjacent or nearby property uses. Zoning is a process by which the municipality is divided into regions, such as residential, industrial, agricultural, commercial, or business use. As such, certain land uses are

permitted, or not, based on the zone.

Waterfowl Lane was established in 1998 as a residential street in a residential area zoned R-1. Adjacent and nearby residential property owners have abided by zoning laws in growing the investment we've made in our homes and properties. We pay state, federal, and local taxes. We fund the safety forces, roads, and schools. LGRC is a tax-exempt business and will do nothing to support our township roads, safety forces, or schools.

We did not purchase our homes in an agriculturally zone area. We did not purchase our homes in an industrial zoned area. We did not purchase our homes in a commercially zoned area. And we certainly did not purchase our homes in a business district. Residentially zoned areas ensure that nearby properties are residential, not business, and are used compatibly with neighboring properties. This provides predictability and stability to these neighborhoods and decreases the risk of declining property values.

We purchased our home on Waterfowl Lane 21 years ago to raise our daughters. We never dreamed that the home at the entrance to our street could possibly be granted a variance to allow any business

to operate. I don't care if it would be a flower shop or a tattoo parlor. Business is business. Paying rent, getting income constitutes business, not residence.

We have formed a very close knit group of neighbors over this issue and we are committed that the residence at 12700 Ravenna Road be returned to just that, a residence. The Munson Township Board must rule against granting the variance. Now, we were told it would be on record what our requests are. If it does go through, I want to be on record to say that if it remains, there will be no signage on the property relevant to that business, and privacy fencing must be erected on both sides of the property and meet adjacent neighbors' approval before being erected. Thank you.

MR. PILAWA: Thank you. Anybody else? Hold on.

I'm sorry, you wanted to say something?

MR. GILLETTE: I have a couple of questions.

MR. PILAWA: Sure.

MR. GILLETTE: When you mentioned traffic congestion, I had a difficult time hearing you.

```
1          MS. FETHEROFF:  Yeah.  Traffic —
2          MR. GILLETTE:  Traffic congestion?
3          MS. FETHEROFF:  Coming and leaving
4    Waterfowl Lane.
5          MR. GILLETTE:  But doesn't the traffic
6    from the house on Ravenna Road exit onto Waterfowl
7    and then go directly to Ravenna Road.
8          MS. FETHEROFF:  That's the point,
9    exactly, more congestion.
10         MR. GILLETTE:  But there wouldn't be
11   any additional traffic on the balance of Waterfowl
12   Lane.
13         MS. FETHEROFF:  It's right at the
14   intersection.  It's a very short distance from
15   Route 44 to the driveway.  Sometimes I have to wait
16   five minutes to get out on 44.  It's a very busy —
17   it's a State Route, as you well know.
18         MR. GILLETTE:  So you think five or
19   six people living there would contribute
20   significantly to the traffic congestion in addition
21   to all the people who live on Waterfowl Lane?
22         MS. FETHEROFF:  There are 15 houses.
23         MR. GILLETTE:  How many?
24         MS. FETHEROFF:  15 houses on Waterfowl
25   Lane.
```

```
1          MR. GILLETTE:  Okay.
2          MS. FETHEROFF:  And each house
3    probably has two or three cars.  So, yeah, I do.
4          MR. GILLETTE:  Okay.  What's the value
5    of your house, the approximate value of your house?
6          MS. FETHEROFF:  Is that relevant?
7          MR. GILLETTE:  Yes.
8          MR. PILAWA:  Well, why is that
9    relevant?
10         MS. FETHEROFF:  Why is that —
11         MR. PILAWA:  Why do you ask that?
12         MS. FETHEROFF:  Why does that matter.
13   We're not talking about the use of my house.
14         MR. GILLETTE:  The issue is she's
15   talked about the property values —
16         MR. PILAWA:  Okay.
17         MR. GILLETTE:  -- so I'd like to know
18   what the value of her house is to follow up.
19         MS. FETHEROFF:  What I said was that
20   zoning rules and regulations help to — a
21   residential area helps to prevent the declining
22   property values because it is residential.
23         MR. GILLETTE:  Okay.
24         MS. FETHEROFF:  So that's what I said.
25         MR. GILLETTE:  So let's forget the
```

```
1    value --
2          MS. FETHEROFF:  You can look it up.
3          MR. GILLETTE:  -- of your house.  I'll
4    withdraw that.
5          When did you learn this was going to be a
6    recovery house?
7          MS. FETHEROFF:  I learned back -- I
8    think from Joe.  I think that was probably —
9          MR. ZUCCARO:  After it sold.
10         MS. FETHEROFF:  — October, yeah,
11   after it sold.  It was all done indiscretely,
12   nondisclosure agreements, nobody could -- we
13   couldn't find out until it was --
14         MR. GILLETTE:  So it was October of
15   2019 that you learned that this was going to be used
16   as a recovery house, correct?
17         MS. FETHEROFF:  Yes.
18         MR. GILLETTE:  Have you had an
19   appraisal of your property since that time?
20         MS. FETHEROFF:  We actually had an
21   offer for our house.
22         MR. GILLETTE:  Have you had it
23   appraised either by a bank or a professional
24   appraiser?  Yes or no?
25         (Miscellaneous conversations were had with
```

```
1    multiple speakers.)
2          MR. PILAWA:  Hold on.  Just stop.
3    It's going to take all night long.  Just let him ask
4    questions.  He's entitled to ask questions.  That's
5    just the way it's going to go.
6          MS. FETHEROFF:  No.
7          MR. GILLETTE:  Thank you.  I don't
8    have anything further.
9          MR. PILAWA:  Is there anybody else
10   that would like to speak?
11         MR. BUSHIK:  I do.
12         MR. PILAWA:  Who is -- who's yelling?
13         MR. BUSHIK:  When the first lady said
14   she --
15         MR. PILAWA:  Can I swear you in first?
16         MR. BUSHIK:  No, no, no.
17         MR. PILAWA:  You don't want to
18   testify?  You don't want to say anything under oath?
19   Then we don't — we are not going to consider what
20   you say.  Oh, I guess he is going to be sworn in.
21         (Edward Bushik, of lawful age, was duly
22   sworn.)
23         MR. PILAWA:  Would you state your name
24   for the record, spell your last name, and give your
25   address, please.
```

MR. BUSHIK:  B, as in bravo,
B-U-S-H-I-K, first name Edward, of Bradford, Munson
Township.  Anything else?

MR. PILAWA:  No.  We haven't said
anything.

MR. BUSHIK:  The lady that was
speaking before, before she moved here there were
cows there.  What happened to those?  It was, what
do you call it, agricultural at one time.  This
whole world was.

Number two, we have approximately — we did
have about 50 people here.  Take a vote.  People
that want to get rid of the people, raise their
hands.  The ones that aren't bigots, in my opinion;
the other side.  Simple as that.  You know, she's —
she's out there planning a good life.

MR. PILAWA:  Now we're asking about —

MR. BUSHIK:  Now she's keeping other
people —

MR. PILAWA:  You have to stop.  Just
stop.  When I was suggesting earlier that we should
limit it to the use variance, you're exactly who I
was thinking of.  You need to sit down now.  We've
heard from you.  We know what you have to say.

MR. BUSHIK:  First of all, before I

go, would Jesus do this?  I'm not very religious.

MR. PILAWA:  Well, thank you.

MR. BUSHIK:  Stand up?

MR. PILAWA:  Okay.  Bye-bye.  Okay.
All right.  Well, thank you.

MR. BUSHIK:  I'm waiting for her to
stand up.

MR. PILAWA:  And we're waiting for you
to sit down.

MR. BUSHIK:  I'm down.  Let's hear --
have the witness people stand up.

MR. PILAWA:  Ma'am, you wanted to
speak?

MS. SEREDICH:  I'd like to start
off --

MR. PILAWA:  I need to swear you in.

(Kim Seredich, of lawful age, was duly
sworn.)

MR. PILAWA:  Will you state your name
for the record, spell your last name, and give your
address.

MS. SEREDICH:  Kim Seredich,
S-E-R-E-D-I-C-H.  We're at 12250 Waterfowl Lane.

MR. PILAWA:  Okay.

MS. SEREDICH:  First, I want to start

off by saying that when Melanie said she didn't know
this was in Munson, the MLS printout says Munson.
Also, your legal description said Munson Township;
therefore, you have to know what you're signing or
it's buyer beware.

I'd like to address justification for a use
variance.  A, is the hardship unique to the
property?  No.  Is it a commercial business trying
to operate in a residential location.  This will
affect the surrounding neighbors.

B, does the zoning regulations deprive the
owner of substantial property rights?  No.  The
owner can use it as a residential location by
limiting the occupants for a residential zone that
are in compliance.

C, can the property be used in an
economically viable manner without a variance?  Yes.
The property can be rented to interested parties
involved in the corporation as long as it goes along
with the two-person resident limit of not being
related.

D, the proposed use is opposite of the
current use and will affect nearby property owners'
health, safety, and morals.

E, is the hardship self-induced?  Yes.  The

need for the variance, the lack of preparedness, and
investigation to find appropriate locations, which
they have purchased over many years, such a business
is expected to be well planned and investigated.
That's something this company knew.

F, are the zoning regulations protecting
the health, safety, and morals?  The current zoning
regulations strictly protect the health, safety, and
morals of the residential property owners from
commercial activities and potential disruption of
services.

G, will the adjoining properties be harmed?
With the introduction of a commercial transient
group of occupants, over time there is a potential
likely impact to the surrounding local socioeconomic
dynamics.

H, did the property owners purchase the
property with knowledge of the zoning restrictions?
This is a moot point.  It was very important this
was done through a relator with commercial use.  And
every buyer goes through the title company where
they adhere to the laws; however, this purchaser is
seasoned and should be informed with a buyer beware
attitude only.  It matters not that the buyer's
making claims of ignorance of regulations and

zoning. Ignorance is no excuse.

LGRC knew what they were purchasing;
therefore, the purchase agreement was not presented
to the seller until a nondisclosure and
confidentiality was signed.

MR. PILAWA: Okay. Thank you. Anyone
else want to speak?

Yes, sir, in the blue shirt here.

By the way, for what it's worth, I had a
request to take a short break at 9:00. Do you think
you can get it done in five minutes?

MR. TRZASKA: Oh, yeah.

MR. PILAWA: Okay, great. See, I
already handled it.

(Jim Trzaska, of lawful age, was duly
sworn.)

MR. PILAWA: You know what we're
looking for. Go ahead and --

MR. TRZASKA: Jimmy Trzaska,
T-R-Z-A-S-K-A, 12750 Bass Lake Road. I had a real
long speech here, but Sarah said it so much better
than I could that I just have to agree with her.

Thank you.

MR. PILAWA: Thank you. All right.
We're going to take a break at 9:00. Anybody else

---

who wants to speak next? There, in the green
checked shirt back there.

(Bob Zeperly [phonetic], of lawful age, was
duly sworn.)

MR. PILAWA: Can you tell us your
name.

BOB: My name is Bob Zeperly
[phonetic]. I am not a resident of the community,
but I live in Madison, Ohio.

MR. PILAWA: I'm even having trouble
with the microphone. Is there any chance you can
speak up?

BOB: Yes. Well, my daughter will be
visiting our friends that live adjacent to the
property, so I do feel like this is affecting me so
I would just want to voice my opinion about it.
It's my opinion. It doesn't have to do with the
variance, but I think they had ample time to give
their opinions that didn't have to do with the
variance.

So anyway, I am a recovering drug addict.
I was a heroin user. I was in over ten different
rehabs. I actually went to Lake-Geauga three or
four times. I've been in halfway houses. And my
main concern about the whole thing is that they're

---

only required to have 30 days of sobriety to have
the freedom of living in the halfway house.

Now, when I lived in halfway houses it
wasn't run by Lake-Geauga, but I -- there's -- as
addicts, you do whatever your mind tells you to do
what you need. 30 days is not long enough to create
a new lifestyle, a new way of thinking that's not in
an addictive way.

I was able to sneak out at 2:00 in the
morning when the supervisor had gone to sleep.
People would pick me up. I got -- there were
several guys. When I wasn't in a halfway house, I'd
relapse, and they lived in the Lake House in
Painesville. So my main concern is that 30 days is
just not long enough to give the freedom to
recovering addicts.

I commend them for what they're doing. It
took me many years. It took me over 15 months of
being inpatient rehab to get sober. And I was able
to find sobriety from Jesus and he's the one that
set me free from the addiction. I'm not saying that
that's the only way. 12 steps are great, whatever
the plan may be.

I'm just saying that 30 days of sobriety is
not enough time to give freedom to people that have

---

to make the right choices, and I'm just concerned
that there is a great chance that it can affect my
friends, and also my daughter that goes over there
that spends time, you know, in various ways. I
mean, they could lose a needle, or pills, or leave
their alcohol in the driveway, and my daughter
strolls in and picks that up. There is just a —
it's really a very scary spot, I think, and I don't
think that any of the community homeowners who
bought houses — they just purchased this about a
year ago — they didn't sign up for that.

They can't even — the ladies can't even
walk to a meeting if they feel like they need it.
At least the Oak House and the Lake House there's
ample meetings that they can just walk to. I just
don't feel like this neighborhood is correct and
suitable for that halfway house. Thank you. That's
all I have.

MS. NELSON: Can I say something?

MR. PILAWA: In response to what he
just said?

MS. NELSON: Yeah.

MR. PILAWA: All right. Let me swear
you in.

(Carly Nelson, of lawful age, was duly

sworn.)

MR. PILAWA: All right. Can you state your name, please.

MS. NELSON: Carly N-E-L-S-O-N, Nelson. I live at 12700 Ravenna Road. I am currently a tenant there, and before going there I was in Oak House for three months, and I've been sober for almost a year in September, the 16th.

BOB: I took her --

MR. PILAWA: Well, here, just let her talk.

MS. NELSON: I just wanted to say — I just wanted to say I understand where you're coming from, but I feel like people that really want sobriety, I offered to — that was -- when I went to Oak House, I asked if there was something that was there for me, after I got out, that would give me structure to keep me safe, and that was Lake-Geauga Recovery Center, that was the Chardon house. I grew up in Lake County. I didn't want to go back to what I was familiar to. I wanted something different. I wanted a fresh start. I wanted to live again, so that was my option and that's what I took, and it saved my life.

So I understand peoples' concerns. I

---

completely understand because, honestly, a year ago I would have been like "You guys are crazy," but now going through what I've been through, I understand what beauty can really come out of recovery centers, what comes out of halfway houses. Ultimately, you can't control what people do. You know, if they relapse, then that's on them. I understand your concerns about that.

But I'll tell you right now, it's just me and her. And I go to meetings almost every day. I've probably skipped out on one meeting. I literally work me — I work every day and then I go to meetings. I do what I'm supposed to do.

BOB: That's —

MS. NELSON: And so for me that's -- I know you want to speak. But for me, that's — I'm just kind of like I don't understand what — I know what the issue is, but I just wanted to — that's all I wanted to say.

MR. PILAWA: Folks, look. Again, that's getting off the issues related to the use variance.

BOB: You know that relapses can occur, I understand, and --

MR. PILAWA: Great.

---

BOB: — statistics show more people are going to relapse in that house than they are going to stay sober.

MR. PILAWA: All right. We're to take a five-minute -- well, we're going to come back at 9:10.

- - - -

(Thereupon, a recess was had.)

- - - -

MR. PILAWA: Okay. We're back. Go ahead.

MS. BLASKO: I just wanted to comment on the fact that the gentleman that was referring to 30 days of sobriety was non-sufficient. When we originally set up the recovery house, it was 90 days and it was the State's requirement that we change it to 30 days. Our literature says 30, but I think we've never had anybody at the recovery house that have not been sober at least 90 days. I just wanted to clarify that.

MR. CAMPANY: Can I ask her a question?

MR. PILAWA: Go ahead, sure. Can I -- have you been sworn in yet?

MR. CAMPANY: I have not been sworn in

---

yet.

(Kevin Campany, of lawful age, was duly sworn.)

MR. PILAWA: Go ahead and tell us your name.

MR. CAMPANY: Kevin Campany. I live at 12245 Waterfowl.

MR. PILAWA: Can you spell your last name for the court reporter, please.

MR. CAMPANY: C-A-M-P-A-N-Y.

MR. PILAWA: Go ahead.

MR. CAMPANY: I just have a few related questions.

So as the responsible party for a $5,000,000 budget, are you aware of the statistics of your people in your houses to fall out of sobriety at any length of time? What are the statistics within 30 days?

MS. BLASKO: Within 30 days?

MR. CAMPANY: After 30 days. What are the statistics? Once they get to your house, in the next 30 days what's the statistic that they fall out of sobriety?

MS. BLASKO: Are you talking about recovery house or residential treatment?

MR. CAMPANY: Your recovery —

MS. BLASKO: Recovery houses?

MR. CAMPANY: -- houses.

MS. BLASKO: I can tell you 67 percent of the people who come to recovery houses are successfully transitioning into independent living, and in order to do that they have to remain sober that entire time. The average length of stay has been roughly nine months, some are less, some stay longer.

MR. CAMPANY: Have any of your residents had moving violations, substance abuse moving violations, while they were living in your residences?

MS. BLASKO: Have any of them had DUIs --

MR. CAMPANY: Correct.

MR. PILAWA: — while in recovery houses?

MS. PITCOCK: Excuse me. Can we kind of keep this to the property owners?

MR. CAMPANY: I've got a couple of questions. I've been sitting here for two hours. I spent hundreds of thousands of dollars in real estate taxes.

MS. PITCOCK: If you're —

MS. PILAWA: Well, that's fair, but I do want to take us back to the fact that there are eight separate and discrete elements that we need to evidence on --

MR. CAMPANY: And this one relates to public safety.

MS. PILAWA: I'm not suggesting that you can't ask, but I'm just reminding the group.

MR. CAMPANY: So, again, while in your recovery, as one of your residents, has anybody had any moving violations for DUI or being under the influence, to your knowledge?

MS. BLASKO: I'm going to guess you're referring to our homeowners, have any relapsed —

MR. CAMPANY: I'm not referring — I'm asking if you're aware —

MS. BLASKO: That's the only one I'm aware of.

MR. CAMPANY: Pardon me?

MS. BLASKO: That's the only one I'm aware of.

MR. CAMPANY: So it has happened?

MS. BLASKO: There was a gentleman that relapsed, correct.

MR. CAMPANY: Okay. How often do you randomly drug test? What's the criteria for drug testing?

MS. BLASKO: It's just random and also it can be on a reasonable suspicion. If there's a reason to test them, it could happen every day, or it could happen once a week. It's purely random and depends on the individual.

MR. CAMPANY: How long after somebody tested positive are they out of your residence home?

MS. BLASKO: We have to comply with the Ohio Tenant and Landlord Law and so we have to serve them with an eviction notice. It's a three-day eviction notice.

MR. CAMPANY: And during that time, can they be driving their own vehicle?

MS. BLASKO: Well, we have to abide by those laws. If we're aware that someone's driving under the influence, we will call the police.

MR. CAMPANY: If you're aware?

MS. BLASKO: Yes.

MS. SEREDICH: I have a question for you.

MR. PILAWA: As far as the landlord-tenant relationship, is that as a result of

anything — is there any of the federal code sections or the Ohio Revised Code Section that were referenced by Mr. Gillette earlier, or is that just separate and apart because you've got this, quote, landlord-tenant relationship with the people that live there?

MS. BLASKO: According to the Ohio Recovery Housing Association, to be certified we have to comply with the Ohio Tenant and Landlord policies and the Ohio Recovery Housing Association.

MR. PILAWA: Yeah, okay.

MS. SEREDICH: I have a question for her. How often do any of the people in your recovery houses use EMS or public facilities for security, safety issues that the taxpayers are paying for?

MS. BLASKO: With the recovery house, I wouldn't have that number, but they aren't using EMS.

MS. SEREDICH: They don't call when —

MS. BLASKO: Well, like any other family would, if you had an emergency you can get someone to take you like any other family.

MS. SEREDICH: And the other question I have is, do you make sure that their

1  hospitalization is reimbursed if you do use it?  Is
2  there a way to make sure they have hospitalization
3  and things to take care of those bills?
4       MS. BLASKO:  No, we don't pay them
5  and, no, we don't make sure that they have
6  hospitalization.  They are all working, so they all
7  have either private insurance or Medicaid.
8       MS. SEREDICH:  And you go by the laws
9  that govern you, if you want to change the variance
10  to you -- you're —
11       MS. BLASKO:  I'm not sure what you're
12  asking.
13       MS. SEREDICH:  I'm saying, you know,
14  you go by the laws and — the landlord-tenant laws,
15  but you don't want to follow the laws of Munson?
16       MS. BLASKO:  We're trying to follow
17  the laws of Munson.  That's why we originally
18  contacted Mr. Herringshaw to follow his
19  instructions.
20       MS. SEREDICH:  Right.  But you knew
21  you bought in Munson, and if you did your homework
22  you would have known that there's a two-person
23  variance.  You've been doing this for how many
24  years?
25       MS. BLASKO:  I'm not denying that that

1  happened.  It says right in the application that
2  it's Chardon.  I'm not denying that was the case.
3       MR. PILAWA:  Anything else related to
4  these?
5       MS. SEREDICH:  No, just those things.
6       MR. PILAWA:  Thank you.  There is --
7  oh, there we go.
8       (Amy Slack, of lawful age, was duly sworn.)
9       MR. PILAWA:  All right.  Can you state
10  your name for the record and spell your last name
11  and give your address, please.
12       MS. SLACK:  Amy Slack, S-L-A-C-K,
13  12295 Waterfowl Lane.  I, too, purchased a property
14  on Waterfowl Lane in September of 2019.  I am not a
15  relator.  I'm a stay-at-home mom.  We lived in
16  Buffalo, New York and I actually knew when I was
17  buying my house — We lived in a house in Camden —
18  Chardon, Chardon Township, and I bought in Munson
19  Township and I was aware of that.
20       I want to say specifically that I support
21  and applaud any person in recovery and treatment and
22  in taking an active role in living a healthy and
23  productive lifestyle.  I do question the leadership
24  and the leadership of an organization that doesn't
25  respect and follow the rules.  I'm sorry, I'm

1  just — I guess I want to know — a lot of what I
2  have in here has already been covered.
3       Specific to the variance, what is to
4  prevent the future potential next homeowner of this
5  property of making it just a rental property, just a
6  boarding house?  If this happens, it's going to set
7  the precedence with that property forever, including
8  any other properties in Munson Township.  It's
9  just — I'm concerned with how her claimed mistake
10  is becoming our problem monetarily and, I mean,
11  safety, you know, just the community asks — I mean,
12  a mile away is zoned for this.  She wouldn't have
13  had to have gone through all these battles.
14       And I'm just concerned that in the future,
15  you know, this is going to be a rental property
16  basically boarding house style.  And I'm not
17  confident that an error like this is really
18  indicative of a well-run establishment.  I mean,
19  it's a simple thing.  The relator is negligent.  Jim
20  Gillette, you're her attorney.  My attorney looked
21  at my single-family home and said, 'Hey, your
22  contract looks good.'  I mean, I just don't
23  understand how it happened.  And I guess she said
24  under oath it did, but I don't know.  So that's all.
25       MR. PILAWA:  All right.  Thank you.

1       MS. SLACK:  And, actually, I have to
2  say, too, my mom was a drug and alcohol counselor
3  growing up, so I don't — I'm not here
4  discriminating or saying anyone is a bad person.  I
5  hold it in high regard.  But there are avenues to
6  follow, there are rules, there are codes.
7       It's time that we start doing things
8  properly, the right way.  I mean, I paid my taxes on
9  the 22nd the right way.
10       MR. PILAWA:  Okay.  Thank you.  As I
11  said early on, this wasn't supposed to be a
12  discussion about whether good, bad, you like it, you
13  don't.  It's supposed to be about whether a use
14  variance has been established — the entitlement to
15  a use variance has been established, and it seems
16  we've gotten a bit off task.  It's probably my
17  fault.  Who's next?  Who wants to speak to the
18  application?
19       (Regina Wagner, of lawful age, was duly
20  sworn.)
21       MS. WAGNER:  My name is Regina Wagner,
22  W-A-G-N-E-R.  I live at 12691.  I live directly
23  across from the facility, and I take offense to
24  being accused of looking in people's windows.
25  Unfortunately, when I pull out of my driveway, my

car lights go right into your window. And when
you're looking at me out my window, of course I look
back. It's just common knowledge. That's not why
I'm here.

Lake-Geauga Recovery Services under
President and CEO Melanie Blasko bought the property
on Ravenna Road to open a Level II recovery house.
This business has an accreditation from the Ohio
Mental Health and Addiction Services that states
very clear avenues for such a facility. Ohio Mental
Health and Addiction Services supports with
housing criteria. It states under the Code and
Licensing Enforcement, and I quote, "All properties
must be maintained in a safe and healthy condition
and in compliance with any state or local
regulations, but not limited to: local zoning
regulations, applicable Ohio Building Codes and
Certificate of Occupancy, local building code
authority that reflects the current use of the
building, local health and safety standards, and any
local municipal codes that may be specific to
jurisdiction."

Failure to follow these guidelines can
prevent the business from receiving public taxpayer
money. She is receiving our taxpayer money. She is

not following the guidelines that's she's expected
to do.

Melanie bought this property without
researching the property. If she would have done
the proper research into this property, she would
have realized that this property did not meet her
desired use. She also did not contact the township
zoning inspector before buying this property, as is
recommended by the Ohio Board of Health.

It is not her first property. She knows
the laws, she knows the rules, chose not to follow
the regulations and now is crying foul. It is not
the BZA or the residents of Munson to fix her
problem. Ignorance of the law is not an excuse. At
the end of the day, this business property does not
meet zoning regulations. It's very clearcut.
That's all.

MR. PILAWA: Who is next?

MR. RODERICK: Doug Roderick.
R-O-D-E-R-I-C-K, 12685 Ravenna Road.

(Doug Roderick, of lawful age, was duly
sworn.)

MR. RODERICK: Follow the codes. No
variance. That's it, bottom line. That's what they
wrote those codes for, was to follow rules. I say

follow the code, no variance.

MR. PILAWA: Well, let me just — I
understand your position. Let me just suggest to
you that the zoning ordinance actually provides for
the variance; that's why we're here. We're actually
following the code by doing everything we've done
tonight listening to this, so I don't want anybody
to leave — I don't know whoever is going to have
another opportunity to go to a BZA meeting,
hopefully never, but don't leave here today thinking
that asking for a variance is somehow contrary to
the zoning code. It's all provided for in the
zoning code. I just want you all to be aware of
that, okay.

And there's another fellow over there.

(Joe Zuccaro, of lawful age, was duly
sworn.)

MR. ZUCCARO: Joe Zuccaro,
Z-U-C-C-A-R-O. I live at 12330 Waterfowl Lane. The
property is adjacent to the recovery house.

MR. PILAWA: Okay.

MR. ZUCCARO: Thank you for your time.
Question A: Is the hardship unique to this
property? No. The hardship is not unique to this
property because the zoning ordinances already on

the books governing this area indicates that this is
a residential neighborhood and not a commercial
district, and this Level II recovery center is a
business. Other residents in the area are not
permitted to operate a business on their property.

Question B: Does the zoning regulation
deprive the owner of a substantial property right?
No. The regulation does not deprive the owner of a
substantial property right because they could, one,
sell the property and recoup their investment; or,
two, rent the property to a family or individual and
abide by the residential zoning requirements.

Question C: May the property be reasonably
used in an economically viable manner without a
variance? Yes. The property can be reasonably used
for the previous two answers I just gave.

Question D: How did the proposed use
compare to adjacent and nearby uses? The proposed
use does not compare to any of the adjacent or
nearby uses. The proposed use is a business and the
adjacent and nearby homes are single-family
residences, not businesses. Yes, we may live close
to a commercial district, but we're not in a
commercial district.

Question E: Is the hardship self-induced?

As stated by Ms. Blasko on the various requests,
yes, this hardship is self-induced. The failure on
the part of Ms. Blasko and/or her real estate agent
to thoroughly investigate or check the local
municipalities prior to purchasing is not a problem
that should now be placed on us.

This is not the first property purchased by
the company but the twelfth, as stated in their
address, Twelve Meadows. If this was the first,
they may be able to claim ignorance, but a guiding
principle of law states ignorance is no excuse of
the law. This is their twelfth property purchased,
and at the December 12th, 2019 informational session
meeting that Ms. Blasko scheduled for us, the
residents, she and her committee admitted/stated
that this is not their first time they have had
surrounding residents be apprehensive and/or
disagreeable with their moving into the
neighborhood, plus this purchase was made with all
parties being required to sign a nondisclosure
agreement, showing signs of trying to hide their
intentions until after the fact and now trying to
claim that they were unaware.

I feel that Ms. Blasko now knew full well
that this would not be allowed. When we purchased

our house on Waterfowl, we did some checking into
the area, such as is this a residential or
commercial area? Is it next to a business? Is
there access to stores, entertainment, freeways, or
is there big-box stores close by? And we purchased
also in September of 2019, a couple weeks after the
close of the recovery house.

It is not believable that a business this
well established would not have done similar
checking. Plus, going to and from this property,
Ms. Blasko, or her team, would have had to travel
down Route 44 from Chardon and pass the entering
Munson and leaving Chardon signs and would have
known that this was not Chardon, Ohio.

