IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

Lake-Geauga Recovery          )
Centers, et al.,              )
                              )
              Plaintiffs,     )
                              )
      vs.                     )    Case No. 1:20-CV-02405
                              )
Munson Township, et al.,      )
                              )
              Defendants.     )

- - -

Deposition of John Majer, Ph.D., a witness herein, called on behalf of the plaintiffs for oral examination, pursuant to the Federal Rules of Civil Procedure, taken before Karen A. Toth, Notary Public in and for the State of Ohio, via Zoom, on Monday, February 22, 2021, commencing at 10:01 a.m.

- - -

APPEARANCES:

On behalf of Plaintiff Lake-Geauga Recovery Centers:

>       Benjamin G. Chojnacki, Esq.
>       Walter Haverfield
>       1301 East Ninth Street
>       Suite 3500 Tower at Erieview
>       Cleveland, Ohio 44114
>       216-619-7850

On behalf of Plaintiff Fair Housing Resource Center:

>       Stephen Dane, Esq.
>       Dane Law, LLC
>       312 Louisiana Avenue
>       Perrysburg, Ohio 43551
>       419-873-1814

On behalf of the Defendants:

>       David Smith, Esq.
>       Mazanec, Raskin & Ryder, Co.
>       100 Franklin's Row
>       34305 Solon Road
>       Solon, Ohio 44139
>       440-248-7906

- - -

INDEX

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| John Majer, Ph.D. | | | | |
| By Mr. Chojnacki | 4 | | 107 | |
| By Mr.Smith | | 72 | | 110 |

- - -

E X H I B I T S

| PLAINTIFFS': | MARKED |
|---|---|
| 1 and 2 | 113 |
| DEFENDANTS': | |
| 3 and 4 | 113 |

- - -

FINCUN-MANCINI -- THE COURT REPORTERS

(216)696-2272

JOHN MAJER, Ph.D.

Of lawful age, being first duly sworn, as hereinafter certified, was examined and testified as follows:

DIRECT EXAMINATION

By Mr. Chojnacki:

Q     Good morning, Dr. Majer.  This is Ben Chojnacki.  How are you doing, sir?

A     Well, thank you.

Q     Very good.  I want to just get a couple procedural matters on the record.  We're here by agreement of the parties.  I understand that you're going to be out of the country for the next several weeks and you won't be able to attend the March 9th hearing on the preliminary injunction of Lake-Geauga, Inc., so I appreciate you scheduling and opposing counsel's agreement to accommodate these scheduling needs to get your trial testimony on the record.

Please, if you have any need for breaks or don't understand anything, we're happy to take them as needed, just not while -- not while we have a question pending.

The other item that I'll just raise is

I don't anticipate that we'll be going until 1:30 but in the event that we do I would suggest that we allocate a break time for 1:30 for lunch and everyone to get situated for a brief recess.

With that in mind, I'm going to turn on screen sharing and I'm going to direct your attention to what's been marked or will be marked as Exhibit A.

MR. SMITH: Ben, I do want to note for the record that we are going to preserve our right to challenge qualifications in this case. We were not provided a CV prior to you submitting it as an exhibit this morning. So we will preserve that right to challenge qualifications at a later date if necessary.

MR. CHOJNACKI: Understood.

Q    Okay. Dr. Majer, right now we're screen sharing what we'll mark as Exhibit 1. This is -- well, can you tell me what this is, sir?

A    Yes, it's a copy of my curriculum vitae.

Q    Is it possible you can lean a little closer to the microphone, Dr. Majer? I'm having a hard time hearing you, sir.

A    Yes.  Would it be better if I found a headset with a microphone?

Q    Yeah, why don't we try that so -- you're breaking up a little bit on my end, sir.

A    Sure.  Okay.  One moment.  Thank you.  Is this better?

Q    Much better.  Thank you, sir.

A    Sorry for the delay.

Q    No, not a problem at all.  So I will -- well, let's get started.  Can you please state and spell your name for the record?

A    Certainly.  John Matthew Majer.  J-o-h-n, middle initial M, Majer, M-a-j-e-r.

Q    And Dr. Majer, will you please, for the court, explain what education you've received post-high school?

A    Certainly.  I was awarded the Associates of Arts degree in general studies from Anne Arundel Community College, though it's not listed on my CV.  From there I earned my Bachelor of Science in psychology, Magna Cum Laude from Bowie State University in Bowie, Maryland.  I earned my Master's of Arts in counseling psychology from Bowie State University.  I earned a Master's of Arts in

clinical psychology from DePaul University, Chicago, Illinois. And then I received a Doctorate in philosophy, in clinical psychology from DePaul University.

Q   And what year did you obtain that Doctorate?

A   2004.

Q   So throughout your education and post-educational attainment what professional positions have you held, sir?

A   A number of them. Started in 1989. Part of my Bachelor's Degree program was to complete a practicum experience in a clinical setting. I was able to secure a practicum position in a drug rehabilitation center called The Meadows. I believe it's somewhere in my vitae. It's been a while.

Anyway, it a typical in-patient 28 day kind of a rehab or intermediae care facility. I think it's called New Beginnings at The Meadows. I was required to give 12 or 16 hours each week throughout the semester.

As it turned out, when I applied to use or exercise my practicum I was offered a part-time job as a treatment aide, and I was an aide to the staff psychologist who is a

counseling psychologist.  My duties included I'd do some light documentation and administering vitals for patients that were coming in, checking, you know, the respirations, heart rate, temperature, stuff like that; taking patients out of the facility to 12 step meetings such as Alcoholics Anonymous and Narcotics Anonymous.  And I couldn't wait for it to be over.  I couldn't believe that these people complained so much.

I wanted to be a psychologist working with real people who had real mental health problems, but because of that experience I realized very quickly that people with substance use disorders have horrific pasts.  They have great psychological needs.  They are the most vulnerable population.  And it was because of that experience that kind of forged the trajectory of my professional development to work with this population.

Anyway, after about eight months I graduated and I applied for a position at a halfway house called Raft House.  It was located on the grounds of Crownsville State Hospital.  It's something that we would today

consider to a Level 3 recovery home. It was in an institutionalized setting. I was hired as an addictions counselor and as a statistician for that organization. There I had a caseload of about seven clients, engaged them in individual counseling and collecting data to describe what we were doing.

At that time in the county funding was pretty tight so the task was on me to create some statistics to kind of show what we were doing. That ultimately led to my first publication published in the International Forum for Logotherapy in 1992.

Unfortunately, that organization lost their funding. And from there I sought employment at the outpatient level at New Life Addiction Counseling Services in Pasadena, Maryland.

So for about two and a half years I was involved in providing intensive outpatient counseling on an individual and at group levels, and I also was responsible for running a DUI offenders group. Basically providing weekly psychoeducational groups for folks who did not meet criteria for having substance

abuse or -- substance abuse or substance dependence disorder. That was the nomenclature at the time -- but people who were probably at risk, who were targeted by the criminal justice system as having a potential problem. So the psychoeducational groups were to inform them, to maybe prevent them from repeating this offense.

After two and a half or three years I was hired by the Hope House, an intermediate care facility or a 28 day kind of rehab where I was hired as a primary therapist overseeing a multi-disciplinary team consisting of licensed medical staff, a licensed family therapist. And that involved providing individual and group therapy to clients. It also involved in providing aftercare recommendations. And for a number of our clients that included going into a recovery home.

So I worked with neighboring recovery homes in the Baltimore/Washington area to try to find what were the best residential settings for those clients we served who needed a recovery home upon discharge.

A few years later I applied and was accepted as the first addictions therapist at the Henry Phipps Clinic of Psychiatry at John Hopkins Hospital in Baltimore, Maryland. This was a shorter intensive treatment unit approach to treating people coming in, patients, for substance use disorders.

I worked in a multi-disciplinary team. We were licensed psychiatrists, licensed social workers, registered nurses. And I conducted individual therapy. I was involved in the morning rounds of evaluating patients on a day-to-day basis with other staff, and I was the uni's community liaison where my duty was to go out in the community, go into recovery homes and try to keep our recovery home referral list up to date.

Unfortunately I was laid off. There was some reengineering within the organization, and at that time Master's level clinicians weren't licensed. So my position was terminated because I wasn't licensed.

And that's when I made to decision to go back to school to become a licensed psychologist and get my Doctorate. So as I

applied to a number of programs I also found employment as a mental health assessor for Anne Arundel County Department of Health in Annapolis, Maryland where I would engage in conducting screenings and assessments of persons coming into the local jail, the Anne Arundel County Detention Center at Jennifer Road, and tried to flag those who might be better served in the drug court initiative at the time.

So I worked with members of criminal justice and the Department of Health trying to find alternative sentencing for people who might be better served going to the other detention center that was located in the northern part of Anne Arundel County at that time. That was basically a comprehensive inpatient drug facility rather than traditional sentencing.

That lasted about six months when I start my Ph.D. program at DePaul University's American psychological associated -- accredited scientist practitioner Ph.D. program. This opportunity was a scholarship. I didn't have to pay my tuition but I

committed to 16 hours of research duties for the first three years for the stipend I received.

When I started this program I had supervised experience in assessing and diagnosing children at DePaul's Community Mental Health Center for the first two years. My third year of training or my externship involved my work at Grants Hospital, which is now known as Lincoln Park Hospital, working with the Lifeline program treating people who have substance use disorders in a short-term capacity. The average length of stay was three days. Working closely with psychologists and other therapists.

And it was around this time, around 2000 I was teaching psychology courses part time in the psychology department at DePaul University. But when I started my program at DePaul in 1998 I was also teaching part time group counseling at DePaul's School of Education's Human Services and Counseling Program. So I was engaged as an educator.

By 2001, the School of Education offered me a one-year visiting instructor

position, which was pretty nice.  So I was engaged in teaching, engaged in research and engaged in doing clinical work.

My last externship prior to my predoctoral internship was at Illinois Masonic Hospital working in their psychiatric unit. Folks who came to that setting did not necessarily have a substance use disorder problem but I wanted to get a well rounded feel as a clinician working with different populations such as children, children and their families, working with folks who didn't necessarily have substance use disorders and those who did.

And that prepared me to apply for my predoctoral internship which I took at Illinois Department of Corrections working at the Statesville Prison, who served men, and the Dwight Prison which served women.  And at both facilities I engaged in assessing, evaluating, applying advanced psychodiagnostic measures to do psychological evaluations on the inmates at these facilities. I was able to engage them in individual therapy and group psychotherapy.  I completed this internship in

2004 and then I was awarded my doctorate.

From there I had a couple offers. One at Northwestern University's -- a location downtown in Chicago as a therapist, something I needed to do to obtain licensure as a licensed psychologist working in a setting with a licensed psychologist for a one year period of time for a postdoc fellowship, but I was also given an opportunity to continue my academic and research work at DePaul University's Center for Community Research where I was hired as a research associate getting clinical supervision on a weekly basis from a licensed psychologist.

I worked there for two years in that capacity, and then I took position with City Colleges of Chicago. City Colleges of Chicago is a consortium of seven community colleges in the Chicago area. My first campus was Richard J. Daley College. And after about three and a half years I transferred to Harry S. Truman College.

Since I came to City Colleges in 2006 I maintain my work as a consultant for DePaul's Center for Community Research. I have served

in a number of cases like today's case, serving as an expert, giving an opinion on matters pertaining to recovery homes, and I maintain my connection with DePaul University as a consultant because in 2007 we applied for an RO1 grant to investigate participatory action research among women exiting criminal justice systems, women would have substance use disorders.

I wrote the intellectual piece of that application and it got funded, but due to my current position I couldn't get release time so I served as a consultant. And that led to about a dozen reports that were published in peer review outlets.

Throughout this time I have served as a reviewer for a number of reputable journals in the field involving substance use disorders. I've served as an editorial board member for the American Journal of Men's Health, Alcoholism Treatment Quarterly and the Journal of Diversity in Higher Education.

I would like to point something out that I think speaks to my qualifications. That my work with these journals and my

publications in these journals involves journals that do not operate on an open access process.

Let me explain. These journals -- most journals operate on a peer review process where authors submit their manuscripts to an editor, the editor makes a decision to send it out for review. The editor knows specific experts in the field within that manuscript.

So if I'm going to submit something for publication an editor would take my manuscript, give it to experts who know what I'm talking about in my area of inquiry. In turn the reviewers give their critical comments to the editor and then the editor makes a decision whether to flat out reject the manuscript, to encourage the author to make major revisions and resubmit, or to make minor revisions and resubmit, and in very rare cases to accept the manuscript as it is, which happened to me twice so far in my career.

Anyway, it's important for me to point out that peer review is one thing, but open access is something completely different. Traditionally to get access to the scholarly

works one must have a subscription to the journal or maybe a subscription to a bundle package through programs like PsychInfo or PsychArticles, something that the American Psychological Association sells to academic institutions.

So for people like me, if I'm working in an academic institution my academic institution has a subscription, which is a hefty fee, to utilize PsychArticles or PsychInfo, and now I have access to these scholarly works; where people who don't work in academic settings, they either have to have an individual subscription to that particular journal or to PsychInfo, or if they wanted to go online and find a particular article they have to pay for it. Something like 30 or $40 per article.

Obviously there is some production costs in creating these journals and circulating them to various libraries. So we're talking about costs associated with a publication of scholarly works that go through a peer review process.

About 15 or 20 years ago some

entrepreneur came up with a brilliant idea to make research more accessible to the public. Instead of having the consumer pay for access to these articles, why not make the authors of these manuscripts, of these investigations pay up front the production fee. In turn they will release the articles to be public domain and make it open for others.

So I'm talking about the advent of the open access system to scholarly works. And I really need to talk about this because a lot of my students get access to publications that go through the open access process. And I'm here to tell you that in my experience the level of scientific rigor is very low, and there is probably some reason for that.

Now, on a daily basis I get invitations to submit my works to these open access outlets, and these emails kind of come to me in the form of those emails we all got back in the '90s of that Nigerian prince who really trusted us and wanted to deposit millions of dollars in our bank account.

I think you get the impression that I'm painting the picture that there is this

financially based incentive to create peer review journals that operate on this open access process where the authors have to cover the article processing charge or the article processing fee.  And I'm not alone in saying that these purely open access enterprises have generated low quality research.

Now when I get these invitations I'm told there is a distinguished editorial board, experts in my field.  And I have gone to their websites, I've looked at their distinguished board of editors and reviewers and I don't recognize a name.  And when I do a literature search based on these people's names I find that most of them have never published in a peer review journal and some have done so only once or twice in their career.

So it's very important for me to qualify myself by saying I am a researcher who will publish his work in the traditional sense in that these are being published in journals that are not purely open access.  However, a number of journals where I have my works published in operate on an optional open access, meaning if my manuscript is accepted I

don't have to pay the article processing charge; that my covering of the fees is not contingent upon acceptance, which is the case with the open access outlets.

When these reputable journals expand the option to open access they're basically saying if I have funds, if I receive funding from my funders I could make it an option to provide access to the public free of charge my work.

So it's a big distinction in my thinking between scholarly journals that allow authors like myself the option to make my works open versus the purely open access outlets.

So I'm here to say that none of my publications have ever been published in an open access journal, and none of the articles that I cite in my report come from the open access journals.

Q    Okay.  Just to clarify then, it says that you're -- the articles you're referencing then in your report are to this higher standard that you're describing, correct?

A    Yes.  Unless I'm speaking to standards from

the National Alliance of Recovery Residents. These are documents that are available. They are not subject to a peer review process. But those articles that were subjected to a peer review process did so in these outlets that are not contingent upon the open access method.

Q Understood. And just to clarify for the court, can you please just briefly summarize once against your current positions that you hold and what your responsibilities are currently at those institutions?

A Certainly. I'm a full professor of psychology at Harry S. Truman College. I teach -- I'm required to teach five courses each semester. I usually teach six courses each semester and a couple of courses during the summer terms.

I also serve as consultant for DePaul's Center for Community Research. I serve on editorial boards and as a reviewer for a number of journals. And from time to time I get involved in legal matters like this one rendering an opinion as to my expertise with recovery homes.

Q Understood. So briefly can you summarize some

of the scholarly research you've conducted regarding substance use disorder?

A     Certainly.  The vast majority of my works have to do with people who have substance use disorders.  You know, very broadly I'll say that I've looked at the role of recovery homes for people recovering with substance use disorders; specifically looking at cognitive resources.  You know, what is it about these recovery homes that produce therapeutic benefits.  So looking at things like abstinence social support, self-efficacy for abstinence or abstinence self-efficacy is something I've spent a lot of time doing some research.  Trying to distinguish the effects of recovery home living versus 12 step involvement, examining 12 step involvement for this population, looking at those who have psychiatric comorbidity within this population, comparing sober living homes to maybe Level 3 recovery homes, such as therapeutic communities; being involved in randomized clinical trial research showing the distinct benefits and advantages of living in a recovery home versus not living in a

recovery home.

And in the last few years I developed my own research project looking at recovery home residents who utilize medication and assisted treatment as part of the recovery. In other words, folks who use medications such as methadone or buprenorphine or Subuex, those kinds of medications. Because in the substance use disorder research world it seems as though folks who have taken a medication approach versus those who do not take a medication approach are distinct and separate interventions. Where the current thought -- in the recent year or two is that we need to combine these elements.

And I became interested in this because of my community emersion, my field work experiences working with people who are in recovery homes, such as a Oxford House model. That over the years we found that people living in these recovery homes are on these medications, where ten years ago that would never have happened. Why is it that these people are getting into these recovery homes and are they doing well in these recovery

homes where the majority of people did not take these medications.

So to summarize, I've looked at that in the last few years. I've involved a number of my students at Truman College, some at DePaul University. We have three publications to date. I believe they were all published in the last year, basically showing the homophily effects. When you are first on these medications and you have at least one other person in your residence, chances are you're going to have the therapeutic benefits of the social support within that home than if you lived in a home with no one that you could identify with.

Q And can you briefly summarize once again your clinical work experiences as well?

A Yes. I've worked across a number of treatment modalities or interventions for people who have substance use disorders. I've worked in an intensive treatment unit that involved detoxification and acute intervention, the intermediate care facility usually post-detox where people spend 28 or 30 days.

I've worked at a Level 3 recovery home,

halfway house located in the state hospital. I've worked in several outpatient capacities as a treatment provider whether doing group therapy or counseling or intensive outpatient counseling. I worked with the drug courts. So I've kind of gone across the spectrum of professional treatments and I've immersed myself in the 12 step communities in Maryland and the Chicago area. And I've visited a number of recovery homes, so I kind of have a knowledge about this population and the various interventions that are used to treat people who have substance use disorders.

Q And you've summarized the history that you've just explained, you summarized that in the report you prepared with respect to this case?

A I believe I did.

Q You've also mentioned that you've worked as an expert report in cases in the past. Can you tell me a little bit about that?

A Yes. Since 2007 I believe I've been contacted by various parties asking me to give an opinion on the therapeutic benefits of recovery homes and the need to increase the number of residents to these homes.

In almost all these cases it came down to giving argument for why I think recovery homes are beneficial, why they are necessary, why it's necessary to increase the number of residents living in these recovery homes. But on two occasions in recent years I took the opposite approach.

I was contacted by attorneys in Salt Lake City and in Maricopa County, Arizona to weigh in and give my opinion why what appeared to be a recovery home should not be situated in a residential community. And in these two cases these organizations presented themselves as if they were operating or wanting to operate a recovery home when it was very clear to me it was not a recovery home. These were professional treatments that were time limited.

What really distinguishes recovery homes is they are not time limited, that residents stay in recovery homes for an indefinite period of time because that allows the individual resident enough time to get their confidence, their stability, to reintegrate into their community.

Now I might mention about 25 years ago the literature on therapeutic communities stated that they were time limited to six months. When I started doing my research on the Oxford House model one thing they always spoke about was this recovery home has clear advantages to the therapeutic communities in that recovery homes are not time limited. And now these days therapeutic communities themselves are not limiting themselves anymore to a six month duration.

So in these two cases where I was actually on the opposite side of the argument that I had been in previous cases, I made the case that there was no justification to have these organizations existing in residential neighborhoods. It wasn't fair to the residents in these residential neighborhoods because these really weren't recovery homes. Just because they called themselves a recovery home didn't mean that they were. And I gave argument why they weren't recovery homes. They were really professional treatments in a disguise of a recovery home.

So that's sort of my overview of my

involvement in these legal matters.

Q   And have you been -- actually testified in trial and found to be an expert in any cases?

A   Yes.

Q   Very good.  I'm going to shift focus now to what I will be marking as Exhibit 2.  Do you -- you should have a copy -- a hard copy I believe available, but I'll let you scroll through and ask if you recognize this document?

A   Yes, I do.

Q   And what is this document, sir?

A   It's the report that I provided for this matter.

Q   Okay.  Will you please explain for the court what did Lake-Geauga Recovery Centers ask you to do in this case?

A   They asked me to give my opinion on the necessity of having six residents living in this recovery home.

        Now, when I say in my report six residents I mean one staff member and five additional co-residents.

Q   Okay.  And were you also asked to discuss or give an opinion on the necessity of recovery

housing?

A    Yes.

Q    I'm going to scroll down to page 13 here.  I believe you've provided a list of materials that you consulted in preparing this report.

A    Yes.

Q    Do you recall preparing that list of materials?

A    Yes, I do.

Q    And is that the list of materials that you've reviewed and considered in looking at this report?

A    Yes, they are.

Q    And so you relied upon these to form your expert opinion, yes?

A    Yes.

Q    And did you speak with anyone else at Lake-Geauga Recovery Centers about Twelve Meadows?

A    Yes.

Q    Who did you speak to?

A    I spoke with Ms. Melanie Blasko who is the president and CEO of Lake-Geauga -- is that how you say it?

Q    Close enough.

A    Lake-Geauga Recovery Centers.

Q    Okay.  And what did you speak to Mr. Blasko about?

A    Well, I interviewed her on the phone to get a feel for the operation at Twelve Meadows.  She provided me with a bit of information, gave me a good feel for how they operate there, the number of rooms, the rent costs, characteristics of the house, some qualifications of a staff member who I believe has over three years sobriety.  She's had experience working in this population in clinical settings.

     After my interview with her I went on the Internet, I believe it was Zillow, and I got a better feel for the physical characteristics by looking at the visuals that were provided to me.  And with that I made my opinion as to why I thought having six people living in that recovery home was necessary to produce therapeutic benefits to engage those in recovery.

Q    And is it accurate to state that within your report where you reference the characteristics of Twelve Meadows Recovery Home, that

information that you generated was derived from your conversations with Ms. Blasko and your review of Zillow and other Internet sources?

A   Yes.

Q   Okay.  And is it also accurate to say that the site references that you make beginning on page 13 of your report, those are all scholarly journals, not the lower open access journals that aren't subject to such rigorous academic scrutiny?

A   Yes, that's correct.

Q   So did you perform an analysis of the issues that you were asked to give your professional opinion upon?

A   Yes.

Q   What did you do to analyze the issues of how much you were asked to give your professional opinion?

A   Well, I looked at the literature that I cite in my report, and I basically demonstrate that recovery homes are necessary.  What makes them effective -- well, there is a lot of things that make them effective.  But to your question, my analysis, I wanted to know is

Twelve Meadows similar to recovery homes that have been scientifically investigated in the literature. I find that to be the case.

When I looked at the characteristics of the house, the number of total residents that Twelve Meadows wanted, I found that to be consistent with the science on recovery homes.

You know, recovery homes on average house about six to eight residents. That number is really proportionate to the living space. This is something that you're going to find when you go and visit recovery homes; that the number of bedrooms or the number of square footage for these houses vary. And the number of residents is proportionate to the living space.

So I came to the conclusion, given the size of Twelve Meadows, I believe it's just over 2,300 square feet. There are four bedrooms, three of them earmarked for residents. Two of those rooms are double beds, so they are going to have two roommates in each of those rooms, and one is earmarked I believe for a more senior resident who is stable enough to not need a roommate.

Given the number of bathrooms, given the number of common areas, given the space outside, that six people could live in there quite comfortably without sensing -- without providing a sense of overcrowding.

And it's important to maximize -- and this has been my argument in a lot of these cases. You want to maximize the number of residents in these dwellings to create a home environment to secure a therapeutic atmosphere that is a recovery first atmosphere among the residents. And that's what's going to lead to the therapeutic benefits of recovery home living.