How does this — Question F: How does the
zoning regulation protect the public health, safety,
and morals? The zoning regulations protect the
public health, safety, and morals by setting aside
specific residential areas from commercial areas,
thus hoping to limit vehicular traffic in an area
where children and families may be outside, limiting
the chance of someone accidentally being struck by a
vehicle or litter being thrown out of many vehicles
that may frequent the area but not live there or
have a vested interested in the cleanliness of that

area and thus giving the appearance or a feeling of
a rundown area.

In addition, the business, Lake-Geauga
Recovery Center, is specifically designated for
recovering alcoholics and drug addicts. If they or
any of their visitors discard any paraphernalia or
drug byproducts out the window into the ditches,
there is the strong possibility that curious
unknowing children playing may find and pick up or
touch something that could harm themselves. Also,
we have many families on the street that walk their
dogs for exercise, and if a dog comes upon something
or in contact with it, now the animal could possibly
be harmed.

Also, this house is located at the corner
of the street, right where the neighborhood children
wait to catch the bus, placing them in direct sight
and contact with the residents and any visitors.

Young children are impressionable and
friendly and this location now places them in close
proximity to a person, visitor or anybody else, who
may see them as a potential target. It is for that
reason I hope that we will only need to have this
meeting and not an "I told you so" meeting.

Question G: Will adjoining properties be

harmed? This is a question that would be
inexcusable, that may be up to interpretation. It
is my opinion that, yes, adjoining properties will
be harmed. If you ask any real estate agent they
will say there is no proof and they usually do not
want to give their names associated with any
comments for worry of discrimination. But there
have been articles written, such as one I would like
to present later as part of the record, Not In My
Back Yard, that cites that 8 percent to 17 percent
loss in property value due to living next door to or
having a treatment center in your neighborhood.

If they do not decrease the property value,
they decrease the number of buyers that may look at
your house, thus decreasing the pool of prospective
buyers and prolonging the time it takes to sell your
house.

The house that we're discussing, 12700
Ravenna Road sold and closed close to the same time
we closed on our house. If we would have known we
were moving next door to drug addicts, we would not
have purchased our house. Also, living next door to
a business, we did that checking; that's why we
moved into a residential area.

Why do you think Ms. Blasko stated on the

variance request and it is stated in their brochure
that they prefer to move into a residential
neighborhood?  My opinion is because they don't want
to live next to drug addicts either.  I do not know
the personal lives of my other neighbors, but you
now have admitted alcoholics and drug addicts living
in the area with children and also just a few houses
from a school and/or church that conducts classes
and sports activities for elementary age children,
at-risk children.  Also, the residents in the
surrounding area are taxpayer homes that pay for
roads, public services, police, sheriff, and fire
response.

This business operating out of the house at
12700 Ravenna Road is listed as a nonprofit company
and as many of the properties listed on the
auditor's site they, too, are nonprofit, so they are
non-taxpaying but are potential users of the
services that all taxes pay for.

Question H:  Did the property owner
purchase the property with the knowledge of the
zoning restrictions?  It is my opinion that, yes,
the property owner did purchase the property with
the knowledge of the zoning restrictions.  The legal
counsel for Lake-Geauga is Mr. Jim Gillette.  He is

the former law director for the City of Chardon.  He
and the real estate agents should have known that
this was not in Chardon even though they share the
same ZIP code.  They should have checked the zoning
requirements prior to purchase.

It is also my opinion that Ms. Blasko and
the company knew the zoning restrictions, thus the
reason for the nondisclosure agreement between all
parties, and were operating under the it is easier
to ask for forgiveness than ask for permission
premise and will now push the course to sue knowing
the township probably doesn't want to involve a
legal firm.

These statements regarding Lake-Geauga
Recovery Center reflects my opinions and are based
on my life experience and interactions.  I recognize
that these types of businesses and facilities may be
a necessity, but they should be in a commercial
district.  We already have zoning ordinances on the
books.  We're just asking that you abide by and
follow those ordinances; otherwise, what's the use
of having them.  I know as a homeowner that if I
wanted to build an accessory building, shed, garage,
do anything to my driveway, I need to follow the
same rules and so should they.

The Lake-Geauga Recovery Center is citing
the definition of a family in the zoning ordinance,
Article 2, page 2-4.  When a reasonable person reads
that definition, they would interpret the two
unrelated adults and an employee as two people who
have hired an employee, a caretaker, nanny,
housekeeper, et cetera, and that employee is
responsible to the adults, a situation where the
employee is paid by the residents and is responsible
to those residents.  That is not the case with this
recovery house.  The house manager is an employee of
Lake-Geauga Recovery Centers, not the rent paying
residents.  And they, as residents, are responsible
to her, not the other way around.

They need to meet requirements that she is
overseeing and monitoring.  It is for that reason
that they do not meet the definition of a family
that is described in our ordinance.

At the January 16th, 2020 BZA meeting,
Chairman Pilawa was asked if the home could be
occupied until this matter was settled and his reply
was no, but that house has been occupied
continuously and bringing in income to the company
in violation of his statement and I feel should have
been closed down already by the township.

As a business providing their services,
they should have notified the township of their
intentions and should have met the requirements set
forth in the building and fire codes for suppression
and alarms.  Hopefully they will comply with our
fire codes.  Just because their legal counsel sees
things differently is only a difference of an
opinion and does not give them legal permission.

I would like to submit copies of — I have
it with me -- what I downloaded from the Ohio EMS
Board pertaining to the use and administration of
Narcan.  It covers the entire county for two years.
And Narcan has only one function, and that is to
counter the effects of narcotics both in an
in-hospital setting and also out-of-hospital setting
to help a drug addict during an overdose situation.
EMS agencies have to report this usage.

The Lake-Geauga Recovery Center has
distributed a flyer, which I would like to present
tonight as evidence, stating that they will be a
distribution center for free Narcan making me wonder
are they in the business of helping addicts get off
of drugs, or are they just enabling them to use and
stay alive so they can be recycled into their
business thus helping their financial status?

Also, it is my opinion that there will be Narcan available in the house so that if a rent paying resident relapses Narcan can be used but will not be reported, thereby never providing any negative feedback as to the success or failure of the business.

I was able to find out how many homes were sold in 2019 for the following parameters, and I would like to submit them also. How many homes were sold in Lake-Geauga County — I'm sorry, in Lake County between $200,000 and $300,000, which covers the price of Twelve Meadows? How many homes were sold in Geauga County between that same price? How many homes were sold within a half mile of 6251 Cheryl Drive in Concord, Ms. Blasko's house? And how many homes were sold within one mile of her house?

17 homes were sold within the last six months within a half mile of Ms. Blasko's home and 44 homes within six month at one mile. I bring this up because why didn't Ms. Blasko purchase a home in her neighborhood, a residential neighborhood, as opposed to our residential neighborhood?

At the December 12th, 2019 informational session for the neighbors, Mr. Don [sic] Hanlon,

part of Ms. Blasko's team, stated that this house and residents should be considered an asset to the neighborhood, and if he's here or someone could answer from the team, I would to like to know why and how we should consider them an asset to the neighborhood.

In my — in one of my previous residences, I lived next door to an alcoholic. The police were repeatedly called because he would drive home intoxicated, drive his car over the sidewalk, and park on the lawn and then get out and leave the car running for long periods of time, or he'd arrive home intoxicated after midnight and proceed to physically beat up on his wife and/or son, causing his wife to run over to our house, banging on the door, waking me up at all hours of the night, requesting that we call the police.

I'm a retired firefighter/paramedic and through my career I have had the opportunity to interact and care for both alcoholics and drug addicts. Even while trying to help them and save their lives with Narcan or other things, they became physically violent and threatening towards my partners and myself. We would administer Narcan, revive them, and they would instantly go from zero

to 60, jump up with that crazy look in their eyes, and instantly try to claw and attack us. I have been scratched, spit on, involved with fighting to restrain an addict, and had my life and the life of my family members threatened just because I saved their lives. We do not need to increase that possibility so close to our neighboring families by allowing this business to operate against the variance.

Again, I'm hoping that we'll only be having tonight's meeting and not an "I told you so" meeting. Thank you for your time and opportunity to speak tonight. Please do the right thing and uphold the variance and our ordinances.

MR. PILAWA: You wanted to admit evidence?

MR. ZUCCARO: Yes, sir.

MR. PILAWA: All right. Just make sure we have that.

MR. ZUCCARO: Can I proceed?

MR. PILAWA: Yeah, sure.

MR. ZUCCARO: And you can have everything I just read tonight, too.

MR. PILAWA: Thank you. Anyone else?

(Therese Lanese-Turkish, of lawful age, was

duly sworn.)

MR. PILAWA: All right. Will you state your name for the record, please, and spell your last name.

MS. LANESE-TURKISH: Therese Lanese-Turkish, L-A-N-E-S-E, hyphen, T-U-R-K-I-S-H.

MR. PILAWA: Okay. What's your address?

MS. LANESE-TURKISH: 12290 Waterfowl Lane. I'll get right to it.

MR. PILAWA: Good.

MS. LANESE-TURKISH: It took me eight years of intense research in order to find what I thought was going to be my perfect home. I wanted to live on a no-outlet street away from an urban area, in an area safe, free of any known criminal elements, near good schools, with like-minded neighbors. One thing not on my checklist was living a stone's throw away from a house with transient recovering alcoholics and drug addicts. My neighborhood is not known for this or any other business. I, like Joe, lived near addicts, recovering addicts, for over ten years in another city, a nice city. It was a nightmare for my family. There were — I did my due diligence by

purchasing my new home. I knew what city I was
buying and the zoning laws that were put in place to
protect me and the integrity of my new home. I did
not have access to research the tenants of this
property, as I did my neighbors, when I moved in,
which I did. I will not know anything about them.
I chose to live in a residential district in order
to avoid all of the what-ifs.

I chose to live on Waterfowl Lane because
of the limited interaction with non-Waterfowl Lane
residents. If I would have known this, I would have
never, never, never have purchased this home to
raise my family. I chose to live in a quiet
residential district. Our small street cannot
handle our own ingress and egress being used as a
possibility of a business with up to six additional
vehicles and their visitors.

I bought a home in a residential district,
not a city, not a commercial, and not an industrial
area. According to The Geauga Maple Leaf, May 22nd,
2014, Melanie Blasko, CEO of LGRC, states, and I
quote, There is misplaced concern in a community
that problems can arise if a recovery house was
opened nearby, end quote.

A misplaced concern? I ordered over 100

police incident reports from all the LGRC houses.
That doesn't sound misplaced to me. Also in the
article Melanie made light of zoning laws stating, I
quote, zoning is a stumbling block, end quote. Last
I checked, laws were laws and not stumbling blocks.

More recently, on June 18th, 2019, an
article by Auburntownship.org entitled Lake-Geauga
Recovery On the Hot Seat Again as Melanie Blasko is
providing an annual recap, they were seeking over
$41,000 from the Geauga commissioner. Folks,
Commissioner Lennon voiced confusion about the
actual outcomes compared to stated ones. Blasko was
either evasive, not eligible, or incomprehensive.
Both Lennon and Commissioner Spidalieri seemed
incredulous. Blasko acknowledged that she was not
100 percent certain of the Geauga County data.
Blasko did not specifically answer all of
Spidalieri's questions, raising the question of the
efficiency of Lake-Geauga Recovery Centers, end
quote. Melanie Blasko has a reported income of over
$95,000, $95,879 plus an additional $14,706 as of
2019. So let us be clear that LGRC is a business.

In an interview regarding the Chardon Sober
House in the Geauga Maple Leaf on August 6th, 2015
Melanie said, and I quote, Lake-Geauga Recovery

Centers chose an urban setting so the residents have
more opportunities for employment, but also so that
they have a variety of things to do and people to
interact with, she said. Chardon has a number of
churches, places to shop, and activities, such as
the library, the theater, and on the square, all
within walking distance. They need to change their
whole lifestyle, Blasko said, and a village or city
is the best place for that, end quote.

Interesting that 12700 Ravenna Road offers
none of the adjectives used by Melanie herself to
described the list of best places. Melanie Blasko
also made it public knowledge that she thought she
was buying a house in Chardon. Whether that is true
or untrue, we will never know because of the
nondisclosure confidentiality agreement signed
during the purchase of the house in question which
does not permit the required zoning for her intended
purpose of the property. And as it's been stated,
ignorance of the law is no excuse.

From the beginning, LGRC has been
secretive, caught in alleged untruths, errors
involving convoluted words, and received Internet
reviews for LGRC somewhere between a D and an F,
depending on the grading scale. In addition, LGRC

have been in deliberate violation of instructions to
not occupy the home under directive from the BZA
here, and that is from the January 2020 meeting.

If acceptance, support, and a sense of
community is what Melanie or any other business is
hoping to find at 12700 Ravenna Road, she chose the
wrong location. I am well aware of my surroundings,
and if something looks out of place I will always
alert the authorities.

The proposed use of 12700 Ravenna Road does
not compare with adjacent or nearby uses, as the
area is zoned residential. The hardship is
self-induced. LGRC boasted of their long history
since 1971 and how they purchased several of these
homes, yet Melanie did not do her due diligence,
like I did, before purchasing this home in Munson
Township. Their mistake, their problem, their
alleged lie or untruth, and their issue sits.

LGRC is requesting a variance in an R-1
district, a residential district. The responsible
thing to do is to uphold zoning expectations and
abide by a land-use plan. The zoning regulation
does not deprive the owner of the vehicle property
rights, as the home has been used as a residence
since 1847. LGRC could rent its own home, recoup

1 their money, and purchase a home in the correct
2 environment with a properly zoned area. If LGRC was
3 purchased in a properly zoned area, a lot of money
4 and trouble would have been avoided on both sides.
5     The zoning regulation was put in place to
6 protect public, health, safety, and morals of the
7 township's taxpaying residents. LGRC is not paying
8 taxes. They receive all the benefits of my tax
9 dollars. The morals of the neighborhood will
10 forever be changed and the once beautiful century
11 homes in jeopardy of being turned into recovery
12 houses in an un-properly zoned area.
13     Adjoining properties will be harmed
14 physically and financially, in my opinion. The
15 two-car garage cannot, obviously, accommodate
16 vehicles for up to six people and in addition their
17 invited and uninvited guests. Parking is not
18 allowed on the street within 30 or so feet of the
19 stop sign. The intersection is already busy enough.
20 The thought of creating a business setting in a
21 residential area is absolutely absurd. LGRC is
22 forcibly trying to introduce an element of already
23 failed morals into a residential area. The people
24 within this home are transient. The revolving-door
25 lifestyle of these tenants does not represent a

1 family environment versus those of us who have
2 chosen to put down permanent roots.
3     Marketability for future sale is going to
4 be diminished. The former owner of 12700 Ravenna
5 Road, Audrey Schuetzman, told me herself over the
6 phone on Friday, January 10th, 2019, and I quote, I
7 guess your property values will be affected, huh,
8 end quote. If this is such a great thing, why are
9 there so many secrets. There are several unknowns.
10 Will it always be women, or can that change? Women
11 with children, pregnant, nursing? Will it increase?
12 What is their intention to increase the structure?
13 What if they want to accommodate more than six
14 people or six vehicles?
15     I do expect BZA to uphold the zoning laws
16 in order to protect me and my family and all the
17 taxpaying residents of Munson Township. However,
18 should the BZA succumb to this ludicrous zoning
19 request, I, in turn, request the following be put
20 into the record that LGRC will do the following. I
21 guess, according to our local zoning laws and
22 rights. That we will absolutely have no parking on
23 the street for a to-be-determined number of feet
24 beyond the stop sign, more than 30 feet. Under no
25 circumstances shall this home be increased in size

1 in order to increase the capacity of tenants. No
2 additional structure, outbuilding, barn, et cetera
3 be erected on the property. It would be nice if
4 they moved the mailbox to Ravenna Road in order to
5 coordinate with the street address, all their
6 occupants also on Ravenna Road to coordinate with
7 the street address. They might just move the
8 driveway to Ravenna Road, too. No sign placement
9 relating to the use of this house of any kind. And
10 more importantly, no tenant shall have a criminal
11 record or be a non-documented US citizen.
12     Melanie and LGRC have displayed their
13 defiance with following local laws. I would like
14 the reassurance that LGRC at least follow federal
15 laws.
16     Thank you for allowing me this time to
17 express my concerns about this life-altering
18 situation.
19     MR. PILAWA: Did I fail to mention
20 earlier on that we have very limited authority? We
21 just determine variance requests. We can't tell
22 anybody where to put their mailbox. I mean, if
23 that's what you're expecting from us, you're going
24 to be really, really disappointed.
25     MS. LANESE-TURKISH: Well, from what I

1 understood, you said for us to say what we wanted to
2 say.
3     MR. PILAWA: Okay. If you're
4 expecting us to tell somebody where to put their
5 mailbox, that's not going to happen.
6     MS. LANESE-TURKISH: No. No.
7     MR. PILAWA: You already had a chance.
8     MR. ZUCCARO: Yeah. I forgot to ask a
9 question.
10     Earlier it was brought up that there's a
11 camera on the trees facing the house. I own that
12 property. I'm the property that is adjacent to
13 them. I own from my driveway all the way to the
14 stop sign, including the mound, as I discussed last
15 time. That camera faces the mailbox and the street.
16 It does not face the house, and is not intrusive to
17 that house. My wife wants to plant flowers on that
18 mound, so I've watched for deer. We moved from
19 Highland Heights and they ate every flower she put
20 down on the ground. It's also to monitor traffic.
21 Second of all, it was brought up earlier that there
22 were cars parked on the side of the street on
23 Waterfowl. Can the people from Lake-Geauga, would
24 you elaborate on that? Because my family has not
25 picked up people loitering and parking on Waterfowl.

Can you address that, please?

MR. PILAWA: Well, again —

MR. ZUCCARO: Not you. I'm sorry.

MR. PILAWA: No, no, no. I don't see where that addresses the terms of the use variance.

MR. ZUCCARO: No, it doesn't. It's just that they were complaining about the camera. It's at my property and it's not facing the house.

MR. PILAWA: Okay. You are now disputing what they thought earlier or they said earlier. Okay.

Is there anyone new? Okay. thank you. I guess your hand's up first.

MR. MCHALE: Yeah. This is going to be real quick.

MR. PILAWA: I hope.

MR. MCHALE: Pat McHale, 12165 Waterfowl Lane.

MR. PILAWA: Hold on.

(Pat McHale, of lawful age, was duly sworn.)

MR. MCHALE: I can't follow a lot of my neighbors, but I just want to get it on the record that I oppose the variance. The only thing that I've been thinking about is there is — this

might actually apply to the variance. There is a tremendous safety issue on that corner if you live on the street, especially with visitors, if they stay there all day. There could be up to, I don't know, eight visitors. They will not understand how to back in and out of that driveway. Coming off 44, they're going to get T-boned. I guarantee it.

That driveway should not be there. I know that you can't move the driveway, but there is a safety issue there, which if you care about the people that live there -- again, just sell the house. Buy a different one. You wouldn't have to go through any of this. It's not that important.

MR. GILLETTE: Is it your belief that the driveway goes directly onto Route 44?

MR. MCHALE: No, but it should. It doesn't.

MR. PILAWA: All right. Thank you.

There was somebody else back there. Ma'am? Let me swear you in right now.

(Bobbie Jo Freeman, of lawful age, was duly sworn.)

MS. FREEMAN: My name is Bobbie Jo Freeman, F-R-E-E-M-A-N. I live at 12690 Ravenna Road. I am the property right next door. My

husband and I closed on our house just over a year ago in July. I have a one-year-old daughter. And we expected to plant our roots here and never move again. We never wanted to live by a multifamily home or a business, but it seems that there is a business.

Unfortunately, I — well, I'm very proud. I work in Painesville city; I'm a teacher. If I wanted to live in that atmosphere, by those type of things, I would have bought a house there. All of their locations are in the city. They're in Painesville city, they're in Mentor, they're in Chardon. We live in Munson Township for a reason, and I cannot thank Sarah and Tim and Therese and Joe and Gina, and everybody else that I missed, for their statements and their facts. They were spot on. I had more to say, but I can't support them more. They did a fantastic job. But I'm having a really hard time swallowing this. We would have never purchased our house. Thank you.

MR. PILAWA: Thank you.

(Sonja Siebert, of lawful age, was duly sworn.)

MS. SIEBERT: My name is Sonja Siebert, and I live at 12170 Waterfowl Lane.

Waterfowl Lane is a street which houses the LGRC sober home driveway. Waterfowl Lane is the only ingress and egress for the sober home's residents and guests. First, I would like to address the idea of zoning. One purpose of zoning is to protect the health and safety of the residents of a community. Zoning is also about expectations. When one invests in a certain area, they have the expectation that the surrounding neighborhood will have similar characteristics that will be protected in the future by zoning regulations.

When you move into a residential community, the expectation is you will able to enjoy the same or similar values. I support the concept that LGRC shall be required to request a use variance and be denied that variance. It is questionable there already were two residents and a house manager living there without meeting the definition of a family, and they are requesting three additional residents be permitted. This hardship for which they are requesting remains self-induced and should be denied. By its own admission with the zoning application, LGRC's director admits that she thought the house was in Chardon.

I am submitting a copy of the MLS listing

which states Munson no less than three times. A
multimillion dollar nonprofit corporation really
should know better to research the township and the
laws prior to purchasing. This owner has both the
ability to sell the home or use it in another
economically viable manner without a variance,
namely renting it or selling it according to zoning
laws.

The definition clause of family in the
Munson zoning code at the center of this controversy
is as follows: A number of adult persons, not
exceeding two, living and cooking together as a
single housekeeping unit though not related by
blood, adoption, guardianship or marriage shall also
be deemed to constitute a family, exclusive of
live-in hired employees. LGRC makes the argument
that the sober house is entitled to a reasonable
accommodation to allow three additional unrelated
adults to reside in the house in addition to the two
residents and the house manager who are already
residing there just to make us hesitant. First, the
LGRC home will just lead to more zoning issues if
this manager is not reporting a scheduled resident
and is asking Munson Township to change their
definition of a family. The definition states it is

exclusive of a live-in employee such as a
housekeeper, et cetera; however, the live-in manager
of the LGRC is an employee of the corporation
thereby rendering LGRC as invalid.

Another flaw is the argument stated by
LGRC's attorney that LGRC is entitled to a
reasonable accommodation to allow the home's living
situation. To this argument, the sober house is not
entitled to a reasonable accommodation simply by
reciting some federal regs while ignoring the local
zoning laws.

Finally, the accommodation requested must
be reasonable. An accommodation is reasonable if it
does not cause undue hardship, a physical or
administrative burden to the municipality, or does
not undermine the basic purpose of zoning ordinances
for its use. FHA violations are established by
showing if there is impact or failure to make a
reasonable accommodation. LGRC relies on a request
for a reasonable accommodation. A three-part test
is applied to determine whether a reasonable
accommodation is necessary. It must be reasonable,
necessary, and allow a substance abuser have equal
opportunity to use and enjoy the particular
accommodation.

The accommodation requested by LGRC is
unreasonable. It is unreasonable if it imposes
undue financial and administrative burdens, imposes
an undue hardship on the township, or requires a
fundamental alteration in the township zoning
program.

LGRC's sober home will impose undue
financial and administrative burdens on Munson
Township and its residents. As a nonprofit
corporation receiving both county and federal money,
LGRC residents of the sober home will not be
carrying the same tax burden of contributing to the
taxpayers of Munson Township who are its permanent
residents and corporations.

LGRC itself, as a corporation, will not be
contributing to the tax dollars of the community.
The residents may not be from Munson Township or may
not work in Munson Township. They might not
register to vote as a Munson Township resident. In
other words, they will not be invested in our
community as we are, the permanent taxpaying and
voting residents of Munson. However, they will be
utilizing disproportionately the township's and
county's resources in terms of sheriff, fire, and
ambulance.

This is not conjecture. This is direct
evidence from the police reports from LGRC locations
which I'm submitting tonight into evidence.

In general, first is how the law cannot be
subjective where a restriction attempts to recenter
to legitimate concerns and worries raised by
affected individuals. This leads to the question
will adjoining property be harmed? Yes. The
driveway of the sober house is at the location for
the drop-off for all of the children who live on
Waterfowl who attend Chardon schools. The traffic
will be worse from increased transportation and this
is within 100 feet of a 55 miles per hour zone. At
the location of the children's bus stop, it is an
extreme safety hazard.

Number two, the residents and their guests
have unknown criminal backgrounds. As former drug
and alcohol users and addicts they have been
involved in criminal activity, even if they have not
been prosecuted. The nature of this arrangement is
in direct conflict with the quiet community that we
live in. It's the reason people live here and the
reason that we moved here. The admission of
multiple former drug and alcohol addicts in a
concentrated space brings lower moral turpitude to

Munson.  Ironically, this is why LGRC chose this
location, so that the temporary residents can be
around us.

I am submitting copies of three reports
from neighbors of LGRC's facilities in Lake-Geauga
Counties.  There are over 100 reports.  Among some
of the highlighted reports — these are public
record, but I'll use initials.  On Water Street,
Chardon sober homes, I'll read this, the threats
centered around R's access to the sniper rotation.
He also made comments about vandalizing 114 Water
Street.  Another report says R is highly intoxicated
and being very loud.  A caller advised that the male
was ranting and irate.  Quote, Mr. P called down to
complain and said he'll kill him.  Another report
says E was at the sober house and he got kicked out
of there.  M said he is drunk.  He is on probation.

At the 800 Oak Street location, a female
resident, quote, officers were dispatched to the Oak
House for a report of a female who had a change in
mental status and had to be raced to the hospital
for a full evaluation.  Quote, request from staff
member at Oak House for a health check due to
suspicious vehicle that had pulled into the property
and then left quickly.  This happened several times,

unquote.  I'll skip the next ones.

These are just a few anecdotes.  These
reports present direct uncontroverted evidence of
injurious criminal activity, threats, suspicious
vehicles, combative, shots fired, trespassers,
drunkenness and potential drug use at LGRC's
centers.  This evidence proves community members'
concerns are well founded.  There is actually no
evidence to the contrary that we, the affected
residents, will not be subject to this criminal
activity.  Will the adjoining property members be
harmed?

On a personal note, my husband and I are
the parents of two daughters.  We moved here two
years ago from North Collinwood.  Our family moved
to Munson for the peace and quiet that Munson has to
offer, for the very nature that people want to place
permanent roots here.  After reading the police
reports and researching the failure rates of the
LGRC sober homes' clients and having a full grasp of
what is in store for us, I can safely say that our
lives will change dramatically should this be
permitted.  I have been forced to have very
unfortunate conversations with my twelve and
nine-year-old daughters, conversations that I

normally would be years away from having.

By now, my girls know almost everyone and
their cars by sight, and they will now have to be on
the lookout for strange cars driving and strangers
walking up and down the street.  I will no longer be
comfortable allowing my daughters out of sight on
their bikes as we walk our dogs up the street.
These issues are not directly with the residents;
this also has everything to do with the criminal
activity which abounds from their guests as shown in
the police reports.  That's why I'm urging the Board
to deny this request.

I have one question in follow-up.  When you
say you had to evict the residents, you had a 67
percent success rate, meaning two out of every six
residents in this home are potentially going to not
be able to be residents there, so four out of six
will be positive.  When you give a three-day notice,
those people may not move out.  Under the Ohio
Landlord Tenant Law, you have to file an eviction.
They could still be there for 30 to 60 days.  I'm
wondering about their status as protected
individuals for that time period after they've been
given the three-day notice.  How are they still
protected and how will the home be protected for

disabled individuals?

MR. PILAWA:  Are you asking
Ms. Blasko?

MS. SIEBERT:  I'm asking Ms. Blasko.

MS. BLASKO:  Could you repeat that,
please?  There were a lot of things I was going to
comment about, but what was your last question?

MS. SIEBERT:  You said that some of
your sober homes have a 67 percent success rate.
That means one out of three is not successful; is
that correct?

MS. BLASKO:  People leave on their
own, so it's not that everybody — it's not that
everyone — the others all relapse, some just leave
on their own.

MS. SIEBERT:  Okay.  So the ones that
don't leave and that have relapsed, you have to give
them a three-day notice; is that correct?

MS. BLASKO:  If they are — if they
relapse in our residence, correct.

MS. SIEBERT:  And if they don't leave
after three days, you have to file an eviction,
which means they could be in that home for 30 to 60
days?

MS. BLASKO:  No, they're weekly

leases, so no, they can't be in the home for 30 days. They're weekly, week to week, seven days.

MS. SIEBERT: Okay, so you — but you have to file an eviction with the court, correct?

MS. BLASKO: We serve them with an eviction notice. We've never had a situation where someone didn't leave the same day. Usually they get out of there --

MS. SIEBERT: You could have that situation though?

MS. BLASKO: We could, yes.

MS. SIEBERT: So how are those people protected within that time frame still protected as disabled people?

MS. BLASKO: How are they protected?

MS. SIEBERT: How is their disability protected?

MS. BLASKO: Because they relapse — you're asking — you're assuming they are active users, so they're asked to leave. And I don't know how to answer that question because they then are no longer protected as such. We don't keep them there either after that point either, if they relapse.