Q So just for clarification, you took a look at the scholarly journals and the information that you were provided from Melanie Blasko and the information you provided on your own and you've prepared a report; is that correct?

A Yes.

Q And that report is the Exhibit 2 that's being screen shared currently?

A Yes.

Q Thank you.

Dr. Majer, do you have an opinion to a

reasonable degree of professional certainty as a researcher and former clinician as to whether recovery housing is a necessary community based intervention for some persons with substance use disorder?

A    Yes.

Q    What is that opinion?

A    They are necessary for some persons with substance use disorders. You know, I think the analogy is a substance use disorder is like cancer. There isn't any one kind. The severity level of a person afflicted with a substance use disorder will vary from person to person, just like cancer will have a severity impact from patient to patient. That there isn't just one way to treat people with substance use disorders; there isn't just one way to treat people with cancer.

So do all persons who have a substance use disorder need a recovery home? The answer is no. But I have no doubt that for some persons who have substance use disorders it is absolutely necessary for them to live in a recovery home, in that they cannot get and stay clean and sober otherwise.

And I think this is evident by the fact that there are approximately 18,000 recovery homes in the United States. And I cited this in my report. Recovery homes are about. Clearly there is a need for them.

Q    So let's take a step back. Can you explain what is a substance use disorder and how it affects people in their daily lives over time?

A    Certainly. Substance use disorder is a term we use in the profession to make reference to a list of specific substance use disorders found in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition from the American Psychiatric Association that came out in 2013.

Basically, they vary with respect to the drug type being used; whether we're talk about opioid or cannabis or alcohol. But there is a lot of shared diagnostic criteria across the different drug types. But then there is some variation that might be specific to a certain drug type. But overall, any particular substance use disorder, whether we're talking about cannabis use disorder or alcohol use disorder, they share common

characteristics such as a significant impairment in one's social and/or occupational functioning; spending more time in behaviors related to getting their substances, time spent being on the substances or recovering from the substances, inability to stop using once having started, things like that.

And when people meet diagnostic criteria, according to the DSM system, they usually endorse two or more diagnostic criteria in the last 12 months, and then depending on the number of criteria that they endorse or that they meet, a severity level is given; mild, moderate to severe level of that diagnostic category. And that speaks to a number of symptoms that they present with.

Q  And how does having a substance use disorder affect your ability to engage in activities of daily living?

A  Well, it does, although it does vary from person to person. When people meet diagnostic criteria for any of the substance use disorders there is going to be some kind of impact in the social and/or occupational functioning.

Now when we talk about people who are seeking to live in a recovery home, it's been my experiences clinically working with multi-disciplinary treatment teams and as a researcher going out and meeting people that use recovery homes, that impact is severe. They would probably have that specifier as a severe level of that substance use disorder.

And in my experiences, we're talking about people who cannot stay clean and sober without a recovery home. So that is a major impairment of functioning. They cannot get clean and sober unless they are in that nurturing environment with that access to abstinence social support. So that's one consideration.

In addition to that consideration, oftentimes there are impairments in social functioning. They tend to lack social skills. They have maybe severed relationships with family members or friends. They don't really have social networks. Some of them don't have any recent employment experiences or none whatsoever. Some of them lack the ability to engage in instrumental activities of daily

living like picking up after themselves, doing dishes, laundry, hygiene, nutrition.

So when people come to recovery homes it's a lot more than just finding a place to live. It's connecting with a community of people who could be instrumental in gradually helping this person with severe impairments gradually overcome these impairments, develop effective coping skills, and first and foremost keeping their recovery up and center. And it takes time for them to gradually reintegrate in their community so they can become those responsible productive members of society.

Q So how is it that a recovery home helps people with substance use disorder?

A Well, there is something about the communal living that gives these people access to something they cannot access. Access to family, a home-like atmosphere.

I was told by the CEO of Oxford House, Paul Molloy, that recovery homes typically draw two kinds of highly debilitated people in recovery. And this is his terms not mine, but I think it illustrates an important point. He

says that recovery homes bring in has-beens and never-was.

In other words, people who were able to live productive lives in society and they lost it all due to the severity of their substance use disorder. And then you have people who never really amounted to anything. They never got on with their life.

So in both cases when you give people an opportunity to be part of the community within that home, a community that's based on reciprocal responsibilities, that if I'm moving into this recovery home I can get support from others, and most importantly I can learn to give support to others, that's going to help me connect with a therapeutic community. People who are going to help me develop a confidence that I too can beat this thing one day at a time. That if I do what these people are doing then I can probably get what they're getting.

So you kind of have a therapeutic atmosphere of recovery homes that puts recovery first, that reminds individual residents everything they do must be within

that outlook that the recovery comes first.

Second, recovery homes provide available social support for their abstinence 24/7. If I'm in a recovery home there is going to be typically a couple residents in there that I can turn to as needed.

The benefit of recovery homes is that they typically engage a buddy system involving roommates. So at any time, especially in the middle of the night, if I wake from a nightmare or I have a panic attack or I'm going through some biological changes associated with my newfound abstinence I have access to somebody who could help me before I make an impulsive decision to maybe leave the house and use drugs.

So we have the availability of abstinence social support within the common areas of the home, within the bedrooms. And you have hopefully a large enough census that's going to connect me to that social support.

I mean, as the old saying goes, you can lead a horse to water but you can't make them drink it. You can put a person in recovery

around a social support mechanism but that's no guarantee that they're going to actually connect and buy into it. But there is something very appealing being in a single-family home in a single-family residence where there is an atmosphere of family.

And that is a key characteristic of any recovery home, according to the National Alliance of Recovery Residences, that you need to promote a family communal life presence where people feel like they're invested in their own home. When you have that and you increase the number of residents you're going to make it easier for that individual resident to actually identify with at less one other resident on some common ground, whether it has to do with their drugs of choice or previous life experiences. And I think that's absolutely key.

You have a family-like environment in a natural setting and then you have a number of residents that makes the individual capable of engaging with and identifying with. Because when they see somebody like themself in a

recovery home doing this stuff it reinforces the belief that they themselves can do the same thing, and it makes it a lot more easier for them to engage in the arduous process of change.

Q    So just to put a pin in that, you did make reference in your report to this therapeutic milieu.  And can you just explain just -- I think what you're describing is the therapeutic milieu that you reference in your report; but is that accurate?

A    Yes, it is.  And when you have more residents you increase the therapeutic atmosphere within that milieu or the community of recovery home residents.

        If you have fewer residents you're going to water down that therapeutic atmosphere.  And I'd be happy to give some explanation to that.

Q    By all means.

A    Okay.  With the social support in these homes that produce the therapeutic milieu, I believe it's contingent upon having as many residents that the dwelling could house without creating an overcrowding effect.  I mean, we're talking

about a home.

There is some kind of psychological haven, if you will, when we go home. It's our safe place. It's not just a safe and secure place for people recovering from substance use disorders, it's not just a clean and sober environment, it should be a home environment. You increase that home environment when you increase the number of residents.

If Twelve Meadows was limited to two residents in a dwelling that size that wouldn't create a home-like environment, it would make it easier for individual residents to physically, socially and emotionally isolate from their peers. But when you fill up the house with a number of residents to the point that it doesn't cause an overcrowding effect, there is something that you actually kind of feel if you go into recovery homes. This is something that I've experienced in the many recovery homes I've entered. You kind of have a feel like wow, this is a family environment. It doesn't take you long to kind of pick up on that vibe when you go in there. So we have that family environment that is

important, then we have the therapeutic atmosphere.

When you have a recovery home that maximizes the number of residents you're going to find probably a greater degree of recovery in that environment. So let me explain that.

All recovery homes you're going to find that residents typically fall into three categories. You have those who are brand new. I guess you want to call them newbies. They just arrived. It might take them a couple months to become acclimated to recovery home living and/or the recovery. Then you kind of have mid-level residents. They're not brand new but they're not seasoned veterans. They've been there for probably six or nine months or so. And then you have the most senior members.

When recovery homes become established, usually about a year or two after they start their operations you're going to find that they have a number of senior level residents. These are the veterans, if you will. They've been there the longest and oftentimes they're looked to as the elders in a recovery home.

When you have more residents in any recovery home you're going to increase the probability of having proportionately more senior-ended level residents. When you narrow that down you're going to decrease the number of those effective elders, those leader, those senior members. So that's part of maintaining the therapeutic atmosphere.

Another one is when you have enough clients in there -- enough residents in there you're going to defray the costs associated with recovery home living. And that has several advantages. One, for the individual resident the advantage is they could afford to move in there, thus making the recovery home accessible.

Second, you're going to reduce the living expenses, which on a day-to-day basis reduces stress related to finances for the individual resident.

Third, when a recovery home maximizes the number of residents without producing overcrowding it puts them in a strategic position to be more discerning of who they let in the recovery home.

Now, I've had, you know, the unfortunate experience in visiting recovery homes in the Baltimore area years ago, visiting recovery homes where they didn't really care about the quality of residents coming in. That from what I've learned anecdotally by former residents and people in the 12 step community, some of these recovery homes have no regard to that therapeutic atmosphere. They are not putting recovery first. They are allowing people to stay there even if they relapse and use drugs, as long as they are paying their rent. That they produce double standards really for the purpose of generating money. And it's very unfortunate because I think it gives recovery homes, the vast majority of them, a bad reputation. Because all recovery homes are not in the business to make money. However, economic concerns are very much part of the equation of understanding recovery homes.

So if a place like Twelve Meadows were allowed to have six total residents, a staff member and five co-residents, they would be in a position where they would be financially

stable and they could be discerning who they permit.

Now, a prospective candidate moving into a home like Twelve Meadows could be a person who has stable employment and they could pay their first two to four weeks moving in. Financially they are sound, but in other areas when it comes to being a really good fit can they contribute to the therapeutic atmosphere within our home. Do they have that recovery-first mentality or perspective.

Or maybe this applicant, well, they're not the greatest fit but they're not the worst fit. You know, maybe we would consider this person.

But if someone else applies for residency and that person has no money, has no recent work experience but they are determined to be an excellent fit within that recovery home, now this recovery home that has maximized the number of residents is in a position financially to extend an invitation into the home to that person who can't pay for the first two to four weeks. And I have heard this numerous times by recovery home

residents. I can't imagine what that's like.

Somebody is taking a risk on me, somebody is letting me move in here without having to pay rent, without a promise that I'm going to find a job, telling me that they are going to help me find work even though I don't have any recent work history. It's stuff like that that I think makes a difference in the recovery of people coming to these homes.

But back to the question, the financial aspects of recovery home operations indirectly and sometimes directly has an impact on the therapeutic atmosphere of a recovery home. So it's been my experiences in my field work and my understanding of recovery homes when you maximize the number of residents you're going to provide economic benefit for the individual and that's going to have a positive impact on the therapeutic atmosphere within the recovery home.

Q    Thank you.

Dr. Majer, can you tell me what group dynamics is?

A    Yeah. Group dynamics is a term that speaks to characteristics or behaviors or interactions

among members of groups, whether within a group or between groups.

Q   And what role does that play in achieving sober and productive living among persons with substance use disorders?

A   Well, it varies from group to group. If we're talking about a 12 step group that dynamics is a little different. It meets maybe an hour or so once a night out in the community.

If you're talking about an outpatient facility they might meet once or twice a week, whether it's a group therapy or maybe the group counseling. But when you talk about a recovery home group dynamic we're talking about that social microcosm, that mechanism that is therapeutic in nature. And it's my opinion to make that social microcosm therapeutic you need to increase the number of residents living in there.

I'll give you a couple of reasons why. As I probably spoke to a little bit before, one individual comes into that recovery home. If there are to few residents -- I think in this case they want to have two residents living in Twelve Meadows -- you're not going

to have the diversity of experience you would otherwise if you increase it to six residents living in that recovery home.

The diversity of the experience generally speaking produces a social microcosm that's more representative of the community. This is the case when you have more versus less residents living in the recovery home. When you have more residents you kind of add to the collective experiences for problem solving and coping. When you have a more representative social microcosm within a recovery home I think it makes it a bit easier for these newfound coping mechanisms and social skills to generalize across social contexts out in the community.

So there are those considerations why having more is necessary. But on the individual level, if you have fewer people in a recovery home you decrease the likelihood that the individual resident coming in is actually going to connect and identify with the experiences of residents living in that home.

For example, let's say hypothetically I

have an alcohol use disorder and I'm going to move into a recovery home that has only two residents. I go there and I'm interviewed and I find that I get accepted and I find that the two other residents, one has a cocaine use disorder and the other gentleman has an opioid use disorder.

Now when I go to a setting and I agree to follow the house rules, and I do all these things for recovery home living and go to my 12 step meetings and all that stuff, it's one thing to commit to that stuff and have an idea, it's another thing when you get in there.

Now when I'm in there, and they're going to -- these recovery home residents and maybe a house manager, if it has a house manager, you know, a staff member, they're telling me to do these rules, these things that I really don't understand, I'd probably say this is nonsense. This is not instrumental to my recovery. Cleaning my bathroom, doing these chores, showing up for the weekly house meeting, it's good for that person who did cocaine, or it's good for that

resident who did heroin. I drank alcohol. This stuff doesn't apply to me.

And I have found this in my clinical experiences early on and in my experiences doing field work that when people are new in recovery it's very difficult for them to see the similarities of their substance use disorder and their recovery from their substance use disorder. This is something that takes time for people in recovery to achieve.

But in recovery homes it's so easy. And I've done some research I believe I cited in my report, that came out in 2002 published in the Journal of Substance Use Treatment that looking at two samples that were collapsed, samples from people in the Mid-Atlantic region of the United States and the Midwest, and we found them to be very much similar, that a number of residents report that they have issues that make it difficult to identify with their peers. And when they have that they typically have significantly lower levels of abstinence social support, which tells us they are not tapping into their social support for

abstinence, and specifically lower levels of abstinence self-efficacy, especially when they have -- when their issues involve previous criminal justice involvement and being a veteran.

So my whole argument is -- and this is something that resonates in my experiences and meeting with hundreds of recovery home residents over the last 25 years, is that when you increase the number of residents to the recovery home the individual who's moving into that home, whether they are interviewing to get a position or they actually move in, they're going to find some common ground, wether it has to do with either drug of choice or some personal life experience.

And, you know, frankly, I think it's horrible what we do for our veterans who serve our county. But I have worked with veterans in recovery, and for them it's very important that they find a recovery home where they can connect with at least one other noncivilian, one other fellow veteran.

So it's issues like that that have to do with previous life experiences in addition

to the drugs of choice and the lifestyles associated with that that's going to not just lead that horse to the water but help them connect and get them to believe hey, if I'm in this recovery home with six people and there's one guy who drank alcohol, like he's been sober for 18 months, he's doing all these things that I just think are nonsense, but because this guy is doing it it works for him, now that's going to foster a belief it probably will work for me.  And I think that's what makes the difference that gets people engaged in their recovery.

Oftentimes people come in complicit. They are going to comply with these rules and things they have to do, but by connecting and identifying with their peers it changes complicity to engagement, and that's what gets them invested in their recovery.

Q   Are there academic studies or scholarships that supports the efficacy of the recovery house model?

A   Yes, there are.

Q   And what do they typically find?

A   Well, you know, there are a lot of studies

that show the benefits of recovery home living. I draw attention to two randomized clinical trials in my report.

In the first one folks were leaving In patient treatment in Northern Illinois and upon completing inpatient treatment they were randomly assigned to two conditions: A usual care condition that they would have been prescribed by their treatment providers on discharge, or random assignment to an Oxford House recovery home.

So to make a long story short, over the course of two years those who were discharged to an Oxford House -- and they were also given professional treatment recommendations as needed based on their needs upon discharge. They were basically the same as those in the usual care condition. The only difference is that they were living in a recovery home. So we looked at outcomes at the end of two years and we found significant differences in that there were better abstinence rates, significantly better, significantly better income levels and employment outcomes and significantly fewer involvements in criminal

behaviors than people who were not living in a recovery home.

So the take away when you control for these variables is that recovery homes offer superlative benefits. And when we're looking at substance use disorders and we know that they can be fatal, we need to do everything we can to ensure good outcomes.

Now in relation to this one study, I cited an investigation I did based on this data set looked at the randomized controlled trial teasing out the difference between 12 step involvement and being randomly assigned to a recovery home versus not living in a recovery home.

To try to be succinct, the findings are that if you are categorically involved and highly involved in your 12 step groups, whether it's Narcotics Anonymous or Narcotics Anonymous, regardless of which condition you're in you're about 2.7 times more likely to be continuously clean and sober at the end of two years. However, that effect is independent of the treatment effect in that if you lived in a recovery home over the course

of two years versus not you're likelihood of maintaining continuous abstinence is twice that amount. It's I believe 5.6 times more likely that you're continuously clean and sober.

So this is important because, you know, we've heard some criticism that recovery homes are not necessarily that effective. How do we know it's the recovery home experiences versus the fact that the vast majority of people in the United States go to 12 step groups like Alcoholics Anonymous and Narcotics Anonymous?

Well, this study allowed us to tease apart those separate effects, and that kind of extends something that I found in my dissertation that was published in 2000; that abstinence self-efficacy seems to be developed earlier on in one's recovery when they live in a recovery home versus members of the 12 step community who never lived in a recovery home.

We have that randomized clinical research and we also had the randomized clinical trial looking at three treatment conditions. People who are randomly assigned to a usual care condition not involving a

recovery home, and then two recovery homes, the Oxford House model and then a therapeutic community which would be a Level 3 recovery home. And basically the outcomes among people who are in these two different recovery homes were the same, and they were better than people who were not given the recovery home experience upon discharge.

Now this particular sample involved people exiting the criminal justice system.

Q Very good. Is there a particular need for recovery house living among women with substance use disorder?

A Yes.

Q Can you explain that?

A Yes. My clinical experiences, working in a variety of treatment -- professional treatment organizations, my experience is of meeting with men and women in recovery homes in particular match what I found in the literature: That women typically don't have resources like men do in this country. It might speak to the economic -- the disparity based on gender. I really can't say. But research has also shown that women who have

substance use disorders tend to have a greater amount of severity or the affects of the substance use disorder is more pronounced in them then it is for men, and recovery homes for women are not as available as they are for men. So it seems that we need more resources for women who are recovering from substance use disorders.

Q   Are there soft social factors that would go into that as well?

A   I'm sorry, what was that?

Q   Are there social factors that -- domestic partnerships, things of that nature that would go into that as well?

A   Certainly. That's why recovery homes are gender specific. And, you know, I have worked with women as a direct service provider. I have worked with men. And for some persons with substance use disorders they have been victimized in their childhood, in their adolescence or in their adult years. And there is abuse, physical, sexual, emotional abuse. And it's been my clinical experiences that women have proportionately more experience of being abused and victimized than

men do.

So I don't want to give -- get into any details. Please take my word, it's beyond imagination what some of these people have experienced in life. Being victimized is a nice way of saying it. I can't imagine what it's like to overcome some of these experiences that these women faced.

But what I found out working with other therapists who work with women and talking to women who live in recovery homes, that there is something that is essential for these women. When they live in this therapeutic atmosphere, when they come to grips with some ugly realities that they experienced they find themselves in an empathetic and supportive environment that allows them to process some very painful affect states to try to reconcile and heal some horrific trauma, knowing that they're not alone, coming to understanding and reframing these things that these things don't define who they are. But they describe where they've been and it helps them, especially if they can benefit by some auxiliary services like professional counseling. And many women

do that who are in recovery homes, and some don't. But there is something quite therapeutic by talking about these with understanding and empathetic peers that they realize what had happened to them  is not so uncommon, that they're not the only ones. That when they look at senior level residents, people who maintain their sobriety, they can look at them and believe that they can make their peace with their demons in their past.

And so it gets to the point where they are now in a position to help women who are earlier in their recovery hang in there in that rocky ride in their early recovery with nightmares and panic attacks and very strong emotional reactions that triggers some of the traumas that they've experienced.

That there is something about living in this recovery home, the supportive and empathetic peers is necessary for them to overcome some of these hurdles and reconciling some of the rules of the past without relapse.

Q   Thank you.  In your opinion, where should recovery homes be located?

A   Well, the science is very clear on that.

Recovery homes should be in single-family homes, in single-family residences or neighborhoods. A lot of the research I draw upon says that. I know that every single Oxford House I ever visited in Maryland and Illinois and other recovery homes in the State of Illinois and outside have all been in single-family homes and single-family residences.

A lot of the research, what we know, or at least the research that I cite in my report comes from recovery homes that are situated in single-family homes in residential neighborhoods. In fact, the National Alliance of Recovery Resources say for a Level 2 recovery home, which -- which Twelve Meadows qualifies as, they primarily should be in single-family residences.

Q So just to reiterate, are recovery homes like Twelve Meadows necessary for some people with substance use disorder to maintain abstinence and engage in recovery?

A Yes.

Q Thank you.

Dr. Majer, do you have an opinion to a

reasonable degree of professional certainty as a researcher and former clinician as to what is the appropriate -- or what is the number of residents at Twelve Meadows that is necessary to achieve therapeutic benefits produced by recovery homes?

A    Yes.

Q    What is that opinion?

A    It's my opinion that there should be six total residents at Twelve Meadows, the staff member and five additional residents.

Q    What is the bases for your opinion?

A    Well, I probably spoke to some of these things before.  That recovery homes really work when you have a community.  It's communal living.  You achieve that when you maximize the number of residents within that home.  That's necessary to create a home environment, it's necessary to create a therapeutic milieu.

You know, most recovery homes are about three or four bedrooms.  Twelve Meadows is.  Most recovery homes have six to eight residents.  They are looking at six residents.  The science supports this particular type of recovery home with this number of people, so I

go with the science on that.

But I do know anecdotally if you have fewer people you can make it easier for residents to isolate, to not buy into the community that exists within that recovery home.

Q So how did you go about picking the -- or determining the number six was the appropriate number of residents to be at Twelve Meadows?

A Very simple. You know, recovery homes vary in terms of their size. In every case that I have experienced going into these homes or meeting people, Oxford House members, they tell me the number is proportionate to the number of I guess bedrooms in there. The number of area or the number of -- I'm sorry not the number, I should say the size of the dwelling speaks to how many residents should be in there. And in all cases it's let's maximize the number of residents who can live in there without producing overcrowding.

Now, there is an exception and that has to do with some Oxford Houses. When Oxford House residents leave, when they feel like it's time for them to go, that they got

everything they can, they are ready to make it in the community, I have heard anecdotally that there are some alumni Oxford Houses.  And these are not for people who are new in recovery, these are for people who lived in an Oxford House for a certain period of time, who left on good terms and then they applied to live in an alumni house.  And if they get chosen, then they move in and they have their own bedroom.

So most recovery homes, most Oxford Houses, they like to do the buddy system, or they'd like to have two or three bedrooms -- two or three residents in each bedroom, depending on the size of the bedroom.  But when you get to the alumni house level, then these are people who are very stable in their recovery and they could live in their own bedroom without the need of having that 24/7 kind of social support with a roommate in their bedroom.

So I've come up with a number because it's my understanding that Twelve Meadows is just over 2,300 square feet.  There are four bedrooms.  I'll just give you the size of each

of the bedrooms. And, you know, it's my determination that six total people could live in that dwelling and make it a home environment without providing a sense of overcrowding.

Q So you've referenced -- you've made reference to the potential negative effects of having too many residents. Can you explain what those are in detail, please?

A Certainly. Now, this is not getting to the literature. I have not consulted to -- consulted with scientific investigations looking at overcrowding effects. This all has to do with anecdotal information that I've learned over the decades in my field work research looking at recovery homes. That a number, for instance, who have been living in recovery homes have reported a history of being in a recovery home that was overcrowded, that they had way too many residents. For example, six or seven residents had to share one bathroom. You know, that goes against the National Alliance of Recovery Residents's recommendation for the number of residents in bedrooms. Having seven or eight women share a

bathroom. That's an example. That it seemed like that they were more concerned having more people in the home because the recovery home was aiming to perhaps make more money then to really secure a recovery environment, because if they were interested in securing an atmospheric -- therapeutic atmosphere bases for recovery they would have a lot fewer people, maybe something like six or eight versus something like 12 or 15 in a three bedroom house. I don't think a three bedroom house is suitable for 15 people to live in there.