MS. SIEBERT: So if they don't leave, you may have to file an eviction that they need to

leave?

MS. BLASKO: Three days.

MS. SIEBERT: Oh, no. You have to file an eviction in court.

MS. BLASKO: With my own eviction -- it's a week-long lease, so they are gone within seven days.

MS. SIEBERT: No, that's not true. You don't get the court hearing after you file an eviction. There's five days or seven days or —

MS. BLASKO: Well, we've never had to do that.

MS. SIEBERT: All right. Thank you.

MR. PILAWA: Do you want those as part of the record?

MS. SIEBERT: Yes. Thank you.

MR. PILAWA: You can put them by the court reporter.

(Jamie Keyser, of lawful age, was duly sworn.)

MR. PILAWA: State your name, please.

MS. KEYSER: Jamie Keyser, K-E-Y-S-E-R, 12180 Waterfowl. And I don't — mine's really short because my great neighbors put a lot of work into this, and so I'm kind of piggy-backing off

of everything they say. But I just wanted to put on the record that I am opposed to the variance. I have four young children on the street. We moved there a couple years ago and so Tom and I are also uncomfortable with the situation. So, yeah, I just want to say thank you for speaking up.

MR. PILAWA: Thank you. Anyone else?

(Kevin Campany, of lawful age, was duly sworn.)

MR. CAMPANY: For the record, Kevin Campany. This is a signed affidavit notarized, and I will submit it after I'm done. I, the affiant, reside at 12245 Waterfowl Lane with my wife and two daughters and have lived at the residence since March 2002, that's 18 years.

I, the affiant, have been a property owner and have paid real estate tax on the property located in Munson Township for approximately 27 years, having moved to my first Munson Township residence in 1993.

As a resident of Munson Township and traversed Waterfowl Lane, and an affected property owner, I, the affiant, state my absolute opposition to the use variance request submitted by Lake-Geauga Recovery Centers for the property located at 12700

Ravenna Road, Munson, Ohio to the Board of Zoning Appeals of Munson Township.

I, the affiant, base my opposition on the following reasons. Based up on my information, belief and opinion, I feel that granting the use variance for the property located at 12700 Ravenna Road, Munson, Ohio will create congested and unsafe traffic patterns, on and offsite parking traffic issues, and storm water runoff issues which will individually or together further create life safety issues at or near the intersection of Waterfowl Lane and State Route 44.

I, the affiant, have traveled Waterfowl Lane thousands of times during the time period of my residence, both by foot and by car, and have, again, thousands of times traversed and navigated the intersection of Waterfowl Lane and State Route 44. In that time frame I have seen countless near misses at this intersection, which carries native residential traffic inbound then and outbound for Waterfowl Lane, as well as significant traffic from a host of other sources, including school buses, garbage trucks, service and landscape vehicles, test drives for our local car dealership, FedEx delivery vehicles, U.S. mail vehicles, Amazon delivery, and

emergency vehicles, just to name a few. Vehicles entering Waterfowl Lane and State Route 44 tend to do so at a high rate of speed, as the speed limit for State Route 44 at this intersection is 55 miles an hour. A vehicle going 55 miles per hour travels approximately 87 feet per second. At this intersection the speed limit for Waterfowl Lane is 25 miles an hour. A vehicle going 25 miles an hour travels approximately 39.5 feet per second. The only ingress and egress, driveway, for the property located at 12700 Ravenna Road, Munson, Ohio is located approximately 135 lineal feet from the center line of State Route 44 on Waterfowl Lane, see the map attached. A car entering Waterfowl Lane from State Route 44 will reach the driveway at 12700 Ravenna Road on average in less than 3.4 seconds.

I, the affiant, believe that increasing the permitted occupancy for the property at 12700 Ravenna Road and in turn the amount of vehicles entering and exiting the driveway will create a situation where transient residents, their visitors, and even more service vehicles who are unfamiliar with the intersection, the driveway, and its close proximity to State Route 44, will place themselves, their visitors, the residents of Waterfowl Lane and

all who navigate the intersection of State Route 44 and Waterfowl Lane in grave danger.

I believe that prior to even considering a use variance for the property, it is the obligation of the Board of Zoning Appeals of Munson Township to obtain from ODOT or a similar independent provider a Data Driven Safety Analysis pertaining to the increased traffic and congestion which will be created in close proximity to the intersection of State Route 44 and Waterfowl Lane from ingress/egress to 12700 Ravenna Road, as well as potential on-street parking in close proximity to this intersection and their combined impact on life safety.

I, the affiant, believe that allowing the residents of 12700 Ravenna Road and their visitors to park their cars on the street, if the variance would pass, will significantly exacerbate the congestion, navigation, and life safety issues at this intersection described in paragraph six above, which is also the exact location of a Chardon local schools bus stop for K through 12 grade school aged kids. The Board of Zoning Appeals of Munson Township must not create a situation by approving the use variance which will further create a need

for on street parking due to a lack of onsite parking at 12700 Ravenna Road, which is currently insufficient to support the parking requirements created by the use variance as requested. Prior to any consideration of a use variance, the Board must first obtain a DDSA as noted in paragraph six above.

I, the affiant, believe that in order to accommodate the level of onsite parking at 12700 Ravenna Road necessary to alleviate my concern in paragraph seven above and accommodate the requirement inherent in such a use variance, significant additional hard pan or paved surface area will need to be created onsite. Creation of this additional hard pan or paved surface will create additional water runoff which will directly impact sublot 16 Waterfowl Lane and all downstream properties.

Prior approval of a use variance would create a potentially hazardous storm water runoff issue. It is incumbent upon the Board of Zoning Appeals to require a study by the Ohio Division of Soil and Water or a similar body which determines the requirements for additional onsite detention or other storm water detention or mitigation based upon an increased onsite parking area and related soil

disturbance. That's all.

MR. PILAWA: Okay. You know, of course, we have absolutely no ability to do what you have said. Zero ability.

MR. CAMPANY: That's just my opinion.

MR. PILAWA: Well, you just telling us what's incumbent upon us. No, you just did that under oath and it's in the record. We don't need your affidavit.

MR. CAMPANY: I'd like to submit it though.

MR. PILAWA: Well, you just did. You just read it into the record.

MR. CAMPANY: So I can hit the road now.

MR. PILAWA: Here, okay, let's — okay. Here.

MR. CAMPANY: Thank you.

MR. PILAWA: There's absolutely nothing that you asked for that — we decide variance requests. That's what we decide.

MR. CAMPANY: Okay. All right.

MR. PILAWA: And we don't sanction the traffic codes.

MR. CAMPANY: I didn't -- I didn't

```
1    need to know anything about their business plans for
2    the variance request either, but I heard it.  I sat
3    here for two hours for that.
4                MR. PILAWA:  Well, we've been here for
5    four hours.  I said a hundred times we have very
6    limited authority.
7                MR. CAMPANY:  I get it.  They got
8    their two hours and we get ours.
9                MR. PILAWA:  Yeah, go ahead.
10               MR. GILLETTE:  A couple questions,
11   sir.  Have you investigated the grade of 12700
12   Ravenna Road?
13               MR. CAMPANY:  Pardon me, the raid?
14               MR. GILLETTE:  The grade.
15               MR. CAMPANY:  Grade.  No, I have not.
16               MR. GILLETTE:  So you don't know which
17   direction the water will flow, correct?
18               MR. CAMPANY:  I have an opinion that
19   it will flow left.  It'll all go downhill onto my
20   property.
21               MR. GILLETTE:  But you don't know the
22   grade, necessarily?
23               MR. CAMPANY:  A professional — I have
24   observed the grade thousands of times and I've
25   watched the water flow and where it flows.
```

```
1                MR. GILLETTE:  Have you requested from
2    the Ohio Department of Transportation the traffic
3    counts on State Route 44?
4                MR. CAMPANY:  No, I have not.
5                MR. GILLETTE:  So you don't know if
6    there's 10,000 trips a day, 50,000 trips a day?
7                MR. CAMPANY:  No.
8                MR. GILLETTE:  You have no idea?
9                MR. CAMPANY:  I do not.
10               MR. GILLETTE:  What about traffic
11   counts on Waterfowl Lane that may have been done by
12   Munson Township, have you requested those?
13               MR. CAMPANY:  I have not.
14               MR. GILLETTE:  Thank you.
15               MR. PILAWA:  I'm sorry, did you want
16   to --
17               MR. SABEL:  Yeah.  For the record,
18   Chris Sabel, 12195 Waterfowl Lane, and I will tell
19   the truth.
20               MR. PILAWA:  Let me swear you in
21   first.
22               (Chris Stable, of lawful age, was duly
23   sworn.)
24               MR. SABEL:  I get over 24 inches of
25   water through my driveway from the very beginning of
```

```
1    Waterfowl Lane when we get a rainstorm, okay.  So we
2    don't need to do the study.  The study is the size
3    of my pipe that goes over the driveway.  There's
4    records of what everybody says here.
5                Your lack of due diligence has put
6    everybody here at risk.  You're hiding behind state
7    law and federal law, okay.  The loophole of good
8    faith and protected citizens is not what this is
9    about, okay.  It's about your failure to do your
10   job.  We're paying the price, okay.  If I were going
11   to buy a piece of property, I would have done my due
12   diligence.  I would have found out why I don't want
13   to move there, okay.
14               Like everybody else here has said, 18 years
15   ago, 19 years ago we bought residential property
16   governed by Munson Township, and that's the way this
17   should continue, plain and simple.  It's going to
18   get out of control when they disapprove it, okay,
19   you get your way, and then you do something
20   different.  This world has gone bat crazy, and it's
21   for reasons like this.  If you don't uphold the law,
22   go somewhere else and do it but not here in our
23   community.
24               MR. PILAWA:  All right.  Anybody else?
25               MR. GILLETTE:  I have a question.
```

```
1                MR. PILAWA:  Okay.
2                MR. GILLETTE:  Regarding the flow of
3    the water, what has changed in the flow of the water
4    onto your property since Lake-Geauga Recovery
5    Centers acquired the property?
6                MR. SABEL:  Nothing at this point
7    but --
8                MR. GILLETTE:  Thank you.
9                MR. SABEL:  -- but -- hold on.  Let me
10   finish the question.
11               MR. GILLETTE:  You answered the
12   question, sir.
13               MR. SABEL:  If you — it's going
14   downhill, and it's going downhill over everybody's
15   property.
16               MR. PILAWA:  Is there anyone who
17   hasn't spoken yet who wants to?  Okay.  Let me swear
18   you in.
19               (Michael Seredich, of lawful age, was duly
20   sworn.)
21               MR. SEREDICH:  Michael Seredich,
22   S-E-R-E-D-I-C-H, I live at 12250 Waterfowl.
23   Everybody pretty much said everything that I wanted
24   to say tonight already.  I just want to let you know
25   that I am adamantly opposed to this.  I think if
```

people want to have a personal business, go with
commercial property and do so. Leave the residents
alone. We all moved out there for a reason. It's
quiet, and that's the way we'd like to keep it.
Thank you.

    MR. PILAWA: Thank you. Who else?
That was an excellent example of brevity.

    MR. SEREDICH: Thank you.

    (Bill Gray, of lawful age, was duly sworn.)

    MR. GRAY: My name is Bill Gray,
G-R-A-Y. I just wanted to state my opposition to
the variance request. It's as simple as that. I
live at 12255 Waterfowl Lane, been there since 1998,
and everything that's been said I would agree with
with regards to the community. I just wanted to
state that for the record, my opposition.

    MR. PILAWA: Thank you. I appreciate
it. Ma'am, may I swear you in.

    (Elizabeth Hagood, of lawful age, was duly
sworn.)

    MR. PILAWA: State your name, please.

    MS. HAGOOD: It's my first meeting.
Go easy. Elizabeth Hagood, 12380 Bean Road. I grew
up in Munson and moved away, 20 years, and came
back. I am a single homeowner, but I moved here for

the safety of the community that I live in.

    I've already experienced too many people
traveling down 44 and it can be very uncomfortable.
I am totally opposed to the variance for this. I
don't want any more traffic that is going to be
possibly endangering our community. And I did look
in Concord, I looked in several other areas. I took
a job downtown. I chose to live in a rural
community for the safety factors, hospitals, town.
Didn't want the city water. I had specific things
that I wanted, and first and foremost was safety.
And I pay high taxes. I don't have children in this
school district, but I am willing to do that to keep
the home value and what I desire is to keep this a
safe community. I am very opposed to the variance.

    MR. PILAWA: Thank you.

    MR. TURKISH: Mike Turkish,
T-U-R-K-I-S-H.

    MR. PILAWA: Would you raise your
right hand, please. I haven't sworn you in today,
have I?

    MR. TURKISH: No.

    (Mike Turkish, of lawful age, was duly
sworn.)

    MR. TURKISH: I reside at 12290

Waterfowl Lane. I don't know who is aware of this
or if this was said already, but the township of
Munson was the first rural township in all of Ohio
to take the initiative of full development of its
own territory providing for orderly time to grow
with its zoning resolutions.

    When you look at the organization in terms
of LGRC, taking ownership of a residential home that
is unsuitable for their use and then having no
regard for local preexisting laws or ordinances is
appalling. Is the hardship unique to this property?
No. This hardship is identical to any and all
surrounding properties zoned for R-1 criteria. This
hardship was brought upon solely by Melanie Blasko.
She was not being mindful of her tenants,
surrounding properties, or the Township of Munson
where she — where Melanie clearly acted defiantly
by immediately occupying this against instruction by
BZA chair Dennis Pilawa of the BZA meeting January
16th of this year.

    Does the zoning regulation deprive the
owner of a substantial right? Lake-Geauga Recovery
Centers are not deprived of any rights by using the
property with the same and equal rights to all
adjacent and nearby property owners.

Can the property be used in an economically
viable manner without the variance? Yes. The
property may be used under the R-1 regulations which
were available for review by LGRC prior to purchase.

    How does the proposed use compare to
adjacent and nearby uses? No other house nearby
fell under the R-1 regulations operating similarly
as low rent housing for occupying multiple unrelated
persons, which is no different than a revolving door
weekly motel. However, unlike a business property,
the transient residents in this home will not only
have no substantial financial investment in the
community but have little to no contribution
socially to increase the quality of the
neighborhood.

    Is this hardship self-induced? Yes. The
hardship is solely the result of the actions of
Melanie Blasko. There was no due diligence or
proper research to locate a property suitable for
housing requirements. She disregarded local laws
and ordinances which were in place and enforced
before the purchase of this home. As a precursor,
in my opinion, before purchasing the property on
Waterfowl Lane, I met on the actual ground of the
property with the then zoning inspector Tim Kearns

with the sole purpose of determining if the property
would suit our use under the zoning guidelines.
This is what responsible people do, foresee the
liability of their investment and take
accountability for their actions. Only after
meeting with Tim Kearns were then our needs
addressed to determine if we were going to purchase
the property.

The lack of responsibility of Melanie
Blasko and LGRC does not free them of the
obligations to adhere to the government restrictions
of use of properties. There was absolutely nothing
limiting Melanie from educating herself regarding
the use of the property.

How does the zoning regulation protect the
public health, safety, and morals? Well, the newest
police reports, as mentioned by Sonja here,
associated with LGRC clearly show the property
attracts a negative element. This house, if it's
allowed to operate with its revolving door of
tenants, changes the dynamics of the neighborhood,
removing the benefits.

There are over 100 reports directly
associated with all of Lake-Geauga Recovery Center
properties, included but not limited to suspicious

activities, suspicious persons, suspicious vehicles,
trespassing, warrant arrests, fights, illegal
burning, assaults, alarms, physical threats,
criminal damaging or endangering, disturbance, high
on heroin, suicidal attempts and threats,
harassment, mentally ill, possible overdoses, high
and intoxicated persons, missing persons, illegal
fires, property theft, citizens arrest, weaned
detox, opium withdrawal, heroin overdose, and lastly
shots fired.

One report I think it's worth to re-mention
that Sonja did mention that's very close to us here
is regarding the Chardon recovery house at 114 Water
Street. They're running into things like someone
will stay for the night and they're saying they cut
brake lines. This report was from the same type of
Level II recovery home LGRC has tried to establish
here.

At the Oak Street house there were reports
of shots fired. Twelve .9 millimeter shell casings
were located nearby the home. Also, there was a
report recently received in Chardon for an illegal
fire and living in the woods.

Now, we could discuss episodes of drug
relapses, overdoses, but the point here is a few of

the reports that I have just mentioned have no
relevance to actual drugs because the houses do not
have an association with drugs and the frequent
relapses associated with it. Also, there's non-drug
related violence. These reports show a documented
pattern of criminal behavior which affect not just
the residents of the recovery houses but represent a
very probable, physical, psychological, and possibly
even economic hazard.

After reviewing the reports, I have now
felt the need to invest in security surveillance
equipment. This was an expense I felt wholly
necessary because of LGRC's history.

Will the adjoining properties be harmed?
More than likely. Within days of the house manager
and others occupying the house there has already
been trouble. The lackadaisical attitude of the
house manager and her inability to perform the
simplest actions places my family and adjoining
homes in a position to be burdened. In a documented
conversation on February 11 of this year, the house
manager stated several days prior she said she
observed a suspicious vehicle trespassing on her
property and made no attempt to investigate or
document the incident to the sheriff's department.

I know this because I asked about the incident
reports.

Now, LGRC as an organization has documented
constant suspicious persons and the house manager
has responsibility for policing and makes no attempt
to perform any due diligence to report this incident
for their own safety. I believe this places a level
of documented unnecessary burden and my — it's
instrumental to get involved.

This now raises another concern. Did
Melanie know of the zoning restrictions? I believe
she did. The record shows in the Maple Leaf dated
May 29, 2014, Melanie states, quote, zoning is also
a stumbling block but the advantages of having a
local place for recovering addicts to go are
worthwhile, end quote. And reference the Geauga
County Maple Leaf dated August 20th, 2015, quote,
Chardon planning and zoning administrator Steve
Yaney said in early June, Melanie Blasko, executive
director of Lake-Geauga Recovery Centers told him
the organization was buying the house and explained
it will be used to provide housing for up to five
men who have completed their three- to nine-month
treatment and need a place to live among other
recovering addicts determined to stay sober, end

quote.

After talking with then city solicitor Jim Gillette, Yaney said the sober house met all the zoning regulations as a permitted use and required no variances, public hearings, or notifications. In addition, Patricia Kidd, executive director of Fair Housing Resource Center, said these words, Kidd said, quote, Kidd credited LGRC Executive Director Melanie Blasko for her grant-writing efforts, finding the right location for a sober house and going through all the right channels to make the project happen, end quote.

So after a few-minute Google search about the history of LGRC's operation, be aware Melanie admits zoning is a major obstacle, our top legal argument. Both Melanie and her now attorney Jim Gillette know how to but there were very few people communicated with, in the local government. From the history of the first recovery house in Chardon, how does Jim Gillette, legal counsel, not know about that location.

MR. PILAWA: From what I can tell, you've given us your view on all of the factors that we have to consider, A through H. I don't mean to cut you off, but it seems like we're getting a

little off task here.

MR. TURKISH: Okay. Let me just finish up by saying Patricia Kidd, you know, I wish she were here, but you're all — with these locations for these houses, there are right and wrong channels to go through to establish them in the community, and Melanie knows what they are.

Melanie has over 40 years of experience. A letter from Jim Gillette to Munson Township dated February 20th details why this is not making me very excited to view LGRC as new neighbors. Drugs are not new for the Chardon sober house. In the Geauga Maple Leaf, they stated having a sober house is in Chardon's favor.

MR. PILAWA: You know, I think we get the point. I really do.

MR. TURKISH: Okay. Lastly —

MR. PILAWA: I mean, why should I cut you off? Tell us what you wrote you have to say.

MR. TURKISH: Well, lastly, and the most important thing that I would like to say is —

MR. PILAWA: You should have said that first.

MR. TURKISH: With all due respect to the BZA, if the community doesn't support this, we

would ask you decide, given the location, what's in our best interests. This is not the right environment.

I agree and support any and all notification requests for this property made by my neighbors and for the residents who also oppose the house operating at this location. Thank you to the BZA for hearing my concerns this evening. Please take my statement under consideration for your decision in this matter.

MR. PILAWA: Thank you. All right, folks. I think we've pretty much discussed this back and forth as far as we can. We're going to have to — I apologize, but we're going to have to take about a ten-minute break.

Unless there is anything else you wanted to say? Probably not.

MR. GILLETTE: I just want to make some comments for the record.

MR. PILAWA: Then we will take our break as the Board.

MR. GILLETTE: One of the exhibits I submitted was Appellate's Exhibit Number 5. It's an email between Melanie Blasko and James Herringshaw, and the first email is from Melanie to

Mr. Herringshaw. And she said she investigated the issue of the residential facility and determined that that section, that's a permitted use under the resolution, did not apply because it's only for persons with developmental disabilities.

And then she also commented that this was a situation where the issue is whether or not it can be occupied by a protected class. And Mr. Herringshaw's response was: As far as our legal counsel is aware, whether or not an individual is recovering — an individual is in recovery as part of a protected class does not exempt one from zoning requirements. However, she said she would be interested in seeing that legal interpretation and forward it on to her.

The issue in this case has always been whether or not the five unrelated woman in recovery are a protected class. It's been the issue since November 8th, it was the issue on December 23rd when she went in to file an application for zoning certificate. That application for zoning certificate was immediately denied, and at that point there was a notice of appeal and request for variance filed.

The BZA's jurisdiction is set forth in

Section 1103.3 of your zoning resolution. Your jurisdiction applies to two areas: Hear and decide appeals where it is alleged there is an error in any order, requirement, decision, or determination made by the zoning inspector, and to grant a variance when sufficient evidence to warrant same unnecessary hardship will result.

Again, I'm asserting the position that not only is this a request for a variance, but it was a proper notice of appeal timely made on December 23rd, 2019, the same day as the zoning certificate was denied. On that basis, there is no reason whatsoever that the recovery house should not be permitted.

A licensed residential facility is a permitted use. It allows five developmentally disable individuals who are part of a protected class to live in one residence. The recovery house is no different.

Finally, I would note that — direct your attention to pages 12 and 13 of the memorandum that I provided that provides guidance regarding public opinion and community sentiment as evidenced at the board of Zoning Appeals here. Thank you.

MR. PILAWA: All right. We'll see you

about in about ten minutes or so.

(A recess was held.)

MR. PILAWA: All right. We can go back on the record.

With respect to Case 20-02, before I ask for a motion, it is a consensus, the unanimous belief of the Board, that the case does not involve an appeal of a decision of the zoning inspector in his original decision, as among other reasons, it was not timely filed.

Is there a motion with respect to Case 20-02?

MS. PITCOCK: Yes. I'll make a motion with respect to 20-02 to deny the variance request.

MR. PILAWA: Is there a second?

MR. O'NEILL: I second.

MR. PILAWA: How about discussion? I don't mind leading off, if that's all right with the Board.

MS. PITCOCK: Go ahead.

MR. PILAWA: I'm struck by the absolute lack of evidence that has been presented on behalf of the applicant here. The obligation on the part of the applicant is to bring us evidence of the factors that we need to consider.

A use variance isn't a minor thing. Because this type of relief is so significant, the use variance requires the existence of an unnecessary hardship and that unnecessary hardship is filed through the consideration of certain factors that have to be weighed in determining whether the property owner seeking the use variance — well, here (handing).

It includes all of the factors that we have been talking about tonight. For example, we've been given no evidence that the hardship is unique to this property, that the hardship — in fact, it seems to me that -- or it seems to the Board, it certainly seems to me, that there is no hardship associated with this property at all because it fits perfectly as a single-family residence within the district that's zoned for single-family residences, that the hardship was created by the numbers to make it something it wasn't.

Does the zoning regulation deprive the owner of a substantial property right? Well, we've seen no evidence of what that substantial property right may be or that it has been denied. In fact, that property can be used as it has been historically used, until now, which is precisely the

right that we believe is not being deprived to the current property owner.

May the property be reasonably used in an economically viable manner without a variance? Well, that was conceded. Not only was there no evidence presented that the property could not reasonably be used in an economically viable manner, but in fact it was conceded. We were told -- and frankly, it would have been silly to fight this. You know, we've been told that it's no different than any other single-family residence in an R-1 residential district. It is that.

And then how does the proposed use compare to adjacent and nearby uses? And it took a little time for us to get there, but we finally got there that 12700 is going to be used for weekly renters. There has been no evidence to suggest that this area has any other weekly renter situations or anything other than single-family residences. We were just not given that evidence.

Is the hardship self-induced? Yes, absolutely. I think the overwhelming evidence is that due diligence wasn't done. There were multiple opportunities to determine where this property was located. And because that wasn't done, then a

hardship is created; yet that hardship wasn't created by the zoning ordinance, any decision of the zoning inspector, anybody other than the group that ultimately purchased this for doing lack of due diligence, and I think that evidence is overwhelming.

Under the zoning regulation protecting public health, safety, and morals, you know, we had evidence presented by the fire chief and we had evidence presented by residents who have lived there for a long time suggesting that although the zoning regulation, as it currently is constituted, is designed to protect public health, safety, and morals. Actually, the granting of the variance, the use variance, might weaken that protection that's already in the zoning ordinance. And that evidence I thought was substantial coming from the fire chief, and frankly from all of the residents who have been there for a long time.

The next factor is will adjoining properties be harmed? And we, I, didn't receive evidence of sufficient quality from the applicant to suggest that there would be no harm, and that evidence could have come to us in any number of fashions. And I don't mean to second guess how

anybody wants to present their case. But why didn't we hear from the realtor? You know, the realtor was there. That realtor had a vested interested in this, to establish that, in fact, the house they sold wasn't going to have any affect on the property values, or have a single person come in and say — a single person other than the applicant and those associated with her or it, the group, come in and say that no, no, no, no, you have this wrong, actually it's going to stay the same or actually it's going to go up or actually I brought you the tax logs, you know, they've gone up on Waterfowl Lane. But we've had an absence of that evidence.

And then, finally, did the property owner purchase the property with knowledge of the zoning restriction? And I understand that the claim is that there was no knowledge of the zoning restriction, but as a Board I think we don't find that credible. LG Recovery, that's a sophisticated organization that deals in hundreds of thousands of dollars of grants, sophisticated enough to put together grant applications to get the kind of money to buy an almost $300,000 house and yet they didn't have anybody who could look — that's almost the first question you ask anymore when you're on the

commercial side of things, is that the zoning — when you contact the government authorities, "Does zoning permit me to do what I want to do before I'm going to give out that outlet?" But even so, the testimony was that she did not know, she did not have knowledge of the zoning restriction. But that's only one of eight. And the use variance requires that we have evidence to satisfy all eight of those required elements, and we just didn't have it, and that evidence which we did have, indicated just the opposite, that is, there was no unique hardship. I just went through them. I'm not going to go through them again.

And I've probably spoken enough about the discussion part of it. Is there anybody else on the Board who wants to discuss before we call the roll?

MR. TOMARIC: Yes. I'd like to say that the house at 12700 Ravenna has been in the R-1 district for many years and it successfully fit into the surrounding neighborhood. And when the Lake County group purchased it, I think they decided that they were going to change everything in the neighborhood to suit their needs, and I think that is against the eight factors that we have to analyze in their request.

MR. PILAWA: Anyone else?

Well, there is a motion to deny the variance request and a second.

Paula, would you call the roll, please.

MS. FRIEBERTSHAUSER: Mr. Alexander?

MR. ALEXANDER: Yes.

MS. FRIEBERTSHAUSER: Mr. O'Neill?

MR. O'NEILL: Yes.

MS. FRIEBERTSHAUSER: Mr. Tomaric?

MR. TOMARIC: Yes.

MS. FRIEBERTSHAUSER: Mrs. Pitcock?

MS. PITCOCK: Yes.

MS. FRIEBERTSHAUSER: Mr. Pilawa?

MR. PILAWA: Yes.

Thanks, everybody, for coming. We are adjourned at 11:19.