So, you know, people, women and men have told me that they've tried recovery home living, they didn't like it because there was way too many people. But when I interview them and they tell me about their current experiences in their current recovery home they say this is great because there is space for me to breathe in. We don't feel like sardines in a can. There is only maybe three of us sharing a bathroom versus seven or eight. Things like that. You know, the noise level's considerably lower. So that's what I

mean by overcrowding.

I've never met anyone who lived in a recovery home that reported to be overcrowded that benefited by it.

Q    So in making a determination on the appropriate number necessary to achieve that therapeutic benefit, there is a cap on the high end.  Is there a cap on -- there is a cap on the low end as well?

A    I don't understand what you mean by a cap on the low end.

Q    Are there negative effects to limiting the number of residents in a recovery home?

A    Yes.  And I believe that I addressed some of those in my testimony today.

You know, if you don't have enough people in a recovery home it's not going to be a recovery home, it's going to be a house or dwelling.  If you have too few residents it makes it easier for individual residents to isolate.  There is going to be no communal feel in there.  You're not going to have a family home life environment.  You're not going to have a rich therapeutic atmosphere.

Are you going to have some therapeutic

atmosphere if you have two residents in there? Well, if they can maintain the recovery in that setting, which I don't think they could, then technically you have some therapeutic atmosphere there.

But again, it gets back to the concept of, you know, cancer and treatment for cancer. We know that, you know, treatments are not 100 percent under the optimal conditions for a number of ailments. And people who have substance use disorders are no exception.

My thing is like cancer, I know that substance use disorders for some are deadly, they're fatal, that some people who need recovery homes cannot engage in their sobriety unless they have the recovery home experience, and you cannot give them something that technically will work because that sets them up for failure. We have to optimize this therapeutic atmosphere of these recovery homes. And I think the request to do so is highly reasonable.

We're talking about providing them with a family-like environment that other people in the community have rights to, and we're not

talking about overcrowding them. We're talking about giving them a living space that will create a family-like environment that will maximize the therapeutic atmosphere for the recovery.

Q    And for clarity, how many residents are necessary for Twelve Meadows to have in order to achieve the therapeutic -- maximum therapeutic benefits of recovery home living?

A    For Twelve --

         MR. SMITH:         Objection.

Q    You can answer.

A    Okay. For Twelve Meadows that would be six; one staff members and five residents. But I have to say that limiting it to two is -- I can't believe that. I don't know any recovery home where two people or two people and a staff member reside in.

         I've actually kind of said to a colleague of mine that I'm getting involved in a case where they want to limit the number of people at this recovery house to two residents. And my colleague just kind of sighed like --

         MR. SMITH:         I'm going to object.

This is not -- you got to agree with me, this is going beyond any question that you asked and what he said to a colleague doesn't matter.

Q Well, you can finish testifying and what we'll do is we'll have the judge make a ruling on it.

A Okay. Well, just let me conclude by saying I don't know of any scientific literature that shows therapeutic benefits for having only two residents per recovery home or two residents plus a staff member.

Q Okay. Thank you.

MR. CHOJNACKI: At this point I have no further questions. Perhaps you want to take a five minute break so you can gather your thoughts and go to the restroom. Is that okay with everyone?

MR. SMITH: That's perfect.

(Short recess.)

CROSS-EXAMINATION

By Mr. Smith:

Q Dr. Majer, my name is David Smith. I represent Munson Township and the defendants in this case.

I have a few questions just to follow-up on your testimony this morning and your report.

I just want to start off, can you describe for me what Oxford House is?

A    Well, Oxford House is an organization I believe located in Silver Springs, Maryland. And they are a number of -- they produce a number of recovery homes throughout the United States and Canada and some other countries.

Q    Okay. What is your affiliation with Oxford House?

A    I served as a consultant in one matter. I was asked to go into a women's recovery home in South Carolina, interview the women and write a report for the therapeutic necessity for them living in that recovery home.

Other than that, every year they invite me to come to their annual Oxford House world conference to speak on the findings from my published reports.

Q    Do you have any income from Oxford House?

A    I was paid for my involvement in the legal matter in South Carolina. Other than that they don't pay me.

Q    Okay.  Your CV also says that you are on the Census Community Advisory Board for Oxford House?

A    I had served on this advisory board for about a one year period of time back I think in 2015.  I can't remember the dates.  I'm sure it's on my CV.

Q    Do you agree with me that the majority of your opinions in your report that you submitted in this matter have to do with your knowledge based on the Oxford House; is that correct?

A    I'm sorry, could you repeat the first part of that question?

Q    You'd agree with me that the majority of the opinions that you've presented in your report are based on your work with the Oxford House; is that right?

A    Yes.

         MR. CHOJNACKI:    I'll object, but you can answer.

A    Yes.

Q    Okay.  And the Oxford House, according to their website, is a model that advocates for homes of six to ten individuals; is that right?

A      No.

Q      That's not correct?

A      They don't advocate for homes for six to ten residents.  I think --

Q      That's their model though, right?

A      No.

Q      Do they have homes with less than six residents?

A      I'm not aware of it.  They have many homes.  I think there are nearly 2,500 homes worldwide. That the average number of residents seems to be about six to eight.

Q      Okay.  Are you aware of any of those homes that have less than six?

A      No.

Q      Have you ever worked with any Level 2 recovery homes that have less than six?

A      Less than six?  No.

Q      So you have no knowledge of actual therapeutic value of any homes that would offer treatment to individuals with less than six residents; is that right?

A      Correct.

Q      You'd agree with me that there are individuals working in your field of expertise that would

advocate that groups of less than six are appropriate for Level 2 housing; is that correct?

A   No.

Q   You've never seen any opinions saying that less than six is an adequate number for a Level 2 therapeutic home?

A   Correct.

Q   Never?

A   Correct.

Q   Okay.  And that's less than six?

A   I don't know of any Level 2 recovery homes or professional treatment providers that would insist that a person move into a recovery home that has less than six residents.

Q   Okay.  You testified about two cases that you worked on the defense side in in 2019; is that correct?

A   Around 2019.  I'd have to check my CV.

Q   You agree with me that you submitted almost identical affidavits in those two cases that you did in this case; is that right?

A   I don't know what you mean by identical affidavits.  Can you clarify?

Q   Where you cut and pasted almost 12 pages of

each of those into all of these reports; is that right?

A    I'd have to take a look.  I'd have to take a look at that before I could answer that question affirmatively.

MR. SMITH:    Can we go off the record just for a minute?

(Discussion off the record.)

Q    Dr. Majer, exhibit -- I think this will be Exhibit 3 to your deposition, is now before you.  This is an affidavit that you prepared August 1, 2018; is that correct?

A    Yes.

MR. CHOJNACKI:    Just mark an objection just on the record, but go on.  Go ahead, Dr. Majer.

A    Yes.

Q    Okay.  Do you recall preparing this affidavit?

A    Yes.

Q    Okay.  And this was for -- regarding Maple Mountain Recovery program; is that right?

A    That would be the case.

Q    Okay.  And they were seeking to increase the number of occupants that they had at their facility; is that right?

A    Frankly, I'm not familiar with this case at this time.  I didn't prepare to speak to this affidavit today.  I would probably need some time to look at my report that I wrote.  But at this moment I don't really recall much at all of this case.

Q    Well, my position -- what I'm asking you is would you agree with me that the same research that you were relying on in this case is the research that you were relying on in our current case?

MR. CHOJNACKI:    Object, but you can answer.

A    I think if we scroll down to the references I should be able to identify some cited works that I used in this case that's being presented that I used for Twelve Meadows.  I would imagine that that would be the case.

MR. SMITH:      Can you scroll to the second page, Karen.  Go down to the next one.

Q    This is your background and qualifications.  This is essentially the same cut and paste that you did in our -- in the current report; is that correct?

MR. CHOJNACKI:    Objection.

A    It looks similar.

Q    Okay. Page 4. Evidence-based appraisal of Oxford Houses and co-occurring disorders. Again, here you're talking about Oxford House; is that correct?

A    Yes.

Q    All right. You base the majority of your opinions in most of your cases on your experiences with Oxford House; is that right?

A    I cited a lot of research that was done on Oxford House, but my opinions are formed by my clinical experiences, field work experiences, those involving Oxford House and other recovery homes.

MR. SMITH:    Okay. Can you go to page 5 please.

Q    Recovery home residents' and community involvement. That section there is identical to pages 5 and 6 of your report in the current case for Twelve Meadows; is that right?

A    That would appear to be the case. I'm pretty sure it is.

MR. SMITH:    Can you scroll a little, Karen?

Q    And then again recovery homes for women, that

is the exact same section that you have included on pages 7 through 8 of our -- of the report in this matter as well, correct?

MR. CHOJNACKI: Objection.

A I can't say with certainty if it's exactly verbatim the same paragraphs, but I'm pretty sure I used the same sources in discussing these issues in the Twelve Meadows case.

Q Okay.

MR. SMITH: Can you flip to the second affidavit as well, and to the second page.

Q This is also a report that you recently published, August 14th of 2018; is that correct?

MR. CHOJNACKI: Objection.

A It looks like the report I did submit, yes.

Q And this one also had to do with reducing the number of a facility; is that correct?

A I can't say. I need to read this report. It's kind of hard for me to see it on the screen, but it appears to me it's mine. It says expert report, John M. Majer, Ph.D., Harry S. Truman College with my employer's letterhead, so I'm pretty certain I wrote it.

Q I just don't have any recollection at this time what's involved in this report that you're showing me.

MR. SMITH: Karen, can you scroll down a little bit more?

Q This case had to do with the Center for Community -- I'm sorry, with elevated sober living; is that right?

A Yes.

Q Does that refresh your recollection about whether this is again regarding reducing the size of a facility?

A I have no idea what's in that report unless I read it. There have been many intellectual adventures I've done since then, so, you know, I would need to read it to really speak to it.

MR. SMITH: Can you scroll to the third again?

Q Background information and qualifications there again is what you've cut and pasted into your report in this matter; is that right?

A I would imagine it is very, very similar if not cut and paste.

Q Okay.

MR. SMITH:          Can you go to the fourth page, Karen?

Q    And that's again your background.  And the bottom of that says, "Evidence-based appraisal of recovery houses;" is that correct?

A    That's what it says on the page.

Q    And that is the same section that appears on pages 4 and 5 of the report in your Twelve Meadows report; is that correct?

MR. CHOJNACKI:     Objection.

A    Are you saying that the headings that I used in this report are similar to the ones for the Twelve Meadows report?

Q    I believe it's the same except you changed Twelve Meadows for the name of the other facility.

A    Well, I think that the subheadings are similar if not the same.

MR. SMITH:          Can you scroll down, Karen?

Q    Okay.  So you're saying that your subheadings in all those reports are the same and they are all based on the same research; is that right?

A    Well, I'm saying that all these reports follow a similar format, and I try to make them I

guess tailor-made to each case, but certainly there is going to be some overlap of cited works and some overlap about issues that I think are important to the research involved in recovery homes.

Q    Okay.  But you've used the same research to pretty much come down on both sides of this issue, correct; whether a house should have more or less people?

A    I don't know what you mean by that question.

Q    Well, you fit your research to whatever organization is asking you to give an opinion, right?

A    I fit my research to substantiate the claims based on my field work experiences, my training and my clinical experiences.

Now, I really don't know what this particular case that you're showing me involves that elevates sober living.  I'd have to refresh my memory by reading the report.

The one before that with Maple, I would need to refresh my opinion.  But I think it's an unfair description to say that I'm using the same resources for both sides of the issue about having more people in recovery or not

having people in recovery or not allowing them to operate in a neighborhood.

Off the top of my head I recall at this time that the Maple enterprise was not really a recovery home, that they wanted to operate a professional treatment center within a residential setting. So I used a number of sources that were similar across my other reports to illustrate, you know, the need for recovery homes and why they are effective. But it's not the same thing to say that I'm using one report that says more residents are better and another case that says less residents are better, if that's what you're getting at.

Q   Okay. But you will agree with me that the majority of your reports rely on the same -- the same research and the same articles that you have relied on here in this case; is that right?

A   Yes.

MR. SMITH:   Karen, you can take those down?

Q   Dr. Majer, would you agree with me that overcrowding would be more of a detriment than

limiting the number of individuals in a recovery home?

A    I can't say.

Q    Well, you spoke to the problems of overcrowding, correct?

A    Correct.  I think overcrowding and under-enrolling residents, if you want to use that word, but in other words, having too few residents or having too many, both would have detrimental effects comparatively on a scientific basis to compare them.  But in my thinking categorically that they would be the same is that they would produce detrimental effects.

Q    I need to kind of narrow something down here.  In your opinion that you provided, the written opinion, you state that Twelve Meadows needs to have six residents plus a house manager.  Your exact wording is six in addition to the house manager.  In today's testimony you say that it needs a total of six, which would be five and the house manager.  So what is your difference of your opinion between the written report that you've submitted and your testimony today?

MR. CHOJNACKI: Do you want to show him the portion of the report where he says that?

MR. SMITH: It is -- can we go off the record for one second? I'm having technical difficulties on my end as well.

(Discussion off the record.)

Q Okay. Doctor, page 12 of your report, if you can go there.

A Yes.

Q You state that the house is adequate to accommodate six residents plus the house manager.

A Can you show me where exactly on page 12 it says that?

Q The paragraph right above your conclusion.

A "This is more than adequate to accommodate six residents (plus the house manager) according to the NARR standards." Is that what you mean?

Q Correct.

A Okay. I meant to say including the house manager.

Q So that's a typo in your report; is that what your testimony is today?

A    I wouldn't call it a typo as much as it would be a choice of wording.

Q    Okay.

A    So I think it's pretty clear in other sections of my report that it's a total of six persons in there, one staff member, five co-residents.

Q    Okay.  Did you review any Ohio standards that might apply to recovery homes in providing your report?

A    I'm not familiar with Ohio standards.

Q    Okay.  Have you reviewed any Munson Township standards including the zoning resolution here?

A    No.

Q    Have you reviewed any demographics regarding Munson Township?

A    What do you mean by demographics?

Q    Do you know is Munson Township rural, is it urban?  Do you have any information regarding the makeup of Munson Township?

A    Not the makeup.  It's my sense that it's a rural area.

Q    Okay.  Are you aware of facilities in Ohio that are considered Level 2 recovery homes that allow for two individuals living

together, such as apartments or condos?

A    No, I'm not.

Q    So you didn't look into that at all?

A    That's correct.

Q    Have you seen any research regarding Level 2 recovery homes that only have two individuals showing whether or not they are effective?

A    No, I haven't.

Q    So all of your experience and research has been on homes that have six or more?

A    No, all of my research experience has to do with recovery homes that report on average a census of six to eight residents.

Q    Okay.  Are you familiar with what treatment options are available around Munson Township?

A    No, I'm not.

Q    Are you aware of Ravenwood Treatment Center around Munson Township in Lake or Geauga County?

A    No.

Q    Are you aware of the options that are offered by University Hospitals in the Lake and Geauga County areas to provide treatment for substance abuse -- substance abuse individuals?

A    No.

Q    You didn't take any of that into account when you prepared your report?

A    That's correct.

Q    You said you spoke with Melanie Blasko who is the CEO of Lake-Geauga; is that correct?

A    Yes.

Q    Did she provide you any documentation regarding the house or her plan for running the house?

A    No, she did not.

Q    Okay.  Did you ever see any documentation regarding the plan for running the house?

A    For the plan for running the house?

Q    Right.

A    No.

Q    For --

A    No.

Q    Did you receive any documentation regarding this matter other than your own personal research?

A    I received a declaration that was signed by Ms. Blasko.  I think it's about three pages.

Q    Okay.  Did you review any of the -- did you review the complaint filed in this action?

A    Not closely.  Those were things I don't really read.  Sort of things I don't really have expertise in understanding, you know, the legal jargon and that kind of stuff.

Q    Okay.  So the only documentation specific to Lake-Geauga's case in this matter that you reviewed was Melanie Blasko's declaration; is that correct?

A    Yes.

Q    Have you ever testified as an expert in an Ohio court?

A    No.

Q    Have you done any -- has any of your research pertained to Ohio?

A    Can you be a bit more specific by what you mean by pertain to Ohio?

Q    Well, it seems like most of your work -- let's start with that.  Most of your work is through Oxford House; is that correct?

A    Probably.

Q    Is Oxford House located anywhere in Ohio, that you're aware of?

A    I believe that they have some homes in Ohio.

Q    Okay.  Have you been involved in any of those homes?

A    No.

Q    Do you know how many residents are in any of those homes?

A    No.

Q    You'd agree with me that the program that is offered by a Level 2 recovery home is more important than the number of people living there; is that correct?

A    No.

Q    No?

A    That was my answer, no.

Q    Okay.  Explain what you mean.

A    Excuse me?

Q    Can you explain to me why you don't believe so?

A    Well, I think you're asking me to compare a therapeutic program with a therapeutic atmosphere element that's related to having more residents.  I find them as being, you know, two components to a treatment, and I don't know how I could begin comparing these two elements.  I could say that a program is important for a Level 2 recovery home and having enough residents in the recovery home is important.

Q      Okay.  But you don't even know what Melanie Blasko and Lake-Geauga is proposing as a therapeutic program in this case; is that correct?

A      No, I have some idea and that is this is going to be a Level 2 recovery home, it's going to be staffed by a person who herself is in recovery who has worked in the clinical capacity with this population and therefore is probably one of the best people that you could have in a Level 2 recovery home.  That there is some kind of a screening process I think through Lake-Geauga Recovery Center's process.  That much I know.  That women can live there for an indefinite period of time.  That no drugs are allowed.  Recurrent drug use is grounds for immediate eviction.  So these things are pretty much common across a lot of recovery homes that are Level 2 recovery homes.

Looking at specific rules, I know that they have rules.  I haven't looked at them myself and I haven't closely examined all the documentation that speaks to the programmatic value of Twelve Meadows, but I have --

Q But you haven't even been provided with that documentation; is that correct?

A That's correct.

Q Have you reviewed any documents that have been put out by the Ohio Mental Health & Recovery Services Center regarding recovery homes in Ohio?

A No.

Q So you're not familiar with that organization or the documents that they put out; is that correct?

A That's correct.

Q You testified a lot about reducing -- or giving -- the number of six to eight would give a home-like environment; is that correct?

A I wouldn't say I testified a lot that six to eight creates a home-like environment, but I believe I testified to the necessity of having more residents to create a home-like environment in a recovery home.

Q Okay. You'd agree with me though that the average family is only four individuals; is that correct?

MR. CHOJNACKI: Objection.

A I'm not an expert in that area.

Q     How many individuals live in your home?

          MR. CHOJNACKI:     Objection.

          MR. SMITH:          It's a fair question.

A     My wife and I.

Q     Correct.  So in your home is it not a
home-like environment because there is only
two of you?

          MR. CHOJNACKI:     Objection.

A     Well, it is my wife and I and we call it home,
but it's hard to -- it is what it is.

Q     Right.  So six to eight individuals actually
is less like a home-like environment; wouldn't
you agree with me?

A     No, I wouldn't.  I think it depends on the
context of the dwelling.  You know, the whole
point, which I thought I made clear, was that
you want to have enough residents in any type
of dwelling to create a home-like atmosphere,
and in this case a therapeutic atmosphere to
put their recovery first.

Q     But you are unfamiliar with the homes in
Munson Township; is that correct?

          MR. CHOJNACKI:     Objection.

A     Correct.

Q     So you are unfamiliar with what a home-like

environment in Munson Township is; is that correct?

A    I have the knowledge that Twelve Meadows is situated in a residential setting.  I'm familiar with the literature that says recovery homes do well when they're in single-family homes in residential settings.

So to answer your question, I have not inspected other homes in the township, that's correct.

Q    All right.  You'd also agree with me that the more people you put in the home it also increases the chance of conflict within that home; is that correct?

A    There's going to be conflicts that arise naturally in any living settings.  I think -- well, I'll speak to the point of overcrowding, that might be in alignment with the question that you're asking me.  I think when you have an overcrowded recovery home you're going to experience more conflicts.  So in that context I would agree to say yes.

Q    So you'd agree with me that there are potentials that a smaller size or fewer individuals in a recovery home could make a

more home-like environment with less conflict; is that correct?

A   Not at all.  I mean, you're going to have conflicts in any home setting, whether we're talking two or three or six or 12.  I think that's just part of living with someone.

Now I can tell that, you know, some of us, you know, have partners or spouses and I think we know firsthand that when you live with someone conflicts arise from time to time.  And I think that's just part of the reality of cohabitation.

So yeah, they will arise from time to time.  And I think it's great for people in recovery homes because they learn to invest in conflict resolution, whereas before they would run away from conflicts.

Q   I want to go back a little.  You said that you have -- the majority of your research has been done on houses -- recovery homes that have an average of six to eight individuals.  What's the smallest recovery home you've worked with?

A   I'm not sure I understand what you mean, what's the smallest recovery home that I worked with.

Q    Well, you said average six to eight.  You keep stressing that it's an average of six to eight.

A    Well, I said a few times that the average number of residents nationwide seems to be six to eight, but that number is an average and it doesn't represent all recovery homes.

Q    Correct.  So would you agree with me that in that average there is a low end, correct?

A    It depends on the sample of what you're looking at.  Now, when you say work with, in terms of actually going into recovery homes as a clinician and updating a referral list for recovery homes for a psychiatric unit or one who works in an intermediate care facility making referrals, work in that context or work as a field work researcher going into Oxford Houses and other recovery homes and meeting residence, I can tell you that in all of my experiences, my firsthand appraisal of recovery homes, I've never seen a recovery home that had only two or three residents living in it.

That I think in just about every single case other than the Level 3 therapeutic

community, institutional recovery house or halfway house I worked at I think starting in 1990 called the Raft House, all of these have been single-family homes in residential neighborhoods and they all seemed to have about an average of six residents.

Q   Okay.  So since you have not had any personal experience with two to three residents in a location you have no knowledge as to whether they are receiving a therapeutic benefit; is that correct?

        MR. CHOJNACKI:    Objection.

A   Well, I don't know about these places so I can't really have an opinion on them, but I can tell you --

Q   Correct.

A   -- I've been in many recovery homes and I've never seen any of them with a census of two or three.  And that leads me to infer --

Q   Put it this way --

A   That leads me to infer that you're not going to maintain a recovery home in a single-family home in a residential neighborhood with only two or three.  But I don't know of any scientific reports that substantiate that two

or three residents in such a context is therapeutic. That I have no knowledge of it.

Q But you have no knowledge of any that says that two or three residents is not therapeutic; is that right?

A Correct.

Q Okay. In your report you state that the maximum capacity should be in a residential neighborhood and as many as possible without overcrowding; is that right?

A Correct.

Q What data do you rely on for that opinion?

A That was based on data I got or information I got in visiting various recovery homes across this country, particularly Oxford Houses. And this comes from my clinical experiences working with people who have been in recovery homes that were overcrowded.

Q You speak a lot about financial concerns in your report and in your testimony today regarding financial limitations. However, since Twelve Meadows -- since you've been provided no information regarding Twelve Meadows you don't know what their financial constraints are; is that correct?

A    Not exactly.  I know that residents are looking to pay $50 or $85 a week, depending whether they're in the double room or that one single room.

Q    But that's the extent of the knowledge you have about their financial constraints; is that right?

A    Correct.

Q    And you testified earlier that increasing the number in some situations is more based on money than the program; is that correct?

          MR. CHOJNACKI:    Objection.

A    I believe what I said is that some recovery homes that I have been made aware of in my field work experiences in Baltimore, based on anecdotal information from folks who have been in these recovery homes, they operated purely out of ambition of making money; that they were not about promoting recovery in the community.  That I do believe I spoke to.  And I said that -- I believe I said that the financial aspect of operating a recovery home is a reality that has to be addressed that could have direct and indirect affects on the therapeutic atmosphere within the recovery

Q   Your opinion also goes into the integration to
the community and the need for that; is that
correct?

A   The need for community integration?

Q   Correct.

A   Yeah, I do address -- I think you mean people
being involved in the community, being of
service, the second order effect or ripple
effect?

Q   Right.

A   Yes.

Q   Do you -- but you have no idea -- since you
didn't look into Munson Township you don't
know where that community is even located in
terms of bigger urban areas that might be
where these residents are coming from; is that
correct?

A   No, it's not correct.  You know, recovery
homes are not really urban things.  You know,
they exist in rural and suburban -- in
addition to rural settings, urban settings.  I
mean, I've been to recovery homes in all three
of those locales.