(Meeting concluded at 11:19 p.m.)

```
                    C E R T I F I C A T E

        State of Ohio,        )
                              ) SS:
        County of Cuyahoga.   )

            I, Sarah Lane, a Notary Public in and for
        the state of Ohio, do hereby certify that these
        proceedings were by me reduced to stenotypy in the
        presence of said parties, afterwards transcribed by
        means of computer-aided transcription, and that the
        foregoing is a true and correct transcript so given
        as aforesaid.

            I do further certify that these proceedings
        were taken at the time and place as specified in
        the foregoing caption, and that I am not a
        relative, counsel, or attorney of either party,
        that I am not, nor is the court reporting firm with
        which I am affiliated, under a contract as defined
        in Civil Rule 28 (D), or otherwise interested in
        the outcome of this action.

            IN WITNESS WHEREOF, I have hereunto set my
        hand and affixed my seal of office at Cleveland,
        Ohio, this date of September 29, 2020.


        _____
        Sarah Lane, Notary Public
        My commission expires December 18, 2021.
```

---

**A**

A-D-A-M-S 67:11
A-T-T-Y 86:12
a.m 60:17,24
abide 115:17
124:12 130:20
140:22
abided 95:5
ability 36:3
40:19 41:25
149:5 164:3,4
able 4:19 15:6
40:2,14 72:1
72:18,19 89:3
107:9,19
125:10 133:7
148:13 155:17
aboodah 155:10
absence 46:6
186:13
absolute 159:23
182:22
absolutely 94:16
141:21 142:22
164:3,19
173:12 184:22
abuse 40:14 141:21
abuse 27:1
37:20 68:5
113:12
abuse 41:7
150:23
accept 3:11
10:20 39:24
92:1
acceptance
140:4
acces 49:2
126:4 137:4
153:10
accessibility
48:2 59:13
accessory
130:23
accidentally

accommodate
141:15 142:13
accommodation
19:9 21:19
21:23 29:12,15
30:10 31:6
33:23,24 73:15
73:19 76:16
149:18 150:7,9
150:12,13,19
150:20,22,25
151:1
accommodati...
23:17,19 26:1
26:4
accomodation
75:15 76:21
accompanying
23:19
accountability
38:6 173:5
absolute 159:23
37:6 121:8
accumulate
44:12
addict 24:21
accomodation
138:15
acquire 70:17
acquired 168:5
act 2:10 20:1
22:22,23 13
24:4 25:7
26:20 75:16
76:13,14,20
accord 171:17
action 24:14
189:14
acutely 107:8
addicts 76:24
173:5 107:5,16
active 25:5 40:6
40:15 42:1
82:16 118:22
157:19
actively 25:3

83:3
activities 23:1
24:9 25:10
38:5 41:22
163:8,10
139:5 174:1
activity 23:2
24:18 25:5,6
152:19 154:4
154:11 155:10
actual 24:15
86:19 138:12
172:24 175:2
ADA 24:23
adamantly
168:25
4:3,8,10,12
46:23 67:10,10
67:18,22 68:7
68:10,17,22,25
69:3,17,21
70:2,5,8,13,19
70:22,24 71:1
71:6,21 72:4
72:21 73:6,16
73:20,22
add 11:19
acknowledged
135:4
addiction 17:22
23:5 25:15
26:24 27:6
35:24 36:1
37:5 38:9
48:17,21 49:7
49:10 82:10
107:21 121:9
121:11
addictive 107:8
addicts 76:24
173:5 107:5,16
184:14
addicts 139:11
160:2 140:11
129:6 132:25
134:21 136:9
136:22,23
152:18,24

176:15,25
addition 48:9
86:24 97:20
127:3 139:25
141:16 149:19
177:6
additional 4:12
63:20 79:1
138:21 143:2
148:19 149:18
163:12,14,15
163:23
additions 56:11
address 3:1 9:2
16:25 35:14
43:8,10,12
46:23 67:10,10
67:12 81:19,21
85:9 86:10
92:23 93:1,2
94:10 100:25
102:21 103:6
115:11 125:9
136:8 143:5,7
145:1 148:4
addressed 20:7
175:17
addresses 50:24
59:14 145:5
addressing
22:18
adequate 39:9
adhere 58:23
104:22 173:15
adjacent 94:21
95:4 96:15
104:10 126:20
124:18,19,21
123:11 130:20
142:5 159:24
148:7 171:1
177:14 180:10

152:8 154:11
175:14,19
185:20
adjourned
188:16
administer
69:19 134:24
administration
132:11
administrative
27:7 44:18
48:3 50:9
58:21 59:5,14
administrator
176:18
administration
40:7
41:23 60:10
64:16 148:22
152:23
admit 135:15
admits 148:23
177:15
admitted 23:12
25:22,23 72:11
admitted/stated
125:15
adopted 58:2,16
adoption 18:9
18:15 149:14
adult 17:21
18:12,13,19
19:7 25:20
29:17 37:19
39:24 49:14,25
50:3,16 51:1
74:10 87:22
91:2,3,4
149:11
adults 26:13,14
28:3,7 44:1,2
51:20 53:2
58:8 131:5,8
149:19
advance 64:20
advantages

---

176:14
advice 51:9
advised 21:12
50:10,22 51:4
52:19 153:13
advocate 75:10
Advocates 74:16
aerial 7:1
affect 46:12
103:10,23
108:2 175:6
186:5
affiant 159:13
159:16,23
160:3,13
161:17 162:15
163:7
affidavit 159:11
164:9
affiliated 189:13
affixed 189:15
afford 23:20
aforesaid 189:9
afoul 7:13
aftercare 36:12
afternoon 51:11
51:17
age 12:13 16:18
35:11 81:11
86:6 92:19
100:21 102:17
105:15 106:3
108:25 112:2
118:8 120:19
122:21 123:16
129:5 145:22
145:20 146:21
147:22 158:19
159:8 166:22
168:19 169:9
169:19 170:23
aged 162:22
agencies 38:20
68:12,12
132:17
agency 21:9
48:1461:14

68:3,8,19 69:18
70:6,21 71:6
71:12
agenda 10:14
agent 135:2
agents 130:2
ages 12:18 34:13
83:18 95:23
aggo 1:10 110:1
147:2 154:15
159:4 160:20
160:22
agree 3:14 21:16
56:3,9 58:23
63:12 105:22
105:23 106:22
agree 13:11
agreed 19:5
44:1 60:20,21
61:2,16 66:8
83:17,19 87:7
125:25 141:18
173:20
allowing 39:19
135:8 143:16
155:6 162:15
allows 18:2,18
29:14 44:11
159:6 162:16
161:16
alteration 151:5
alternative
20:1921:14,18
86:1 90:23
96:17 100:9
amazon 160:25
92:8 151:25

ambulatory
36:8
Americans 24:4
amount 4:25
7:17 27:11
48:18 71:24
161:19
ample 39:12
106:18 108:15
Amy 118:8,12
analogy 29:20
analysis 80:1
162:7
analyze 187:24
and/or 125:3,17
129:8 134:14
139:1 134:6,16
138:7
anecdotes 154:2
angry 82:19
animal 127:13
annual 48:8
138:9
annually 41:3
anonymity 85:5
85:8
answer 8:6 15:2
55:8 134:4
138:17 157:21
answered 53:3
168:11
answers 124:16
anticipated
39:15 49:5
anybody 3:22
7:20 10:10
11:15 16:2,3
31:18 53:24
64:19 65:9
66:1,5,13
86:1 90:23
96:17 100:9
152:20
Amazon 160:25
85:11 111:18
92:8 151:25

186:1,24
187:15
anymore 82:8
186:25
anyway 106:21
apart 19:19
116:4
apologize
179:14
appalling
171:11
apparently 3:8:42
appeal 3:24 4:2
4:3,10 5:21
129:8 134:14
18:25 21:5,8
21:10,1331:12
28:3 169:1
apparent 31:4
appeals 1:7 2:10
3:6 19:24
20:10 30:20
32:20,23 77:5
93:6 160:2
162:5,23
165:21 181:3
181:16 24:23
187:2
Appeals' 2:3
appearance
127:1
Appellate's
179:23
applaud 118:21
applicable 26:2
37:7 89:16
applicant 3:15

approximate
98:5
approximately
38:8 101:11
159:18 161:9
161:12
arbitrary 27:10
architect 87:19
area 39:10 52:4
52:7 54:24
65:21 66:5
72:10 73:17
93:18 95:3,12
95:13,14 98:21
124:1,4 126:2
126:3,20,24
127:1,2 128:24
28:18 29:12
30:4 149:16
150:5,8 177:16
arcos 66:6
arrange 68:3
arrangement
44:15 46:17
10:14 42:17
96:15 163:18
approved 4:8
11:17 37:2,25
40:5 42:3 48:1
59:9
approving
162:24

asked 6:24 8:22
14:1,22 52:21
65:12 75:15
77:1 78:22
84:8 109:16
131:20 157:20
164:20 176:1
asking 10:9
14:13 29:22
31:2 62:5
63:22,25 76:4
87:2 101:17
114:17 117:12
123:11 130:20
149:24 156:2,4
157:19
asks 117:14
assaults 174:3
asserting 181:8
assessment 36:8
asset 134:2,5
144:23 148:8
163:13,25
184:17
areas 26:8 58:25
60:3,5,22
174:18,24
173:18,24
154:9 143:15
attorney 16:14
17:13 74:21
119:20,20
115:18 189:6,9
attracts 173:19
Auburn 1:8
audience 8:23
47:18
auditor's 90:4
129:13
Audrey 142:5
August 4:9
133:19 133:2
54:4
attention 181:21
attitude 104:24
175:17
attorney 16:14

attendance 2:6
42:2,5
attended 52:12
attending 17:15
54:4
attention 181:21
attitude 104:24
175:17
attorney 16:14
17:13 74:21
119:20,20
115:18 189:6,9
attracts 173:19
Auburn 1:8
audience 8:23
47:18
auditor's 90:4
129:13
Audrey 142:5
August 4:9
authorities
140:9 187:2
authority 2:12
76:9 196:2
19:20,22,25,25
21:18929:2
133:7 123:13
143:20 165:6
authorized
57:17
auto 40:23
automatically
77:24
available 25:20
26:22 38:23
49:3 133:2
attack 135:2
17:24 35:16
74:22
avenues 120:5
121:10
average 33:5

---

3:20 5:1 9:15
16:6 29:7 32:8
182:23,24
185:22 186:7
application 2:18
20:22 21:4,5
22:2 28:19
30:9 40:8
48:24 49:12
52:15,16,18,21
52:24 53:3
80:1 118:1
120:18 148:23
180:20,21
applications
186:22
applied 56:19
150:21
applies 23:22
24:18 63:18
87:6 88:17
181:2
apply 2:13 46:25
87:1,8 88:23
90:2 146:1
183:18 143:16
appraisal 99:19
appraised 99:23
appraiser 99:24
appreciate
28:22 46:20,22
169:17
apprehensive
125:17
appropriate
87:21 104:2
appropriately
87:17 92:16
approval 4:4
10:14 42:17
96:15 163:18
approved 4:8
11:17 37:2,25
40:5 42:3 48:1
59:9
approving
162:24

attendance 2:6
42:2,5
attended 52:12
attending 17:15
54:4
attention 181:21
attitude 104:24
175:17
attorney 16:14
17:13 74:21
119:20,20
115:18 189:6,9
attracts 173:19
Auburn 1:8
audience 8:23
47:18
auditor's 90:4
129:13
Audrey 142:5
August 4:9
133:19 133:2
54:4
Aurburntown...
128:6
authorities
140:9 187:2
authority 2:12
76:9 196:2
19:20,22,25,25
21:18929:2
133:7 123:13
143:20 165:6
authorized
57:17
auto 40:23
automatically
77:24
available 25:20
26:22 38:23
49:3 133:2
attack 135:2
17:24 35:16
74:22
avenues 120:5
121:10
average 33:5

85:13 83:18
113:8 161:16
avoid 137:8
avoided 141:4
Award 41:4
awarded 70:25
aware 8:16,17
46:20 86:21
112:15 114:17
114:19:22
115:18,20
118:19 123:13
140:7 171:1
177:14 180:10

**B**

B 18:16 101:1
103:11 124:6
B-L-A-S-K-O
35:16
B-U-S-H-I-K
162:2
back 8:4 15:10
15:12 17:7
27:15 30:7
75:24 84:5
92:13 94:5,6
99:7 106:2
109:20 111:5
111:10 114:3
121:3 128:10
146:6,19
163:9 179:13
182:4
background
41:2,3,8
backgrounds
152:17
bad 64:5 120:4
120:12
balance 97:11
banging 134:15
bank 99:23
bam 143:2
barred 4:17
bars 83:25
base 160:3

based 26:7 71:13 72:22 80:1 86:20 87:4,5 90:8 95:1 130:15 160:4 163:24
basic 91:25 150:16
basically 75:12 75:21 87:13 119:16
basis 48:20 56:19 57:14 73:19 181:12
Bass 105:20
bat 167:20
baths 39:10
battles 119:13
beach 56:13
Bean 169:23
bear 90:5
beat 85:18 134:14
beautiful 141:10
beauty 110:4
becoming 119:10
bedrooms 26:8 39:9
began 2:1 12:21 17:18
beginning 65:4 65:20 139:21 166:25
begins 4:9
behalf 182:23
behavior 175:6
belief 146:14 160:5 182:7
believable 126:8
believe 22:10 33:22 55:13,23 73:20 83:6 85:23 87:11 91:6,12 161:17 162:3,15 163:7 176:7,11 184:1
benefit 48:17 53:14
benefits 80:4 141:8 173:22
benefitted 38:23
best 5:13 41:18 139:9,12 179:2
better 19:19 56:7 69:6 80:16,19 105:21 149:3
beverages 25:17
beware 103:5
beyond 73:17 142:24
bid 71:12,14,15
big 77:4
big-box 126:5
bigots 101:14
bikes 155:7
Bill 169:9,10
billed 90:10,13 90:13,15 92:13
billing 90:9
bills 117:3
binding 56:20
bit 4:14 10:8 114:6 144:21 120:16
Blasko 12:3 13:13 16:9 174:4,16 21:12 35:9,11,15,15 42:12,13,18,21 42:24 43:8,12 43:17,20 44:8 44:10,22,24 45:2,4,12,15 45:20 46:8,15 47:3,8,11,13 47:15 53:16,20 52:3 54:1 55:19 57:24 58:3,8,14 58:15,17,18,23 64:22 65:2,7 65:16 73:24 74:3,7,11 94:3 94:14 111:12 112:19,24 113:2,4,15 114:14,18,21 114:24 115:4 115:11,17,21 116:7,17,21 117:4,11,16,25 121:6 125:1,3 125:14,24 126:11 128:25 130:6 133:21 137:21 138:8 138:12,15,17 138:20 139:8 139:12 156:3,4 156:5,12,19,25 157:5,11,15,18 158:2,5,11 171:14 172:18 173:10 176:19 177:9 179:24
Blasko's 68:18 133:15,19 134:1
block 138:4 176:14
blocks 138:5
blood 18:9,15 28:6 38:19
blue 105:8
board 1:7,14 2:2 2:9,10 3:6 8:16 16:2 17:7,17 19:24 20:6,10 21:2,17,24 22:8 27:5 29:7 32:23 33:20 37:13,14 38:10 38:11 48:13,22 52:10 53:25 54:13 56:2 62:17 63:3 65:10 66:14 67:19 71:13 72:6,24 77:11 80:2 85:20 90:24 93:6 96:8 122:9 132:11 135:11 160:1 162:5,23 163:2 163:20 179:21 181:24 182:1,19 183:13 186:18 187:16
Board's 20:7 67:12
boarding 89:14 96:6
boards 2:21 82:16
boasted 140:13
Bob 106:3,7,7 106:13 109:9 111:1
Bobbie 146:21 146:23
body 20:19 163:22
book 3:2 76:17
boss 141:6 150:20
bootstrap 29:24
bottom 82:12 85:13,15 122:24
bought 44:23 45:11 108:10 117:21 118:18 121:11 128:3 121:18 137:10 167:15
Bradford 101:2
brake 174:16
bravo 101:1
break 105:10,25 179:15,21
brett 9:8 169:7
briefly 2:9
bring 73:9 133:20 182:24
bringing 131:23
brings 152:25
broad 34:24
brochure 129:1
brought 62:12 89:1 144:10,21 171:14 186:11
budget 38:8 112:15
build 130:23
building 87:5,12 87:15,18,20 88:8,13,24 91:9 93:5 95:10,13 121:17,18,20 130:23 132:4
burden 5:2 90:6 90:16 150:15 151:12 176:8
burdened 175:20
burgess 151:3,8 163:22
bus 127:17 152:14 162:22
buses 160:22
Bushik 100:11 100:13,16,21 101:1,6,18,25 102:3,6,10
business 35:14 41:6 75:6 86:9,19 87:17,19 88:11 91:2 94:25 95:9,16,18,25 96:2,3,3,13 103:8 104:3 121:8,24 122:15 124:4,5 124:20 126:3,8 127:3 128:23 129:12 130:15 132:22,25

133:6 135:8 136:22 137:16 138:22 140:5 14:20 147:5,6 165:1 169:1 172:10
businesses 124:22 130:17
busy 93:23 97:16 141:19
butts 75:5
buy 146:12 167:11 186:23
Buy 23:15 103:5 104:21 104:23
buyer's 104:24
buyers 128:14 128:16
buying 80:8 118:17 122:8 137:2 139:14 176:21
buys 80:18
Bye-bye 102:4
byproducts 127:7
BZA 7:24,25 28:19 75:14 86:16 91:24 121:3 123:9 131:19 140:2 142:15,18 171:19 172:16 178:25 179:8
BZA's 180:25

C
C 103:16 124:13 189:1,1
C-A-M-P-A-N... 112:10
call 10:25 66:18 115:19 116:20 134:17 187:16 188:4
called 14:25 38:3 50:14 54:1 82:23 83:21 134:9 153:14
caller 53:13
calls 12:24
Camden 118:17
camera 64:22 66:2 144:11,15
cameras 65:25
Company 111:21,25 112:2,6,6,10 112:12,20 113:1,3,11,17 113:22 114:6 114:10,16,20 114:23 115:1,9 115:15,20 159:8,10,11 164:5,10,14,18 164:22,25 165:7,13,15,18 165:23 166:4,7 166:9,13
cancer 42:5
capacity 93:3 143:1
caption 189:11
car 66:7 84:3 121:1 134:10 134:11 160:15 160:24 161:14
care 16:7 37:12 40:3 42:8 59:3 68:24 69:4,9 69:12,13,15,20 69:24 71:8,9 117:3 134:20 146:10
85:5 108:25 109:4
carries 160:19
carrying 151:12
cars 65:3,7,18 71:9,18,20 85:1,10 98:3 144:22 155:3,4 162:17
Carson 17:17
case 10:14 12:2 12:3 29:8,9 32:5 34:17,22 42:2 57:19 62:25 63:1 72:14 78:2,3 81:14 118:2 131:10 180:16 182:5,7,11 186:1
cases 73:10
casings 174:20
catch 42:17
caught 139:22
cause 150:14
causing 134:14
cell 84:3
center 13:1 41:1 70:17 71:3 87:1,3 88:23
cancer 42:5
capacity 93:3 143:1
caption 189:11
car 66:7 84:3
121:1 134:10
certain 2:13 7:17 26:23 27:7 46:23,24 62:3 71:7,7 94:25 138:16 148:8 183:5
certificate 37:4
certificates 87:22
certification 37:4 47:21
certified 27:3 44:21 47:19 116:8
certify 189:7,10
cetera 13:7 143:2 150:2
chair 17:17 153:6
Chairman 1:15 117:19 118:12
challenge 18:22
58:24 59:2 66:24 68:16 70:12 74:6,9 82:25 92:19,25 91:14 93:12 104:4 131:12 138:19 139:1 139:6 140:16 154:7 159:25 168:5 171:23 176:20
Centers' 47:25 48:10 60:15
59:23
century 93:13 141:10
CEO 17:16 37:17
18:24 19:13,14 19:17 21:24 22:1 62:23
challenges 20:22 80:8
chance 106:11 108:2 126:22 144:7
change 75:17 50:12 79:9,12 79:24 87:2 88:25 111:16 117:9 139:7 120:14 149:24 153:20 154:22 187:22
changed 141:10 168:3
changes 39:14 50:7 75:23 87:20 173:21
changing 13:5,8
channels 177:11 178:5
chapter 24:15
characteristic 39:1
characteristics 148:10
Chardon 12:4 13:20 17:2 36:6 43:5,5,8 43:11,13,21 51:7,16 67:13 81:22 90:1,3 94:7,8,11 109:19 118:2 118:18 126:12,13,14 130:1,3 138:23 141:10 149:14 147:13 148:24 152:11 158:1 162:21 174:13 174:22 176:18 177:19 178:12
Chardon's

13:22 178:14
chart 57:8
chatted 94:4
check 14:1,2 41:4,8 72:16 125:4 153:23
checked 106:2 130:4 138:5
checking 126:1 126:10 128:23
checklist 73:1 136:18
checks 41:2
chemically 40:21
Cheryl 133:15
chief 67:18 86:3 86:4,13 90:13 96:3 119:8
child 69:9
children 36:24 126:21 127:9 127:16,19 129:7,9,10 142:11 152:10
children's 152:14
choice 80:5
choices 108:1
chores 42:9
chose 122:11 137:9 157:13 139:1 140:6 153:1 170:8
chosen 121:2
Chris 166:18,22
church 129:8
churches 139:5
circumstances 3:4 70:9 142:25
cites 128:10
citing 131:1
citizen 143:11
citizens 167:8 174:8
city 36:20 43:5 43:21 51:7,8 51:15,16 130:1 136:24,24 137:1,19 139:8 147:8,11,12 170:10 177:2
Civil 189:13
claim 54:9 125:10,23 186:16
claimed 119:9
claims 104:25
clarify 54:12 111:20
class 14:3 15:18 15:19 17:23 19:3 21:20 22:14,20,20,23 23:6,9 28:6 29:14 30:11,16 43:24 51:5,6 51:13,21 73:9 73:22 77:3 78:24 79:6 87:5,7 180:8 180:12,18 181:18
classes 28:4 129:8
classification 87:11 88:2 90:15
classified 87:12
clause 149:9
claw 135:22
clean 37:21 40:1 60:9
cleanliness 124:25
clear 3:3,5 20:4 89:22 121:10 138:22
clearcut 122:16
clearly 171:17 173:4
189:15
client 59:13,24
clients 154:20
Clients' 48:5
clinical 69:6
clock 76:10
close 28:24 96:5 124:22 126:5,7 126:20 128:19 135:7 161:23 162:9,12
closed 128:19,20 131:25 147:1
closely 38:20
closer 39:9 83:24
code 13:4 18:6 26:23 27:4,19 27:21 42:11 44:20 50:19 57:7 59:9 69:16 87:6,12 88:13,17 89:1 89:14 91:25 121:12,18 130:4 149:10
codes 88:3 89:16 91:25 120:16 121:17,21 122:23,25 132:4,6 164:24
collect 90:19
collected 89:24
collectively 26:25
Collinwood 154:15
combative 154:5
combined 39:10 162:13
come 7:2 14:23 15:1,8 31:15 33:5 35:6,6 comes 3:24
83:6 110:4 114:15 113:5 185:24 186:6,8
comes 20:18 66:1 73:3 75:24 76:12 78:20 92:13 110:5 127:12
comfortable 17:10 155:6
coming 3:12 28:24 71:14 72:5 79:25 84:17 93:20,23 97:3 109:13 146:6 185:17 151:16,21 152:1 154:7
commend 107:17
comment 111:12 156:7
commented 128:15
comments 4:21 17:5 128:7
commercial 88:15 94:24 103:8 104:10 104:23 129:15 131:23
commercially 138:12
commission 37:6 189:20
communicated 138:10,11,14 162:13
complain 153:15
complaining 1:7
complete 15:3 40:7 52:18,20 completed 37:20 41:9 53:10
4:1,3,11 5:14 7:13,15,23 30:20 60:22 121:3
communicated 177:18
communication 89:15
communicates 75:13
community 38:2 39:4 40:11,11 60:2 89:5 106:8 108:9 119:11 137:22 140:5 148:6,12 151:16,21 152:21 154:7 167:23 169:15 170:1,6,9,15 170:15,18,22 172:13 178:6 180:23,24
community-h... 37:11 68:24 69:3,15,19,24 70:10 71:4,13,17 103:6 104:11 105:3 119:1 129:15 130:7 131:23
company 19:5 104:21 125:8 129:11 131:23
compare 94:21 124:18,19 143:17 154:8 184:13
compared 138:12
comparison 35:19
concept 99:2,4 148:14
concepts 40:19
concern 106:25 107:14 137:22 137:25 163:9 176:10
concerned 13:3 13:4 21,9:10 89:2,25 108:1 93:11,19 116:1
concerning 17:5 52:25
concerns 89:19 109:25 110:8 143:17 152:6 153:15 161:24
conclude 33:8
concluded 30:13 30:13 85:24 188:17
conclusive 24:3
Concord 36:21 36:22 94:4,9 94:11 133:15

176:23
completely 82:25 110:1
completes 41:11
completion 38:22
compliance 37:3 37:7 42:6 49:6 103:15 121:15
complied 70:1
comply 44:6 49:11 89:16 115:11 116:9 132:5
comprehensive 41:11
computer-aided 189:8
concentrated 152:25
concept 99:2,4 148:14
concepts 40:19
concern 106:25 107:14 137:22 137:25 163:9 176:10
concerned 13:3 13:4 21,9:10 89:2,25 108:1 93:11,19 116:1
conclusive 24:3
170:7
condition 42:19 121:14
conditional 76:5 77:6 79:2
conditions 41:23 49:8 56:15
conduct 59:25
conducts 129:8
confident 22:7 119:17
confidential 80:1
confidentiality 105:1 139:16
confirmed 13:23 13:25 94:7
conflict 152:21
confusion 41:11
congested 41:11
congestion 93:21 96:24 97:2,9,20 162:8,19
conjecture 152:1
connection 7:4 33:24 63:24
consensus 18:25
consequences 58:12
consider 3:9 21:16 27:16 30:8,10 31:6 45:7,25 54:11 56:25 57:21 63:7,23 100:19 134:5 177:24 182:25
considerate 59:25
consideration 163:13
considered 14:6 18:20 19:4,8
24:19 26:10,16 63:3 134:2
conspiracy 151:12 22:19 162:3
consistent 26:19
constant 176:4
Constantine 51:19
constituted 18:11 149:15 93:11 149:15
constitutes 96:3
construction 88:25
constrained 24:24
consumer 49:2
contact 13:7,11 60:7 122:7
contacted 13:13 14:16,17 117:18
continual 76:2
continuance 152:19 15:23
continue 47:4,10 67:4 7:11,11,11 167:17
continued 12:22 37:9
continuing 22:17
continuous 35:19
continuously 131:23
contract 48:11 68:11,15,20 71:7 119:22 189:13
contracted 88:5
88:10 89:23 123:11 154:9
contribute 97:19
contributing 151:12,16
contribution 172:13
control 38:21 110:6 167:18
controlled 23:5 23:8 25:16
controversy 149:10
conversation 94:3,6 175:21
conversations 99:25 154:24 154:25
convinced 21:23 21:25 61:9
convincing 13:4
cooking 18:10 18:14 149:12
cooperation 123:5
coordinate 143:5,6
coordinator 40:9
copies 123:9 153:4
copy 6:10 14:19 51:14 148:25 149:17 123:11 146:2
corporation 35:18 103:19 149:2 150:3 151:10,15
corporations 11:24
couple 14:16 34:13 59:21 96:20 113:22 126:6 159:4 165:10
113:17 114:25 141:1 156:11 163:16 158:20 157:4 165:17 189:9
correspondence 91:24 94:8
cost 38:21 48:8 80:5,7
costly 90:21
costs 80:6 90:6,7 90:10
counsel 14:2,3 16:23 51:12,22 53:15,21 129:25 132:6 177:20 180:10 189:12
counseling 36:10,11 40:12
counselor 120:2
counties 38:13 39:25 68:1
countless 160:18
Country 86:14
counts 163:21
county 35:21 37:17 38:9,10 48:13,14,15,22 66:19 67:1,15 67:25 68:6 69:20 70:18 75:9 87:2,20 109:20 132:12 133:10,11,13 138:16 151:10 176:17 187:21 189:4
court 35:24,24 45:2,20 70:1 74:7 91:16,17 99:16 108:16 165:10

course 13:21 82:15 83:3 121:2 130:11 164:3
court 1:22 2:20 3:25 4:1,3 5:14 7:13 11:25 30:13,20,20 112:9 157:4 158:4,9,18 189:12
cover 92:8
coverage 24:25
covered 48:20 48:22 119:2
covers 132:12 133:11
cows 181:8
cracks 89:17
crazy 110:2 135:1 167:20
create 107:6 160:7,10 161:20 162:24 162:25 163:15 163:19
created 162:9 163:4,13 183:18 185:1,2
creating 141:20
Creation 163:13
credible 186:19
credited 177:8
criminal 41:3 136:16 143:10 152:17,19 154:4,10 155:9 174:4 175:6
criteria 115:2 121:12 171:13
critical 38:18
cross-examina... 3:11
cross-examine 6:15
CROSSBEAM 1:24

crowd 2:25
crying 122:12
curfew 60:16,18 61:1
curious 127:8
current 23:4 25:16,17 41:15 41:18 56:20 59:18 89:20 123:3 104:7 121:19 184:2
currently 17:19 17:24 83:17 47:16,19 58:2 109:6 163:2 185:12
curtains 65:21 65:25
cut 72:16 174:15 177:25 178:18
Cuyahoga 189:4

———— D ————
D 103:22 124:17 139:24 189:13
daily 65:4
damaging 174:14
danger 40:2
Danielle 1:16 10:17
dark 65:23
data 138:16 162:7
date 34:14 86:18 189:16
dated 50:7 176:12,17 178:9
daughter 106:13 108:3,6 147:2
daughters 95:23 154:14,25 155:6 159:14
day 11:20,21,21 13:1 14:12 15:17 56:23