         Although I'm not familiar with Munson

Township, I do know from, you know, over 25 years of experience working with recovery homes that the recovery homes provide a service to the community directly by addressing the needs of people getting clean and sober through the recovery home model, that it is absolutely necessary for some people to live in a recovery home in order to connect with their sobriety, to be clean and sober.

But in addition to that bit, because, you know, the community is not, you know, picking up the tab for any expenses related to substance use disorders in their neighborhood, that recovery homes provide a service in that alumni members, people who transition and reintegrate in the community oftentimes become of service back to that recovery home. They want to kind of give back what was given to them, and they oftentimes help new residents acclimate to the 12 step community outside the home, help them, you know, kind of get through the throes of adjusting to recovery home living.

So you have a second order effect in

that it's helping people get clean and sober in the community, it's helping them acclimate to 12 step recovery, and I have no doubt that if there is some opportunities for Twelve Meadows to extend themselves like in the ways that I have cited in the Jason, Schober and Olson report and other citations in my report, they could probably do that.  But you might recall in that report that about 62 percent of ones paying it forward or giving back to their community had to do with mentoring others in recovery.

Q    Okay.  You'd agree with me though that treatment is dependent not on the recovery home alone but other options for that individual during recovery; is that correct?

A    I don't know what you mean by that question.

Q    Well, they are not going to be cured in the recovery home alone, correct?

A    They -- those who are pursuing professional treatment?

Q    The residents, correct.

A    Maybe the best way I can answer that question is to explain that for some people in a recovery home they need to supplement their

past recovery with outpatient, meaning substance use disorder treatment and/or individual psychotherapy. Some don't need that.

Like the National Institutes of Drug Abuse, the Substance Abuse Mental Health Service Administration say we recognize there is no one pathway to treating these heterogeneous people who have substance use disorders.

With that said, some people might have access and the privilege to go through a detoxification followed up by a 28 day inpatient intermediate care facility and then as need be transition into a recovery home. But the fact is most people don't have access to those resources. I think that's why -- and this is my hunch. Why we have seen an increase in recovery homes in the last couple decades in the United States. That professional treatments are either insufficient in meeting the complexities of all persons with substance use disorders and/or those who have substance use disorders don't have access to them.

So it's a case-by-case thing. There's no one way of treating people. But I can say with certainty that there is clearly a need for people who have substance use disorders, not all of them, but some of them, the only way to engage in their recovery is to live in a recovery home.

Q However, with that statement you did not review the characteristics of Munson Township to find out if other treatment options were available, correct?

A That's correct.

Q So your opinion is a nationally based opinion not a Munson Township opinion; is that correct?

MR. CHOJNACKI: Objection.

A My opinion is based on my academic and scientific research, my clinical experiences and field worker experiences, not just limited to recovery homes but also a variety of professional treatments which I worked in.

Q Right. But not fact specific to this case; is that correct?

A Well, I think they are fact specific to this case, but they are not specific to Munson

Township, that's correct.

Q  Correct.  Because the only facts you have regarding this case is your discussion with Melanie Blasko and her declaration; is that right?

A  I'm not too sure I understand what you mean by that question.

Q  Well, I'm just -- sir, your testimony earlier today, you received nothing regarding this case, this specific case that we're here on today, except for your discussion with Melanie Blasko and her declaration?

A  That's the only sources of information provided to me specific to Twelve Meadows.

Q  And you are aware that currently two recovering substance abuse users are in that house; is that correct?

A  I'm not aware of that.

Q  Okay.  So you're not even aware of how the house is currently being used?

A  Correct.

MR. SMITH:        I have no further questions.

MR. CHOJNACKI:    Stephen, your client is a party to this case.  Do you have any

questions you'd like to ask?

MR. DANE:        No, I have no questions for the witness.  I pass to you for re-examination.

MR. CHOJNACKI:     All right.

Folks, give me a moment.  I'll just gather my notes right quick.  Be right with you.

MR. SMITH:     Do you want to take a short break, Ben, or are you --

MR. CHOJNACKI:     John, do you want to take a break?  It won't be long. It's up to you.

THE WITNESS:     If it won't be long I can wait.  Sure.

MR. CHOJNACKI:  Why don't you take a break.  Take five minutes.  That will give me a little bit more pointed opportunity to get everything together.  Let's do five minutes. Just a quick break.

(Short recess.)

REDIRECT EXAMINATION

By Mr. Chojnacki:

Q    Okay.  I'll be brief, Dr. Majer.

A    Sure.

Q    Is there anything about Ohio State regulatory standards or Munson Township demographics that would change the way you've testified today?

MR. SMITH:    Objection.

A    No.  No.

Q    You testified that you have no knowledge of any of the therapeutic value of homes with fewer than six residents with substance use disorders living within.  Is that because such academic research and scientific literature does not exist?

A    Correct.

Q    In your time as a clinician or your time as an academic and as a consultant, would you treat someone without having the literature support the efficacy of such treatment?

A    No.

Q    In addition to your conversation with Melanie Blasko you also testified that you reviewed the specifications of the Twelve Meadows residential structure and saw its size and layout online; is that correct?

A    Yes.

Q    Was that information, paired with your conversation with Ms. Blasko, sufficient, in

your estimation, for you to form the opinion and testimony that you provided today?

A    Yes.

Q    You were shown a couple of previous reports that you may have authored.  The facts that -- and I guess the point was to show that there is -- you've relied on many of the same literature here as in previous cases.  Does that mean that your -- the literature, the efficacy of recovery houses with six to eight residents is well settled?

A    I'm sorry, that the efficacy is what?

Q    Well settled, well established.

            MR. SMITH:          Objection.

A    Yes.

Q    And last, I asked you this previously but just for the record, does limiting the Twelve Meadows occupancy to two persons with substance use disorder provide Twelve Meadows residents the benefit of the recovery house model?

A    No.

            MR. CHOJNACKI:    That's all I have.

            MR. SMITH:          I do have recross on those issues.

MR. CHOJNACKI:    That's fine.

RECROSS-EXAMINATION

By Mr. Smith:

Q    Dr. Majer, you'd agree with me that since you have not reviewed the Ohio regulations or standards that you can't actually say for sure whether or not that would have changed your opinion, correct?

A    Incorrect.  No.  My understanding is local governments might have some ordinance or maybe some kind of laws that are outdated.  Now, I'm not an expert with fair housing but my understanding of the Fair Housing Act and the American with Disabilities Act of 1988 gives people in recovery the right to live in residential neighborhoods.  So for me I believe that the research has shown that when you live in a recovery home in a single-family home, in a single-family neighborhood you're going to have better benefits when you have more people than less people.  So I'm coming in as an expert on recovery homes, and I don't necessarily know what the standards or the laws are in Ohio.  To me it's not relevant.

Q    Right.  But if you don't know what the laws or

standards in Ohio are you can't say that they wouldn't change your opinion; is that correct?

MR. CHOJNACKI:      Objection.

A    No.  My opinion is based on the scientific research.  That is what forms my opinion.  In addition to my clinical experiences and my field work experiences.

Q    Okay.  And I do want to also follow-up.  You said that you're not aware of any research regarding less than six to eight in a home; is that correct?

A    I've not come across any scientific investigation that specifically looked at less than six residents and the efficacy of a recovery home having less than six residents, that is correct.

Q    That does not mean that it does not exist, it's just that you have not seen it; is that right?

A    I have searched for science backing the claim that having more residents is beneficial.  I've looked for the investigations looking at various sizes and I've yet to come across an empirically based investigation with scientific rigor that demonstrates therapeutic

benefits among those who live in smaller recovery homes.  But I did put in my report several investigations that point looking at different variables across different samples, one consistent finding, and that is when you have more residents in a recovery home you're going to have better therapeutic benefits. And for this population we need to do everything we can because for those -- in particular, those who are pursuing recovery homes it's life saving for them.  It's a matter of staying sober or not.

Q   Doctor, I do want to stop you for a moment. You're not answering my question.  My question is just because you don't have it in front of you right now doesn't mean it doesn't exist, correct?

A   I don't know whether it exists.  I've looked for empirically based investigations on house size and I've yet to come across one that shows research done in single-family homes with fewer residents than what the dwelling could reasonably accommodate with respect to not producing overcrowding.

Q   Okay.  But you don't even know who is living

there currently, correct?

A    Correct.

Q    Okay.  And you don't know if there are individuals with disabilities there that are receiving treatment there, correct?

A    That is correct.

          MR. SMITH:          All right.  I have no further questions.

          MR. CHOJNACKI:    Okay.  We are all set.  Dr. Majer, we are -- you're going to be leaving the country so you won't have access to your transcript before you leave. Ordinarily in Ohio law and federal courts give you the right to read and make typographical corrections to the record itself.  You have the right to waive that, which you can do.  We can discuss that more offline.  But for the purposes of today I think this deposition is over.

           (Deposition concluded at 12:36 a.m.)

                  (Signature waived.)

                        (Plaintiffs' Exhibits 1 and 2

                        marked for identification.)

                        (Defendants' Exhibits 3 and 4

                        marked for identification.)

State of Ohio,                    )
                                  ) SS:   CERTIFICATE
County of Cuyahoga,               )

        I, Karen A. Toth, Notary Public in and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within named witness, John Majer, Ph.D., was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the cause aforesaid; that the testimony then given by him was by me reduced to stenotypy/computer in the presence of said witness, afterward transcribed, and that the foregoing is a true and correct transcript of the testimony so given by him as aforesaid.

        I do further certify that this deposition was taken at the time and place in the foregoing caption specified and was completed without adjournment

        I do further certify that I am not a relative, counsel, or attorney of either party, or otherwise interested in the event of this action.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Cleveland, Ohio on this 26th day of February, 2021.

_____
Karen A. Toth, Notary Public in
and for the State of Ohio.
My Commission expires May 6, 2023.

Lake-Geauga Recovery Centers, et al. v
Munson Township, et al.

John Majer, Ph.D.
February 22, 2021

## $

**$40 (1)**
18:17
**$50 (1)**
100:2
**$85 (1)**
100:2

## A

**ability (2)**
37:18;38:24
**able (5)**
4:14;7:13;14:23;
40:3;78:15
**above (1)**
86:16
**absolutely (3)**
35:23;42:20;102:7
**abstinence (14)**
23:12,13,13;38:15;
41:3,13,18;53:24;
54:1,2;56:22;58:2,
17;63:21
**abuse (9)**
10:1,1;60:22,23;
88:24,24;104:6,6;
106:16
**abused (1)**
60:25
**academic (10)**
15:10;18:5,8,8,13;
32:11;55:20;105:17;
108:10,14
**accept (1)**
17:20
**acceptance (1)**
21:3
**accepted (3)**
11:2;20:25;52:4
**access (30)**
17:2,24,25;18:11;
19:3,10,12,13,18;
20:3,6,22,25;21:4,6,
9,14,18,20;22:6;32:9;
38:14;39:18,19,19;
41:14;104:12,16,25;
113:11
**accessible (2)**
19:2;46:16
**acclimate (2)**
102:21;103:2
**acclimated (1)**
45:12
**accommodate (4)**
4:18;86:12,17;
112:23
**according (4)**
37:9;42:9;74:22;
86:18
**account (2)**

19:23;89:2
**accredited (1)**
12:23
**accurate (3)**
31:23;32:6;43:11
**achieve (5)**
53:11;64:5,16;
69:6;71:8
**achieving (1)**
50:3
**across (11)**
25:18;26:6;36:20;
51:15;84:8;92:18;
99:14;111:12,23;
112:4,20
**Act (2)**
110:13,14
**action (2)**
16:7;89:25
**activities (2)**
37:18;38:25
**actual (1)**
75:19
**actually (11)**
28:13;29:2;42:2,
16;44:18;51:22;
54:13;71:19;94:11;
97:12;110:6
**acute (1)**
25:22
**add (1)**
51:9
**Addiction (1)**
9:17
**addictions (2)**
9:3;11:2
**addition (7)**
38:17;54:25;85:19;
101:22;102:11;
108:18;111:6
**additional (2)**
29:23;64:11
**address (1)**
101:7
**addressed (2)**
69:14;100:23
**addressing (1)**
102:5
**adequate (3)**
76:6;86:11,17
**adjusting (1)**
102:23
**administering (1)**
8:3
**Administration (1)**
104:7
**adolescence (1)**
60:21
**adult (1)**
60:21
**advanced (1)**
14:21
**advantage (1)**

46:14
**advantages (3)**
23:24;28:7;46:13
**advent (1)**
19:9
**adventures (1)**
81:15
**Advisory (2)**
74:2,4
**advocate (2)**
75:3;76:1
**advocates (1)**
74:23
**affect (2)**
37:18;61:18
**affects (3)**
36:8;60:2;100:24
**affidavit (4)**
77:11,18;78:3;
80:11
**affidavits (2)**
76:21,24
**affiliation (1)**
73:11
**affirmatively (1)**
77:5
**afflicted (1)**
35:12
**afford (1)**
46:14
**aftercare (1)**
10:17
**again (8)**
25:16;70:6;79:4,
25;81:11,18,20;82:3
**against (2)**
22:10;67:22
**age (1)**
4:2
**ago (4)**
18:25;24:22;28:1;
47:3
**agree (18)**
52:8;72:1;74:8,14;
75:24;76:20;78:8;
84:16,24;91:5;93:21;
94:13;95:11,22,23;
97:8;103:13;110:4
**agreement (2)**
4:12,18
**ahead (1)**
77:16
**aide (2)**
7:24,25
**ailments (1)**
70:10
**aiming (1)**
68:4
**alcohol (5)**
36:18,25;52:1;
53:1;55:6
**Alcoholics (2)**
8:7;58:12

**Alcoholism (1)**
16:21
**alignment (1)**
95:18
**Alliance (4)**
22:1;42:10;63:14;
67:23
**allocate (1)**
5:3
**allow (2)**
21:12;87:25
**allowed (3)**
47:23;58:13;92:16
**allowing (2)**
47:11;84:1
**allows (2)**
27:22;61:17
**almost (3)**
27:1;76:20,25
**alone (4)**
20:5;61:20;103:15,
19
**alternative (1)**
12:13
**although (2)**
37:20;101:25
**alumni (4)**
66:3,8,16;102:16
**always (1)**
28:5
**ambition (1)**
100:18
**American (5)**
12:22;16:20;18:4;
36:14;110:14
**among (7)**
16:7;34:11;50:1,4;
59:4,12;112:1
**amount (2)**
58:3;60:2
**amounted (1)**
40:7
**analogy (1)**
35:10
**analysis (2)**
32:13,25
**analyze (1)**
32:17
**and/or (5)**
37:2,24;45:13;
104:2,24
**anecdotal (2)**
67:14;100:16
**anecdotally (3)**
47:7;65:2;66:2
**Annapolis (1)**
12:4
**Anne (4)**
6:18;12:3,6,16
**annual (1)**
73:19
**Anonymous (6)**
8:8,8;57:19,20;

58:12,12
**anticipate (1)**
5:1
**anymore (1)**
28:10
**apart (1)**
58:14
**apartments (1)**
88:1
**appealing (1)**
42:4
**appear (1)**
79:21
**appeared (1)**
27:10
**appears (2)**
80:22;82:7
**applicant (1)**
48:12
**application (1)**
16:11
**applied (6)**
7:22;8:22;11:1;
12:1;16:5;66:7
**applies (1)**
48:16
**apply (3)**
14:15;53:2;87:8
**applying (1)**
14:21
**appraisal (3)**
79:2;82:4;97:20
**appreciate (1)**
4:17
**approach (4)**
11:6;24:11,12;27:7
**appropriate (4)**
64:3;65:8;69:6;
76:2
**approximately (1)**
36:2
**arduous (1)**
43:4
**area (8)**
10:22;15:19;17:13;
26:9;47:3;65:16;
87:22;93:25
**areas (5)**
34:2;41:19;48:8;
88:23;101:16
**argument (5)**
27:2;28:13,22;
34:7;54:6
**arise (3)**
95:15;96:10,13
**Arizona (1)**
27:9
**around (6)**
13:16,16;42:1;
76:19;88:15,18
**arrived (1)**
45:11
**article (5)**

Lake-Geauga Recovery Centers, et al. v
Munson Township, et al.

John Majer, Ph.D.
February 22, 2021

18:16,18;20:4,4;
21:1
**articles (6)**
19:4,7;21:18,22;
22:4;84:18
**Arts (3)**
6:18,23,25
**Arundel (4)**
6:19;12:3,7,16
**aspect (1)**
100:22
**aspects (1)**
49:11
**assessing (2)**
13:5;14:20
**assessments (1)**
12:5
**assessor (1)**
12:2
**assigned (3)**
56:7;57:13;58:24
**assignment (1)**
56:10
**assisted (1)**
24:5
**associate (1)**
15:12
**associated (5)**
12:22;18:22;41:13;
46:11;55:2
**Associates (1)**
6:17
**Association (2)**
18:5;36:14
**atmosphere (24)**
34:10,11;39:20;
40:23;42:6;43:13,18;
45:2;46:8;47:10;
48:10;49:13,19;
61:14;68:7;69:24;
70:1,5,20;71:4;
91:18;94:18,19;
100:25
**atmospheric (1)**
68:7
**attack (1)**
41:11
**attacks (1)**
62:15
**attainment (1)**
7:8
**attend (1)**
4:15
**attention (2)**
5:8;56:2
**attorneys (1)**
27:8
**August (2)**
77:12;80:14
**author (1)**
17:17
**authored (1)**
109:5

**authors (4)**
17:6;19:4;20:3;
21:13
**auxiliary (1)**
61:24
**availability (1)**
41:17
**available (6)**
22:2;29:8;41:3;
60:5;88:15;105:11
**average (12)**
13:13;33:8;75:11;
88:12;93:22;96:21;
97:1,2,4,6,9;98:6
**awarded (2)**
6:17;15:1
**aware (11)**
75:9,13;87:23;
88:17,21;90:22;
100:14;106:15,18,19;
111:9
**away (2)**
57:3;96:17

**B**

**Bachelor (1)**
6:21
**Bachelor's (1)**
7:11
**back (10)**
11:24;19:20;36:6;
49:10;70:6;74:5;
96:18;102:18,19;
103:10
**background (3)**
78:21;81:19;82:3
**backing (1)**
111:20
**bad (1)**
47:17
**Baltimore (3)**
11:4;47:3;100:15
**Baltimore/Washington (1)**
10:22
**bank (1)**
19:23
**base (1)**
79:7
**based (19)**
20:1,14;35:4;
40:11;56:16;57:10;
59:24;74:11,16;
82:23;83:15;99:13;
100:10,15;105:13,17;
111:4,24;112:19
**bases (2)**
64:12;68:7
**Basically (8)**
9:23;12:17;21:6;
25:8;32:21;36:16;
56:17;59:4
**basis (5)**

11:13;15:13;19:17;
46:18;85:11
**bathroom (4)**
52:23;67:22;68:1,
23
**bathrooms (1)**
34:1
**beat (1)**
40:18
**became (1)**
24:16
**become (5)**
11:24;39:13;45:12,
19;102:17
**bedroom (7)**
66:10,14,15,19,21;
68:11,11
**bedrooms (9)**
33:13,20;41:19;
64:21;65:15;66:13,
25;67:1,25
**beds (1)**
33:22
**begin (1)**
91:21
**beginning (1)**
32:7
**Beginnings (1)**
7:19
**behaviors (3)**
37:3;49:25;57:1
**belief (2)**
43:2;55:10
**Ben (3)**
4:7;5:10;107:10
**beneficial (2)**
27:3;111:21
**benefit (6)**
41:7;49:17;61:24;
69:7;98:10;109:20
**benefited (1)**
69:4
**benefits (14)**
23:11,24;25:12;
26:23;31:21;34:13;
56:1;57:5;64:5;71:9;
72:10;110:20;112:1,
7
**best (3)**
10:23;92:10;
103:23
**better (14)**
6:1,6,7;12:9,14;
31:16;56:22,23,23;
59:6;84:13,14;
110:20;112:7
**beyond (2)**
61:3;72:2
**big (1)**
21:11
**bigger (1)**
101:16
**biological (1)**

41:12
**bit (9)**
6:4;26:20;31:6;
50:21;51:13;81:5;
90:15;102:11;107:18
**Blasko (11)**
30:22;31:2;32:2;
34:17;89:5,23;92:2;
106:4,12;108:19,25
**Blasko's (1)**
90:7
**board (5)**
16:19;20:9,12;
74:2,4
**boards (1)**
22:20
**both (5)**
14:20;40:9;83:7,
24;85:9
**bottom (1)**
82:4
**Bowie (3)**
6:22,22,24
**brand (2)**
45:9,14
**break (6)**
5:3;72:16;107:10,
12,17,20
**breaking (1)**
6:4
**breaks (1)**
4:22
**breathe (1)**
68:21
**brief (2)**
5:5;107:24
**briefly (3)**
22:9,25;25:16
**brilliant (1)**
19:1
**bring (1)**
40:1
**broadly (1)**
23:5
**buddy (2)**
41:8;66:12
**bundle (1)**
18:2
**buprenorphine (1)**
24:7
**business (1)**
47:19
**buy (2)**
42:3;65:4

**C**

**call (3)**
45:10;87:1;94:9
**called (5)**
7:14,19;8:23;
28:20;98:3
**came (7)**

14:7;15:23;19:1;
27:1;33:17;36:14;
53:14
**campus (1)**
15:19
**can (65)**
5:21,23;6:10;22:9,
25;25:16;26:19;36:6;
39:12;40:13,15,18,
20;41:6,23,25;43:2,8;
48:9;49:22;54:21;
57:7,8;59:15;61:24;
62:8,9;65:3,20;66:1;
67:8;68:22;70:2;
71:12;72:5,16;73:4;
74:20;76:24;77:6;
78:12,19;79:15,23;
80:10;81:4,17;82:1,
19;84:22;86:4,9,14;
90:15;91:14;92:14;
96:7;97:19;98:15;
103:23;105:2;
107:15;112:9;
113:16,17
**Canada (1)**
73:10
**cancer (6)**
35:11,14,18;70:7,7,
12
**candidate (1)**
48:3
**cannabis (2)**
36:18,24
**cap (4)**
69:7,8,8,10
**capable (1)**
42:23
**capacities (1)**
26:2
**capacity (4)**
13:13;15:16;92:9;
99:8
**care (9)**
7:18;10:11;25:23;
47:5;56:8,18;58:25;
97:15;104:14
**career (2)**
17:21;20:17
**Carolina (2)**
73:15,24
**case (38)**
5:13;16:1;21:3;
26:16;28:15;29:17;
33:3;50:24;51:7;
65:11;71:21;72:25;
76:22;77:22;78:1,6,9,
11,16,18;79:20,21;
80:8;81:6;83:1,18;
84:13,19;90:6;92:3;
94:19;97:25;105:22,
25;106:3,10,10,25
**case-by-case (1)**
105:1

Lake-Geauga Recovery Centers, et al. v
Munson Township, et al.