76:9 110:10,12 115:6 122:15 144:5 157:7 166:6,6 181:11
daycare 87:22 91:3,4
days 4:3,6,9 11:17 31:14,15 32:21 34:10 37:22 40:1 60:10 65:19 107:1,6,14,24 111:14,15,17 111:19 112:18 112:19,20,22 155:21 156:22 156:24 157:2,2 158:2,7,10,10 175:15,22
DDSA 163:6
deadline 15:5
deal 43:18 75:17
dealership 160:24
dealing 75:12 82:15
deals 186:20
December 14:24 14:25 15:6 34:23 35:1 529:13 125:13 133:24 180:19 181:10 189:20
decide 4:20 29:2 30:21,21,22 62:21 164:20 164:21 179:1 181:2
decided 52:2 187:21
decision 2:16,17 3:18,21,23,25 5:17,18 16:6 18:22 19:2,14 21:11 22:1 31:12,19 32:1

32:7,7,13,17 32:19,21 33:6 33:14,16,20 346:62 11,14 62:19,24 76:6 78:24 79:10 181:20 182:18 185:2
decisions 20:9
declining 95:21 98:21
decorating 50:3
decrease 128:13 128:14
deemed 18:16 149:15
deer 144:18
defiance 143:13
defiantly 171:17
defined 18:5,8 22:20 63:24 189:13
definition 14:7 15:20 18:18 24:6,23 76:22 131:2,4,17 148:18 149:9 149:25,25
deliberate 140:1
delivery 160:24 160:25
demanding 80:18
demonstrate 61:13
denial 93:11
denied 33:11 534 93:6,10 148:16,22 180:22 181:12 183:23
Dennis 1:15 detection 87:23

155:12 182:14 188:2
denying 117:25 118:2
department 13:2 37:4 41:6 48:16,21 49:7 49:9 86:13,18 87:9,21 88:2,5 88:8,9,17,24 89:9,19,23 90:7 166:2 175:25
dependent 40:21
depending 139:25
depends 90:9 115:8
deprive 55:7 93:25 103:11 124:7,8 140:23 171:21 183:20
deprived 55:11 55:14 171:23 184:1
depriving 55:2
describe 48:24 184:7 176:1
described 37:1 131:18 139:12 162:20
description 41:16 86:19 160:25
design 87:19
designated 32:25 33:1,2 127:4
designed 185:13
desire 170:14
desired 127:7
details 52:24 178:10
detection 87:23
determination 163:23,24
determination

19:23 20:24 21:17 46:4 181:4
determinations 24:1
determine 21:14 30:24 143:21 150:21 173:7 184:24
determined 19:2 43:23 49:10 87:23 176:25 180:2
determines 163:22
determining 26:16 173:1 174:18 175:24 174:9
detox 36:8 83:9
development 171:4
developmental 41:6 180:5
development... 181:16
development... 181:18
diagnosed 82:5
diagnoses 36:11
dictates 27:19
the 83:6
died 82:21
difference 94:11 132:2
different 13:21 43:4,14 44:1 54:13 56:23 57:2 59:2 76:2 79:18 106:22 109:21 146:12 167:20 172:9 181:19 184:10
differently 76:19 79:6 132:7
difficult 86:22

89:10 90:21 93:23 96:24
diligence 93:15 28:5
discriminated 165:7,12 172:18 176:6 184:23 185:5
diminished 142:4
direct 32:6 63:9 63:17 68:4 127:17 152:1 152:21 154:3 181:20
directed 48:14 89:18
direction 165:17
directive 140:2
directly 97:7 120:22 146:15 158:16 63:15 173:23
director 51:16 130:1 148:23 176:20 177:6,8
disabilities 34:4 41:7 180:5
disable 181:17
disabled 28:1 50:25 73:13 76:18 156:1 157:14
disagreeable 125:18
disagrees 5:17
disappointed 143:24
disapprove 167:18
disburse 72:22
discard 17:6
discharge 38:19
discrete 114:8
discretion 60:19

discriminated 30:15
distance 97:14 28:5
discriminating 132:19
discrimination 132:21 15:8 140:15 172:18 176:6 184:23 185:5
discuss 30:25 174:24 187:16
discussed 62:7 144:14 179:12
discussing 22:18 162:21 173:12
disease 82:6 83:10
disheartening 85:12
disorder 27:1 38:18 49:15 50:1 51:2,21
disorders 35:21 35:22 39:25 68:5
dispatched 153:19
disparate 92:1 61:16 80:22 107:17 117:23 120:7 123:6 183:4
disputing 145:10
disregarded 17:20 72:25 90:11 113:24 141:9 151:16 186:21
Don 133:25

3:22,23 11:16 11:22
distance 97:14 118:2
distributed 132:19
distribution 132:21
district 127:7,8 153:6 170:14 95:16 124:3,23 124:24 130:19 137:7,14,18 140:20,20 170:13 183:17 164:12,17
disturbance 164:1 174:4
disturbing 66:9
ditches 127:17
divided 94:23
Division 163:21
document 175:25
documentary 6:25
documented 175:5,20 176:3 176:8
documents 7:3 7:11
dog 127:12
dogs 127:12
doing 29:4 32:1 61:16 80:22 107:17 117:23 120:7 123:6 183:4
dollar 149:2
dollars 72:23,24 72:25 90:11 113:24 141:9 151:16 186:21
Don 133:25

donations 38:14 48:10
door 84:18 128:11,21,22 134:8,16 146:25 172:9 173:20
dope 84:17
double 87:25
Doug 122:19,21
downhill 165:19 168:14,14
downloaded 132:10
downstairs 65:22 84:24
downstream 163:16
downtown 170:8
dramatically 154:22
drank 83:25
drastically 93:20
draw 29:20
dreamed 95:23
drink 83:25
drinker 83:24
drinking 82:4 83:4 84:1
drive 66:6 133:13 134:9 134:10
Driven 162:7
driver's 40:23
drives 160:24
driveway 39:11 64:24 66:1 85:10 97:15 108:6 120:25 120:24 143:8 146:9,15 148:22 152:9 161:10 161:15,10,23

driving 79:13 93:18 115:16 115:18 155:4
drop-off 152:10
drove 66:4
drug 17:22 24:20 25:15 26:24 35:24 36:9 37:22 38:9,25 41:1 42:5 61:14 67:23 76:24 77:2 106:21 115:2,2 120:2 127:5,7 128:21 129:4,4 132:16 134:20 136:20 152:17,24 154:6 174:24
drug/alcohol 36:14
drugs 41:24 58:13 60:11,12 132:23 175:2,3 178:11
drunk 153:17
drunkenness 154:6
dual 36:10
due 93:15 128:11 136:25 140:15 153:23 163:1 167:5,11 172:18 176:6 178:24 184:23 185:4
DUI 114:12
DUIs 113:16
duly 16:18 35:11 67:7 74:24 81:11 86:6 92:19 100:21 102:17 105:15 106:4 108:25 112:2 118:8 120:19 122:21 123:16 136:1

145:20 146:21 147:22 158:19 159:8 166:22 168:19 169:9 169:18 170:23
duration 27:10
duties 67:20
dwelling 13:9 17:25 18:4,4 18:20 23:15,21 26:9,14 54:14 54:17
dwellings 88:18
dynamics 104:16 173:21

———— E ————
E 103:25 124:25 153:16 189:1,1
E-T-H-E-R-O... 92:25
ear 8:14
earlier 60:4 101:21 116:3 143:20 144:10 145:11 149:10 145:11
early 13:12 129:11 176:19
easier 130:9
easy 9:12,12 169:23
economic 79:8 79:23 175:9
economical 45:10
economically 45:8,22 46:3,6 63:15 94:17 109:17 124:14 149:6 172:1 184:4,7
educating 173:13
education 36:2,9
educational 68:2
Edward 100:21

101:2
effect 33:13,15
effectiveness 41:19
effects 132:14
efficiency 41:20 138:19
efforts 71:19,20 177:9
egress 137:15 148:3 161:10
eight 62:3 64:2 114:4 136:12 146:5 187:7,8 187:24
Eighty-Forty-... 83:21
either 3:15 13:10 14:8 72:14 99:23 117:7 129:4 138:13 157:23 157:23 165:2 189:12
elaborate 144:24
element 141:22 173:19
elements 9:9 69:25 114:4 136:17 187:9
elements 129:9
email 13:24 14:1251:3 179:24,25
emails 3:12 50:22
emergency 156:22 162:1 161:1
emotional 44:13
employed 38:2 38:6

employee 51:3 59:24 131:5,6 131:7,9,11 150:1,3
employees 18:12 18:12,17 40:25 149:16
employment 41:2,24 139:2
EMS 88:10 90:9 116:14,19 132:10,17 125:12 116:6
enabling 44:13 132:23
enacted 37:12 encompassed 22:2
endangering 6:23 7:2,6
ends 79:4
enforce 75:10 89:3
enforced 24:5 172:21
enforcement 75:7 88:7,12 121:13
enforcing 80:16 enjoy 23:21 148:13 150:24
ensure 41:19 44:19 95:16
enter 6:2
entered 6:9 entering 126:12 161:2,14,20
entertainment 126:4
entire 113:8 132:12
entitled 19:9 22:12 100:4 138:7 149:17 150:6,9
entitlement 9:25

entrance 93:22 96:12 59:24 131:10 131:7,14,15 131:11 71:21,25 74:7 136:14,19 132:10,17 142:1 179:3
episodes 174:24
equal 23:20 150:23 171:24
equipment 135:12
erected 96:14,16 143:3
either 19:17 181:3
errors 139:22
especially 146:3
essence 5:4
essential 69:25
essentially 3:7,9 42:5
establish 9:24 95:24 44:14 174:17 178:6 186:4
established 42:4 47:25 59:9 95:2 120:14,15 126:9 150:17
establishes 24:13
establishing 67:1
establishment 151:18
estate 113:25 125:3 128:4 130:17 152:5
etc 131:7 143:2 150:2
evaluation 148:22
evasive 138:13
evening 17:18 179:8
everybody 2:3

4:19,25 7:15 16:14 6:21 79:18 80:22 147:15 156:13 167:4,6,14 168:21 188:15
everybody's 168:14
everything's 75:23
evict 155:14
eviction 58:16 115:13,14 155:20 156:2 157:4,6,25 158:4,8,11,24 159:8 166:22
evidence 2:12 3:8,9,10 4:12 6:25 7:2,6 33:12,13,4,15 46:5,25 54:7 54:19 55:1,9 66:17 114:5 132:20 135:16 152:2,3 154:3 154:7,9 181:6 182:23,24 183:11,22 184:6,17,20,22 185:5,9,10,16 185:22,24 186:13 187:8 187:10
evidenced 181:23
exacerbate 44:14
exact 14:14 162:21
exactly 67:2 97:9 101:22
example 8:8 29:23 31:8 69:8 87:16 166:7 183:10

exceeding 18:13 16:14
exceed 175:12
exception 76:15 77:15
exchanged 50:21
excited 178:11
exclusive 18:11 18:17 149:15 150:1
excuse 61:5 69:23 78:13 105:1 113:20 122:14 125:11 139:20
executive 67:18 176:19 177:6,8 79:13,14 177:17 181:9 51:13 180:12
exemption 90:2 90:4
exercise 127:1
Exhibit 57:9 64:21,22,25 65:2,6 179:23
exhibits 57:21 64:16 179:22
existence 183:3
existing 12:5
exists 33:17 44:5 56:8 77:25
exit 87:24 97:6
exiting 161:10
expansion 93:9
expansive 57:18
expect 142:15
expectation 57:20 148:8,13 130:17 152:5
expected 104:21 28:17 29:13,15 29:23,25 31:8 36:22,23 39:13 48:24 50:20,23
expectations 57:17,21 92:5
expenditures

74:4
expense 175:12
expenses 46:10 48:12 49:5
experience 21:3 40:21 44:5 130:16 178:8
experienced 61:14 170:2
expires 189:20
explain 2:8 52:22 55:12 69:1
explained 57:1 176:21
expose 143:17 54:10,16 56:25 79:13,14 177:17 181:9
extreme 152:15
eyes 135:1

———— F ————
F 92:25 104:6 126:15 139:24 146:24
F-R-E-E-M-A-... 146:24
fair 3:15 23:13 25:7 74:15,22 75:3,16 76:13 76:14,19 114:2 177:6
faith 167:8
faith-based 183:15
faiths 36:17
fall 112:16,22
falling 84:7
falls 88:7
familiar 68:23 70:10,13 109:21
familiarity 61:17
families 35:20 95:22 93:18 126:21 127:11

135:7 1:80:2 181:15
facing 144:11 145:8
fact 8:17 20:24 23:25 34:10 46:20 70:14 85:9 111:13 114:3 125:22 183:12,23 184:18 186:4 54:10,16 56:25 149:9,15,25 184:4,7
facts 2:12,14,14 17:6
fact-finder 3:1
fact-finding 19:4,8,23,24 183:11
fair 3:15 23:13 25:7 74:15,22 75:3,16 76:13 76:14,19 114:2 177:6
FAX 1:25
FBI 41:9
fearful 4:14
February 47:23 82:2,13 151:21 178:10
federal 17:23 19:10 22:21,22 24:22 26:3,19 31:5 37:7 76:13 95:7 116:1 143:14 150:10 151:10 167:7
FedEx 160:24

feedback 133:5
feel 62:10 76:12
  84:12 106:15
  108:13,16
  109:14 125:24
  131:24 160:5
feeling 127:1
feels 27:11
feet 39:8 141:18
  142:23,24
  152:1 161:6,9
  161:12
fell 172:7
fellow 123:15
felt 175:11,12
female 153:18
  153:20
fencing 96:14
Fetheroff 92:19
  92:24,24 97:1
  97:3,8,13,22
  97:24 98:2,6
  98:10,12,19,24
  99:2,7,10,17
  99:20 100:6
few-minute
  177:13
FHA 24:7
  150:17
field 56:12
fight 184:9
fighting 135:3
fights 174:2
figured 12:19
  16:11
file 3:24 11:19
  11:20,21 21:12
  31:12 33:5
  51:24 53:5
  155:20 156:22
  157:4,25 158:4
  158:9 180:20
filed 18:25 21:10
  31:22 34:17,21
  52:14 180:24
  182:10 183:5
filing 4:2 32:22

filled 53:7
finally 25:7 27:9
  150:12 181:20
  184:15 186:14
financial 37:9
  44:12 48:6
  90:5 132:25
  151:3,8 172:12
financially
  141:14
finances 92:20
  58:18 86:22
  94:13 99:13
  104:2 107:20
  127:9 133:17
  136:13 140:6
  186:18
finding 177:10
fine 6:23,24 10:4
  17:10
finish 77:17,19
  78:8,15 168:10
  178:3
fire 13:2 86:3,4
  86:12,13,18
  87:6,9,23 88:2
  88:5,8,9,10,14
  88:17 89:1,3,9
  88:25 89:13,18
  90:7,9,24
  91:21,25 92:7
  129:12 132:4,6
  151:24 174:23
  185:9,17
fired 154:5
  174:10,20
firefighter/pa...
  189:12
fires 174:8
firm 130:13
  189:12
first 7:24,22 9:1
  31:14 53:16
  186:22
firsthand
  180:24

92:18 100:13
  100:15 101:2
  101:25 102:25
  122:10 125:7,9
  125:16 145:13
  148:4 149:21
  152:4 159:19
  163:6 166:21
  169:22 170:11
  171:3 177:19
  178:23 179:25
  187:19
fiscal 59:10
fit 14:8 15:20
  187:17
fits 183:15
five 3:13 17:20
  19:7 11:25
  25:20 27:25
  28:3 29:14,16
  36:24 41:8
  42:2 43:2 44:1
  44:2 46:11
  47:16 49:14,19
  49:25 50:2,16
  51:1,5 52:23
  62:3 74:10
  76:23,23,25
  77:2 78:21
  79:9,15,16,19
  80:2 85:2
  88:19 91:14,20
  93:19 97:16,18
  105:11 158:10
  176:22 180:17
  181:16
five-minute
  177:13
fix 112:13
fixed 27:11
flaw 150:5
Flexibility 44:10
floor 39:10
  60:21
flop 61:10 84:17
flow 165:17,19
  165:25 168:2,3

flower 96:1
  144:19
flowers 144:17
flows 165:25
flyer 132:19
focused 21:16
folks 62:20 91:5
follow 15:16
  47:17 48:3
  59:10 73:23
  73:23 98:18
  117:15,16,18
  118:25 120:6
  121:23 122:11
  122:23,25
  123:1 130:21
  130:24 143:14
  145:22
follow-up
  155:13
following 41:2
  65:11 122:1
  123:6 133:8
  142:19,20
  143:13 160:4
foot 160:15
force 154:23
forces 95:8,10
forcibly 141:22
foregoing 189:9
  189:11
foremost 170:11
foresee 173:3
forever 4:17
  55:19 119:7
  141:10
forget 98:25
forgiveness
  130:10
forgot 144:8

formal 86:19
formalities 3:8
formed 96:5
former 93:4
  130:1 142:4
  152:17,24
form 31:20 94:5
  132:4 179:13
  180:25
forum 19:13
  22:5
forward 15:21
  191:15
forwarded
  14:12 51:22
found 167:12
founded 154:8
four 5:12 36:16
  39:9 52:11
  59:20 62:3
  80:5 83:17,19
  88:16 106:24
  155:17 159:3
  165:5
frame 157:13
  160:18
Frank 92:25,25
frankly 3:4,22
  5:20 8:21 22:7
  62:25 184:9
  185:18
free 37:22 38:25
  40:17 107:21
  132:21 136:16
freedom 107:2
  107:15,25
Freeman 146:21
  146:23,24
freeways 124:6
frequent 126:24
  175:3
fresh 109:22
Friday 60:17

---

142:6
Fridays 60:24
Friebertshauser
  1:18 11:1,4,6,8
  11:11 35:4
  188:5,7,9,11
  188:13
friendly 127:20
friends 186:14
  108:3
frustration
  75:20
fulfill 59:22
full 125:24
  153:22 154:20
  171:4
function 132:13
functional 39:13
fund 95:7
fundamental
  151:5
funded 67:25
  68:1
funding 37:10
  49:19 84:8
  71:3,4 73:7
fundraising
  48:10
funds 49:16
  72:22
further 31:9
  52:22 11:18
  81:6 93:9
  100:8 160:10
  162:25 189:10
future 56:21
  71:2,3 119:4
  119:14 142:3
  148:10

gear 47:6
Geauga 35:21
  37:14,17 38:10
  48:6,13,15,21
  52:10 66:19
  68:5 69:20
  70:18 87:2,20
  88:8,23 90:3
  133:13 137:20
  138:10,16,24
  176:16 178:12
  182:5 189:13
  189:24
general 41:4
  48:12 70:9
  152:4
generally 5:23
  73:18
gentleman
  119:20 129:25
gender-specific
  36:10
get 77:7 100:5
  163:8,19 64:9
geographic 72:9
getting 26:15
  80:5 86:4 96:3
  116:21 177:25
  177:5 178:1,9
  20:13,162:1,7
  229:17 28:24
  29:4,11 30:2,7
  30:17,31:1,4
  31:22,25 32:12
  33:4 34:1,4,12
  34:15,20 35:2
  35:8 47:9,12
  47:14 51:15
  54:12,18,22
  55:5,12 56:3,9
  56:17 57:1,23
  57:24 58:4,7,10

66:12,18,23
  67:5,14,17,20
  68:3,8,15,18
  68:23 69:1,14
  69:18,22 70:3
  70:6,10,15,20
  70:23,25 71:2
  71:17 73:23
  74:1,4,8,12,14
  74:19 80:21
  81:6,8,13
  85:22,23 91:1
  91:4,8,10,13
  91:18,22 96:20
  96:23 97:2,5
  97:10,18,23
  98:1,4,7,14,17
  98:23,25 99:3
  99:7 100:7,10
  110:1 111:10
  111:23 112:4
  112:11,16,18
  112:23 113:5,9
  113:16,18,21
  118:1 122:19
  128:6 134:23
  gender 58:21
  gene 92:1
  girls 155:2
  give 3:1 5:7 6:9
  6:61 103:19
  104:21 108:13
  154:15 167:3
  going 4:24 5:2
  5:12 6:1 6:8,17
  9:4,15 10:11
  14:10,18,21
  15:9,15,16
  16:13 23:6,7
  25:19,22,23
  26:21 28:3,7
  30:21,22 33:5
  33:14 46:4

177:23 179:1
  183:11 184:20
  189:9
giving 82:18
  125:1
glad 65:16
Glenbeigh 83:8
  83:8,12
go 5:25 30:5
  6:19 13:11,20
  13:23 20:2,24
  35:7 57:19,22
  63:1 67:3
  72:18 78:17,25
  82:3 84:5
  92:18 96:11
  97:7 100:5
  105:25 109:6
  110:3 111:2,3
  111:5 114:14
  119:6,15 123:8
  126:10 136:14
  142:3 143:23
  144:5 145:14
  146:7 155:16
  156:6 161:5,8
  167:10,17
  168:13,14
  170:5 173:7
  177:11 178:19
  179:13,14
  184:16 186:5
  186:10,11
  187:4,22,22
  190:22 120:12
  136:11,17
  167:7
goodness 82:21
  85:7
Google 177:13
gotten 62:5
  64:10,20
  120:16
govern 117:9
governed 167:16
governing 124:1
government
  24:1 26:18
  173:11 177:18
  187:2
governmental

66:18,21,23
  71:24 72:1,18
  72:19,22 74:18
  76:1 79:9,11
  79:12,14,16,21
  79:22 82:3
  83:2,6 84:7
  93:19,20,24
  99:5,15 100:3
  100:5,19,20
  105:25 109:6
  100:15 108:6
  110:3 111:2,3
  111:5 114:14
  119:15 123:8
  126:10 136:14
  143:14 143:18
  142:3 143:23
  144:3 145:7
  146:14 151:6
  156:6 161:5,8
  167:10,17
  168:13,14

**G**

G 104:12 127:25
G-R-A-Y 169:11
garage 39:11
  63:8,9 64:9
  64:14 65:11

58:4,7,10,19
  118:11 128:6
  132:8 155:18
  156:17 187:4
  56:19,20 57:2
  53:14 46:4
  55:9,22,24
  59:19,25 61:3
  63:9,17,21
  73:11 155:24

66:18,21,23
  71:24 72:1,23
  72:19,22 74:18
  76:1 79:9,11
  79:12,14,16,21
  79:22 82:3
  83:2,6 84:7
  93:19,20,24
  95:5,15 100:3
  100:5,19,20
  105:25 109:6
  103:13 109:6
  110:3 111:2,3
  111:5 114:14
  119:15 123:8
  126:10 136:14
  143:14 143:18
  73:11 155:24
  73:3 64:15,16

---

23:22
grade 162:22
  165:11,14,15
  165:22,24
grading 139:25
grant 9:21 21:19
  31:7 48:16,19
  49:8,16 55:17
  62:15 63:24
  70:17,20,25
  71:20,23 72:4
  72:6 74:2,9
  76:15 86:24
  181:5 186:22
grant-writing
  177:9
granted 2:12
  5:19 75:19
  90:17 95:25
granting 21:19
  55:18 84:20
  86:2 99:9
  160:5 185:14
grants 38:13
  79:25 83:16
  90:4 186:21
grasp 154:20
grave 162:2
Gray 169:9
  169:10
great 47:7 75:23
  97:18 160:10
  105:13 107:22
  108:2 110:25
  142:8 158:24
green 106:1
grew 109:19
  169:23
grief 36:12
grievance 59:14
ground 144:20
  172:24
grounds 3:1
  32:24 56:18
group 36:10
  37:14 89:6,15
  96:5 104:14

114:9 185:3
  186:8 187:21
groups 56:10,11
  36:12,12
grow 27:1
growing 95:5
  120:3
guarantee 146:7
guardianship
  18:9,15 149:14
guess 4:13 55:3
  55:8 76:5
  100:20 114:14
  119:1,23 142:7
  142:21 145:13
  185:25
guests 60:20,23
  61:1,1 141:17
guided 59:7
guidelines 59:19
  121:23 122:1
  173:2
guiding 125:10
guys 107:12
  110:2

**JR**

H 104:17 129:20
  177:24
Hagood 169:19
  169:22,23
half 83:23
  133:14,19
halfway 55:25
  106:24 107:2,3
  107:12 108:17
  110:5
Hall 1:8
Hampshire 89:9
hand 12:12
  16:12 170:20
  189:15
hand's 145:13
handicap 22:23

22:24 23:16
  24:6
handing 183:8
handle 137:15
handled 108:14
hands 101:14
Hanlon 133:25
happen 4:6
  87:10 115:6,7
  145:5 117:12
happened 66:9
  85:1 101:8
  114:23 118:1
  119:23 153:25
happening 79:4
happens 4:7
  73:10 119:6
happy 84:1
harassed 84:22
harassment
  174:6
hard 56:6 90:13
  147:19 163:12
  163:14
hardship 54:8,9
  93:11,14 103:7
  103:25 123:23
  123:24 124:25
  125:2 140:12
  148:20 150:14
  151:4 171:11
  171:12,14
  172:16,17
  181:7 183:4,4
  185:1,1 187:12
hardware 87:25
harm 127:10
  185:23
harmed 104:12
  143:12 149:2
  141:13 152:8
  154:12 175:14
  185:21
harp 131:6

175:9
hazardous
  163:19
hazarded 183:8
he'll 153:15
health 27:5
  36:15 37:5,12
  37:14 38:10,11
  48:1,7,13,17
  48:21,23 49:7
  49:9 52:11
  59:10 66:19
  67:15,23 83:10
  103:24 104:7,8
  121:9,11,20
  122:9 126:16
  126:18 141:6
  148:6 153:23
  173:16 185:8
hear 12:1 16:4,6
  17:11 22:15
  64:1 66:16
  102:10 181:2
  186:2
heard 4:10
  11:20,23 12:24
  154:7,10
  29:19 63:12
  64:5,7 68:18
  101:24 102:2
  102:25 103:6
  103:5,8
  133:2,15,17
  134:1 136:19
  137:5 139:20
  40:25 41:10
Heights 144:19
held 52:10 182:2
help 28:23 58:17
  58:18 71:19
  hold 15:9 20:20
  29:6 96:18
  100:2 120:5
  helping 132:22

12:25
helps 98:21
hemorrhoid 189:15
heroin 106:22
  116:5
Herringshaw
  12:11,13,15,16
  16:1,3 31:14
  31:17 33:18
  34:2,8,13,18
  34:24 35:3,5
  50:7,10,14,21
  51:4,11,22,23
  52:1,19 53:4,5
  53:7,17,19
  54:2 117:18
  179:24 180:1
Herringshaw's
  53:11 180:9
hesitant 149:21
Hey 71:23 75:23
  133:2,15,17
hide 125:21
hiding 167:6
high 153:12
  175:3 176:12
  170:12 174:4,6
high-quality
  44:19
Highland
  144:19
highlight 59:21
highlighted
  158:7
highly 153:12
hired 18:11,17
  40:25 41:19
  18:3,23 41:1
historically
  183:23
history 82:3
  140:13 175:13
hold 15:9 20:20
  29:6 96:18
  100:2 120:5
  145:19 168:9

---

holidays 60:18
home 18:7,7
  38:3 46:12
  52:1 57:3,13
  63:5 66:11
  80:9,10,12,14
  80:17 82:21,24
  83:25 84:1,3,5
  84:12 87:14
  89:6,10 91:13
  95:12,24
  115:10 119:21
  131:20 133:19
  133:21 134:9
  134:13 136:14
  137:2,3,12,18
  140:2,16,24,25
  141:1,24
  142:25 147:5
  148:2 149:18
  150:7
homeowner
  119:4 139:22
  169:25
homeowners
  108:9 114:15
homes 43:11,16
  89:15 95:6,11
  95:13,14,15
  124:21 129:11
  133:7,9,12,14
  133:18,24
  135:9,16,19
  170:24 175:10
  175:20
homework
  117:21
honestly 21:2
  110:1

hoops 79:1
hope 86:24
  127:23 185:16
hopefully
  123:10 132:5
hoping 6:21
  7:16 126:20
  135:10 140:6
hopping 5:18,19
hospital 82:12
  82:23 153:21
hospitalization
  117:1,2,6
hosts 160:22
host 152:1,12
  161:5,5,8,8
  162:20 126:1,7
  127:15 128:15
  128:17,18,20
  128:22 129:14
  129:18 130:3
  131:11,11,22
  132:15,17
  134:1,15
  136:19 137:23
  137:24,25
  138:1,21,24
  38:20,21,24
  47:20,23 49:14
  50:24 69:23
  70:3,7 71:4
  75:3,16 76:13
  76:14,20 116:8
  116:10 121:12
  117:3,20
  176:22 177:7
huh 47:12 142:7
humble 64:16
hundred 36:1
hundreds
  113:24 186:20
hurdle 72:2
hurting 75:5
husband 147:1
  154:13
Hyphen 136:6

housekeeping
  18:11,14
  149:13
houses 44:2
  96:24 167:4
  97:22,24
  104:20 107:3
  108:10 110:5
  112:16 113:2,3
  113:5,19
  115:22 129:7
  138:1 141:12
  148:1 175:2,7
  176:24 176:22
  177:6
HUD 75:7
  170:12 174:4,6
  I 72:3,13
  185:21
  I'm 49:2,7,25
  52:0 53:5
  I'd 4:6 13:16
  13:19 129:20
  132:3 134:1
  I'll 8:10,13,22
  16:12 28:4
  66:16 107:22
  168:13 172:5
  I've 36:24 111:6
  116:10 121:12
  134:6 154:3
  179:7
idea 148:4 166:8
  identical 24:16