John Majer, Ph.D.
February 22, 2021

caseload (1)
9:5
cases (15)
16:1;17:20;26:19;
27:1,13;28:12,14;
29:3;34:8;40:9;
65:19;76:16,21;79:8;
109:8
categorically (2)
57:17;85:12
categories (1)
45:9
category (1)
37:15
cause (1)
44:17
census (4)
41:20;74:2;88:13;
98:18
center (12)
7:14;12:7,15;13:7;
15:11,25;22:19;
39:10;81:6;84:6;
88:17;93:6
Centers (3)
29:16;30:18;31:1
Center's (1)
92:13
CEO (3)
30:23;39:21;89:6
certain (3)
36:22;66:6;80:25
Certainly (8)
6:12,17;22:13;
23:3;36:9;60:15;
67:10;83:1
certainty (4)
35:1;64:1;80:5;
105:3
certified (1)
4:3
challenge (2)
5:12,16
chance (1)
95:13
chances (1)
25:11
change (3)
43:5;108:3;111:2
changed (2)
82:14;110:7
changes (2)
41:12;55:17
characteristic (1)
42:8
characteristics (7)
31:9,17,24;33:4;
37:1;49:25;105:9
charge (3)
20:4;21:2,9
check (1)
76:19
checking (1)

8:4
Chicago (6)
7:2;15:4,17,17,19;
26:9
childhood (1)
60:20
children (3)
13:6;14:11,11
choice (4)
42:18;54:15;55:1;
87:2
Chojnacki (28)
4:6,8;5:18;72:14;
74:19;77:14;78:12,
25;80:4,16;82:10;
86:1;93:24;94:2,8,
23;98:12;100:12;
105:16;106:24;
107:5,11,16,23;
109:23;110:1;111:3;
113:9
chores (1)
52:23
chosen (1)
66:9
circulating (1)
18:21
citations (1)
103:7
cite (3)
21:19;32:20;63:11
cited (7)
36:3;53:13;57:10;
78:15;79:10;83:2;
103:6
City (4)
15:16,17,23;27:9
claim (1)
111:20
claims (1)
83:14
clarification (1)
34:15
clarify (3)
21:21;22:8;76:24
clarity (1)
71:6
clean (9)
35:25;38:10,13;
44:6;57:22;58:4;
102:5,9;103:1
Cleaning (1)
52:22
clear (5)
27:15;28:6;62:25;
87:4;94:16
Clearly (2)
36:5;105:3
client (1)
106:24
clients (5)
9:5;10:16,19,24;
46:10

Clinic (1)
11:3
clinical (20)
7:1,3,12;14:3;
15:13;23:23;25:17;
31:13;53:3;56:3;
58:21,23;59:16;
60:23;79:12;83:16;
92:8;99:16;105:18;
111:6
clinically (1)
38:3
clinician (5)
14:10;35:2;64:2;
97:13;108:13
clinicians (1)
11:21
Close (1)
30:25
closely (3)
13:14;90:1;92:23
closer (1)
5:23
cocaine (2)
52:5,25
cognitive (1)
23:8
cohabitation (1)
96:12
collapsed (1)
53:16
colleague (3)
71:20,23;72:3
collecting (1)
9:6
collective (1)
51:10
College (6)
6:19;15:20,22;
22:14;25:5;80:24
Colleges (4)
15:17,17,18,23
combine (1)
24:15
comfortably (1)
34:4
coming (9)
8:4;11:6;12:6;
47:6;49:9;51:21;
61:20;101:17;110:21
comments (1)
17:15
commit (1)
52:12
committed (1)
13:1
common (6)
34:2;36:25;41:18;
42:17;54:14;92:18
communal (4)
39:17;42:11;64:15;
69:21
communities (5)

23:22;26:8;28:2,7,
9
Community (43)
6:19;11:14,15;
13:6;15:11,18,25;
22:19;24:17;27:12,
25;35:4;39:5,12;
40:10,11,17;43:14;
47:8;50:9;51:6,16;
58:20;59:3;64:15;
65:5;66:2;70:25;
74:2;79:17;81:7;
98:1;100:20;101:3,5,
8,15;102:4,12,17,21;
103:2,11
comorbidity (1)
23:19
comparatively (1)
85:10
compare (2)
85:11;91:16
comparing (2)
23:20;91:21
complained (1)
8:10
complaint (1)
89:25
complete (1)
7:11
completed (1)
14:25
completely (1)
17:24
completing (1)
56:6
complexities (1)
104:22
complicit (1)
55:14
complicity (1)
55:18
comply (1)
55:15
components (1)
91:20
comprehensive (1)
12:17
concept (1)
70:6
concerned (1)
68:2
concerns (2)
47:20;99:19
conclude (1)
72:8
concluded (1)
113:20
conclusion (2)
33:17;86:16
condition (4)
56:8,18;57:20;
58:25
conditions (3)

56:7;58:24;70:9
condos (1)
88:1
conducted (2)
11:11;23:1
conducting (1)
12:5
conference (1)
73:20
confidence (2)
27:24;40:18
conflict (3)
95:13;96:1,16
conflicts (5)
95:15,21;96:4,10,
17
connect (7)
40:16;41:21;42:3;
51:22;54:22;55:4;
102:9
connecting (2)
39:5;55:16
connection (1)
16:4
consider (2)
9:1;48:14
considerably (1)
68:25
consideration (2)
38:16,17
considerations (1)
51:17
considered (2)
30:11;87:24
consistent (2)
33:7;112:5
consisting (1)
10:13
consortium (1)
15:18
constraints (2)
99:25;100:6
consultant (6)
15:24;16:5,13;
22:18;73:13;108:14
consulted (3)
30:5;67:11,12
consumer (1)
19:3
contacted (2)
26:21;27:8
context (4)
94:15;95:21;97:16;
99:1
contexts (1)
51:16
contingent (3)
21:3;22:6;43:23
continue (1)
15:9
continuous (1)
58:2
continuously (2)

Lake-Geauga Recovery Centers, et al. v
Munson Township, et al.

John Majer, Ph.D.
February 22, 2021

57:22;58:4
**contribute (1)**
48:9
**control (1)**
57:3
**controlled (1)**
57:11
**conversation (2)**
108:18,25
**conversations (1)**
32:2
**co-occurring (1)**
79:3
**coping (3)**
39:9;51:11,14
**copy (3)**
5:22;29:7,7
**co-residents (3)**
29:23;47:24;87:6
**Corrections (2)**
14:17;113:15
**costs (4)**
18:20,22;31:8;
46:11
**counseling (11)**
6:24;8:1;9:6,17,21;
13:21,22;26:4,5;
50:13;61:25
**counselor (1)**
9:3
**counsel's (1)**
4:18
**countries (1)**
73:10
**country (4)**
4:13;59:22;99:15;
113:11
**county (8)**
9:8;12:3,7,16;27:9;
54:19;88:19,23
**couple (8)**
4:10;15:2;22:17;
41:5;45:11;50:20;
104:19;109:4
**course (2)**
56:13;57:25
**courses (4)**
13:17;22:15,16,17
**court (5)**
6:14;12:9;22:9;
29:15;90:11
**courts (2)**
26:5;113:13
**cover (1)**
20:3
**covering (1)**
21:2
**create (9)**
9:9;20:1;34:9;
44:12;64:18,19;71:3;
93:19;94:18
**creates (1)**
93:17

**creating (2)**
18:20;43:24
**criminal (6)**
10:5;12:11;16:7;
54:4;56:25;59:10
**criteria (6)**
9:25;36:19;37:9,
11,12,22
**critical (1)**
17:14
**criticism (1)**
58:7
**CROSS-EXAMINATION (1)**
72:21
**Crownsville (1)**
8:24
**Cum (1)**
6:21
**cured (1)**
103:18
**current (8)**
16:12;22:10;24:13;
68:18,19;78:11,23;
79:19
**currently (5)**
22:12;34:22;
106:15,20;113:1
**curriculum (1)**
5:22
**cut (4)**
76:25;78:22;81:20,
24
**CV (5)**
5:13;6:20;74:1,7;
76:19

# D

**daily (4)**
19:17;36:8;37:19;
38:25
**Daley (1)**
15:20
**DANE (1)**
107:2
**data (4)**
9:7;57:11;99:12,13
**date (3)**
5:16;11:17;25:7
**dates (1)**
74:6
**David (1)**
72:23
**day (4)**
7:17;10:11;40:19;
104:13
**days (3)**
13:14;25:24;28:9
**day-to-day (2)**
11:13;46:18
**deadly (1)**
70:13
**debilitated (1)**

39:23
**decades (2)**
67:15;104:20
**decision (4)**
11:23;17:7,16;
41:15
**declaration (4)**
89:22;90:7;106:4,
12
**decrease (2)**
46:5;51:20
**defendants (1)**
72:24
**Defendants' (1)**
113:24
**defense (1)**
76:17
**define (1)**
61:22
**defray (1)**
46:11
**degree (5)**
6:18;7:11;35:1;
45:5;64:1
**delay (1)**
6:8
**demographics (3)**
87:15,17;108:2
**demons (1)**
62:10
**demonstrate (1)**
32:21
**demonstrates (1)**
111:25
**Department (4)**
12:3,12;13:18;
14:17
**DePaul (8)**
7:1,4;12:21;13:18,
20;15:10;16:4;25:5
**DePaul's (4)**
13:6,21;15:24;
22:18
**dependence (1)**
10:2
**dependent (1)**
103:14
**depending (3)**
37:12;66:15;100:2
**depends (2)**
94:14;97:10
**deposit (1)**
19:22
**deposition (3)**
77:10;113:18,20
**derived (1)**
32:1
**describe (3)**
9:7;61:22;73:5
**describing (2)**
21:24;43:9
**description (1)**
83:23

**detail (1)**
67:9
**details (1)**
61:3
**Detention (2)**
12:7,15
**determination (2)**
67:2;69:5
**determined (1)**
48:18
**determining (1)**
65:8
**detoxification (2)**
25:22;104:13
**detriment (1)**
84:25
**detrimental (2)**
85:10,13
**develop (2)**
39:8;40:18
**developed (2)**
24:2;58:17
**development (1)**
8:19
**diagnosing (1)**
13:6
**Diagnostic (6)**
36:12,19;37:8,10,
15,21
**difference (5)**
49:8;55:12;56:18;
57:12;85:23
**differences (1)**
56:21
**different (7)**
14:10;17:24;36:20;
50:8;59:5;112:4,4
**difficult (2)**
53:6,21
**difficulties (1)**
86:6
**DIRECT (4)**
4:5;5:7;60:17;
100:24
**directly (2)**
49:12;102:4
**Disabilities (2)**
110:14;113:4
**discerning (2)**
46:24;48:1
**discharge (4)**
10:25;56:10,16;
59:8
**discharged (1)**
56:13
**discuss (2)**
29:24;113:17
**discussing (1)**
80:7
**Discussion (4)**
77:8;86:7;106:3,11
**disguise (1)**
28:24

**dishes (1)**
39:2
**disorder (27)**
10:2;14:8;23:2;
24:9;35:5,10,13,20;
36:7,9,23,24,25;
37:17;38:8;39:16;
40:6;52:1,6,7;53:8,9;
59:13;60:3;63:21;
104:2;109:19
**disorders (31)**
8:15;11:7;13:12;
14:13;16:9,18;23:5,
8;25:20;26:13;35:9,
17,22;36:11,13;
37:23;44:6;50:5;
57:6;60:1,8,19;70:11,
13;79:3;102:14;
104:10,23,24;105:4;
108:9
**disparity (1)**
59:23
**dissertation (1)**
58:16
**distinct (2)**
23:24;24:12
**distinction (1)**
21:11
**distinguish (1)**
23:15
**distinguished (2)**
20:9,11
**distinguishes (1)**
27:19
**Diversity (3)**
16:22;51:1,4
**Doctor (2)**
86:8;112:13
**Doctorate (4)**
7:3,5;11:25;15:1
**document (2)**
29:10,12
**documentation (7)**
8:2;89:8,12,19;
90:5;92:24;93:2
**documents (3)**
22:2;93:4,10
**dollars (1)**
19:23
**domain (1)**
19:7
**domestic (1)**
60:12
**done (7)**
20:16;53:13;79:10;
81:15;90:13;96:20;
112:21
**double (3)**
33:21;47:14;100:3
**doubt (2)**
35:21;103:3
**down (11)**
27:1;30:3;43:17;

Lake-Geauga Recovery Centers, et al. v
Munson Township, et al.

John Majer, Ph.D.
February 22, 2021

46:5;78:14,20;81:5;
82:19;83:7;84:23;
85:15
**downtown (1)**
15:4
**dozen (1)**
16:14
**Dr (14)**
4:7;5:19,24;6:14;
34:25;49:22;63:25;
72:23;77:9,16;84:24;
107:24;110:4;113:10
**drank (2)**
53:1;55:6
**draw (3)**
39:23;56:2;63:3
**drink (1)**
41:25
**drug (10)**
7:14;12:9,18;26:5;
36:17,20,22;54:15;
92:16;104:5
**drugs (5)**
41:16;42:18;47:12;
55:1;92:16
**DSM (1)**
37:9
**due (2)**
16:11;40:5
**DUI (1)**
9:23
**duly (1)**
4:2
**duration (1)**
28:11
**during (2)**
22:17;103:16
**duties (2)**
8:1;13:1
**duty (1)**
11:14
**dwelling (8)**
43:24;44:11;65:18;
67:3;69:19;94:15,18;
112:22
**dwellings (1)**
34:9
**Dwight (1)**
14:19
**dynamic (1)**
50:14
**dynamics (3)**
49:23,24;50:7

**E**

**earlier (4)**
58:18;62:13;100:9;
106:8
**early (2)**
53:4;62:14
**earmarked (2)**
33:20,23

**earned (3)**
6:20,23,25
**easier (6)**
42:15;43:3;44:13;
51:13;65:3;69:20
**easy (1)**
53:12
**economic (3)**
47:19;49:17;59:23
**Edition (1)**
36:13
**editor (6)**
17:7,7,8,11,15,15
**editorial (3)**
16:19;20:9;22:20
**editors (1)**
20:12
**education (4)**
6:15;7:7;13:24;
16:22
**Education's (1)**
13:22
**educator (1)**
13:23
**effect (7)**
43:25;44:18;57:23,
24;101:9,10;102:25
**effective (7)**
32:23,24;39:9;
46:6;58:8;84:10;88:7
**effects (8)**
23:15;25:9;58:14;
67:7,13;69:12;85:10,
14
**efficacy (5)**
55:21;108:16;
109:10,12;111:14
**eight (17)**
8:21;33:9;64:22;
67:25;68:9,24;75:12;
88:13;93:14,17;
94:11;96:21;97:1,3,
6;109:10;111:10
**either (3)**
18:13;54:15;
104:21
**elders (2)**
45:25;46:6
**element (1)**
91:18
**elements (2)**
24:15;91:22
**elevated (1)**
81:7
**elevates (1)**
83:19
**else (2)**
30:17;48:16
**emails (2)**
19:19,20
**emersion (1)**
24:17
**emotional (2)**

60:22;62:16
**emotionally (1)**
44:14
**empathetic (3)**
61:16;62:4,20
**empirically (2)**
111:24;112:19
**employer's (1)**
80:24
**employment (5)**
9:16;12:2;38:23;
48:5;56:24
**encourage (1)**
17:17
**end (8)**
6:4;56:20;57:22;
69:8,9,11;86:6;97:9
**endorse (2)**
37:10,13
**engage (10)**
12:4;14:24;31:21;
37:18;38:25;41:8;
43:4;63:22;70:15;
105:6
**engaged (7)**
9:5;13:23;14:2,2,3,
20;55:13
**engagement (1)**
55:18
**engaging (1)**
42:24
**enough (9)**
27:23;30:25;33:25;
41:20;46:9,10;69:16;
91:24;94:17
**ensure (1)**
57:8
**entered (1)**
44:21
**enterprise (1)**
84:4
**enterprises (1)**
20:6
**entrepreneur (1)**
19:1
**environment (24)**
34:10;38:14;42:21;
44:7,7,8,12,23,25;
45:6;61:17;64:18;
67:4;68:5;69:23;
70:24;71:3;93:15,17,
20;94:6,12;95:1;96:1
**equation (1)**
47:20
**especially (3)**
41:9;54:2;61:23
**essential (1)**
61:12
**essentially (1)**
78:22
**established (2)**
45:19;109:13
**estimation (1)**

109:1
**evaluating (2)**
11:12;14:21
**evaluations (1)**
14:22
**even (7)**
47:12;49:6;92:1;
93:1;101:15;106:19;
112:25
**event (1)**
5:2
**everyone (2)**
5:4;72:18
**eviction (1)**
92:17
**Evidence-based (2)**
79:2;82:4
**evident (1)**
36:1
**exact (2)**
80:1;85:19
**exactly (3)**
80:5;86:14;100:1
**EXAMINATION (2)**
4:5;107:22
**examined (2)**
4:3;92:23
**examining (1)**
23:17
**example (3)**
51:25;67:21;68:1
**excellent (1)**
48:19
**except (2)**
82:14;106:11
**exception (2)**
65:22;70:11
**Excuse (1)**
91:13
**exercise (1)**
7:23
**Exhibit (7)**
5:9,14,20;29:6;
34:21;77:9,10
**Exhibits (2)**
113:22,24
**exist (4)**
101:21;108:11;
111:17;112:16
**existing (1)**
28:16
**exists (2)**
65:5;112:18
**exiting (2)**
16:7;59:10
**expand (1)**
21:5
**expenses (2)**
46:18;102:13
**experience (20)**
7:12;8:13,18;13:5;
19:14;31:12;47:2;
48:18;51:1,4;54:16;

59:8,18;60:25;70:16;
88:9,11;95:21;98:8;
102:2
**experienced (5)**
44:20;61:5,15;
62:17;65:12
**experiences (30)**
24:18;25:17;38:3,
9,23;42:19;49:14;
51:10,23;53:4,4;54:7,
25;58:9;59:16;60:23;
61:8;68:19;79:9,12,
12;83:15,16;97:20;
99:16;100:15;
105:18,19;111:6,7
**expert (9)**
16:2;26:19;29:3;
30:15;80:23;90:10;
93:25;110:12,22
**expertise (3)**
22:23;75:25;90:3
**experts (3)**
17:9,12;20:10
**explain (11)**
6:15;17:4;29:15;
36:6;43:8;45:6;
59:15;67:8;91:12,14;
103:24
**explained (1)**
26:15
**explanation (1)**
43:19
**extend (2)**
48:22;103:5
**extends (1)**
58:15
**extent (1)**
100:5
**externship (2)**
13:8;14:4

**F**

**faced (1)**
61:8
**facilities (3)**
14:20,23;87:23
**facility (12)**
7:18;8:6;10:11;
12:18;25:23;50:11;
77:25;80:19;81:12;
82:16;97:15;104:14
**fact (6)**
36:1;58:10;63:14;
104:16;105:22,24
**factors (2)**
60:9,12
**facts (2)**
106:2;109:5
**failure (1)**
70:19
**fair (4)**
28:17;94:3;110:12,

Lake-Geauga Recovery Centers, et al. v
Munson Township, et al.

John Majer, Ph.D.
February 22, 2021

13
**fall (1)**
45:8
**familiar (6)**
78:1;87:10;88:14;
93:9;95:5;101:25
**families (1)**
14:12
**family (9)**
10:14;38:21;39:20;
42:7,11;44:22,25;
69:23;93:22
**family-like (3)**
42:21;70:24;71:3
**far (1)**
17:21
**fatal (2)**
57:7;70:14
**federal (1)**
113:13
**fee (3)**
18:10;19:6;20:5
**feel (10)**
14:10;31:5,7,16;
42:12;44:19,22;
65:24;68:21;69:22
**fees (1)**
21:2
**feet (2)**
33:19;66:24
**fellow (1)**
54:23
**fellowship (1)**
15:8
**few (8)**
11:1;24:2;25:4;
50:23;69:19;73:1;
85:8;97:4
**fewer (8)**
43:16;51:19;56:25;
65:3;68:8;95:24;
108:8;112:22
**field (14)**
16:18;17:9;20:10;
24:17;49:14;53:5;
67:15;75:25;79:12;
83:15;97:17;100:15;
105:19;111:7
**Fifth (1)**
36:13
**filed (1)**
89:25
**fill (1)**
44:15
**finances (1)**
46:19
**financial (6)**
49:10;99:19,21,24;
100:6,22
**financially (4)**
20:1;47:25;48:7,22
**find (19)**
10:23;12:13;18:16;

20:14;33:3,12;45:5,7,
21;49:5,6;52:4,4;
54:14,21;55:24;
61:15;91:19;105:10
**finding (2)**
39:4;112:5
**findings (2)**
57:16;73:20
**fine (1)**
110:1
**finish (1)**
72:5
**first (17)**
4:2;9:11;11:2;13:2,
7;15:19;25:9;34:11;
39:9;40:24;41:1;
47:11;48:6,24;56:4;
74:12;94:20
**firsthand (2)**
96:9;97:20
**fit (6)**
48:8,13,14,19;
83:11,14
**five (10)**
22:15;29:22;47:24;
64:11;71:14;72:16;
85:22;87:6;107:17,
19
**flag (1)**
12:8
**flat (1)**
17:16
**flip (1)**
80:10
**focus (1)**
29:5
**folks (8)**
9:24;14:7,12;24:6,
10;56:4;100:16;
107:6
**follow (2)**
52:9;82:24
**followed (1)**
104:13
**follows (1)**
4:4
**follow-up (2)**
73:2;111:8
**footage (1)**
33:14
**foremost (1)**
39:10
**forged (1)**
8:18
**form (3)**
19:20;30:14;109:1
**format (1)**
82:25
**formed (1)**
79:11
**former (3)**
35:2;47:7;64:2
**forms (1)**

111:5
**Forum (1)**
9:13
**forward (1)**
103:10
**foster (1)**
55:10
**found (12)**
6:1;12:1;24:20;
29:3;33:6;36:12;
53:3,19;56:21;58:15;
59:20;61:9
**four (6)**
33:19;48:6,24;
64:21;66:24;93:22
**fourth (1)**
82:2
**frankly (2)**
54:17;78:1
**free (1)**
21:9
**friends (1)**
38:21
**front (2)**
19:6;112:15
**full (1)**
22:13
**functioning (4)**
37:3,25;38:12,19
**funded (1)**
16:11
**funders (1)**
21:8
**funding (3)**
9:8,15;21:7
**funds (1)**
21:7
**further (3)**
72:15;106:22;
113:8

# G

**gather (2)**
72:16;107:7
**gave (2)**
28:21;31:6
**Geauga (2)**
88:18,22
**gender (2)**
59:24;60:16
**general (1)**
6:18
**generalize (1)**
51:15
**generally (1)**
51:5
**generated (2)**
20:7;32:1
**generating (1)**
47:15
**gentleman (1)**
52:6

**gets (4)**
55:12,18;62:11;
70:6
**given (9)**
15:9;33:17;34:1,1,
2;37:14;56:14;59:7;
102:19
**gives (3)**
39:18;47:16;
110:14
**giving (5)**
16:2;27:2;71:2;
93:14;103:10
**goes (3)**
41:23;67:22;101:2
**Good (10)**
4:7,10;29:5;31:7;
48:8;52:24,25;57:8;
59:11;66:7
**governments (1)**
110:10
**gradually (3)**
39:6,8,11
**graduated (1)**
8:22
**grant (1)**
16:6
**Grants (1)**
13:9
**great (3)**
8:16;68:20;96:14
**greater (2)**
45:5;60:1
**greatest (1)**
48:13
**grips (1)**
61:14
**ground (2)**
42:17;54:14
**grounds (2)**
8:24;92:17
**group (15)**
9:21,23;10:16;
13:21;14:24;26:3;
49:22,24;50:2,6,6,7,
12,13,14
**groups (7)**
9:24;10:7;50:1,2;
57:18;58:11;76:1
**guarantee (1)**
42:2
**guess (4)**
45:10;65:15;83:1;
109:6
**guy (2)**
55:6,9

# H

**half (3)**
9:19;10:9;15:21
**halfway (3)**
8:23;26:1;98:2

**hang (1)**
62:13
**happened (3)**
17:21;24:23;62:5
**happy (2)**
4:23;43:18
**hard (4)**
5:24;29:7;80:21;
94:10
**Harry (3)**
15:21;22:14;80:24
**has-beens (1)**
40:1
**haven (1)**
44:3
**head (1)**
84:3
**headings (1)**
82:11
**headset (1)**
6:1
**heal (1)**
61:19
**health (8)**
8:12;12:2,3,12;
13:7;16:20;93:5;
104:6
**heard (3)**
48:24;58:7;66:2
**hearing (2)**
4:15;5:25
**heart (1)**
8:5
**hefty (1)**
18:10
**held (1)**
7:9
**help (8)**
40:16,17;41:14;
49:6;55:3;62:12;
102:20,22
**helping (3)**
39:7;103:1,2
**helps (2)**
39:15;61:23
**Henry (1)**
11:3
**hereinafter (1)**
4:3
**heroin (1)**
53:1
**herself (1)**
92:7
**heterogeneous (1)**
104:9
**hey (1)**
55:4
**high (1)**
69:8
**Higher (2)**
16:22;21:23
**highly (3)**
39:23;57:18;70:22

Lake-Geauga Recovery Centers, et al. v
Munson Township, et al.