57:10 171:12
identified 17:22
  51:6 75:1
identify 48:25
  49:2 57:25
ignorance
  104:25 105:1
  121:9,10
  125:11 139:20
  ignoring 150:10
  1112:6 27:18
  53:10 121:7
  124:3 174:17
III 82:5
ill 174:6
illegal 23:4,8
  25:16 58:13
  174:2,7,22
immediately
  53:4 171:18
  180:22
impact 89:4
  104:15 150:18
  162:13 163:16
imperative
  59:24
implement
  69:19
important 2:22
  3:19 5:22,22
  11:18 27:16
  49:18 104:19
  146:13 178:21
importantly
  143:10
impose 151:7
  imposes 151:2,3
impression
  84:19
impressionable
  127:19
improved 36:3

**Index — Page 205**

50:4
improvement 48:2 59:13
in-hospital 132:15
inability 89:3 175:18
inbound 160:20
inches 166:24
incident 138:1 175:25 176:1,6
include 23:4 36:7 41:24 56:11 59:6 87:25
included 23:1 53:12 173:25
includes 11:8 22:23 23:17 24:7,10,25 25:6,11,15 43:12 183:9
including 38:14 41:17 58:22 60:17 119:7 141:14 160:22
income 96:3 131:23 138:20
incomprehens... 138:13
incorporate 59:5
incorporated 35:18 47:24 59:8 69:15 86:13 88:10
increase 93:21 135:6 142:11 142:12 143:1 172:14
increased 142:25 152:12 162:8 163:25
increasing 161:17
incredulous 94:13 138:15

incumbent 163:20 164:7
independent 39:21 44:14 113:6 162:6
independently 40:3
indicated 187:10
indicates 124:1
indicative 119:18
indiscretely 99:11
indisputably 24:13 36:9,11 38:21 40:23 115:8 124:11 180:10,11
individual's 39:3
individually 160:10
individuals 18:19 23:23 26:23 35:20 38:20 68:4,9 69:13 73:12 79:7 152:7 155:2 156:15 181:17
industrial 94:24 95:13 137:19
inexcusable 128:2
influence 60:12 114:13 115:19
information 6:19 52:16 60:8 75:11 160:4
informational 52:3,8 125:13 133:24
informed 65:22 104:23
informing 13:6
ingress 137:15

148:3 161:10
ingress/egress 162:11
inherent 163:11
initial 16:5
initially 19:18
initiative 171:4
injurious 154:4
inmate 41:5
inpatient 38:15 107:19
inquiry 62:2
insisted 62:20
inspect 88:6,14 88:18,20,21 91:16
inspected 47:21
inspector 12:15 16:5 18:23 20:9,18 31:13 32:20,22,22 34:5 41:4 50:7 51:20 75:22 87:16 122:8 172:25 181:5 182:8 185:3
inspector's 19:14,17 21:11 22:1 31:19 32:1,13,16 33:6,10 52:14 62:11,14,19,24 76:6
installed 39:16 64:23 65:25
instantly 134:25
instead 26:18
instructed 53:5
instructing 54:4
instruction 171:18
instructions 117:19 140:1 161:4,7,23 162:1,9,13,20

163:3
insurance 38:12 40:24 75:12 92:10,13,15 117:7
insurances 92:8
intake 36:7 40:8
integrity 137:3
intended 88:15 139:18
intense 136:13
intensive 36:13
intent 20:2
intention 142:12
intentional 79:5
intentions 125:22 132:3
interact 134:20 139:4
interaction 137:10
interactions 130:16
interest 93:10
interested 89:11 103:18 126:25 180:14 186:3 189:13
interesting 141:17
interfered 89:9
interest 52:8 141:1
involve 91:19 125:25 177:2
involved 19:16 70:16 71:20 72:7 73:3,6 103:19 135:5 152:9 176:9
involving 21:3 163:2
irate 153:14
Ironically 153:1
iron 170:20 22:18,11 43:23 62:6 76:4,7,12 80:7 96:6 98:14 110:18 140:18 146:2

---

**Index — Page 206**

146:10 163:20
180:2,7,16,18 180:19
issues 4:21 9:2 139:3 18:8 75:10 77:4 110:21 116:15 149:22 155:8 160:9,9,11 162:19
item 10:11

**J**
James 12:13 16:18,22 50:7 67:11 179:24
Jamie 158:19,22
January 12:19 15:6,22 131:19 140:3 142:6 171:19
jeopardy 141:11
Jesus 102:1 107:20
Jim 1:16 10:18 17:12 28:10 31:11 61:15 66:18 67:7 105:15 119:19 129:25 177:2 177:16,20 178:9
Jimmy 105:19
Jo 146:21,23
job 9:7,7 41:16 57:16 75:22 147:18 167:10 170:8
Joe 1:15 10:18 99:8 123:16,18 136:2,2 147:14
joke 6:17
judge 3:25 4:11 5:14 67:13 77:21
judges 2:11

judicial 2:10
July 1:10 2:3 147:2
jump 135:1
jumped 66:7
jumps 79:1
June 10:15,17 11:16 138:6 176:19
jurisdiction 2:1 20:8 21:15 88:21 121:22 180:25 181:2
jurisdictional 11:24
justification 103:6

**K**
K 162:22
K-E-Y-S-E-R 158:23
Kearns 11:7 11:8,9,10 172:25 173:6
keep 4:21 109:18 113:21 157:22 169:4 170:13,14
keeping 101:18
kept 84:6
Kevin 112:2,6 159:8,11
Keyser 158:19 158:22,22
kicked 133:16
Kidd 74:15,22 74:21,24 75:3 77:13,15,18,22 78:1,4,10,12 78:14,18,20 81:2 177:6,7,8 178:3
kid 79:19 167:8,9 82:14 162:23
kill 153:15
kin 165:1 166:5

kind 14:4 28:16 73:1 84:18 10:17 113:20 143:9 158:25 186:22
kinds 77:4,5,5 85:1
kitchen 39:11 60:22
knew 43:21 104:5 105:2 117:20 118:16 125:24 130:7 137:1
knock 7:22,24 7:15 8:11,21 9:6 14:10 15:14 19:15,19 28:15 32:15 35:3 45:5,6,6 45:15,165 4:19 54:23 55:1,17 55:23 56:7,14 56:15 61:15,25 65:17,20 66:3 72:17 73:7,8 73:13 75:4 77:6 78:3,5,7 79:17 80:5 82:19 84:10,16 91:11 94:14 97:1 98:4,18 99:2 100:16,16 110:17 116:16 110:17,23 117:13 119:1 119:11,15,24 123:8 129:4 130:22 134:4 155:2 157:20 146:5,8 149:3 155:2 167:20 36:16 37:15 36:4,7,19 39:6 165:21 166:5

168:24 171:1 176:1,11 177:17,20 178:3,15 184:10 185:8 186:2,12 187:5
87:10 130:11
knowing 43:5,6
knowledge 63:17 104:18 114:13 121:3 129:21,24 139:13 186:15
knowledgeable 11:3
known 117:22 126:14 128:20 130:2 136:16 136:21 137:11
knows 122:10 122:11 178:7

**L**
L-A-N-E-S-E 136:6
lack 89:15,15 104:1 163:1 167:5 173:9
land 56:10 94:25
land-use 140:22
Landlord 40:15 115:12 116:9 155:20
landlord-tenant 115:25 116:5 117:14
landlords 23:24
landscape 160:23
landscaping 39:15 50:4
Lane 1:21,24 93:1,21 95:2 95:22 97:4,12 97:21,25 102:23 118:13 118:14 123:19 137:10 145:18

---

**Index — Page 207**

147:25 148:1,2 159:13,22 160:11,14,17 160:21 161:2,7 162:2,10 163:16 166:11 166:18 167:1 169:13 171:1 172:24 186:13 189:6,19
Lanese-Turkish 135:25 136:5,6 136:9,12 143:25 144:6
language 60:4
large 65:19
lastly 89:22 174:9 178:17 185:14
law 2:12,14,15 5:20 14:4 15:12 17:23 19:10 22:21 24:22 25:15,25 31:5 33:1 51:16 60:15 66:25 78:4,8 115:12 122:14 125:11,12 130:1 139:20 152:4 155:20 167:7,7,21
lawful 12:13 16:18 35:11 81:11 86:6 92:19 100:21 102:17 105:15 106:3 108:25 112:2 118:8 120:19 122:21 123:16 135:25 145:20 146:21 147:22 158:19 159:8 166:2 168:19 169:9 169:19 170:23

lawfully 5:19
lawn 134:11
laws 76:17,18 93:16 94:3 95:5 104:22 144:18 184:22 117:14,14,15 117:17 122:11 137:2 138:3,5 138:5 142:15 142:21 143:13 143:15 149:4,8 150:19 171:10 172:20
lawyer 53:25 77:9
lawyers 11:23 77:11
lead 149:22
leadership 118:23,24
leading 182:18
leads 152:7
Leaf 137:20 138:24 176:12 176:17 178:13
learn 52:5 54:19 99:9
learned 89:9 99:15
lease 58:15 158:6
leases 157:1
leave 60:23 108:5 123:8,10 134:11 156:12 156:14,17,21 157:7,20,24 158:4 169:2 169:23,25
leaving 97:3 126:13
lectured 78:8
left 33:21 47:11 47:13 153:25 165:19
legal 9:9,9,10,14 92:4 14:2,2,9,9

14:14 15:2,11 15:11,15,17 16:23 24:22 46:23,24 51:12 51:22 73:17 85:6 103:3 129:24 130:13 132:6,8 177:15 177:20 180:9 180:14
legally 56:20
legitimate 152:6
length 42:9 44:11,15 112:17 113:8
lengthy 103:3
Lennon 138:11 138:14
lesson 94:19
let's 2:4 10:7 44:10 98:25 102:10 164:16
letter 13:6,14 14:18,19 50:6 52:9,22 54:2 178:9
letters 3:12 14:23
lie 140:18
lie 23:1,2 24:9 24:18 25:5,6,9 36:4 101:16 109:24 130:16 135:4,4 160:10 162:13,19
life-altering 143:17
lifelong 36:1
lifestyle 107:7
life 133:9
light 138:3
lights 121:1
like-minded 136:17
limit 4:25 5:11 7:16,16 8:6,10

9:23 24:17 25:4 27:9 101:22 103:20 126:20 161:3,7 128:20 161:3,7 133:18 174:17 176:3 177:8 178:11
6:7 9:20 39:22 42:10 46:9,10 46:12 51:7 93:8 121:16 137:15 177:12 165:6 173:25
limiting 103:14
limits 22:25 24:8 24:17 25:9 26:13
line 82:12 85:13 85:15 86:21 122:24 161:13
lineal 161:12
lines 79:5 154:7
list 79:7 85:18 139:12
listed 25:10 129:15,16
listen 9:4
listening 123:7
listing 148:25
literally 110:12
literature 4:14 10:8
little 4:14 10:8 162:13,19
litter 126:23
loaded 94:9
local 9:9,10 119:22 140:8
loans 49:19
loss 49:19 138:11
lost 84:3,3,3,4 154:15,21 149:17 21:7 73:10 79:25 119:1 141:3 145:2 156:6 158:24
loss 9:12
load 60:3 153:13
loss 7:12
love 78:7
low 38:21 172:8
loud 61:1 141:4
ludicrous 142:18

**M**
M 153:17
Ma'am 102:12 146:19 169:18
Madison 106:9
mail 160:25
mailbox 143:4 143:22 144:5 382:1
mailing 43:10 36:18

---

**Index — Page 208**

116:6 120:22 120:22 121:19 124:22 126:24 129:4 136:15 137:7,9,13 146:2,11,24 147:4,9,13,25 152:10,22,22 168:22 169:13 170:1,4 176:24 181:18
live-in 18:11,17 51:3 149:16 150:1,2
live 148:18 107:8,13 118:15,17 134:8 136:22 143:8 148:10,12
lives 41:22 129:5 134:22 135:6 154:22
living 18:10,13 25:23 37:22 38:3,25 39:10 39:21 44:15,25 46:17 49:4 58:5 60:22 66:10,10 80:12 80:14 82:1 84:12 85:12 88:20 89:6 90:14 91:15,20 97:19 107:2 113:6,13 118:22 128:11 128:23 129:6 136:18 148:18 149:12 150:7 174:23

104:15 121:15 121:16,18,20 121:21 125:4 142:21 143:13 150:10 160:24 162:21 171:10 172:20 176:15 177:18
locate 172:19
located 17:25 36:20,22,24 39:12 93:7,13 93:17 127:15 159:18,25 160:13,15,18 160:22 161:20 162:23 166:11
loss 127:15 149:21 160:25 161:12 174:21 184:25
location 103:9 103:13 127:20 140:7 152:9,14 153:2,18 162:17 170:1 170:21 176:11
logs 195:17
loitering 60:3 144:25
long 7:18 8:7 17:10 19:14 24:7,25 35:19 39:11 67:5 100:13 103:19 105:21 107:6 107:15 115:9 132:4 143:4 162:3 165:13 167:25 168:19 172:20

50:17 57:8,18 69:12 72:22 79:8 84:13 99:2 110:20 121:2 128:14 135:1 170:6 171:7 186:24
looked 119:20 170:7
looking 22:15 36:20,22,24 85:11 105:18 120:24 121:2
loops 72:20 119:22 140:8
loose 49:19 138:11
loot 84:3,3,3,4 184:25 153:19 73:10 79:25 119:1 141:3 145:2 156:6 158:24
loss 9:12
loud 60:3 153:13
loss 7:12
love 78:7
low 38:21 172:8
loud 61:1 141:4
ludicrous 142:18

**M**
M 153:17
Ma'am 102:12 146:19 169:18
Madison 106:9
mail 160:25
mailbox 143:4 143:22 144:5 382:1
mailing 43:10 36:18
longest 83:18
look 14:15 39:10

main 106:25 107:14
maintain 49:20
maintained 121:14
maintains 38:5
maintenance 42:8
major 23:1,2 24:9,17 25:5,5 25:9 177:15
making 28:16 104:25 119:5 132:21 178:10
matters 104:24
may 9:19
maximum 26:3 26:11 87:7
McHale 145:14 145:17,21,25 145:22 146:16
Meadows 38:2 39:23 47:21 48:8,18 49:18 59:4 61:4 125:9 133:12
mean 8:9 19:13 25:16 28:8 43:21 45:16,23 47:5 56:6 66:15 69:5 108:5 119:10 119:11,18,22 120:8 143:22 177:24 178:18 185:25
meaning 25:2 27:11 155:15
means 5:11 7:5 21:19 128:5 69:12 156:10 156:23 189:8
mechanism 32:6
Medical 38:12 117:7
medical 59:12
medication-as... 36:8

Marketability 142:3
marriage 18:10 18:16 149:14
mask 8:4
match 72:24
material 62:13
matter 2:19,23 8:19,20 19:18 21:15 22:19 23:6,25 76:9 82:11 98:12 131:21 179:10

meet 9:15 48:7 57:21 71:8,11 87:20 89:1 96:15 122:6,16 131:15,17
meeting 2:1,3,4 4:4,8,8 7:21,24 7:25 8:1,6,14 9:16,17,20 10:15,17 11:18 14:21,24 15:22 108:13 110:11 123:9 125:14 127:24,24 131:19 135:11 135:12 140:3 148:18 169:22 171:19 173:6 188:17
meetings 4:6 42:2,3,6 54:4 60:15 93:19 108:15 110:10 110:13
meets 41:13
Melanie 12:13 13:12,24 14:16 14:25 16:9 17:16 34:22,25 35:9,11,15 75:23 76:3 79:24 94:9 103:1 121:6 122:3 137:21 138:3,8,20,25 139:11,12 140:5,15 143:12 171:14 171:17 172:18 173:9,13 176:11,13,19 177:9,14,16 178:7,8 179:24 179:25
member 40:19 78:23 153:23
members 1:14 20:6 77:3 79:16 135:5 154:11
members' 154:7
memo 51:15,18 51:18
memorandum 20:6 21:23 181:21
mere 37:19 51:5 176:23
men's 36:18,22 43:21 51:8
mental 22:24 24:7,16 25:8 25:12,13,14 27:5 36:14 37:5,12,14 38:10,11 48:7 48:13,16,21,23 49:7,9 52:11 66:19 67:15,23 83:9 121:9,10 153:21
mentally 174:6
mention 143:19 174:12
mentioned 147:15
Mentor 35:16 36:23 50:9 74:22 83:21 147:12
mercantile 87:18
messed 82:10
met 9:11 54:24 54:25 132:3 172:24 177:3
Michael 86:6,11 168:19,21
microphone 106:11
midnight 134:13
Mike 131:3,13 170:17,23
mile 119:12 133:14,16,19 133:20
miles 152:13 161:4,5,8,8
millimeter 174:20
mind 83:5 86:3 107:5 182:18
mindful 171:15
mine's 158:23
minimum 40:16
minimums 88:3
minor 50:3 183:1
minutes 4:4 5:12 8:12 10:15,16,20 11:18 85:2 97:16 105:11 182:1
Miscellaneous 99:25
misplaced 137:22,25 138:2
missed 73:5 147:15
misses 160:18
missing 174:7
mission 35:25 59:7,23 86:21
misspoke 32:18
mistake 119:9 140:17
mitigation 163:24
mix 6:1 54:24
MLS 103:2 148:25
mom 118:15 120:2
moment 73:24 153:24
monetarily 110:11
money 71:25 72:17 74:2 75:8 83:15 94:18 121:25 121:25 141:1,3 151:10 186:22
monies 89:24
monitor 41:22 144:20
monitored 87:24
monitoring 131:16
monitors 38:4 184:23
month 103:25 133:20
months 12:18 34:13 44:16 83:17,17,20 107:18 109:7 119:13 133:19
moot 104:19
moral 152:25
morals 103:24 104:7,9 126:17 126:18 141:6,9 141:23 173:16 185:8,14
morning 107:10
motel 172:10
mother 79:19
mothers 36:24
motion 10:16,18 10:19 182:6,11 182:13 188:2
mound 144:14 148:4
move 17:8 60:9 129:7 143:7 146:9 147:3 146:12 155:19 167:13
moved 66:4 82:1 101:7 128:24 137:5 143:4 148:18 152:23 154:14,15
moves 80:19
moving 113:12 113:13 114:12 125:18 128:21
multifamily 147:4
multimillion 149:2
multiple 22:3 94:12 100:1 152:24 172:8 184:23
municipal 121:21
municipalities 125:5
municipality 94:23 150:15
Munson 1:7,8,9 13:20,21 19:1 26:12,28:13 506,17 52:13 80:19 84:15 86:13,15,18 87:9,17 88:5,7 88:9,12,14,17 89:19,22 90:4 90:6,9,12,16 93:2,4,9 94:11 113:15 115:5 118:18 119:8 121:25 124:8 117:17,21 119:24 142:15 149:1 153:7 154:16 159:18 159:19,21 160:1,2,7 161:11 162:5 162:23 166:12 171:3,16 178:9

music 60:4

N

N-E-L-S-O-N 109:4
name 2:25 3:1,3 5:7 16:20,22 35:13,13 39:23 67:8,9 81:18 81:19 86:8,9 86:11 92:21,22 100:23,24 101:2 102:19 102:20 106:6,7 108:9 109:9 118:10,10 120:21 136:3,4 146:23 147:24 158:21 161:1 169:10,21
names 128:6
nanny 131:6
Narcan 132:12 132:13,21 133:2,13 134:22 134:24
narcotics 53:12
narrow 62:3,9
national 47:18 71:10
native 160:19
nature 152:20 154:17
navigate 160:16
navigated 160:16
navigation 169:16
near 136:17,22 160:11,18
nearby 94:21 95:4,17 103:23 124:18,20,21 137:24 140:11 174:21 184:14
nearly 8:14,15 24:6
necessarily 2:16 5:18,8:10 30:19 31:1 69:5 165:22
necessary 9:23 9:24 23:19 27:14 29:16 30:17 48:11 55:14 150:22 150:23 163:9 175:13
necessity 4:24
need 7:21 13:10 13:16 15:13,14 32:10 35:12 38:18,21 46:4 55:1 69:6,9,10 55:17 62:7 70:5 102:15 104:1 107:6 108:13 114:4 127:23 130:24 131:15 135:6 138:11 144:18 164:8 165:1 167:2 175:11 176:24 182:25 183:2 188:2
needed 42:7 87:23
needle 108:5
needs 3:5 33:24 40:4 69:8,13 72:10 173:6 87:23 183:12
negative 133:5 173:19
negatively 60:1
negligent 119:19
neighbor 41:17 59:22 60:7,7
neighborhood 61:1 65:15 66:6 84:22 85:4 108:16 124:2 125:19 127:16 128:12 129:3 133:22 133:23 134:2 134:3,6 136:21 141:9 148:9 172:15 173:21 187:20,23
neighborhoods 95:20
neighboring 95:18 135:7
neighbors 3:17 59:25 60:2 65:15 94:4 96:6 103:10 129:5 133:25 136:18 137:5 155:23 158:5 158:24 178:11 179:6
neighbors' 101:25 102:16 104:1 107:6
Nelson 108:19 111:8 123:10 131:15 135:6 135:17 137:7 141:14
nephew 84:16
network 42:5
Nevaeh 36:23
never 8:1 83:5 85:6 95:23 111:18 123:10 131:4 137:12 137:12,12 139:15 147:3,4 147:20 157:6 158:11
new 6:5 83:20 87:1,3,4,5 89:7 89:8 107:7,7 116:16 137:1,3 145:12 178:11 178:12
newest 52:5
newly 40:25
NFPA 87:24
nice 136:24 143:3
night 33:15 84:24 100:3 134:16 174:15
nightmare 136:24
nine 44:16 113:9
nine-month 133:11,13
nine-year-old 131:6
non-called 136:15
non-designated 60:5
non-document... 143:11
non-drug 175:4
non-profit 35:18
non-residents 90:15
non-sufficient 111:14
non-taxpaying 129:18
non-Waterfowl 137:10
nondisabled 99:12 105:4 125:20 130:8 139:16
nonprofit 68:12 185:24 129:17 149:2 151:9
nonresidents 90:13,22
normally 76:2 158:1
North 90:2 154:15
notarized 159:12
Notary 1:22 189:6,19
note 154:13 188:21
noted 163:6
notice 42 18:25 21:7,13 31:22 32:12,16,23 33:2,7,19 34:5 34:16,21 53:6 135:18,24 155:18,24 156:18 187:16 188:23 181:10
notification 179:5
notifications 177:5
notified 86:1,4 113:2
November 13:12 13:12,23,24 14:17 50:14,22 51:17,23 52:1 57:4 94:6
number 8:15,15 8:18 18:12,13 25:10 26:3,7 26:11,13,17 53:1 80:12,13 87:4 93:5 118:25 124:8 128:14 139:4 142:23 149:11 162:8 181:22 83:9,10
numbers 84:25 139:23 183:18
nurse 41:5 82:2 83:9,10
nursing 82:24 142:11

O

O'Neill 1:16

11:4,5 182:16 183:1,18
Oak 36:18 83:12 83:13,14 108:14 109:7 109:16 153:18 153:19,23 174:19
Oaks 86:14
oath 100:18 119:24 164:8
obey 38:1
obligation 162:4 182:23
obligations 173:11
observed 165:24 175:23
obstacle 177:15
obtain 162:6 163:6
obtaining 70:16
obviously 141:15
occupancy 26:7 37:2,5,7 88:1 88:16,23 121:18 161:18
occupant's 80:17
occupants 26:4 26:11,17 80:12 80:14 87:5 103:14 104:14 143:6
occupied 44:23 58:2 131:21,22 180:8
occupy 26:4 140:2
occupying 171:18 172:8 175:1,16
occur 110:24
October 12:23 50:7,9 99:10 99:14
ODOT 162:6
offended 17:13
offense 120:23
offensive 60:4,4
offer 7:5 86:22 90:21
offered 109:15
offers 36:5 38:5
office 14:13,22 28:13 35:6 41:4 50:9 52:10,14,19 75:7 90:4 189:15
Officer 67:19
officers 153:19
official 17:14 60:14
offset 48:12
offsite 42:7
oh 15:12 30:18 31:21 61:25 64:4,5 76:21 100:20 105:12 118:7 158:3
Ohio 1:9,25 12:5 18:5 25:7,15 25:25 26:19,23 27:4,19 37:2,4 44:10 46:24 47:20,22 48:16 48:20 49:7,9 49:10 186:15 186:19,24
onboard 150:1 66:25 69:16 74:23 81:22 87:6,12 88:2 90:1 91:24 106:9 115:12 116:2,7,9,10 121:8,10,17 122:9 126:14 132:10 155:19 160:1,7 161:11 163:21 166:2 171:3 189:3,7 189:16
okay 10:4 16:3 16:17 17:3 31:3 35:8 44:9 45:21 46:19 47:8,15 65:5 66:13,21 67:2 67:6 73:21 74:20 78:21 80:9 81:17 85:5,8,9 91:13 92:1,21 98:1,4 98:16,23 102:4 102:24 105:6 105:13 111:10 115:1 116:11 120:10 123:14 123:21 136:7 144:3 145:9,11 145:12 156:16 157:3 164:2,16 164:17,22 168:1,17 178:2 178:17
on-street 162:12
once 8:16,16 10:11 112:21 115:7 141:10
one 9:22 16:18
ones 101:14 138:12 154:1 156:16
ongoing 46:2
onsite 163:1,8
open 16:7 39:10 161:5 177:15
opened 51:8 137:24
opening 62:8 160:1,7 161:11
operate 37:16 187:15
operated 37:5 124:5 135:8 173:20
operating 38:7 46:10 48:8,12 49:5 61:14 80:2 129:14 91:10,11 70:17 73:4 78:25 79:1,2 113:7 136:13 137:7 61:6 63:4,5 177:4
operational 90:10
operator 175:9
opiate 36:13
opiates 58:12
opinion 14:10 14:14 15:2,11 16:1 106:14 106:16,17 128:3 129:23 130:6 132:8 133:1 141:14 165:8 167:22 165:18 173:22
145:24 179:6
opposed 5:8,10 9:11 133:23 159:2 168:25 170:4,15
opposite 103:22 187:11
opposition 149:22 163:22 169:11,16
option 109:23
order 9:17 20:10 30:24 31:4 119:8 130:6
ordered 87:8 137:25
orderly 171:5
ordinance 30:14 30:24 123:4 131:2,18 185:2
ordinances 123:25 130:19 130:21 135:14 150:16 171:10 172:21
organization 47:22 118:24 171:7 176:3,21 186:20
orientation 41:11
originally 111:15 117:17
out-of-hospital 132:15
outbound 160:20
outbuilding

143:2
outcome 189:14
outcomes 138:12
outgoing 17:17
outlet 185:3
outpatient 36:5 36:7,13 38:15 41:6
outset 32:9
outside 65:3,8 65:18 126:21
overdose 132:16 174:9
overdoses 174:6 174:25
overnight 61:1
overseeing 131:16
oversight 27:7 44:19 58:21 59:15 67:23 68:11
overwhelming 184:22 185:6
owner 13:6,7,11 56:20 63:16 93:4 103:12,13 124:7,8 129:20 129:23 140:23 142:4 149:4 159:17,23 171:22 183:7 184:21 186:11 186:14
owners 3:16,21 142:17 52:7 52:7 55:3 56:21 66:16 86:1 95:4 104:9,17 113:21 171:25
owners' 103:23
ownership 171:8
owns 59:2

P

P 153:14
p.m 2:1 60:16,23 189:23 188:17
packet 6:18 71:14
page 131:3
pages 59:20 181:21
paid 89:23 120:8 131:9 159:17
parents 103:18 131:9 133:1 131:5 139:3 147:20 160:4 146:14 165:6 165:18 172:3
parked 65:7 144:22
parking 39:12 60:4 85:2 146:14,15 96:3 116:16 131:12 133:3 141:7 161:10 181:8
park 65:3 41:25 46:17 90:14,18 95:6 117:4 129:11 129:19 170:12
paying 45:23 69:4 85:2 144:23 171:25
parks 65:3
part 7:7 82:2 46:16 53:7,12 56:1 64:17 81:14 125:3 9:4 22:23 26:24 29:14 158:14 180:11
181:17 182:24 187:15
participate 37:25 40:4 42:1 70:16 71:14
particular 57:2 72:12 150:24
particularly 57:10
parties 103:18 120:8 131:9 189:8
party 112:14 189:12
pass 126:12 162:18
passed 19:15
Pat 145:17,20
pass 169:2
paths 74:15
Patricia 74:15 74:21,24 177:6 178:3
patients 164:8
Paula 1:18 10:25 188:4
paved 161:2,14
pay 36:3 38:1 41:25 46:17 156:9
paycheck 18:16
perform 175:18
period 4:5,21 20:14 23:11 31:11,20 53:15 55:20 155:23
payroll 21:2
peace 154:16
peaceful 39:12
peer 39:19 42:4
people 4:18 6:14 8:15,16,18,23 9:4 22:23 26:24 29:14 158:14 180:11 55:24 58:4 64:16 69:6 69:6 72:9 76:11,19,23,25 78:21 79:10 80:2 84:21 101:12,12,13 107:11,25 113:5 116:5,13 131:5 139:3 146:14 165:6 165:18 172:3 146:4
perceived 24:15 96:3
percent 38:14 48:20,22 113:4 128:10 138:16 155:15 156:9
perfectly 183:16
perform 175:18 171:4 117:4 129:11
perceived 45:20 20:4 23:11 31:11,20 53:15 permanent 44:14 142:2 151:13,21
permission 130:10 132:8
permit 13:7,10 13:17 15:14 53:5 76:3,5 77:6 79:2
permits 71:23 77:4
permitted 12:8 12:10 13:16 26:4 27:17,25 28:12,20 53:9 57:6,13 60:13 60:25 95:1 124:5 148:20 154:23 161:18 171:4 180:3 181:14,16
person 6:13 22:23 23:20 24:19 25:2 33:5 42:4 55:22 78:23
person's 22:25
personal 4:3 59:25 125:9 154:13 169:1
personally 19:15
persons 18:9,13 23:20,24,25 40:21 72:11 76:18 79:6 149:11 172:9 174:1,7,7 176:4 180:5
phone 84:3 142:6
phonetic 106:3,8
photographs 7:1 65:12
phrase 68:24
physical 22:24