John Majer, Ph.D.
February 22, 2021

**hired (4)**
9:2;10:10,12;15:12
**history (3)**
26:14;49:7;67:18
**hold (1)**
22:11
**home (149)**
9:1;10:20,25;
11:17;23:16,25;24:1,
4;25:13,14,25;27:11,
15,16;28:6,21,24;
29:20;31:20,25;34:9,
13;35:20,24;38:2,11;
39:15;40:11,13;41:4,
19;42:5,9,13;43:1,14;
44:1,3,7,8;45:3,12,
25;46:2,12,15,21,25;
48:4,10,20,20,23,25;
49:11,13,20;50:14,
22;51:3,8,13,20,24;
52:2,10,16;54:8,11,
12,21;55:5;56:1,11,
19;57:2,14,15,25;
58:9,19,20;59:1,4,7;
62:19;63:16;64:17,
18,25;65:6;67:3,19;
68:3,3,15,19;69:3,13,
17,18,23;70:16;71:9,
17;72:11;73:14,17;
76:7,14;79:17;84:5;
85:2;91:6,23,24;92:6,
11;93:20;94:1,5,9;
95:12,14,20,25;96:4,
22,24;97:22;98:22,
23;100:22;101:1;
102:6,8,18,22,23;
103:15,19,25;104:15;
105:7;110:18,19;
111:10,15;112:6
**home-like (10)**
39:20;44:12;93:15,
17,19;94:6,12,18,25;
96:1
**homes (132)**
10:22;11:16;16:3;
22:24;23:6,10,20,21;
24:19,21,24;25:1;
26:10,24,25;27:3,5,
20,21;28:8,19,22;
32:22;33:1,7,8,12;
36:3,4;38:6;39:3,22;
40:1,23;41:2,7;
43:21;44:19,21;45:7,
19;47:3,4,9,16,18,21;
49:9,15;53:12;57:4;
58:7;59:1,5,19;60:4,
15;61:11;62:1,24;
63:1,2,6,8,12,13,19;
64:6,14,20,22;65:10,
12;66:11;67:16,18;
70:15,21;73:9;74:24;
75:3,7,9,10,13,17,20;
76:12;79:14,25;83:5;

84:10;87:8,24;88:6,
10,12;90:23,25;91:3;
92:19,20;93:6;94:21;
95:6,7,9;96:15,20;
97:7,12,14,18,21;
98:4,17;99:14,18;
100:14,17;101:20,23;
102:3,3,15;104:19;
105:20;108:7;
110:22;112:2,11,21
**homophily (1)**
25:8
**Hope (1)**
10:10
**hopefully (1)**
41:20
**Hopkins (1)**
11:4
**horrible (1)**
54:18
**horrific (2)**
8:15;61:19
**horse (2)**
41:24;55:3
**Hospital (6)**
8:25;11:4;13:9,10;
14:6;26:1
**Hospitals (1)**
88:22
**hour (1)**
50:8
**hours (2)**
7:21;13:1
**House (66)**
8:23,23;10:10;
24:19;26:1;28:5;
31:9;33:5,9;39:21;
41:16;43:24;44:16;
52:9,17,17,24;55:22;
56:11,14;59:2,12;
63:5;65:13,24;66:6,8,
16;68:11,12;69:18;
71:22;73:5,6,12,19,
22;74:3,11,16,22;
79:4,9,11,13;83:8;
85:18,20,22;86:11,
12,18,22;89:9,10,13,
14;90:19,21;98:1,2,3;
106:17,20;109:20;
112:19
**houses (10)**
33:14;65:23;66:3,
12;79:3;82:5;96:20;
97:18;99:15;109:10
**housing (5)**
30:1;35:3;76:2;
110:12,13
**Human (1)**
13:22
**hunch (1)**
104:18
**hundreds (1)**
54:8

**hurdles (1)**
62:21
**hygiene (1)**
39:2
**hypothetically (1)**
51:25

# I

**idea (5)**
19:1;52:13;81:13;
92:5;101:13
**identical (3)**
76:21,23;79:18
**identification (2)**
113:23,25
**identify (5)**
25:15;42:16;51:22;
53:21;78:15
**identifying (2)**
42:24;55:17
**Illinois (6)**
7:2;14:5,17;56:5;
63:6,7
**illustrate (1)**
84:9
**illustrates (1)**
39:25
**imagination (1)**
61:4
**imagine (4)**
49:1;61:6;78:18;
81:23
**immediate (1)**
92:17
**immersed (1)**
26:7
**impact (5)**
35:15;37:24;38:6;
49:12,18
**impairment (2)**
37:2;38:12
**impairments (3)**
38:18;39:7,8
**important (11)**
17:22;20:18;34:6;
39:25;45:1;54:20;
58:6;83:4;91:7,23,25
**importantly (1)**
40:14
**impression (1)**
19:24
**impulsive (1)**
41:15
**inability (1)**
37:6
**Inc (1)**
4:16
**incentive (1)**
20:1
**included (3)**
8:1;10:19;80:2
**including (2)**

86:22;87:12
**income (2)**
56:24;73:22
**Incorrect (1)**
110:9
**increase (12)**
26:24;27:4;42:14;
43:13;44:8,9;46:2;
50:18;51:2;54:10;
77:23;104:19
**increases (1)**
95:13
**increasing (1)**
100:9
**indefinite (2)**
27:22;92:15
**independent (1)**
57:24
**indirect (1)**
100:24
**indirectly (1)**
49:11
**individual (21)**
9:6,21;10:16;
11:11;14:24;18:14;
27:23;40:24;42:15,
23;44:13;46:13,20;
49:17;50:22;51:19,
21;54:11;69:20;
103:16;104:3
**individuals (13)**
74:24;75:21,24;
85:1;87:25;88:6,25;
93:22;94:1,11;95:25;
96:21;113:4
**infer (2)**
98:19,21
**inform (1)**
10:7
**information (12)**
31:6;32:1;34:16,
18;67:14;81:19;
87:19;99:13,23;
100:16;106:13;
108:24
**initial (1)**
6:13
**initiative (1)**
12:9
**injunction (1)**
4:16
**inmates (1)**
14:23
**inpatient (3)**
12:18;56:6;104:14
**in-patient (1)**
7:17
**inquiry (1)**
17:13
**insist (1)**
76:14
**inspected (1)**
95:9

**instance (1)**
67:17
**Instead (1)**
19:3
**Institutes (1)**
104:5
**institution (2)**
18:8,9
**institutional (1)**
98:1
**institutionalized (1)**
9:2
**institutions (2)**
18:6;22:12
**instructor (1)**
13:25
**instrumental (3)**
38:25;39:6;52:22
**insufficient (1)**
104:22
**integration (2)**
101:2,5
**intellectual (2)**
16:10;81:14
**intensive (4)**
9:20;11:5;25:21;
26:4
**interactions (1)**
49:25
**interested (2)**
24:16;68:6
**intermediae (1)**
7:18
**intermediate (4)**
10:10;25:23;97:15;
104:14
**International (1)**
9:12
**Internet (2)**
31:15;32:3
**internship (3)**
14:5,16,25
**intervention (2)**
25:22;35:4
**interventions (3)**
24:13;25:19;26:12
**interview (3)**
31:14;68:17;73:15
**interviewed (2)**
31:4;52:3
**interviewing (1)**
54:12
**into (31)**
10:19;11:15;12:6;
24:24;27:25;40:13;
42:3;44:19;45:8;
48:4,23;50:22;52:2;
53:25;54:11;60:10,
14;61:2;65:4,12;
73:14;76:14;77:1;
81:21;88:3;89:2;
97:12,17;101:2,14;
104:15

Lake-Geauga Recovery Centers, et al. v
Munson Township, et al.

John Majer, Ph.D.
February 22, 2021

**invest (1)**
96:15
**invested (2)**
42:12;55:19
**investigate (1)**
16:6
**investigated (1)**
33:2
**investigation (3)**
57:10;111:13,24
**investigations (5)**
19:5;67:12;111:22;
112:3,19
**invitation (1)**
48:22
**invitations (2)**
19:17;20:8
**invite (1)**
73:18
**involve (1)**
54:3
**involved (17)**
9:20;10:15,17;
11:11;13:9;22:22;
23:22;25:4,21;57:17,
18;59:9;71:20;81:2;
83:4;90:24;101:8
**involvement (7)**
23:17,17;29:1;
54:4;57:13;73:23;
79:18
**involvements (1)**
56:25
**involves (2)**
17:1;83:19
**involving (4)**
16:18;41:8;58:25;
79:13
**isolate (3)**
44:15;65:4;69:21
**issue (2)**
83:8,24
**issues (8)**
32:13,17;53:21;
54:3,24;80:8;83:3;
109:25
**item (1)**
4:25

**J**

**jail (1)**
12:6
**jargon (1)**
90:4
**Jason (1)**
103:6
**Jennifer (1)**
12:7
**job (2)**
7:24;49:5
**JOHN (5)**
4:1;6:12;11:3;

80:23;107:11
**J-o-h-n (1)**
6:12
**Journal (7)**
16:20,21;18:2,15;
20:16;21:18;53:15
**journals (17)**
16:17,25;17:1,2,4,
5;18:20;20:2,21,23;
21:5,12,20;22:21;
32:9,10;34:16
**judge (1)**
72:6
**justice (5)**
10:5;12:12;16:8;
54:4;59:10
**justification (1)**
28:15

**K**

**Karen (6)**
78:20;79:24;81:4;
82:2,20;84:22
**keep (2)**
11:16;97:1
**keeping (1)**
39:10
**key (2)**
42:8,20
**kind (27)**
7:18;8:18;9:10;
10:11;19:19;26:6,10;
35:11;37:23;40:22;
44:2,19,21,23;45:13;
51:9;58:14;66:20;
71:19,23;80:21;
85:15;90:4;92:12;
102:19,22;110:11
**kinds (2)**
24:8;39:23
**knowing (1)**
61:19
**knowledge (9)**
26:11;74:10;75:19;
95:3;98:9;99:2,3;
100:5;108:6
**known (1)**
13:10
**knows (1)**
17:8

**L**

**lack (2)**
38:19,24
**laid (1)**
11:18
**Lake (3)**
27:9;88:18,22
**Lake-Geauga (8)**
4:16;29:16;30:18,
23;31:1;89:6;92:2,13

**Lake-Geauga's (1)**
90:6
**large (1)**
41:20
**last (8)**
14:4;24:2;25:4,8;
37:11;54:9;104:19;
109:16
**lasted (1)**
12:20
**later (2)**
5:16;11:1
**Laude (1)**
6:22
**laundry (1)**
39:2
**law (1)**
113:13
**lawful (1)**
4:2
**laws (3)**
110:11,24,25
**layout (1)**
108:22
**lead (3)**
34:12;41:24;55:3
**leader (1)**
46:6
**leads (2)**
98:19,21
**lean (1)**
5:23
**learn (2)**
40:15;96:15
**learned (2)**
47:6;67:15
**least (3)**
25:10;54:22;63:11
**leave (3)**
41:15;65:24;
113:12
**leaving (2)**
56:4;113:11
**led (2)**
9:11;16:13
**left (1)**
66:7
**legal (4)**
22:22;29:1;73:23;
90:4
**length (1)**
13:13
**less (19)**
42:16;51:8;75:7,
14,17,18,21;76:1,6,
11,15;83:9;84:13;
94:12;96:1;110:21;
111:10,13,15
**letterhead (1)**
80:25
**letting (1)**
49:3
**Level (29)**

9:1,16;11:20;
19:15;23:21;25:25;
35:12;37:13,14;38:8;
45:22;46:4;51:19;
59:3;62:7;63:15;
66:16;75:16;76:2,7,
12;87:24;88:5;91:6,
23;92:6,11,19;97:25
**levels (4)**
9:22;53:23;54:1;
56:24
**level's (1)**
68:25
**liaison (1)**
11:14
**libraries (1)**
18:21
**licensed (10)**
10:14,14;11:9,9,21,
22,24;15:6,7,14
**licensure (1)**
15:5
**Life (9)**
9:16;40:8;42:11,
19;54:16,25;61:5;
69:23;112:11
**Lifeline (1)**
13:11
**lifestyles (1)**
55:1
**light (1)**
8:2
**likelihood (2)**
51:20;58:1
**likely (2)**
57:21;58:4
**limit (1)**
71:21
**limitations (1)**
99:21
**limited (6)**
27:18,20;28:3,8;
44:10;105:19
**limiting (5)**
28:10;69:12;71:15;
85:1;109:17
**Lincoln (1)**
13:10
**list (6)**
11:17;30:4,7,10;
36:11;97:13
**listed (1)**
6:20
**literature (12)**
20:13;28:2;32:20;
33:3;59:21;67:11;
72:9;95:5;108:10,15;
109:8,9
**little (9)**
5:23;6:4;26:20;
50:8,21;79:24;81:5;
96:18;107:18
**live (21)**

34:3;35:23;38:2;
39:5;40:4;58:18;
61:11,13;65:20;66:8,
18;67:2;68:12;92:14;
94:1;96:9;102:8;
105:6;110:15,18;
112:1
**lived (5)**
25:14;57:25;58:20;
66:5;69:2
**lives (2)**
36:8;40:4
**living (46)**
23:16,20,24,25;
24:21;27:5;29:19;
31:20;33:10,16;
34:14;37:19;39:1,18;
45:13;46:12,18;50:4,
19,25;51:3,8,23;
52:10;56:2,19;57:1,
14;59:12;62:18;
64:15;67:17;68:16;
71:2,9;73:17;81:8;
83:19;87:25;91:7;
95:16;96:6;97:23;
102:24;108:9;112:25
**local (2)**
12:6;110:9
**locales (1)**
101:24
**located (7)**
8:24;12:15;26:1;
62:24;73:7;90:21;
101:15
**location (2)**
15:3;98:9
**Logotherapy (1)**
9:13
**long (5)**
44:23;47:12;56:12;
107:12,14
**longest (1)**
45:24
**look (8)**
34:15;62:7,9;77:3,
4;78:4;88:3;101:14
**looked (12)**
20:11;23:6;25:3;
32:20;33:4;45:25;
56:20;57:11;92:22;
111:13,22;112:18
**looking (17)**
23:8,11,18;24:3;
30:11;31:17;53:16;
57:5;58:23;64:23;
67:13,16;92:21;
97:11;100:2;111:22;
112:3
**looks (2)**
79:1;80:17
**lost (2)**
9:14;40:4
**lot (16)**

Lake-Geauga Recovery Centers, et al. v
Munson Township, et al.

John Majer, Ph.D.
February 22, 2021

19:11;23:14;32:23;
34:7;36:19;39:4;
43:3;55:25;63:3,10;
68:8;79:10;92:18;
93:13,16;99:19
**low (5)**
19:15;20:7;69:9,
11;97:9
**lower (4)**
32:9;53:23;54:1;
68:25
**lunch (1)**
5:4

**M**

**Magna (1)**
6:21
**maintain (6)**
15:24;16:4;62:8;
63:21;70:2;98:22
**maintaining (2)**
46:7;58:2
**MAJER (18)**
4:1,7;5:19,24;6:12,
13,14;34:25;49:22;
63:25;72:23;77:9,16;
80:23;84:24;107:24;
110:4;113:10
**M-a-j-e-r (1)**
6:13
**major (2)**
17:18;38:11
**majority (9)**
23:3;25:1;47:17;
58:10;74:8,14;79:7;
84:17;96:19
**makes (9)**
17:7,16;32:22;
42:23;43:3;49:8;
51:13;55:12;69:20
**makeup (2)**
87:20,21
**making (4)**
46:15;69:5;97:16;
100:18
**manager (8)**
52:17,18;85:18,20,
22;86:13,18,23
**Manual (1)**
36:12
**manuscript (5)**
17:9,12,17,20;
20:25
**manuscripts (2)**
17:6;19:5
**many (16)**
43:23;44:21;61:25;
65:18;67:8,20;68:17;
71:6;75:9;81:14;
85:9;91:2;94:1;
98:17;99:9;109:7
**Maple (3)**

77:20;83:21;84:4
**March (1)**
4:15
**Maricopa (1)**
27:9
**mark (2)**
5:20;77:14
**marked (4)**
5:8,9;113:23,25
**marking (1)**
29:6
**Maryland (7)**
6:23;9:18;11:4;
12:4;26:8;63:5;73:7
**Masonic (1)**
14:5
**Master's (3)**
6:23,25;11:20
**match (1)**
59:20
**materials (3)**
30:4,8,10
**matter (10)**
29:14;72:4;73:13,
24;74:10;80:3;81:21;
89:20;90:6;112:12
**matters (4)**
4:11;16:3;22:22;
29:1
**Matthew (1)**
6:12
**maximize (6)**
34:6,8;49:16;
64:16;65:20;71:4
**maximized (1)**
48:21
**maximizes (2)**
45:4;46:21
**maximum (2)**
71:8;99:8
**may (1)**
109:5
**maybe (14)**
10:7;18:2;23:21;
38:20;41:15;48:12,
14;50:8,12;52:17;
68:9,22;103:23;
110:10
**Meadows (37)**
7:14,20;30:19;
31:5,25;33:1,6,18;
44:10;47:22;48:4;
50:25;63:16,20;64:4,
10,21;65:9;66:23;
71:7,13;78:17;79:20;
80:8;82:9,13,15;
85:17;92:25;95:3;
99:22,24;103:5;
106:14;108:20;
109:18,19
**mean (21)**
28:21;29:22;41:23;
43:25;69:1,10;76:23;

83:10;86:20;87:17;
90:16;91:12;96:3,23;
101:7,23;103:17;
106:6;109:9;111:17;
112:16
**meaning (2)**
20:25;104:1
**means (1)**
43:20
**meant (1)**
86:22
**measures (1)**
14:22
**mechanism (2)**
42:1;50:15
**mechanisms (1)**
51:14
**medical (1)**
10:14
**medication (3)**
24:4,10,12
**medications (5)**
24:6,8,22;25:2,10
**meet (5)**
9:25;37:8,13,21;
50:11
**meeting (7)**
38:5;52:24;54:8;
59:18;65:13;97:18;
104:22
**meetings (2)**
8:7;52:11
**meets (1)**
50:8
**Melanie (8)**
30:22;34:17;89:5;
90:7;92:1;106:4,11;
108:18
**member (9)**
16:19;29:22;31:10;
47:24;52:18;64:10;
71:18;72:12;87:6
**members (10)**
12:11;38:21;39:13;
45:18;46:7;50:1;
58:19;65:13;71:14;
102:16
**memory (1)**
83:20
**men (8)**
14:18;59:19,22;
60:4,6,18;61:1;68:14
**Men's (1)**
16:20
**mental (6)**
8:12;12:2;13:7;
36:13;93:5;104:6
**mentality (1)**
48:11
**mention (1)**
28:1
**mentioned (1)**
26:18

**mentoring (1)**
103:11
**met (1)**
69:2
**methadone (1)**
24:7
**method (1)**
22:7
**microcosm (4)**
50:15,17;51:5,12
**microphone (2)**
5:24;6:2
**Mid-Atlantic (1)**
53:17
**middle (2)**
6:13;41:10
**mid-level (1)**
45:14
**Midwest (1)**
53:18
**might (13)**
12:8,14;28:1;
36:21;45:11;50:11;
59:23;87:8;95:18;
101:16;103:8;
104:11;110:10
**mild (1)**
37:14
**milieu (5)**
43:8,10,14,22;
64:19
**millions (1)**
19:22
**mind (1)**
5:6
**mine (3)**
39:24;71:20;80:22
**minor (1)**
17:19
**minute (2)**
72:16;77:7
**minutes (2)**
107:17,19
**modalities (1)**
25:19
**model (8)**
24:19;28:5;55:22;
59:2;74:23;75:5;
102:6;109:21
**moderate (1)**
37:14
**Molloy (1)**
39:22
**moment (4)**
6:5;78:5;107:6;
112:13
**money (6)**
47:15,19;48:17;
68:4;100:11,18
**month (1)**
28:11
**months (7)**
8:21;12:20;28:4;

37:11;45:12,17;55:7
**more (43)**
19:2;33:24;37:3,
10;39:4;43:3,12;
46:1,3,24;51:6,7,9,
11,18;57:21;58:3;
60:3,6,24;68:2,2,4;
81:5;83:9,25;84:12,
25;86:17;88:10;
90:15;91:6,19;93:19;
95:12,21;96:1;
100:10;107:18;
110:21;111:21;
112:6;113:17
**morning (4)**
4:7;5:15;11:12;
73:2
**most (13)**
8:17;17:4;20:15;
40:14;45:17;64:20,
22;66:11,11;79:8;
90:17,18;104:16
**Mountain (1)**
77:21
**move (6)**
46:15;49:3;52:2;
54:13;66:9;76:14
**moving (4)**
40:13;48:3,6;54:11
**Much (10)**
6:7;8:10;32:18;
47:20;53:19;78:5;
83:7;87:1;92:14,18
**multi-disciplinary (3)**
10:13;11:8;38:4
**Munson (15)**
72:24;87:11,16,18,
20;88:15,18;94:22;
95:1;101:14,25;
105:9,14,25;108:2
**must (2)**
18:1;40:25
**myself (4)**
20:19;21:13;26:8;
92:23

**N**

**name (4)**
6:11;20:13;72:23;
82:15
**names (1)**
20:14
**Narcotics (4)**
8:8;57:19,19;58:12
**NARR (1)**
86:19
**narrow (2)**
46:4;85:15
**National (5)**
22:1;42:9;63:14;
67:23;104:5
**nationally (1)**

Lake-Geauga Recovery Centers, et al. v
Munson Township, et al.