24;7.16 25:8
25:12,13,14
150:14 174:3
175:8
physically
134:14,23
141:14
pick 107:11
127:9
picked 144:25
picks 108:7
picture 65:2
piece 167:11
piggy-backing
158:25
Pilawa 1:15 2:2
2:8 6:4,11,23
7:12 8:3,13 9:1
10:4,6,21,23
11:13,14 12:14
15:25 16:2,11
16:15,20,25
17:3,9 18:21
19:20 21:11,14
20:20 21:21
22:15 28:22
29:6,19 30:3
30:12,18 31:3
31:10,15,18,24
32:4,14 33:12
34:3 35:10,12
42:12,14,19,22
43:6,10,15,18
44:3,9,22,25
45:3,5,13,17
45:21 46:13,19
47:5 53:14,18
53:21,24 54:6
54:18,23 55:6
55:16 56:4,14
56:22 57:1,5
61:3,6,11,19
62:1,16 63:11
63:22 64:11,19
66:1,13,21 67:2
67:6,8 71:19
71:22 72:15

73:5,14,18,21
73:25 74:13,17
74:20,25 77:8
77:14,17,20,23
78:2,7,11,13
78:16,19 81:1
81:3,17,23
85:20,25 86:8
90:23 92:1,4
92:17,21 96:17
96:22 98:8,11
98:16 100:2,9
100:12,15,17
100:23 101:4
101:9,12,18
102:2,4,8,12
102:16,19,24
105:6,13,17,24
105:9,10
106:21
108:2,10
109:20,25
110:20,25
111:4,10,23
112:4,8,11
113:18 114:2,8
114:13 115:24
116:11
118:3,6,9
119:25 120:10
122:18 123:2
123:21 131:20
135:15,18,21
135:24 136:2,7
136:11 143:19
141:3 143:2
143:9,16,19
146:18 147:21
156:2 158:14
162:5 164:2,6
164:23 165:4,9
166:15,20
167:24 168:1
167:18 169:6
171:1,9,19
171:19 177:22

178:15,18,22
179:11,20
181:25 182:3
182:15,17,21
188:1,13,14
pills 108:5
Pines 36:21
pipe 167:3
Pitcock 1:16
10:22 11:6,7
64:21,25 65:5
65:9,12 113:20
114:: 182:13
182:20 188:11
188:12
place 58:18 84:7
137:2 139:9
140:8 141:5
154:17 161:24
172:21 176:15
176:24 189:11
placed 125:6
placement 143:8
places 85:16
127:20 139:5
139:12 175:19
176:7
placing 90:15
121:11
plain 167:17
plan 39:10 48:1
48:2,2,2 59:12
59:12,13,13
86:19 107:23
140:22
planned 140:4
planning 9:5
101:16 176:18
plans 165:1
plant 144:17
147:3
plate 84:25
play 8:13
playing 127:9
plays 24:5
pleas 3:24 4:1,3
4:11 5:1 47:13

11:25 30:20
please 2:4 5:7
162:12,13
162:15 169:2
81:18 86:10
87:15 92:23
100:25 109:3
112:9 118:11
135:13 136:3
145:1 156:6
158:21 169:21
170:20 179:8
188:4
Pledge 2:5,7
plus 93:19
125:19 126:10
138:21
pocket 74:6
podcast 89:11
89:13
point 28:24,25
44:3,4 47:1
62:13,16 10:4
66:3 74:5 82:7
84:23 97:8
137:19 157:23
168:6 174:25
178:16 180:21
pointed 50:18
pointing 29:5
points 64:23
66:1
police 115:19
129:12 134:8
134:17 138:1
152:1 154:18
155:11 173:17
policies 23:18
27:8,41:12,15
48:3 58:22
59:6,10,11
116:10
policing 176:5
policy 41:17
173:12,25
policymaking
75:12

pool 128:15
population 49:1
portion 48:9
position 5:3
44:23 72:24,25
22:18 28:25
33:23 67:17,21
77:21 84:9
123:3 175:20
181:8
positive 115:10
135:18
possess 40:22
possession 60:11
possibility 127:8
135:7 137:16
possible 174:6
possibly 95:15
127:13 170:6
175:8
postponed 7:24
potential 104:10
104:14 119:4
127:22 129:18
154:6 162:12
potentially
155:16 163:19
pounds 83::
practical 2:19
2:23 8:19,20
practices 23:18
41:18
preachy 56:6
precedence
119:7
precisely 183:25
precursor
predict 87:9
predictability
39:18
preexisting
171:10
prefer 129:2
preferred 40:22

pregnant 36:23
142:11
premise 130:11
premises 25:19
58:1
prepared 6:2,7
6:19 8:10 50:2
86:16
preparedness
104:1
presence 189:8
present 1:14
2:20 8:11
63:20,23 66:17
91:23 128:9
132:19 154:3
186::
presentation
47:6
presented 2:13
89:7 105:3
182:22 184:6
185:9,10
President 17:16
35:16 121:6
presumably
71:15
pretty 22:7 72:2
75:16,25
168:23 179:12
prevent 28:9
98:21 119:4
121:24
prevention 36:2
36:13 67:24
68:2,13
prevents 23:13
previous 124:16
134:7
previously 87:18
price 133:12,13
167:10
primary 37:20
38:22
principal 12:8
18:13
principle 23:10

125:11
principles 2:13
2:15 9:10
prior 41:2,25
60:10 93:16
prisons 5:3
149:4 162:3
163:4,18 172:4
175:22
privacy 96:14
private 23:23,24
38:12 68:12
75:7 117:7
probable 175:8
probably 6:11
6:19 59:8 69:20
progressed 82:6
82:6,7
prohibited
24:14 60:3
prohibitive 80:8
project 49:11
177:12
prolonging
128:16
promote 15:21
promotes 39:2
proof 128:5
proper 19:13
42:8 122:5
172:19 181:10
properties 73:2
88:15 94:13,19
95:6,17,19
104:12 119:8
121:13 127:25
128:3 129:16
129:21,23,23
130:5 142:7
143:3 144:12
144:12 145:8
146:25 152:8
153:24 154:11
159:16,17,22
173:1,25
175:14 185:21
property 3:16

3:21 12:25
13:19 14:22
16:7 23:24
39:18 36:7
42:15 44:23
45:8 46:2
49:23 56:22
52:7,25 53:2
54:8,10,20
55:3,8,10,13
55:14,18,19
56:2,18 57:2
58:10,13 60:12
63:14,16,16
66:16 72:8,13
79:24 86:11
89:24 90:1,2,3
93:4,12,14,16
93:17 94:1,2
98:15,22 99:19
103:8,12,16,18
104:17,18
106:15 113:21
118:13 119:5,5
120:3 122:7,9
123:20,24,25
124:5,7,9,10
124:11,13,15
125:7,12
126:10 128:11
128:13 129:20
129:21,23,23
130:4,10,11,17
140:23 142:7
143:3 144:12
144:12 145:8
146:25 152:8
153:24 154:11
159:16,17,22
165:2 165:20
167:8 180:8,12

167:11,15
168:4,5,15
169:2 171:11
171:24,25
172:1,5,7,10
173:2,4,7,15
179:5 183:7,12
183:15 185:13
183:16,24,25
184:16,24,25
184:9
prosecuted
14:13 28:13
prospective
128:15
protect 88:3
104:8 126:16
126:17 137:3
141:4,6 142:16
148:19 158:15
183:5
protected 14:3
15:18,18 17:23
18:22,25 19:3
19:23,25 22:13
23:20,24,22
23:6 28:4,6
51:11,12 73:9
73:12 77:3
78:24 79:6
85:8 148:10
155:22,25,25
157:13,13,15
157:17,22
167:8 180:8,12

180:18 181:17
protecting 104:6
185:7
protection
185:15
protocol 27:7
protocols 58:20
58:24
proud 147:7
prove 80:19
proves 154:7
provide 7:10
28:3 36:3
37:13 38:24
44:18 48:15
49:14 68:1,4
68:13 74:9
88:10 176:22
provided 33:7
42:7 48:25
52:17 90:20
123:11 182:22
provider 162:6
providers 39:19
providers 37:18
94:12 180:20
95:19 123:4
181:22
providing 35:19
90:12 132:11
133:4 138:9
171:5
provision 42:16
proximity
127:21 161:24
150:17 28:12
psychological
175:8
public 1:22
114:7 116:14
121:24 126:16
126:18 129:12
139:13 141:6
153:7 178:16
177:5 181:22
185:8,13 189:9
186:19

publicly 67:25
pull 120:25
pulled 153:24
purchase 42:16
63:16 94:19
95:11,12,14,15
104:17 105:3
125:19 129:21
129:23 130:5
133:21 139:17
141:: 172:4,22
173:7 186:15
purchased 12:25
13:20 39:6
42:15 43:2
49:23 57:4
94:12,19 95:7
104:3 108:10
118:13 125:7
125:11,22
125:24 128:22
126:15 128:22
137:12 140:14
141:3 147:20
145:5 187:21
purchaser
104:22
purchasing
93:16 105:2
125:5 137:1
140:16 149:4
172:23
purely 4:11
115:7
purpose 61:18
139:19 148:5
quality 27:7
quick 12:18,20
75:5 145:15
quickly 153:25
quiet 137:13
152:21 154:16
169:4
158:24 159:1

167:5 186:21

_____ y _____

qualifications
40:13 72:11
quality 27:7
36:3 41:19
48:2 58:21
59:12 71:9
172:14 185:22
quarrel 45:22
quasi 2:10
question 5:25
6:5,15,24 7:20
7:25 8:2,5
10:10 34:2
53:3 92:3,5
111:22 115:22
116:12,24
118:23 123:23
124:6,13,17,25
126:15 127:25
128:1 129:20
138:18 139:17
144:9 152:7
155:13 156:7
157:21 167:25
168:10,12
186:25
questionable
148:16
questions 5:23
8:22 57:24
62:6 64:15
65:10 77:1
78:22 81:4
96:21 100:4,14
112:13 113:23
138:18 165:10
quick 12:18,20
75:5 145:15
quickly 153:25
quiet 137:13
152:21 154:16
169:4
158:24 159:1

quote 116:4
121:13 137:22
137:24 138:4,4
138:20,25
139:7 122:20
139:14,19,22
176:13,16,17
177:1,8,12

_____ R _____

R 153:12 189:1
163:13,19
R-f 12:8 17:25
18:2 19:5
R-d 12:8 17:25
28:12,20 54:14
57:3 76:25
93:13 95:3
140:19 171:13
172:3,7 184:11
187:18
R-48 7:13
R-QD-E-R-I-
122:20
raced 153:21
raid 165:13
rainstorm 167:1
raise 12:11
16:11 95:23
101:13 137:13
170:19
raised 152:6
raises 176:10
raising 138:18
random 42:5
115:4,7
randomly 115:2
ranting 153:14
rare 4:10
rate 155:15
156:9 161:3
rates 154:19
Ravenna 12:4
147:19 149:2
158:24 178:16
real 52:1 66:11
reason 3:19 5:9

81:21 86:20
88:16 93:8
94:21 96:7
97:6,7 109:5
112:7 122:20
128:19 129:15
130:9 140:6
140:10 142:8
143:4,6,8
146:24 160:1,6
161:11,16,19
162:11,16
163:2,9 165:12
187:18
re-mention
174:1
reach 2:15,16,17
161:15
reached 5:18
read 21:22 24:2
59:21 135:23
139:2,10 164:8
reading 154:18
reads 131:3
ready 154:8
72:16
real 105:20
113:24 125:3
128:4 130:2
145:14 145:17
145:19 159:17
reads 121:19
172:13
reassurance
143:14
recap 12:20
138:9
receive 33:18
34:8,9,11
49:16 56:24
74:9 87:21
14:18 185:21
received 13:24
34:5 47:21
50:8 54:3 74:1
86:18 139:23
174:23
receiving 13:13
121:24,25
151:10
recenter 152:5
recess 111:8
182:2
reason 3:19 5:9

17:6 24:21
76:4 82:22
115:6 127:23
130:8 131:16
131:23 132:12
152:23 169:3
181:12
reasonable 19:9
147:7 23:3
30:10 31:6
33:8,22,23
73:15,19 75:15
76:16,20 115:5
131:3 149:17
150:7,9,13,13
150:19,20,21
150:22
reasonableness
7:18 10:8
reasonably 45:8
46:2 63:14
124:13,15
184:3,7
reasons 160:4
167:21 182:9
reassurance
143:14
recap 12:20
138:9
receive 33:18
34:8,9,11
49:16 56:24
74:9 87:21
14:18 185:21
received 13:24
34:5 47:21
50:8 54:3 74:1
86:18 139:23
174:23
receiving 13:13
121:24,25
151:10
recenter 152:5
recess 111:8
182:2

recited 3:6
reciting 150:10
reclassified 87:4
recognize 8:3
136:10
recommend
51:25 122:9
record 2:21 3:3
3:5,17,19 4:11
6:9,22 16:21
23:2 24:10
25:11 33:16
35:13 64:12,13
64:18 67:9
81:8 86:10
92:22 96:10,11
100:24 102:20
118:10 128:9
136:3 142:20
143:11 145:24
153:8 158:15
159:2,10 164:8
159:5 164:16
179:19 182:4
183:24 185:18
recorded 89:18
recording 89:18
records 167:4
recoup 94:18
124:10 140:25
recover 90:7
recovery 17:21
24:20,20
38:17 40:20
49:15,19 51:1
52:23 76:23
77:2 79:15
80:24 84:21
127:5 136:20
136:23 176:15
175:6 165:16
recovery 172:4,5
25:13 28:21
33:22 126:7
17:13,15 19:8
33:23 25:21
26:21,21,24

27:3,12,13,19
27:23 28:2,3,4
28:7,17 29:17
35:17 36:1,4
36:14 37:13,14
37:15,16,16,18
37:25 38:1,3
38:11 39:1,2,3
39:7,14,17,24
40:6,10,15,18
42:20 40::1
42:8,9 43:1,9
43:22 44:2,19
44:20 47:16,17
47:18,19,20,22
47:24,25 48:4,7
48:10,14,15,18
48:23,25 49:2
49:4,6,11,13
50:1,11,15,17
51:4,6,7,8,13
51:20 52:2,5,6
52:11 53:1,10
57:5,6 58:11
58:19,24 59:2
59:23 61:9,16
65:15 66:3,20
67:1,15 68:16
69:22 70:3,7
70:11,11,18
71:4 78:23
86:25 88:19,22
89:25 90:18,21
91:14 93:12
99:6,16 109:19
111:4,13 14:15
115:16,25
116:2,9,21,24
116:10,14,17
118:15 119:12
120:21 120:24
131:1,11,12
131:3,13,15,22

38:18,25
141:11 159:25
168:4 171:22
173:24 174:13
175:17 176:7
176:20 177:19
180:11,17
181:13,18
186:19
recycled 132:24
red 8:9,9,9
reduced 40:8
42:6,13
reduce 87:18
reduces 90:11
reference 61:10
89:6 176:16
referenced
116:3
references 40:10
referrals 36:15
referred 25:1
26:25 91:2
referring 35:23
111:13 114:15
114:16
reflects 121:19
130:15
refusal 25:17
26:1
regard 120:5
regarded 23:3
24:11,12
regarding 14:3
25:12 26:3,11
59:17 60:14
130:14 138:23
163:3 173:13
174:13 181:22
Regina 120:19
120:21
regional 103:21
112:13 118:3
149:13 163:25
175:4
related 9:2 18:9
18:12,13,16
76:23,25 78:21
79:10 80:20
103:21 110:21
112:13 118:3
149:13 163:25
relates 64:1 67:3
114:6

regulation 14:5
53:8 55:7
93:25 124:6,8
126:16 140:22
141:5 171:21
172:1,3,10,19
172:23,25
173:1,8,14,18
179:5 183:7,12
183:15,21,22
183:24 185:2,3
184:6,24 186:5
186:14 186::
187:9
Rehabilitation
37:6
rehabs 106:23
reimbursed
49:13 80:5,6
117::
reimbursement
48:20
relapse 36:12
107:13 110:7
111:2 156:14
156:20 157:18
157:23
relapsed 114:15
114:16 156:2
relapses 110:23
123:15,23
175:4
rehab 83:7
107:19
related 9:2 18:9

relating 4:22
143:9
relation 80:13
relationship
60:1 66:24
115:25 116:5
relative 189:12
relator 42:25
104:20 118:15
119:19 186:2
relevance 175:2
relevant 62:13
96:13 98:6,9
relief 183:2
relies 180:19
religious 102:1
rely 46:9
remain 113:7
remains 55:18
96:12 148:21
remember 8:20
8:21 9:19
reminding 114:9
remission 25:2,4
removing
173:22
rendering 150:4
rent 23:24 38:1
41:25 45:24
46:10,14,15,18
48:5 96:3
124:11 131:12
133:2 140:25
172:8
rental 23:14
119:5,15
rented 103:18
renter 23:16
184:18
renters 184:11
renting 149:7
repeat 3:2 5:2
156:5
repeatedly
134:9
repeating 8:7
reply 131:21
report 88:6
132:17 153:12
153:15,20
174:11 176:12
176:6
reported 133:4
reporter 1:22
2:20 112:9
158:18
reporting 1:24
149:23 189:12
reports 138:1
152:2 153:4,6
153:7 154:3,19
represent 4:22
27:1,3,23 37:9
45:25 46:23
50:12,13 51:10
57:17,21 59:20
60:15 63:23
70:21 87:1,19
88:3,20 90:12
91:10,15 93:19
107:1 125:20
139:18 148:15
177:4 187:9
representative
14:9
representatives
17:14
represents 69:14
request 5:6,7
requested 5:8
96:10 125:1
143:21 164:21
179:5
require 27:6
32:8 43:24
44:20 88:25
163:21
required 4:22
27:1,3,23 37:9
52:23 55:15,23
61:7 96:4,7,8
115:10 140:24
156:20 159:15
159:20 160:15
181:18 183:16
184:1
requirement
88:1 91:18
111:16 163:11
181:4
requirements
9:10 37:4
46:24 51:14
54:21 56:7
57:11 71:7
87:21 89:1,14
124:12 130:5
131:15 132:13
163:5,23
172:20 180:13
187:8
51:14 150:12
151:1 163:4
166:1,12
requesting
134:17 140:19
148:19,21
172:19
researching
142:2
requests 17:19
18:1 28:6
29:17 53:2
68:5 86:14
93:24 104:9
170:25
residence 12:6
39:8 40:14
42:9 45:14,19
47:18 49:25
50:16,23,25
52:23 55:15,23
61:7 96:4,7,8
115:10 140:24
156:20 159:15
159:20 160:15
181:18 183:16
184:1
residency 41:7
41:23,25 56:2
115:10 140:24
resident 27:11
37:24 38:5
39:20 40:4
44:11 58:12
60:6 86:15
88:11 90:19
93:1,4 103:20
106:8 133:3
149:23 151:19
153:19 159:21
resident's 27:10
residential 12:7
12:8 13:15,18
18:1,2,5 19:5
27:2,18,21,24
28:17 29:13
28:19 29:16
40:22 41:14
residential 172:9
187:8
residency 41:7
41:23,25 56:2
172:19
research 75:4
122:5 136:13
137:4 149:9
residentially
134:17 140:19
residents 12:24
residents 47:19
113:14 124:22
134:7 183:17
184:19
residency 41:7
residency 41:7
residential
Residentially
residents 12:24
13:2 14:20
residents' 49:3
resident's 27:10
residency 41:7
50:19,23 54:14
54:15 56:1
57:3,7,12
88:14,17,18
939,10,13,17
94:24 95:3,3,4
95:17 98:21,22
103:9,13,14
104:9 112:25
124:2,12 126:2
129:2 133:22
133:23 137:7
137:14,18
140:12,20
141:21,23
148:12 160:20
167:15 171:8
180:7 181:15
184:12
Residentially
184:11
residents 47:19
113:14 124:22
134:7 183:17
184:11
residents 24:24
281:5 38:2
49:18 52:3
58:23 60:25
65:14,14,22
72:9 88:19
89:5,7,23 90:5
90:8,12,14,20
91:15,19,20
93:18,19
113:12 114:11
122:13 124:4
125:15,17
127:18 129:10
131:9,10,13,13
134:2 137:11
139:1 141:7
142:17 148:3,6
148:12,20
149:20 151:9
151:21 152:16
152:22 154:20
157:8,14,16,17
155:8,14,16,17

161:21,25
162:16 169:2
172:11 175:7
179:6 185:10
185:18
residents' 49:3
60:20
residing 149:21
resolution 20:8
26:13 27:25
28:5,25 50:18
180:4 181:1
resolutions
41:14
Resource 74:22
177:7
resources 44:12
151:24
respect 2:17
10:16 33:19
118:25 178:24
182:5,11,14
responded 51:11
response 33:4
108:20 129:13
189:9
responsibilities
49:4 67:21
responsibility
66:25 67:22
173:9 176:5
responsible
112:14 131:8,9
131:13 140:20
173:3
rest 79:2,8
53:10 80:20
restrain 135:4
restriction 26:10
152:5 186:16
186:18 187:6
restrictions 26:3
86:18 56:11
63:17 104:18
176:11
result 60:13
115:25 172:17
181:7
result 87:22
retired 134:18
return 49:21
returned 96:7
returning 60:11
revenue 38:8
90:10
revenues 38:14
review 5:14
41:12,15,17
142:18 143:2
183:23 184:1
reviewed 3:25
reviewing
175:10
Revised 18:6
26:23 27:4,19
27:21 42:10
44:20 50:19
69:16 116:2
revive 134:25
revolves 10:2
revolving 172:9
173:20
revolving-door
141:24
Richard 51:18
rid 101:13
Ridge 36:23
right 3:24 4:15
5:15 6:15 10:11
12:14 15:24
16:12 33:13
45:5 55:8,10
55:13,18 56:2
66:4,15 75:24
86:14 88:5,14
94:1 97:13
102:5 105:24
109:9 110:14
110:9 117:13
120:7 173:11
176:11
119:25 120:8,9
121:1 124:7,9
127:16 135:13
135:18 136:2
136:10 146:18
146:20,25
158:13 164:22
167:24 170:20
171:22 177:10
177:11 178:5
179:2,11
181:25 182:3
182:18 183:21
183:23 184:1
rights 55:3
59:13 103:12
120:24 122:4
171:23,24
risk 48:1 59:11
88:4 95:21
167:6
RIVER 1:25
RN 84:4
road 1:8 12:4
17:19,24 25:19
28:2 29:18
39:6 50:8 52:5
58:1 66:11
67:21 70:12
81:21 85:2
86:20 93:8
94:21 96:7
97:6,7 105:20
109:5 121:7
122:20 128:19
129:15 139:10
140:6,10 142:5
143:4,6,8
146:25 160:1,7
161:11,16,19
162:11,16
163:2,9 164:14
165:12 169:23
roads 95:8,10
129:22
ROCKY 1:25
Roderick 122:19
role 24:5 118:22
roll 10:25
187:16 188:4
room 60:22
rooms 60:20
room 142:2
147:3 154:18
Rosemary 65:17
66:3,8 81:11
81:20
rotation 153:10
roughly 113:9
Route 93:22
97:15,17
126:12 146:15
160:12,17
161:2,4,13,19
161:24 162:11
162:16 166:3
rude 96:9 189:13
rules 23:18 26:2
81:20
S
S-C-R-I-B-B-...
81:15
S-E-R-E-D-I-...
102:23 168:22
S-L-A-C-K
118:12
Sabel 166:17,18
166:24 168:6,9
168:13
safe 39:4 41:20
109:18 121:14
136:16 170:15
safely 154:21
safety 48:1
59:11 89:4,5
95:7,10 103:24
104:3 114:7
116:15 119:11
121:20 126:16
126:18 141:6
146:2,10 148:6
152:15 160:10
162:7,14,19
170:1,9,11
173:16 176:7
185:8,13
sale 23:14 142:3
sanction 164:23
Sarah 1:21
92:19,22
105:21 147:14
149:6,19
sat 65:18 165:2
satisfied 64:12
64:13
satisfy 76:22
187:8
Saturday 60:17
Saturdays 60:24
save 134:21
saved 109:24
135:5
saying 2:5 3:13
4:14,17 6:16
6:16 7:23 9:19
10:7 14:18
31:4 45:24
61:24 75:21
103:1 107:21
107:24 117:13
120:4 174:15
178:3
says 20:22 32:19

33:2 75:23
76:3 103:2
111:17 118:1
153:12,16
167:4
scale 139:25
scary 108:8
schedule 52:3
scheduled
125:14 149:23
school 129:8
160:22 162:22
170:13
schools 95:8,10
136:17 152:11
162:22
Schuetzman
142:5
scope 73:17
scratched 135:3
screen 41:1
Scribben 81:7
81:10,11,15,20
81:20,25 92:3
92:6,11,14
seal 189:15
search 177:13
seasoned 104:23
Seat 138:8
second 10:21,22
60:21 144:21
161:6,9 182:15
182:16 185:25
188:3
secondly 19:7
secondly 116:4
Secretary 1:18
secretive 139:22
secrets 142:9
section 12:7
18:6 24:2
116:2 180:3
181:1
sections 116:2
security 116:15
175:11
see 2:19 5:15
13:8,11 44:10
57:9 61:21
62:22 80:9
85:11 105:13
127:22 145:4
seeing 180:14
seeking 37:22
69:13 138:9
183:7
seen 62:23
106:18 183:22
sees 132:6
self-induced
103:25 124:25
125:2 140:13
183:9
Seredich 102:14
102:17,22,22
102:25 115:22
116:12,20,24
117:8,13,20
122:5 140:19
145:2 149:21
172:15 174:14
173:14 174:18
seven 62:3 79:19
157:2 158:7,10
87:24
seventy-four
87:24
169:8
seriously 56:5
serve 72:8,10
75:8 115:13
157:5
service 1:24
35:20 67:15
72:12 90:6
126:23 161:22
services 23:18
27:6 36:6,7
37:5,13,15
38:10,11 39:18
42:7 48:7,14
48:15,17,21,23
52:11 58:17
66:20 67:24
68:2,4,9,13,19
68:21 69:6,9
71:13,16 88:11
90:12,20
104:11 121:5,9
121:11 129:12
129:19 132:1
Services' 49:8
session 52:3,8
62:8 125:13
133:25
set 31:20 32:6,15
68:11 72:1
107:21 111:15
119:6 132:3
180:25 189:15
setting 37:19
39:13 40:22
126:18 132:15
141:20
settled 131:21
share 51:2 130:3
shed 130:23
shell 174:20
sheriff 129:12
151:24
signing 103:4
signs 65:19
84:14 85:4,9
125:21 126:13
shirt 105:8
short 97:14
shot 95:18,21
shop 96:2 139:5
short 97:14
similarly 172:7
simple 101:15
similar 27:1,17
137:22 136:8
163:22
shutting 82:14
82:25
shows 176:12
showing 125:21
150:18
shown 155:10
show 111:1
173:18 175:5
sheriffs 175:25
signs 65:19
sight 127:17
155:3,6
sign 8:8,9,9
108:11 125:20
141:19 142:24
143:8 144:14
signage 96:12
signed 105:5
141:24 189:15
significant 72:2
sits 140:18
sitting 113:23
183:2
significantly
50:4 97:20
162:18
signing 103:4
signs 65:19
84:14 85:4,9
125:21 126:13
139:17,24,25
140:6,8 158:7
164:22 165:3
166:3,6,20,23
167:10 168:10
168:11 169:16
169:25 186:6,7
single-family
139:17 24,25
140:6,8 158:7
sit 42:13 105:8
135:17 165:11
168:12
sit 60:25 101:23
sit 41:22 49:3
183:3
sits 140:18
sitting 113:23

situation 24:5
159:21 176:10
72:3 131:8
132:16 143:18
150:8 157:6,10
159:5 161:21
162:24 180:7
situations 4:10
184:18
six 43:25 43:16
47:16 62:3
82:24 83:14
85:2 97:19
133:18,20
133:16,18
142:13,14
145:14
155:5,17
162:20 163:6
size 2:25 26:18
39:4 40:1
60:10 89:6,14
111:23 137:9
138:23 148:2,3
149:17 150:8
161:7,11 152:9
153:9,12 139:1
154:20 156:9
176:25 177:3
177:10 178:12
178:13
sobriety 37:25
49:20 107:1,20
107:24 109:15
111:14 112:17
112:23
socially 172:14
society 27:15
28:8
socioeconomic
104:15
soft 90:13
soil 163:22,25
sold 55:15 94:18
99:9,11 128:19
133:8,10,13,14
133:16,18
146:11,16
140:25 141:2
142:13,14
145:14
solely 93:3
171:14 172:17
solicitor 177:2
solid 49:19
somebody 3:12
5:3,4 9:11 21:3
44:25 45:18
54:7 66:6
84:16 92:18
115:9 144:4
146:19
someone's
101:10
son 134:14
Sonja 147:22,24
173:17 174:12
3:9 4:1 40:1
60:10 89:6,14
sorry 28:10 30:6
101:19 109:8
111:23,25
96:19 118:25
133:10 145:3
155:2 159:16
171:11 152:9
153:9,15
154:20 156:9
sort 47:6
sought 53:9
sound 56:6
178:2
sources 37:10
38:8,13 160:22
South 17:1
space 39:9
152:25
speak 2:24 3:2
4:20 7:8 8:25
21:24 46:21
65:17 66:22,23
81:7 86:2
100:10 102:13
106:1,12
110:16 120:17
135:13
speakers 100:1
speaking 17:7
101:7 159:6
speaks 4:25
89:19
special 43:25
specific 53:8
70:8 72:7,12
74:18,19 79:23
112:11 113:5
126:19 170:10
specifically
27:22 50:18
58:20 78:5
89:8 118:20
127:4 138:17
specified 189:11
specifying 32:24
speech 105:21
speed 161:3,3,7
spell 3:1 35:13
679 81:18
86:6 9:22,22
100:24 102:20
112:8 118:10
122:21 138:2
136:3
spelled 62:20
spend 71:24
72:18,19
spends 88:4
spent 113:24
Spidalieri
153:14
Spidalieri's
91:11,13 92:21
95:7 97:17
105:9 117:21
spit 135:3
spoke 3:13 52:1
187:14
sponsor 42:4
sports 129:9
139:6
SS 189:3
stability 44:13
95:20
Stahl 96:22
153:22
Stand 5:7 64:4
standard 75:16
178:13
statement 6:2,7
6:18,19 7:8
8:11,12 35:25
52:22 81:9
86:16,22 93:3
131:24 179:9
states 27:22
72:23 78:4
89:8 121:9,12
125:11 137:21
149:1,25
stating 51:12
53:9 86:17
132:20 138:3
132:21 139:3
statistics 111:1
112:15,18,21
statute 23:25
25:2 26:6,15
27:6,8 127:12
statute 23:25
25:2 26:6,15
28:3 58:6 69:23,24
80:21
stay 27:10,12
28:15 44:11,15
121:15 136:3
158:21 159:23
160:12,17
161:2,4,13,15
162:11,16,21
162:10 166:3
167:6 169:11
169:14,16,21
189:3,7
State's 111:16
stated 30:8
51:20 79:24
80:21 86:20
125:1,8 128:25
129:1 134:1
138:12 139:19
149:1,25