John Majer, Ph.D.
February 22, 2021

105:13
**nationwide (1)**
97:5
**natural (1)**
42:22
**naturally (1)**
95:16
**nature (2)**
50:16;60:13
**nearly (1)**
75:10
**necessarily (4)**
14:8,13;58:8;
110:23
**necessary (17)**
5:17;27:3,4;31:20;
32:22;35:3,8,23;
51:18;62:20;63:20;
64:4,18,19;69:6;
71:7;102:7
**necessity (4)**
29:19,25;73:16;
93:18
**need (27)**
4:21;19:11;24:14;
26:24;33:25;35:20;
36:5;42:10;50:18;
57:7;59:11;60:6;
66:19;70:14;78:3;
80:20;81:16;83:22;
84:9;85:15;101:3,5;
103:25;104:3,15;
105:3;112:8
**needed (5)**
4:23;10:25;15:5;
41:6;56:16
**needs (6)**
4:19;8:16;56:16;
85:17,21;102:5
**negative (2)**
67:7;69:12
**neighborhood (5)**
84:2;98:23;99:9;
102:14;110:19
**neighborhoods (6)**
28:17,18;63:3,14;
98:5;110:16
**neighboring (1)**
10:21
**networks (1)**
38:22
**never-was (1)**
40:2
**New (7)**
7:19;9:16;45:9,15;
53:5;66:4;102:20
**newbies (1)**
45:10
**newfound (2)**
41:13;51:14
**next (2)**
4:14;78:20
**nice (2)**

14:1;61:6
**Nigerian (1)**
19:21
**night (2)**
41:10;50:9
**nightmare (1)**
41:11
**nightmares (1)**
62:15
**nine (1)**
45:16
**noise (1)**
68:24
**nomenclature (1)**
10:3
**noncivilian (1)**
54:22
**none (3)**
21:16,18;38:23
**nonsense (2)**
52:21;55:8
**northern (2)**
12:16;56:5
**Northwestern (1)**
15:3
**note (1)**
5:11
**notes (1)**
107:7
**number (67)**
7:10;10:18;12:1;
16:1,17;20:23;22:21;
25:4,18;26:10,25;
27:4;31:8;33:5,10,13,
13,15;34:1,2,8;37:12,
16;42:14,22;44:9,16;
45:4,22;46:5,22;
48:21;49:16;50:18;
53:20;54:10;64:3,16,
25;65:8,9,14,15,16,
16,17,20;66:22;
67:17,24;69:6,13;
70:10;71:21;73:8,9;
75:11;76:6;77:24;
80:19;84:7;85:1;
91:7;93:14;97:5,6;
100:10
**numerous (1)**
48:25
**nurses (1)**
11:10
**nurturing (1)**
38:14
**nutrition (1)**
39:2

**O**

**object (3)**
71:25;74:19;78:12
**Objection (16)**
71:11;77:15;78:25;
80:4,16;82:10;93:24;

94:2,8,23;98:12;
100:12;105:16;
108:4;109:14;111:3
**obtain (2)**
7:5;15:5
**Obviously (1)**
18:19
**occasions (1)**
27:6
**occupancy (1)**
109:18
**occupants (1)**
77:24
**occupational (2)**
37:2,24
**off (7)**
11:18;73:4;77:6,8;
84:3;86:5,7
**offenders (1)**
9:23
**offense (1)**
10:8
**offer (2)**
57:4;75:20
**offered (4)**
7:23;13:25;88:21;
91:6
**offers (1)**
15:2
**offline (1)**
113:17
**oftentimes (5)**
38:18;45:24;55:14;
102:17,20
**Ohio (15)**
87:7,10,23;90:11,
14,16,21,23;93:5,7;
108:1;110:5,24;
111:1;113:13
**old (1)**
41:23
**Olson (1)**
103:7
**once (6)**
20:17;22:10;25:16;
37:7;50:9,11
**One (44)**
6:5;15:2,7;17:23;
18:1;22:22;25:10,14;
28:5;29:22;33:23;
35:11,16,17;38:15;
40:19;42:16;46:9,13;
50:22;52:5,11;54:22,
23;55:6;56:4;57:9;
67:22;71:14;73:13;
74:5;78:20;80:18;
83:21;84:12;86:5;
87:6;92:10;97:14;
100:3;104:8;105:2;
112:5,20
**ones (3)**
62:6;82:12;103:10
**one's (2)**

37:2;58:18
**one-year (1)**
13:25
**online (2)**
18:16;108:22
**only (15)**
20:16;52:2;56:18;
62:6;68:22;72:10;
88:6;90:5;93:22;
94:6;97:22;98:23;
105:5;106:2,13
**open (18)**
17:2,23;19:8,10,13,
18;20:2,6,22,24;21:4,
6,14,14,18,19;22:6;
32:9
**operate (8)**
17:2,5;20:2,24;
27:15;31:7;84:2,5
**operated (1)**
100:17
**operating (2)**
27:14;100:22
**operation (1)**
31:5
**operations (2)**
45:21;49:11
**opinion (35)**
16:2;22:23;26:23;
27:10;29:18,25;
30:15;31:19;32:15,
19;34:25;35:7;50:17;
62:23;63:25;64:8,9,
12;83:12,22;85:16,
17,23;98:14;99:12;
101:2;105:13,13,14,
17;109:1;110:8;
111:2,4,5
**opinions (5)**
74:9,15;76:5;79:8,
11
**opioid (2)**
36:18;52:6
**opportunities (1)**
103:4
**opportunity (4)**
12:24;15:9;40:10;
107:18
**opposing (1)**
4:17
**opposite (2)**
27:7;28:13
**optimal (1)**
70:9
**optimize (1)**
70:19
**option (3)**
21:6,8,13
**optional (1)**
20:24
**options (4)**
88:15,21;103:15;
105:10

**order (4)**
71:7;101:9;102:8,
25
**ordinance (1)**
110:10
**Ordinarily (1)**
113:13
**organization (6)**
9:4,14;11:20;73:6;
83:12;93:9
**organizations (3)**
27:13;28:16;59:18
**others (4)**
19:8;40:14,15;
103:11
**otherwise (2)**
35:25;51:2
**out (19)**
4:13;7:22;8:6;
11:15;16:23;17:8,16,
23;36:14;38:5;50:9;
51:16;53:14;57:12;
61:9;93:5,10;100:18;
105:10
**outcomes (4)**
56:20,24;57:8;59:4
**outdated (1)**
110:11
**outlets (5)**
16:15;19:19;21:4,
15;22:5
**outlook (1)**
41:1
**outpatient (6)**
9:16,20;26:2,4;
50:10;104:1
**outside (3)**
34:3;63:7;102:21
**over (12)**
8:9;24:20;31:11;
33:19;36:8;54:9;
56:12;57:25;66:24;
67:15;102:1;113:19
**overall (1)**
36:22
**overcome (3)**
39:8;61:7;62:21
**overcrowded (4)**
67:19;69:3;95:20;
99:18
**overcrowding (15)**
34:5;43:25;44:17;
46:23;65:21;67:5,13;
69:1;71:1;84:25;
85:5,6;95:17;99:10;
112:24
**overlap (2)**
83:2,3
**overseeing (1)**
10:12
**overview (1)**
28:25
**own (6)**

Lake-Geauga Recovery Centers, et al. v
Munson Township, et al.

John Majer, Ph.D.
February 22, 2021

24:3;34:18;42:13;
66:10,18;89:20
**Oxford (31)**
24:19;28:5;39:21;
56:10,14;59:2;63:5;
65:13,23,23;66:3,6,
11;73:5,6,11,19,22;
74:2,11,16,22;79:3,4,
9,11,13;90:19,21;
97:17;99:15

**P**

**package (1)**
18:3
**page (10)**
30:3;32:8;78:20;
79:2,16;80:12;82:2,
6;86:8,14
**pages (5)**
76:25;79:19;80:2;
82:8;89:23
**paid (1)**
73:23
**painful (1)**
61:18
**painting (1)**
19:25
**paired (1)**
108:24
**panic (2)**
41:11;62:15
**paragraph (1)**
86:16
**paragraphs (1)**
80:6
**Park (1)**
13:10
**Part (11)**
7:10;12:16;13:17,
20;24:5;40:10;46:7;
47:20;74:12;96:6,11
**participatory (1)**
16:6
**particular (9)**
18:14,16;36:23;
59:9,11,20;64:24;
83:18;112:10
**particularly (1)**
99:15
**parties (2)**
4:12;26:22
**partners (1)**
96:8
**partnerships (1)**
60:13
**part-time (1)**
7:24
**party (1)**
106:25
**Pasadena (1)**
9:17
**pass (1)**

107:3
**past (4)**
26:19;62:10,22;
104:1
**paste (2)**
78:22;81:24
**pasted (2)**
76:25;81:20
**pasts (1)**
8:15
**pathway (1)**
104:8
**patient (3)**
35:15,15;56:5
**patients (4)**
8:3,6;11:7,12
**Paul (1)**
39:22
**pay (10)**
12:25;18:17;19:3,
5;21:1;48:6,23;49:4;
73:25;100:2
**paying (2)**
47:13;103:10
**peace (1)**
62:10
**peer (8)**
16:15;17:5,23;
18:24;20:1,16;22:3,4
**peers (5)**
44:15;53:22;55:17;
62:4,20
**pending (1)**
4:24
**people (100)**
8:10,12,14;10:3;
11:6;12:13;13:11;
18:7,12;23:4,7;24:18,
20,24;25:1,19,24;
26:13;31:19;34:3;
35:16,18;36:8;37:8,
21;38:1,5,10;39:3,6,
15,18,23;40:3,6,9,17,
20;42:12;44:5;47:7,
11;49:9;51:19;53:5,
10,17;55:5,12,14;
57:1;58:10,24;59:4,7,
10;61:4;62:8;63:20;
64:25;65:3,13;66:4,5,
17;67:2;68:3,9,12,14,
17;69:17;70:10,14,
24;71:17,17,22;83:9,
25;84:1;91:7;92:10;
95:12;96:14;99:17;
101:7;102:5,8,16;
103:1,24;104:9,11,
16;105:2,4;110:15,
21,21
**people's (1)**
20:14
**per (2)**
18:18;72:11
**percent (2)**

70:9;103:9
**perfect (1)**
72:19
**perform (1)**
32:13
**perhaps (2)**
68:4;72:15
**period (5)**
15:8;27:22;66:6;
74:5;92:15
**permit (1)**
48:2
**person (15)**
25:11;35:12,13,14;
37:21,21;39:7;41:25;
48:5,15,17,23;52:25;
76:14;92:7
**personal (3)**
54:16;89:20;98:7
**persons (10)**
12:6;35:4,8,19,22;
50:4;60:18;87:5;
104:23;109:18
**perspective (1)**
48:11
**pertain (1)**
90:16
**pertained (1)**
90:14
**pertaining (1)**
16:3
**PhD (4)**
4:1;12:21,23;80:23
**philosophy (1)**
7:3
**Phipps (1)**
11:3
**phone (1)**
31:4
**physical (2)**
31:16;60:22
**physically (1)**
44:14
**pick (1)**
44:24
**picking (3)**
39:1;65:7;102:13
**picture (1)**
19:25
**piece (1)**
16:10
**pin (1)**
43:6
**place (4)**
39:4;44:4,5;47:22
**places (1)**
98:13
**Plaintiffs' (1)**
113:22
**plan (3)**
89:9,13,14
**play (1)**
50:3

**Please (8)**
4:21;6:10,14;22:9;
29:15;61:3;67:9;
79:16
**plus (4)**
72:12;85:18;86:12,
18
**point (10)**
16:23;17:22;39:25;
44:17;62:11;72:14;
94:16;95:17;109:6;
112:3
**pointed (1)**
107:18
**population (8)**
8:17,20;23:18,20;
26:11;31:12;92:9;
112:8
**populations (1)**
14:11
**portion (1)**
86:2
**position (12)**
7:13;8:22;11:21;
14:1;15:16;16:12;
46:24;47:25;48:22;
54:13;62:12;78:7
**positions (2)**
7:9;22:10
**positive (1)**
49:18
**possible (2)**
5:23;99:9
**post-detox (1)**
25:23
**postdoc (1)**
15:8
**post-educational (1)**
7:8
**post-high (1)**
6:16
**potential (2)**
10:6;67:7
**potentials (1)**
95:24
**practicum (3)**
7:12,13,23
**practitioner (1)**
12:23
**predoctoral (2)**
14:5,16
**preliminary (1)**
4:16
**prepare (1)**
78:2
**prepared (5)**
14:15;26:16;34:19;
77:11;89:3
**preparing (3)**
30:5,7;77:18
**prescribed (1)**
56:9
**presence (1)**

42:11
**present (1)**
37:16
**presented (3)**
27:13;74:15;78:17
**preserve (2)**
5:12,15
**president (1)**
30:23
**pretty (8)**
9:9;14:1;79:21;
80:6,25;83:7;87:4;
92:18
**prevent (1)**
10:7
**previous (6)**
28:14;42:18;54:3,
25;109:4,8
**previously (1)**
109:16
**primarily (1)**
63:17
**primary (1)**
10:12
**prince (1)**
19:21
**prior (2)**
5:13;14:4
**Prison (2)**
14:18,19
**privilege (1)**
104:12
**probability (1)**
46:3
**probably (14)**
10:4;19:16;38:7;
40:20;45:5,16;50:21;
52:20;55:11;64:13;
78:3;90:20;92:10;
103:8
**problem (4)**
6:9;10:6;14:9;
51:10
**problems (2)**
8:13;85:4
**procedural (1)**
4:11
**process (11)**
17:3,5;18:24;
19:13;20:3;22:3,5;
43:4;61:17;92:12,13
**processing (3)**
20:4,5;21:1
**produce (6)**
23:10;31:21;43:22;
47:13;73:8;85:13
**produced (1)**
64:5
**produces (1)**
51:5
**producing (3)**
46:22;65:21;
112:24

Lake-Geauga Recovery Centers, et al. v
Munson Township, et al.

John Majer, Ph.D.
February 22, 2021

production (2)
18:19;19:6
productive (3)
39:13;40:4;50:4
profession (1)
36:10
professional (17)
7:8;8:19;26:7;
27:17;28:23;32:14,
18;35:1;56:15;59:17;
61:25;64:1;76:13;
84:6;103:20;104:21;
105:21
professor (1)
22:13
program (13)
7:11;12:21,24;
13:4,11,19,23;77:21;
91:5,17,22;92:3;
100:11
programmatic (1)
92:24
programs (2)
12:1;18:3
project (1)
24:3
promise (1)
49:4
promote (1)
42:11
promoting (1)
100:19
pronounced (1)
60:3
proportionate (3)
33:10,15;65:14
proportionately (2)
46:3;60:24
proposing (1)
92:2
prospective (1)
48:3
provide (8)
21:9;41:2;49:17;
88:23;89:8;102:3,15;
109:19
provided (12)
5:13;29:13;30:4;
31:6,18;34:17,18;
85:16;93:1;99:23;
106:14;109:2
provider (2)
26:3;60:17
providers (2)
56:9;76:13
providing (8)
9:20,23;10:15,17;
34:5;67:4;70:23;87:8
PsychArticles (2)
18:4,10
psychiatric (4)
14:6;23:19;36:14;
97:14

psychiatrists (1)
11:9
Psychiatry (1)
11:3
PsychInfo (3)
18:3,11,15
psychodiagnostic (1)
14:21
psychoeducational (2)
9:24;10:6
psychological (5)
8:16;12:22;14:22;
18:5;44:2
psychologist (7)
7:25;8:1,11;11:25;
15:6,7,14
psychologists (1)
13:15
psychology (7)
6:21,24;7:1,4;
13:17,18;22:13
psychotherapy (2)
14:25;104:3
public (3)
19:2,7;21:9
publication (3)
9:12;17:11;18:23
publications (4)
17:1;19:12;21:17;
25:6
publish (1)
20:20
published (11)
9:12;16:14;20:15,
21,24;21:17;25:7;
53:14;58:16;73:21;
80:14
purely (4)
20:6,22;21:14;
100:17
purpose (1)
47:14
purposes (1)
113:18
pursuing (2)
103:20;112:10
put (8)
41:25;43:6;93:5,
10;94:20;95:12;
98:20;112:2
puts (2)
40:23;46:23
putting (1)
47:10

**Q**

qualifications (6)
5:12,16;16:24;
31:10;78:21;81:19
qualifies (1)
63:17
qualify (1)

20:19
quality (2)
20:7;47:5
Quarterly (1)
16:21
quick (2)
107:7,20
quickly (1)
8:14
quite (2)
34:4;62:2

**R**

Raft (2)
8:23;98:3
raise (1)
4:25
random (1)
56:10
randomized (5)
23:23;56:2;57:11;
58:21,22
randomly (3)
56:7;57:13;58:24
rare (1)
17:19
rate (1)
8:5
rates (1)
56:22
rather (1)
12:18
Ravenwood (1)
88:17
reactions (1)
62:16
read (5)
80:20;81:14,16;
90:2;113:14
reading (1)
83:20
ready (1)
66:1
real (2)
8:12,12
realities (1)
61:15
reality (2)
96:12;100:23
realize (1)
62:5
realized (1)
8:14
really (23)
19:11,21;27:19;
28:19,23;33:10;
38:21;40:7;47:5,14;
48:8;52:20;59:24;
64:14;68:5;78:5;
81:16;83:17;84:4;
90:1,2;98:14;101:20
reason (1)

19:16
reasonable (3)
35:1;64:1;70:22
reasonably (1)
112:23
reasons (1)
50:20
recall (5)
30:7;77:18;78:5;
84:3;103:9
receive (2)
21:7;89:19
received (5)
6:15;7:2;13:3;
89:22;106:9
receiving (2)
98:10;113:5
recent (5)
24:14;27:6;38:23;
48:18;49:7
recently (1)
80:13
recess (3)
5:5;72:20;107:21
reciprocal (1)
40:12
recognize (3)
20:13;29:9;104:7
recollection (2)
81:1,10
recommendation (1)
67:24
recommendations (2)
10:18;56:15
reconcile (1)
61:18
reconciling (1)
62:21
record (11)
4:11,20;5:11;6:11;
77:7,8,15;86:5,7;
109:17;113:15
recovering (5)
23:7;37:5;44:5;
60:7;106:16
recovery (283)
9:1;10:19,21,25;
11:16,16;16:3;22:1,
24;23:6,10,16,21,25;
24:1,3,5,19,21,24,25;
25:25;26:10,24;27:2,
5,11,15,16,19,21;
28:6,8,19,20,22,24;
29:16,20,25;30:18;
31:1,20,22,25;32:22;
33:1,7,8,12;34:11,13;
35:3,20,24;36:2,4;
38:2,6,11;39:3,10,15,
22,24;40:1,13,23,24;
41:1,2,4,7,25;42:9,
10;43:1,14;44:19,21;
45:3,5,7,12,13,19,25;
46:2,12,15,21,25;

47:2,4,8,10,16,18,21;
48:19,20,25;49:9,11,
13,15,19;50:14,22;
51:3,8,13,20;52:2,10,
16,22;53:6,8,10,12;
54:8,11,20,21;55:5,
13,19,21;56:1,11,19;
57:2,4,14,15,25;58:7,
9,18,19,20;59:1,3,5,
7,12,19;60:4,15;
61:11;62:1,13,14,19,
24;63:1,6,12,15,16,
19,22;64:6,14,20,22,
25;65:5,10;66:5,11,
18;67:16,18,19,23;
68:3,5,8,15,19;69:3,
13,17,18;70:2,15,16,
20;71:5,9,16,22;
72:11;73:9,14,17;
75:16;76:12,14;
77:21;79:14,17,25;
82:5;83:5,25;84:1,5,
10;85:2;87:8,24;
88:6,12;91:6,23,24;
92:6,8,11,13,19,19;
93:5,6,20;94:20;95:6,
20,25;96:15,20,22,
24;97:7,12,14,18,21,
21;98:1,17,22;99:14,
17;100:13,17,19,22,
25;101:19,23;102:2,
3,6,8,15,18,23;103:3,
12,14,16,19,25;
104:1,15,19;105:6,7,
20;109:10,20;110:15,
18,22;111:15;112:2,
6,10
recovery-first (1)
48:11
recross (1)
109:24
RECROSS-EXAMINATION (1)
110:2
Recurrent (1)
92:16
REDIRECT (1)
107:22
reduce (1)
46:17
reduces (1)
46:19
reducing (3)
80:18;81:11;93:13
reengineering (1)
11:19
re-examination (1)
107:4
reference (5)
31:24;36:10;43:7,
10;67:6
referenced (1)
67:6
references (2)

Lake-Geauga Recovery Centers, et al. v
Munson Township, et al.

John Majer, Ph.D.
February 22, 2021

32:7;78:14
**referencing (1)**
21:22
**referral (2)**
11:17;97:13
**referrals (1)**
97:16
**reframing (1)**
61:21
**refresh (3)**
81:10;83:20,22
**regard (1)**
47:9
**regarding (15)**
23:2;77:20;81:11;
87:15,19;88:5;89:9,
13,19;93:6;99:21,23;
106:3,9;111:10
**regardless (1)**
57:20
**region (1)**
53:17
**registered (1)**
11:10
**regulations (1)**
110:5
**regulatory (1)**
108:1
**rehab (2)**
7:18;10:11
**rehabilitation (1)**
7:14
**reinforces (1)**
43:1
**reintegrate (3)**
27:25;39:12;
102:17
**reiterate (1)**
63:19
**reject (1)**
17:16
**relapse (2)**
47:12;62:22
**related (4)**
37:4;46:19;91:18;
102:13
**relation (1)**
57:9
**relationships (1)**
38:20
**release (2)**
16:12;19:7
**relevant (1)**
110:24
**relied (3)**
30:14;84:19;109:7
**rely (2)**
84:17;99:12
**relying (2)**
78:9,10
**remember (1)**
74:6
**reminds (1)**

40:24
**rendering (1)**
22:23
**rent (3)**
31:8;47:13;49:4
**repeat (1)**
74:12
**repeating (1)**
10:8
**report (55)**
21:19,23;26:16,19;
29:13,21;30:5,12;
31:24;32:8,21;34:19,
21;36:4;43:7,11;
53:14,20;56:3;63:11;
73:3,16;74:9,15;78:4,
23;79:19;80:3,13,17,
20,23;81:2,13,21;
82:8,9,12,13;83:20;
84:12;85:24;86:2,8,
24;87:5,9;88:12;
89:3;99:7,20;103:7,7,
9;112:2
**reported (2)**
67:18;69:3
**reports (9)**
16:14;73:21;77:1;
82:22,24;84:9,17;
98:25;109:4
**represent (2)**
72:24;97:7
**representative (2)**
51:6,12
**reputable (2)**
16:17;21:5
**reputation (1)**
47:17
**request (1)**
70:21
**required (2)**
7:20;22:15
**research (44)**
13:1;14:2;15:10,
11,12,25;16:7;19:2;
20:7;22:19;23:1,15,
23;24:3,9;28:4;
53:13;58:22;59:25;
63:3,10,11;67:16;
78:8,10;79:10;82:23;
83:4,6,11,14;84:18;
88:5,9,11;89:21;
90:13;96:19;105:18;
108:10;110:17;
111:5,9;112:21
**researcher (5)**
20:19;35:2;38:5;
64:2;97:17
**reside (1)**
71:18
**residence (3)**
25:11;42:6;97:19
**Residences (4)**
42:10;63:2,9,18

**residency (1)**
48:17
**resident (8)**
27:23;33:24;42:15,
17;46:14,20;51:21;
53:1
**residential (13)**
10:23;27:12;28:16,
18;63:13;84:7;95:4,
7;98:4,23;99:8;
108:21;110:16
**Residents (115)**
22:1;24:4;26:25;
27:5,21;28:18;29:19,
22;33:5,9,15,21;34:9,
12;40:25;41:5;42:14,
23;43:12,15,16,23;
44:9,11,13,16;45:4,8,
14,22;46:1,4,10,22;
47:5,7,23;48:21;49:1,
16;50:19,23,24;51:2,
8,9,23;52:3,5,16;
53:20;54:9,10;62:7;
64:4,10,11,17,23,23;
65:4,9,18,20,24;
66:14;67:8,20,21,24;
69:13,19,20;70:1;
71:6,14,23;72:11,11;
75:4,8,11,21;76:15;
84:12,14;85:7,9,18;
86:12,18;88:13;91:2,
19,24;93:19;94:17;
97:5,22;98:6,8;99:1,
4;100:1;101:17;
102:20;103:22;
108:8;109:11,20;
111:14,15,21;112:6,
22
**residents' (1)**
79:17
**Residents's (1)**
67:23
**resolution (2)**
87:12;96:16
**resonates (1)**
54:7
**resources (6)**
23:9;59:22;60:6;
63:15;83:24;104:17
**respect (3)**
26:16;36:16;
112:23
**respirations (1)**
8:5
**responsibilities (2)**
22:11;40:12
**responsible (2)**
9:22;39:13
**restroom (1)**
72:17
**resubmit (2)**
17:18,19
**review (14)**

16:15;17:5,8,23;
18:24;20:2,16;22:3,
5;32:3;87:7;89:24,
25;105:9
**reviewed (7)**
30:11;87:11,15;
90:7;93:4;108:19;
110:5
**reviewer (2)**
16:17;22:20
**reviewers (2)**
17:14;20:12
**revisions (2)**
17:18,19
**rich (1)**
69:24
**Richard (1)**
15:19
**ride (1)**
62:14
**right (39)**
5:12,15,19;74:17,
25;75:5,22;76:22;
77:2,21,25;79:7,9,20;
81:8,22;82:23;83:13;
84:20;86:16;89:15;
94:11;95:11;99:5,10;
100:7;101:11;
105:22;106:5;107:5,
7,7;110:15,25;
111:19;112:16;
113:7,14,16
**rights (1)**
70:25
**rigor (2)**
19:15;111:25
**rigorous (1)**
32:10
**ripple (1)**
101:9
**risk (2)**
10:4;49:2
**RO1 (1)**
16:6
**Road (1)**
12:8
**rocky (1)**
62:14
**role (2)**
23:6;50:3
**room (2)**
100:3,4
**roommate (2)**
33:25;66:20
**roommates (2)**
33:22;41:9
**rooms (3)**
31:8;33:21,23
**rounded (1)**
14:9
**rounds (1)**
11:12
**rules (6)**

52:9,19;55:15;
62:22;92:21,22
**ruling (1)**
72:6
**run (1)**
96:17
**running (4)**
9:22;89:9,13,14
**rural (4)**
87:18,22;101:21,
22

## S

**safe (2)**
44:4,4
**Salt (1)**
27:8
**same (21)**
43:3;56:17;59:6;
78:8,22;80:1,6,7;
82:7,14,18,22,23;
83:6,24;84:11,17,18,
18;85:13;109:7
**sample (2)**
59:9;97:10
**samples (3)**
53:16,17;112:4
**sardines (1)**
68:22
**saving (1)**
112:11
**saw (1)**
108:21
**saying (10)**
20:5,19;21:7;
41:23;61:6;72:8;
76:5;82:11,21,24
**scheduling (2)**
4:17,19
**Schober (1)**
103:6
**scholarly (8)**
17:25;18:12,23;
19:10;21:12;23:1;
32:9;34:16
**scholarship (1)**
12:24
**scholarships (1)**
55:20
**school (4)**
6:16;11:24;13:21,
24
**Science (6)**
6:21;33:7;62:25;
64:24;65:1;111:20
**scientific (10)**
19:15;67:12;72:9;
85:11;98:25;105:18;
108:10;111:4,12,25
**scientifically (1)**
33:2
**scientist (1)**

Lake-Geauga Recovery Centers, et al. v
Munson Township, et al.