58:18 79:3 80:6 83:17,19 83:19 111:3 113:8,9 132:24 146:4 174:15 176:25 186:10
stay-at-home 118:15
stayed 44:16 83:22
stenotypy 189:7
step 72:16
stepped 29:7
steps 14:10 51:9 107:22
Steve 176:18
stick 5:13
stone's 136:19
stood 2:6
stop 8:8,9,9 82:11 100:2 101:20,21 141:19 142:24 154:12 154:14 162:22
stopped 66:6
store 154:21
stores 126:4,5
stories 84:15
storm 160:9 163:19,24
straight 9:3
strange 155:4
strangers 155:4
street 171:6 5:18 90:2 95:3,24 127:11,16 136:15 137:14 141:18 142:23 143:5,7 144:15 144:22 146:3 148:1 153:8,12 153:18 155:5,7 159:3 162:17 163:1 174:14 174:19
strengthen

44:13
strict 56:7 80:15
strictly 104:8
strides 108:7
strong 127:8
struck 126:22 182:21
structural 39:14 50:5
structure 38:24 93:7 109:18 142:12 143:2
structured 39:17,20 49:20
Structures 129:23
study 163:21 167:2,2
stuff 6:21 10:5 84:18
stumbling 138:4 138:5 176:14
subject 3:10 24:14 42:17
subjective 152:5
sublot 163:16
submit 8:24 142:3 163:21
submits 71:12
submitted 33:9 48:16 63:17 64:17 70:21 159:24 179:23
submitting 40:17 148:25 152:3 153:4
subsequently 75:19
substance's 5:5 23:5 25:17 27:1 35:20,22 37:20 38:17 44:13 49:15 50:1

51:1,21 68:5 113:12 150:23
substances 23:8
substantial 55:7,10 94:1 103:12 124:7,9 171:22 172:12 183:21,22 185:17
substantially 22:25 24:8 25:4,9
substantiated 79:25
success 13:5 155:15 156:9
successful 56:16 156:10
successfully 113:6 187:19
succumb 142:18
sudden 77:4
sue 130:11
suffering 25:1,3 35:23
suffices 6:10
sufficient 44:11 181:6 185:22
suggest 123:3 184:17 185:23
suggesting 10:6 31:5 45:23 63:20 77:23 101:21 114:8 185:11
suggests 26:16
suicidal 174:5
suit 173:2 187:23
suitable 108:17 172:19
Sunday 60:16 60:23
superceded 14:4 14:5
supersedes 15:13

supervision 39:22
suspect 22:4
suspicion 115:5
suspicious 107:10
supplement 90:10
supplemented 69:7
support 27:3 36:12 37:10 62:21 62:22 164:6
48:6 49:17,20 38:5,24 39:18 40:20 42:4 48:6 49:17,20 81:13 82:18 86:23 95:9 118:20 140:4 147:17 148:14 163:18 178:25 179:4
supports 121:11
supposed 76:8 100:3 120:11
surrounding 52:4,7 60:2 65:14 103:10 104:15 125:17 129:11 148:9 171:13,16 187:20
surroundings 140:7
surveillance 175:11

Susan 28:12,22
suspect 22:4
suspicion 115:5
suspicious 107:10
swallowing 147:19
swear 5:8 16:15 100:15 102:16 108:21 146:20 166:20 168:17 169:18
sworn 2:24 3:9 3:17 12:13 16:19 35:11
temporary 122:5
ten 12:17 106:22 136:23 182:1
ten-minute 179:15
tenant 58:13 60:14
tends 145:16 147:14,20,21 158:13,16
term 24:5 35:22 186:12
terminated 25:23
terminology 40:18
terms 57:10 62:9 145:5 151:24 171:7
territory 171:5
they'd 65:23 thing 11:19 191:11 64:4,5 77:9 84:10 149:6 153:14 180:3 145:20 186:10

X
T 189:1,1
T-boned 146:7
T-R-Z-A-S-K-A 105:20
T-U-R-K-I-S-H 136:6 170:18
take 2:12 3:8 4:12 5:23 7:1,1 7:1,11 89:19 52:17 54:19 55:1 56:4

---

61:22 62:4,8 67:5 77:1 100:3 101:12 105:10,25 111:4 114:3 116:10 110:9 112:4 173:3 179:9,15 179:20
taken 4:2 32:20 51:10 82:12 92:7 189:11
takes 128:16
talk 78:17 109:11
talked 53:16,19 98:15
talking 5:24 34:18,24 56:23 57:15 84:11 98:13 112:24 177:2 183:10
target 127:22
targeted 49:1
task 120:16 178:1
tattoo 96:2
tax 90:2,11 141:8 151:12 151:16 159:17 186:12
tax-exempt 95:8
taxes 89:24 95:7
113:25 120:8 129:19 141:8 170:12
taxpayer 121:24 121:25 129:11
taxpayers 90:16 116:15 151:13
taxpaying 88:11 141:7 142:17 151:21
teacher 147:8
teachers 28:9
team 40:19 126:11 134:1,4

tell 2:22 4:14 5:11 6:12 9:3 30:19 61:20 60:8 78:16 85:3,10 106:5 110:9 112:4 144:4 166:18 177:22 178:19
telling 47:2 62:21 62:22 164:6
tells 107:5
temp 1:11
ten 12:17 106:22 136:23 182:1
47:1 06:1:18 62:12 63:10,12 63:21,23 64:1 66:17 68:19 85:24 187:5 testing 36:14 42:5 115:3 thank 6:4 31:9 35:8 57:23 66:12 71:17 74:12,20 78:18 82:20 85:6,19 90:23 91:22 96:12 96:16,17 97:3 100:7 102:2,5 105:6,23,24 108:17 118:6 119:25 120:10 123:22 135:12 135:24 143:16 145:12 146:18 147:14,20,21 158:13,16 159:6,7 164:18 169:5,6,8,17 170:16 179:7 179:11 181:24 187:23
that'd 47:7 theater 139:6 theft 174:8 Therese 135:25 136:5 147:14 150:23 this 6:25 thing 11:19 191:11 64:4,5 77:9 84:10 85:5,14 106:25 119:19 135:13 141:20 145:10 148:23 185:17

threatened 135:5
threatening 134:23
threats 153:9 154:4 174:3,5
three 5:12 28:9 58:20,25 62:2 83:17 98:3 106:23 109:7 148:19 149:1 148:18 183:4 156:10,22 158:2
three-176:23
three-day-150:20
throw 135:19 thrown 126:23
Thursday 66:10 60:24
tick 76:10
Tim 1:17 10:17 147:14 172:25 184:6,7
time 3:2 4:5,25 6:1,6 8:6,10,23 19:13 20:12,15 23:11 27:11 31:11,20 44:12 52:17,23 53:15 53:18,19,22 55:21 60:6 64:14 66:15 72:13 75:18 76:11 83:13 90:15 96:24 99:19 101:9 104:14 106:18 107:25 108:4 112:17 113:8 115:15 120:11 120:17 120:22 122:3 124:18 139:14 134:12

---

135:12 143:16 144:15 147:19 155:23 157:13 160:14,18 171:5 184:15 185:11,19 189:11
timely 11:25 181:10 182:10
times 14:16 22:23 40:17 106:24 164:5,24 160:14,16 165:5,24
tired 75:4
title 67:17 104:21
to-be-determi-142:23
today 55:20 123:10 170:20
today's 28:8
told 48:17 50:17 51:12,23 55:19 75:1 83:1 96:10 127:24 135:11 142:5 176:20 184:8 184:10
tolerated 60:5
Tom 159:4
Tomaric 1:15 10:7,11,23 187:17 188:9 188:10
ton 75:8
tonight 4:7,16 5:15 8:25 10:8 10:13 11:17 12:2 16:8 17:15 18:22 28:19 30:21,22 123:7 132:20 135:13,23 152:3 168:24 183:10
tonight's 4:4,7

9:16,17 135:11
top 177:15
topographical 54:16
Total 43:17
touch 170:4
touch 127:10
town 1:8 170:9
township 1:7 28:14 33:1 34:9 36:22 50:6,17 51:19 52:14 80:19 86:15 88:6,12 90:7,9 95:9,6,8 94:10,11,12,15 95:9 96:8 101:3 103:3 118:18,19 119:8 122:7 142:17 147:13 149:3,24 151:4 151:5,9,13,17 151:18,19 169:18,19,21 23:10 36:2,5,9 36:17,18,19 37:1,20 38:16 38:19,22 39:21 40:9 41:14 42:6,67,24 68:4,9,13 69:5 69:9 11:2:15 11:18:21 128:12 12:24 15:3

189:8
transient 89:7
908,8,14 104:13 136:19 141:24 161:21 172:11 transition 27:14 39:3,5,20 49:21
transitioning 113:6
transplant 85:18 81:17 90:7 90:19
transportation 162:12
transports 90:11
travel 126:11
traveled 160:13
traveling 170:3
travels 161:5,9
traversed 159:22 160:16
treat 76:18
treating 79:5
treatment 23:10 23:10 36:2,5,9 36:17,18,19 37:1,20 38:16 38:19,22 39:21 40:9 41:14
40:941:14
trees 68:4,9,13 69:5 69:9 11:2:15 11:18:21 128:12 12:24 176:24
tree 64:23
trees 144:11
tremendous 146:2
trespassers 154:5
trespassing 174:2 175:23
trial 3:7,8
tried 56:14 46:9,11,13

trips 166:6,6
trouble 106:10
true 139:14
truck 160:23
truly 28:11
try 5:13 32:8 135:2
trying 6:17 29:8 29:9,20,21 54:3 61:20 77:10,12 89:17 72:16 85:17 125:21,22 133:14 141:22 114:9 125:15 105:15,19,19
Turkish 7:22 85:24 10:1,5 170:17,17,22 170:23,25 178:2,17,20,24 turn 142:19 turned 82:14 turning 85:10 turpitude 152:25
TV 65:23 84:24 twelfth 125:8,12 twelve 28:1 39:23 47:20 48:8,11 49:17 59:3 61:3 125:9 133:12 154:24 174:20 two 12:23 17:18 18:13,18 26:14 28:7 36:21 39:9 40:10,16 46:9,11,13

49:18 57:9 58:6,7 62:2 98:3 101:11 113:23 124:11 124:16 131:4,5 132:12 148:17 140:12 141:5 159:11 165:9 169:4,7 172:5 2:two-car 39:11
141:15
two-person 103:20 117:22
type 18:6 29:25 89:10 147:9 174:16 183:2
types 72:10 130:17
typically 2:4 164

U
U.S 160:25
Uh-huh 77:22
ultimately 89:4
110:5 185:4
unable 74:9
unanimous 182:6
unavailable 23:15
unaware 125:23
uncomfortable 159:5 170:3
unconcerned 154:3
undermine 150:16
understand 16:15 21:1,21 21:22 22:6 29:20 31:24

---

33:22 54:22 75:13 76:23 77:10,12 80:15 87:15 109:13 109:25 110:1,3 28:3,7 39:17 44:5 42:24 144:3 119:23 123:3 146:5 186:16 understanding 43:4,7
understood 144:2
undue 150:14 151:3,4,7
unfamiliar 161:22
unfortunate 154:24
Unfortunately 120:25 147:7
unintentionally 79:5
uninvited 141:17
unique 5:9 54:8 54:9,15,20 63:14 75:17 79:23 93:14 103:7 123:23 123:24 171:13 183:11 187:11 unit 18:11,14 19:3 26:9 27:3 149:13
United 38:12
units 38:22 181:25
unknowing 127:9
unknown 152:17
unknowns 142:9
unnecessary 52:20 93:11 176:8 181:4 183:4,4
unquote 154:1
unreasonable

80:23 151:2,2
unrelated 17:21 18:18 19:7 25:20 26:13 28:3,7 39:17 44:1 53:2 58:8 77:2 78:23 131:5 149:18 142:8 168:0? 152:4 19:3,21 27:3 18:9 29:16 22:2,11,16,19 24:2,21 25:16 25:17,18,22 27:17,25 28:11 28:12,19 29:3 30:9,11,17 31:14,17,17,21 15:24 19:12,19 19:21 20:25 23:16,19,19 25:24 19:12,19 28:20 29:3 146:5 119:25 126:11 96:7,13 7:17 9:3,12 10:7 12:5,10 12:5,8,17 14:11 15:21 16:2 24:22 135:24 137:14 14:9 19:21 20:1 22:24 144:19 15:24 19:12,19 use 157:17 26:3 28:20 57:16

53:9 54:21,24 55:25 56:1,5,8 56:9,10,18,24 57:6,13 60:10 58:25 59:13 62:1,15,22 63:25 64:7 66:22 74:18 76:2,5 77:6 79:2,2,9,22 84:11 86:20 87:3,4 88:2,25 93:7,9 94:20 99:1 128:11,13 170:14 109:18 98:9 98:15,22 142:7 98:15,22 142:17 100:22 103:6 103:13,22,23 104:20 110:21 116:14 117:1 120:13,15 121:19 122:7 124:17,19,20 130:21 132:11 132:23 140:10 143:9 145:5 148:15 149:5 150:17,24 153:8 158:3 164:14 168:5,11,18 169:23 171:9 173:2,12,14 177:6 180:8 181:16 183:7 183:7 184:13 183:18 184:14 184:22 185:22 185:17 185:5,9 186:1 187:23 190:7 193:5 94:17

157:7
utilizing 151:23

V
V 86:12
vacation 43:3
valid 40:23
valuable 94:19
value 98:4,5,18 99:1 128:11,13 170:14
values 95:21
Van 17:16
vandalizing 153:11
variance 2:18 4:20,22,23 5:5 5:6 9:3,12,22 9:15 15:2 9:3 15:13,19 152:14 18:24 19:12,21 20:17 31:7,23 32:2,9 32:10 33:8,11 33:21,25 34:7 34:16,21,22 35:1 45:9 46:1 49:17 139:3 143:7 184:11 various 108:4 125:1
Vatty 13:2,3 86:6,11,12 91:3,12,23 92:10,12,16 95:17 56:10,16 96:12,12,18 126:23 140:23 153:24 161:5,8 175:23
vehicle 15:16 126:23 140:23 153:24 161:5,8 175:23
vehicles 60:25 126:23 137:17 141:16 142:14 154:5 160:23 160:25

161:1,1,19,22
174:1
vehicular
126:20
verbally 7:8
versus 142:1
vested 126:25
186:3
viability 79:8
viable 45:9,10
45:22 46:3,6
63:15 94:17
103:17 124:14
149:6 172:2
184:4,7
Victor 86:12
view 17:20
57:16 62:9,18
177:23 178:11
village 139:8
violates 12:7
violating 58:14
58:15
violation 60:13
131:24 140:1
violations 89:4
1 13:12,13
114:12 150:17
violence 175:5
violent 134:23
virtually 3:7
vision 59:8
visit 13:1
visiting 106:14
visitor 127:21
visitors 59:17
127:6,18
visits 137:1 146:3,5
161:21,25
162:1,16
voice 7:22 89:18
106:16
voiced 138:11
volunteer 59:24
voting 89:2 101:12
151:19
voting 151:22

**W**

W-A-G-N-E-R
120:22
Wagner 120:19
120:21,21
wail 11:21 97:15
127:17
waiting 102:6,8
waking 134:16
walk 108:13,15
127:11 155:7
walking 139:7
155:5
want 4:19 5:5
7:12 9:1 20:23
28:15 35:14
46:19 47:3
55:21,25,25
62:21 63:1,9
64:1,3,7 66:5
66:17 71:25
76:18 81:8
82:17 84:10,20
84:21 85:11,15
83:6,16 89:22
96:11 100:17
100:18 101:13
102:25 105:7
106:16 109:14
109:20 110:16
114:3 117:9,15
118:20 119:1
122:7,13 128:6
129:3 130:12
142:13 145:23
154:17 158:14
159:6 166:15
167:12 168:24
169:1 170:5,10
179:18 187:3
wanted 5:20
7:15,22 13:10
16:15,17 16:1,3,6
15:8 20:3 47:2
47:6 52:17
71:3 92:18

96:19 102:12
109:12,13,21
109:22,22
110:18,19
111:12,19
130:23 135:15
136:14 144:1
147:4,9 159:1
148:25 163:9
169:15 170:11
179:16
wants 2:24
106:1 120:17
144:17 168:17
186:1 187:16
WARE 1:24
warrant 174:2
181:6
wasn't 8:14
19:16 20:2
43:22 72:13
83:2,15 107:4
107:12 120:11
183:19 184:23
184:25 185:1
186:5
watch 84:24
85:4
watched 144:18
165:25
watching 65:23
65:24
water 83:1
83:8,11 160:9
163:15,19,22
163:24 165:17
165:25 166:25
168:3,3 170:10
174:13
Waterfowl 65:8
66:4 93:1,21
95:2,22 97:4,6
97:11,21,24
102:23 112:7
118:13,14
123:19 126:1
136:9 137:9

144:23,25
145:18 147:25
148:1,2 152:11
158:23 159:13
159:22 160:11
162:10 163:16
161:2,7,13,14
161:25 162:2
162:10 163:16
166:11,18
167:1 168:22
169:13 171:1
172:24 186:12
way 29:24 32:11
38:12 55:13
61:23 72:18
100:5 105:9
107:7,8,22
117:2 120:8,9
121:14 144:13
147:16,19
169:4
ways 108:4
we'll 5:7 16:8
33:15 35:9
64:11 76:5
79:17 92:1
135:10 181:25
83:7,14,21,25
106:23 109:15
109:20 148:7
wears 18:7
33:14
what-ifs 137:8
whatsoever
181:13
WHEREOF
189:15
wholly 175:12
Wieland 28:10
28:12
wife 134:14,15
144:17 159:14
willing 90:18
170:3
window 121:1,2
127:7

128:18 130:20
167:10 177:25
179:13,14
we've 64:5,6
95:6 101:23
111:18 120:16
123:6 157:6
158:11 165:4
179:12 183:10
183:21 184:10
186:13
weaken 185:15
weaned 174:8
weapon 185:5
115:7 157:2,2
week-long 158:6
weekly 42:5
156:25 157:2
172:10 184:16
184:18
weren's 8:7
83:8 126:6
weighed 183:6
welcome 2:2 8:4
78:19
well-run 119:18
went 15:21
52:13 82:23,24
83:7,14,21,25
106:23 109:15
119:18 140:12
141:2,3,12
171:13 183:17
140:21,22
141:5 142:15
148:5,5,7,11
176:11,13,18
177:4,15
180:12,20,21
181:1,5,11,24
182:8 183:20
185:2,3,7,11
186:16 186:15
186:17 187:1,3
187:6
Zuccaro 6:1,6
149:10,22
123:16,18,18
123:22 135:17
135:20,22

---

windows 120:24
wise 4:13,15
wish 178:3
withdraw 99:4
withdrawal
174:9
worthwhile
176:16
witness 102:11
189:15
witnesses 74:15
woke 11:11
woman 44:13
49:8 180:17
women 17:21
19:7 23:9
25:20 29:17
36:23 37:19
39:24 46:9
50:3,16 51:1,2
51:4 52:23
74:10 79:15
80:24 142:10
142:10
women's 36:19
wonder 132:21
wondering 92:6
155:22
woods 174:23
word 4:13,15
words 45:22
151:20 177:7
work 40:19
42:20 46:22
82:7 93:18
112:1,12
147:8 151:18
158:25
worked 38:19
42:24 43:1,13
83:8
working 23:1
25:6,11 43:3
83:15 117:6
works 37:15
world 101:10
167:20
worried 65:24

worries 152:6
worry 128:7
worse 152:12
worth 11:15
105:9 174:11
worthwhile
176:16
wouldn't 5:23
45:15 83:2
85:16,17 92:8
97:10 116:18
119:12 146:12
written 6:10
7:10 10:20
72:5,7,8 128:8
wrong 5:16
20:23,24 21:15
32:9 140:7
178:5 186:9
wrote 122:25

**X**

**Y**

Yaney 176:19
177:3
Yard 128:10
yeah 16:11 32:4
34:3 70:19
73:16 75:22,25
77:13 81:10
92:4,11 97:1
98:3 99:10
105:12 108:22
116:11 135:21
144:8 145:14
148:9 151:18
158:25
year 44:16 71:14
75:8 83:22,23
108:11 109:8
110:1 147:1
171:20 175:21
198:23 21 35:22
40:16 41:8
44:17 61:15
75:7 83:9,14

93:5 95:23
104:3 107:18
117:24 132:12
136:13,23
154:15 155:1
159:4,15,19
167:14,15
169:24 178:8
187:19
yelling 100:12
yellow 65:19
York 118:16
young 127:19
159:3

**Z**

Z-U-C-C-A-R-...
123:19
Zeperly 106:3,7
zero 134:25
164:4
ZIP 94:8 130:4
zone 95:1,12
103:14 152:13
zoned 87:17
94:20 95:3,13
95:14,16
119:12 140:12
141:2,3,12
171:13 183:17
140:21,22
141:5 142:15
143:2 148:5
144:8,5,7,11
148:5,5,7,11
155:8,9
166:17
worked 38:19
42:24 43:1,13
83:8
working 23:1
25:6,11 43:3
83:15 117:6
171:20 175:21
32:13,20,21,22
28:5 30:24
31:13,19 32:1
171:20 175:21
32:13,20,21,22
34:5 42:17,23
123:22 135:17
135:20,22

50:11,18 51:14
51:19 52:14,15
52:16 55:2,6
57:7 62:10,13
62:18,24 63:17
71:23 72:2
73:11 75:21
76:6 88:7
89:21 93:6,25
94:3,22 95:5
98:20 103:11
105:1 121:16
122:18 123:4
123:12,13,25
124:6,12
126:16,17
129:22,24
130:4,7,19
131:2 137:2
138:3 139:18
140:21,22
141:5 142:15
143:2,18,21
144:18 145:5
145:12,15
148:8,16,18
151:4 162:1
148:5,7 162:10
155:22
168:12,20,21
181:1,5,11,24
182:8 183:20
185:2,3,7,11
186:16 186:15
186:17 187:1,3
187:6
Zuccaro 6:1,6
149:10,22
123:16,18,18
123:22 135:17
135:20,22

144:8 145:3,6

**0**

**1** 57:9 64:16
1065:1,2
10,000 166:6
100 137:25
138:16 152:13
153:6 173:23
10th 47:23 142:6
1131:21 64:17
656 175:21
11:00 60:16,23
11:19 188:16,17
11:00 74:22
1103.3 181:1
114 90:1 153:11
174:13
117 17:1
11h 51:23
12:8 12,23 91:7
91:8,9 107:22
162:22 181:21
14-minute 89:18
12-step 40:5,11
40:15 184:2 1
42:2,3 60:15
12:2,13,18
12:00 60:17,24
12165 145:17
121706:14
147:25
12180 158:23
12195 166:18
12210 1:8
12245 112:7
159:13
12250 102:23
168:22
12255 169:13
12298 118:13
12330 123:19
12335 93:1

---

12380 169:23
12685 122:20
12690 146:24
12691 120:22
12700 12:4
17:19,24 25:19
28:2 29:18
50:8 52:4
54:13 58:1
70:128 1:21
86:20 88:16
90:14 93:7
94:20 96:7
109:5 128:18
140:6,10 142:4
159:25 160:6
161:11,15,18
162:1,16
163:2,8 165:11
184:16 187:18
12750 105:20
12th 14:24 53:7
125:13 133:24
138:12 59:2,4
181:21
13244 67:12
135 161:12
14,706 138:15
15 97:22,24
107:18
15th 52:2
16 163:16
16-bed 36:18,19
36:22
16th 199:8
131:19 171:20
17 128:10
133:18
17th 10:15,17
11:16
18 159:15
167:14 189:20
1847 140:25
18th 138:6
19 167:15
1971140:14

1993 159:20
1998 95:2
169:13
1st 50:14

**2**

2131:3
2-4 131:3
2,382 39:8
2:00 107:9
2021:23 1:14,15
182:5,12,14
169:24
20-02 12:3 93:5
20-day 31:11,20
20-plus 75:6
200,000 133:11
2002 159:15
2014 137:21
176:13
201551:9,15
12th 24 176:17
2017 82:13 87:6
89:1
2019 39:7 49:24
50:7 94:6,6
99:15 118:14
125:13 126:6
133:8,24 138:6
138:22 142:6
181:11
2020 1:10 10:15
10:17 38:7,15
47:23 89:13
131:19 140:3
189:16
2021 189:20
20th 11:21
176:17 178:10
2193:5 95:22
216.533.7606
1:25
21860 1:24
21st 14:17 34:23
22 83:9
22nd 120:9

137:20
23rd 14:25
52:13 180:19
181:11
24 166:24
25 48:22 161:8,8
258,400 39:8
25th 52:9
27 85:25 159:18
28 189:13
28th 50:9
29 1:10 176:13
189:16
29th 2:3 11:20

**3**

3.4 161:16
304:3,6,9 11:16
37:21 40:1
60:10 107:1,6
107:12,24
111:14,17,17
112:18,19,20
112:22 141:18
122:24 155:21
156:23 157:1
300,000 133:11
186:23
31st 11:20
334,56 148:19
340,03 4:42:11
39.5 161:9

**4**

40 83:1 178:8
401.2 12:7
41,000 138:10
44:93,22 97:15
97:16 126:12
133:20 146:6
146:15 160:12
160:17 161:2,4
161:13,15,24
162:...,10 166:3
170:3
440,33 0:7 45
1:23

44024 81:22
44077 74:23
44116 1:25
44 35:21 61 61:15

**5**

5 179:23
5,000,000
112:15
5,759,966 38:8
50 82:4 85:10
101:12
50,000 166:6
501(c)3 35:18
5123,19 186:6
50:19,24
55 152:13 161:4
161:5

**6**

6:32 2:1
60 85:10 135:1
155:21 156:23
6:30-av 4:5
6251 133:14
67113.4 155:14
156:9
6th 49:24 138:24

**7**

7548:20

**8**

8 128:10
80015 3:18
82.5 38:14
85 48:5
87 161:6
8th 13:23,24
50:22 51:17
180:19

**9**

912:23 64:21,22
174:20
9:00 105:10,25
9:10 111:6
90111:15,19

9083 35:16
95 48:5
95,000 138:21
95879 138:21
9th 50:7