John Majer, Ph.D.
February 22, 2021

12:23

**screen (4)**
5:7,19;34:22;80:22

**screening (1)**
92:12

**screenings (1)**
12:5

**scroll (8)**
29:8;30:3;78:14,
19;79:23;81:4,17;
82:19

**scrutiny (1)**
32:11

**search (1)**
20:14

**searched (1)**
111:20

**seasoned (1)**
45:15

**Second (8)**
41:2;46:17;78:20;
80:11,11;86:5;101:9;
102:25

**section (3)**
79:18;80:1;82:7

**sections (1)**
87:4

**secure (4)**
7:13;34:10;44:4;
68:5

**securing (1)**
68:6

**seeking (2)**
38:2;77:23

**seemed (2)**
68:1;98:5

**seems (6)**
24:9;58:17;60:6;
75:11;90:17;97:5

**self-efficacy (4)**
23:12,13;54:2;
58:17

**sells (1)**
18:5

**semester (3)**
7:21;22:15,16

**send (1)**
17:7

**senior (5)**
33:24;45:18,22;
46:7;62:7

**senior-ended (1)**
46:4

**sense (4)**
20:20;34:5;67:4;
87:21

**sensing (1)**
34:4

**sentencing (2)**
12:13,19

**separate (2)**
24:12;58:14

**serve (3)**

22:18,19;54:18

**served (11)**
10:24;12:9,14;
14:18,19;15:25;
16:13,16,19;73:13;
74:4

**service (6)**
60:17;101:9;102:4,
15,18;104:7

**Services (4)**
9:17;13:22;61:24;
93:6

**serving (1)**
16:2

**set (2)**
57:11;113:10

**sets (1)**
70:18

**setting (10)**
7:12;9:2;14:7;
15:6;42:22;52:8;
70:3;84:7;95:4;96:4

**settings (7)**
10:24;18:13;31:13;
95:7,16;101:22,22

**settled (2)**
109:11,13

**seven (5)**
9:5;15:18;67:21,
25;68:23

**several (4)**
4:14;26:2;46:13;
112:3

**severe (4)**
37:14;38:6,8;39:7

**severed (1)**
38:20

**severity (5)**
35:12,15;37:13;
40:5;60:2

**sexual (1)**
60:22

**share (3)**
36:25;67:21,25

**shared (2)**
34:22;36:19

**sharing (3)**
5:7,20;68:23

**shift (1)**
29:5

**short (4)**
56:12;72:20;
107:10,21

**shorter (1)**
11:5

**short-term (1)**
13:12

**show (5)**
9:10;56:1;86:1,14;
109:6

**showing (6)**
23:23;25:8;52:23;
81:3;83:18;88:7

**shown (3)**
59:25;109:4;
110:17

**shows (2)**
72:10;112:21

**side (2)**
28:13;76:17

**sides (2)**
83:7,24

**sighed (1)**
71:24

**Signature (1)**
113:21

**signed (1)**
89:22

**significant (2)**
37:1;56:21

**significantly (4)**
53:23;56:23,23,25

**Silver (1)**
73:7

**similar (8)**
33:1;53:19;79:1;
81:23;82:12,17,25;
84:8

**similarities (1)**
53:7

**simple (1)**
65:10

**single (3)**
63:4;97:24;100:4

**single-family (14)**
42:5,5;63:1,2,8,8,
13,18;95:7;98:4,22;
110:18,19;112:21

**site (1)**
32:7

**situated (4)**
5:4;27:11;63:12;
95:4

**situations (1)**
100:10

**six (55)**
12:20;22:16;28:3,
11;29:19,21;31:19;
33:9;34:3;45:16;
47:23;51:2;55:5;
64:9,22,23;65:8;67:2,
21;68:9;71:13;74:24;
75:3,7,12,14,17,18,
21;76:1,6,11,15;
85:18,19,21;86:12,
17;87:5;88:10,13;
93:14,16;94:11;96:5,
21;97:1,2,5;98:6;
108:8;109:10;
111:10,14,15

**size (10)**
33:18;44:11;65:11,
17;66:15,25;81:12;
95:24;108:21;112:20

**sizes (1)**
111:23

**skills (3)**
38:19;39:9;51:15

**smaller (2)**
95:24;112:1

**smallest (2)**
96:22,24

**SMITH (25)**
5:10;71:11,25;
72:19,22,23;77:6;
78:19;79:15,23;
80:10;81:4,17;82:1,
19;84:22;86:4;94:3;
106:22;107:9;108:4;
109:14,24;110:3;
113:7

**sober (15)**
23:20;35:25;38:10,
13;44:6;50:4;55:7;
57:22;58:5;81:7;
83:19;102:6,10;
103:1;112:12

**sobriety (4)**
31:11;62:8;70:15;
102:9

**social (25)**
11:10;23:12;25:13;
37:2,24;38:15,18,19,
22;41:3,18,21;42:1;
43:21;50:15,17;51:5,
12,15,15;53:24,25;
60:9,12;66:20

**socially (1)**
44:14

**society (2)**
39:14;40:4

**soft (1)**
60:9

**solving (1)**
51:11

**somebody (4)**
41:14;42:25;49:2,3

**someone (4)**
48:16;96:6,10;
108:15

**sometimes (1)**
49:12

**somewhere (1)**
7:15

**Sorry (6)**
6:8;60:11;65:16;
74:12;81:7;109:12

**sort (2)**
28:25;90:2

**sought (1)**
9:15

**sound (1)**
48:7

**sources (4)**
32:4;80:7;84:8;
106:13

**South (2)**
73:15,24

**space (5)**

33:11,16;34:2;
68:20;71:2

**speak (9)**
30:17,21;31:2;
59:23;73:20;78:2;
81:16;95:17;99:19

**speaking (2)**
21:25;51:5

**speaks (5)**
16:24;37:15;49:24;
65:18;92:24

**specific (12)**
17:8;36:11,21;
60:16;90:5,15;92:21;
105:22,24,25;106:10,
14

**specifically (3)**
23:8;54:1;111:13

**specifications (1)**
108:20

**specifier (1)**
38:7

**spectrum (1)**
26:6

**spell (1)**
6:11

**spend (1)**
25:24

**spending (1)**
37:3

**spent (2)**
23:14;37:5

**spoke (7)**
28:6;30:22;50:21;
64:13;85:4;89:5;
100:20

**spouses (1)**
96:8

**Springs (1)**
73:7

**square (3)**
33:14,19;66:24

**stability (1)**
27:24

**stable (4)**
33:25;48:1,5;66:17

**staff (12)**
7:25;10:14;11:13;
29:22;31:10;47:23;
52:18;64:10;71:14,
18;72:12;87:6

**staffed (1)**
92:7

**standard (1)**
21:23

**standards (10)**
21:25;47:14;86:19;
87:7,10,12;108:2;
110:6,23;111:1

**start (4)**
12:21;45:20;73:4;
90:18

**started (6)**

Lake-Geauga Recovery Centers, et al. v
Munson Township, et al.

John Majer, Ph.D.
February 22, 2021

6:10;7:10;13:4,19;
28:4;37:7
**starting (1)**
98:2
**state (11)**
6:10,22,24;8:24;
26:1;31:23;63:6;
85:17;86:11;99:7;
108:1
**stated (1)**
28:3
**statement (1)**
105:8
**States (6)**
36:3;53:18;58:11;
61:18;73:10;104:20
**Statesville (1)**
14:18
**Statistical (1)**
36:12
**statistician (1)**
9:4
**statistics (1)**
9:10
**stay (5)**
13:13;27:21;35:25;
38:10;47:11
**staying (1)**
112:12
**step (14)**
8:7;23:16,17;26:8;
36:6;47:8;50:7;
52:11;57:13,18;
58:11,19;102:21;
103:3
**Stephen (1)**
106:24
**stipend (1)**
13:2
**stop (2)**
37:6;112:13
**story (1)**
56:12
**strategic (1)**
46:23
**stress (1)**
46:19
**stressing (1)**
97:2
**strong (1)**
62:15
**structure (1)**
108:21
**students (2)**
19:12;25:5
**studies (3)**
6:18;55:20,25
**study (2)**
57:9;58:13
**stuff (7)**
8:5;43:1;49:7;
52:11,12;53:2;90:4
**subheadings (2)**

82:17,21
**subject (2)**
22:3;32:10
**subjected (1)**
22:4
**submit (4)**
17:6,10;19:18;
80:17
**submitted (3)**
74:9;76:20;85:24
**submitting (1)**
5:14
**subscription (4)**
18:1,2,9,14
**substance (58)**
8:15;9:25;10:1,1;
11:7;13:12;14:8,13;
16:8,18;23:2,4,7;
24:9;25:20;26:13;
35:5,9,10,13,17,19,
22;36:7,9,11,23;
37:17,22;38:8;39:16;
40:5;44:5;50:5;53:7,
9,15;57:6;59:13;
60:1,3,7,19;63:21;
70:11,13;88:24,24;
102:14;104:2,6,9,23,
24;105:4;106:16;
108:8;109:19
**substances (3)**
37:4,5,6
**substantiate (2)**
83:14;98:25
**Subuex (1)**
24:7
**suburban (1)**
101:21
**succinct (1)**
57:16
**sufficient (1)**
108:25
**suggest (1)**
5:3
**suitable (1)**
68:12
**summarize (4)**
22:9,25;25:3,16
**summarized (2)**
26:14,15
**summer (1)**
22:17
**superlative (1)**
57:5
**supervised (1)**
13:5
**supervision (1)**
15:13
**supplement (1)**
103:25
**support (14)**
23:12;25:13;38:15;
40:14,15;41:3,18,22;
42:1;43:21;53:24,25;

66:20;108:15
**supportive (2)**
61:16;62:19
**supports (2)**
55:21;64:24
**Sure (9)**
6:5;74:6;79:22;
80:7;96:23;106:6;
107:15,25;110:6
**sworn (1)**
4:2
**symptoms (1)**
37:16
**system (6)**
10:5;19:10;37:9;
41:8;59:10;66:12
**systems (1)**
16:8

**T**

**tab (1)**
102:13
**tailor-made (1)**
83:1
**talk (4)**
19:11;36:17;38:1;
50:13
**talking (16)**
17:13;18:22;19:9;
36:24;38:9;43:25;
50:7,10,14;61:10;
62:3;70:23;71:1,2;
79:4;96:5
**tapping (1)**
53:25
**targeted (1)**
10:4
**task (1)**
9:9
**teach (3)**
22:14,15,16
**teaching (3)**
13:17,20;14:2
**team (2)**
10:13;11:8
**teams (1)**
38:4
**tease (1)**
58:13
**teasing (1)**
57:12
**technical (1)**
86:6
**technically (2)**
70:4,18
**telling (2)**
49:5;52:19
**tells (1)**
53:24
**temperature (1)**
8:5
**ten (3)**

24:22;74:24;75:3
**tend (2)**
38:19;60:1
**term (2)**
36:9;49:24
**terminated (1)**
11:22
**terms (6)**
22:17;39:24;65:11;
66:7;97:12;101:16
**testified (11)**
4:3;29:2;76:16;
90:10;93:13,16,18;
100:9;108:3,6,19
**testifying (1)**
72:5
**testimony (9)**
4:19;69:15;73:2;
85:20,25;86:25;
99:20;106:8;109:2
**therapeutic (55)**
23:10,22;25:12;
26:23;28:2,7,9;
31:21;34:10,13;
40:16,22;43:7,10,13,
17,22;45:1;46:8;
47:9;48:9;49:13,19;
50:16,18;59:2;61:13;
62:3;64:5,19;68:7;
69:7,24,25;70:4,20;
71:4,8,9;72:10;
73:16;75:19;76:7;
91:17,17;92:3;94:19;
97:25;98:10;99:2,5;
100:25;108:7;
111:25;112:7
**therapist (4)**
10:12,15;11:2;15:4
**therapists (2)**
13:15;61:10
**therapy (5)**
10:16;11:11;14:24;
26:4;50:12
**therefore (1)**
92:9
**thinking (2)**
21:12;85:12
**third (3)**
13:8;46:21;81:18
**though (6)**
6:19;24:10;49:6;
75:5;93:21;103:13
**thought (3)**
24:13;31:19;94:16
**thoughts (1)**
72:17
**three (24)**
10:9;13:2,14;
15:20;25:6;31:11;
33:20;45:8;58:23;
64:21;66:13,14;
68:10,11,22;89:23;
96:5;97:22;98:8,19,

24;99:1,4;101:23
**throes (1)**
102:23
**throughout (4)**
7:7,21;16:16;73:9
**thus (1)**
46:15
**tight (1)**
9:9
**times (4)**
48:25;57:21;58:3;
97:4
**today (11)**
8:25;69:15;78:3;
85:25;86:25;99:20;
106:9,11;108:3;
109:2;113:18
**today's (2)**
16:1;85:20
**together (2)**
88:1;107:19
**told (3)**
20:9;39:21;68:15
**took (4)**
14:16;15:16;27:6;
34:15
**top (1)**
84:3
**total (6)**
33:5;47:23;64:9;
67:2;85:21;87:5
**Township (16)**
72:24;87:11,16,18,
20;88:15,18;94:22;
95:1,9;101:14;102:1;
105:9,14;106:1;
108:2
**traditional (2)**
12:19;20:20
**Traditionally (1)**
17:25
**training (2)**
13:8;83:16
**trajectory (1)**
8:19
**transcript (1)**
113:12
**transferred (1)**
15:21
**transition (2)**
102:16;104:15
**trauma (1)**
61:19
**traumas (1)**
62:17
**treat (4)**
26:12;35:16,18;
108:14
**treating (4)**
11:6;13:11;104:8;
105:2
**treatment (31)**
7:24;11:5;16:21;

24:5;25:18,21;26:3;
38:4;53:15;56:5,6,9,
15;57:24;58:23;
59:17,17;70:7;75:20;
76:13;84:6;88:14,17,
23;91:20;103:14,21;
104:2;105:10;
108:16;113:5
**treatments (6)**
26:7;27:17;28:23;
70:8;104:21;105:21
**trial (5)**
4:19;23:23;29:3;
57:12;58:23
**trials (1)**
56:3
**tried (2)**
12:8;68:15
**triggers (1)**
62:16
**Truman (4)**
15:21;22:14;25:5;
80:24
**trusted (1)**
19:22
**try (6)**
6:3;10:22;11:16;
57:16;61:18;82:25
**trying (2)**
12:12;23:15
**tuition (1)**
12:25
**turn (4)**
5:6;17:14;19:6;
41:6
**turned (1)**
7:22
**Twelve (36)**
30:18;31:5,25;
33:1,6,18;44:10;
47:22;48:4;50:25;
63:16,20;64:4,10,21;
65:9;66:23;71:7,10,
13;78:17;79:20;80:8;
82:8,13,15;85:17;
92:25;95:3;99:22,23;
103:4;106:14;
108:20;109:17,19
**twice (4)**
17:21;20:17;50:11;
58:2
**two (53)**
9:19;10:9;13:7;
15:15;24:14;27:6,12;
28:12;33:21,22;
37:10;39:23;44:10;
45:20;48:6,24;50:24;
52:2,5;53:16;56:2,7,
13,20;57:23;58:1;
59:1,5;66:13,14;
70:1;71:15,17,17,22;
72:10,11;76:16,21;
87:25;88:6;91:20,22;

94:7;96:5;97:22;
98:8,18,24,25;99:4;
106:15;109:18
**type (4)**
36:17,22;64:24;
94:17
**types (1)**
36:20
**typical (1)**
7:17
**typically (7)**
39:22;41:5,8;45:8;
53:23;55:24;59:21
**typo (2)**
86:24;87:1
**typographical (1)**
113:14

### U

**ugly (1)**
61:15
**ultimately (1)**
9:11
**uncommon (1)**
62:6
**under (1)**
70:9
**under-enrolling (1)**
85:7
**Understood (3)**
5:18;22:8,25
**unfair (1)**
83:23
**unfamiliar (2)**
94:21,25
**unfortunate (2)**
47:2,15
**Unfortunately (2)**
9:14;11:18
**uni's (1)**
11:14
**unit (4)**
11:5;14:6;25:21;
97:14
**United (5)**
36:3;53:18;58:11;
73:9;104:20
**University (8)**
6:22,25;7:1,4;
13:19;16:4;25:6;
88:22
**University's (3)**
12:21;15:3,11
**Unless (4)**
21:25;38:13;70:16;
81:13
**up (14)**
6:4;11:17;19:1,6;
39:1,10;44:16,24;
52:23;66:22;70:19;
102:13;104:13;
107:12

**updating (1)**
97:13
**upon (10)**
10:25;21:3;22:6;
30:14;32:15;43:23;
56:6,16;59:8;63:4
**urban (4)**
87:19;101:16,20,
22
**use (64)**
7:22;8:15;11:7;
13:12;14:8,13;16:9,
18;23:2,4,7;24:6,9;
25:20;26:13;35:5,9,
10,13,17,20,22;36:7,
9,10,11,23,24,25;
37:17,22;38:6,8;
39:16;40:6;41:16;
44:5;47:12;50:5;
52:1,5,7;53:7,9,15;
57:6;59:13;60:1,3,8,
19;63:21;70:11,13;
85:7;92:16;102:14;
104:2,9,23,24;105:4;
108:8;109:19
**used (9)**
26:12;36:17;78:16,
17;80:7;82:11;83:6;
84:7;106:20
**users (1)**
106:16
**using (3)**
37:6;83:23;84:12
**usual (3)**
56:7,18;58:25
**usually (4)**
22:16;25:23;37:10;
45:20
**utilize (2)**
18:10;24:4

### V

**value (3)**
75:20;92:25;108:7
**variables (2)**
57:4;112:4
**variation (1)**
36:21
**varies (1)**
50:6
**variety (2)**
59:17;105:20
**various (5)**
18:21;26:12,22;
99:14;111:23
**vary (5)**
33:14;35:13;36:16;
37:20;65:10
**vast (3)**
23:3;47:17;58:10
**verbatim (1)**
80:6

**versus (11)**
21:14;23:16,25;
24:11;51:7;57:14;
58:1,9,19;68:10,23
**veteran (2)**
54:5,23
**veterans (4)**
45:15,23;54:18,19
**vibe (1)**
44:24
**victimized (3)**
60:20,25;61:5
**visit (1)**
33:12
**visited (2)**
26:9;63:5
**visiting (4)**
13:25;47:2,4;99:14
**visuals (1)**
31:17
**vitae (2)**
5:22;7:15
**vitals (1)**
8:3
**vulnerable (1)**
8:17

### W

**wait (2)**
8:9;107:15
**waive (1)**
113:16
**waived (1)**
113:21
**wake (1)**
41:10
**water (3)**
41:24;43:17;55:3
**way (10)**
35:16,18;61:6;
67:20;68:17;98:20;
103:23;105:2,6;
108:3
**ways (1)**
103:5
**website (1)**
74:23
**websites (1)**
20:11
**week (3)**
7:21;50:11;100:2
**weekly (3)**
9:24;15:13;52:24
**weeks (3)**
4:14;48:6,24
**weigh (1)**
27:10
**weren't (3)**
11:21;28:19,22
**wether (1)**
54:15
**what's (6)**

5:8;34:12;81:2,13;
96:21,24
**whatsoever (1)**
38:24
**whereas (1)**
96:16
**whole (2)**
54:6;94:15
**who's (1)**
54:11
**wife (2)**
94:4,9
**within (21)**
11:19;17:9;23:19;
25:13;31:23;40:11,
25;41:18,19;43:13;
48:10,19;49:19;50:1;
51:12;64:17;65:5;
84:6;95:13;100:25;
108:9
**without (13)**
34:4,4;38:11;
43:24;46:22;49:3,4;
62:22;65:21;66:19;
67:4;99:9;108:15
**witness (2)**
107:3,14
**women (22)**
14:19;16:7,8;
59:12,19,21,25;60:5,
7,17,24;61:8,10,11,
13,25;62:12;67:25;
68:14;73:15;79:25;
92:14
**women's (1)**
73:14
**word (2)**
61:3;85:8
**wording (2)**
85:19;87:2
**words (3)**
24:6;40:3;85:8
**work (32)**
8:20;13:9;14:3;
15:10,24;16:25;
18:12;20:20;21:10;
24:17;25:17;48:18;
49:6,7,14;53:5;
55:11;61:10;64:14;
67:15;70:18;74:16;
79:12;83:15;90:17,
18;97:11,16,16,17;
100:15;111:7
**worked (20)**
10:21;11:8;12:11;
15:15;25:18,20,25;
26:2,5,18;54:19;
60:16,18;75:16;
76:17;92:8;96:22,25;
98:2;105:21
**worker (1)**
105:19
**workers (1)**

11:10
**working (17)**
  8:11;13:10,14;
  14:6,10,12,17;15:6;
  18:7;24:18;31:12;
  38:3;59:16;61:9;
  75:25;99:17;102:2
**works (12)**
  18:1,12,23;19:10,
  18;20:23;21:14;23:3;
  55:9;78:15;83:3;
  97:15
**world (2)**
  24:9;73:19
**worldwide (1)**
  75:10
**worst (1)**
  48:13
**wow (1)**
  44:22
**write (1)**
  73:15
**written (2)**
  85:16,23
**wrote (3)**
  16:10;78:4;80:25

## Y

**year (8)**
  7:5;13:8;15:7;
  24:14;25:8;45:20;
  73:18;74:5
**years (23)**
  9:19;10:9;11:1;
  13:2,7;15:15,21;
  18:25;24:2,20,22;
  25:4;27:6;28:1;
  31:11;47:3;54:9;
  56:13,20;57:23;58:1;
  60:21;102:2

## Z

**Zillow (2)**
  31:15;32:3
**zoning (1)**
  87:12

## 1

**1 (3)**
  5:20;77:12;113:22
**1:30 (2)**
  5:2,3
**100 (1)**
  70:8
**12 (20)**
  7:20;8:7;23:16,17;
  26:8;37:11;47:8;
  50:7;52:11;57:12,18;
  58:11,19;68:10;
  76:25;86:8,14;96:5;

102:21;103:3
**12:36 (1)**
  113:20
**13 (2)**
  30:3;32:8
**14th (1)**
  80:14
**15 (3)**
  18:25;68:10,12
**16 (2)**
  7:20;13:1
**18 (1)**
  55:7
**18,000 (1)**
  36:2
**1988 (1)**
  110:14
**1989 (1)**
  7:10
**1990 (1)**
  98:3
**1992 (1)**
  9:13
**1998 (1)**
  13:20

## 2

**2 (15)**
  29:6;34:21;63:15;
  75:16;76:2,7,12;
  87:24;88:5;91:6,23;
  92:6,11,19;113:22
**2,300 (2)**
  33:19;66:24
**2,500 (1)**
  75:10
**2.7 (1)**
  57:21
**20 (1)**
  18:25
**2000 (2)**
  13:17;58:16
**2001 (1)**
  13:24
**2002 (1)**
  53:14
**2004 (2)**
  7:6;15:1
**2006 (1)**
  15:23
**2007 (2)**
  16:5;26:21
**2013 (1)**
  36:15
**2015 (1)**
  74:6
**2018 (2)**
  77:12;80:14
**2019 (2)**
  76:17,19
**24/7 (2)**
  41:4;66:19

**25 (3)**
  28:1;54:9;102:1
**28 (4)**
  7:17;10:11;25:24;
  104:13

## 3

**3 (7)**
  9:1;23:21;25:25;
  59:3;77:10;97:25;
  113:24
**30 (2)**
  18:17;25:24

## 4

**4 (3)**
  79:2;82:8;113:24

## 5

**5 (3)**
  79:16,19;82:8
**5.6 (1)**
  58:3

## 6

**6 (1)**
  79:19
**62 (1)**
  103:9

## 7

**7 (1)**
  80:2

## 8

**8 (1)**
  80:2

## 9

**90s (1)**
  19:21
**9th (1)**
  4:15