**Expert Report: John M. Majer, Ph.D.**
**Harry S. Truman College**

This report cites scholarly literature and presents scientific data to support my opinion that recovery homes such as the one operated as Twelve Meadows in Munson Township, Ohio, should not be limited in terms of occupancy; in fact, my professional opinion is that it is necessary to have a maximum census of what the dwelling can accommodate (without imposing a sense of crowding) to create a therapeutic milieu that enables its residents to engage in their recovery. Although the best situation for a recovery home is a single-family home located in a single-family neighborhood, it is my opinion Twelve Meadows recovery home should have six residents to produce the therapeutic benefits for its residents. I am well aware that Lake-Geauga Resources, Inc. has plans for no more than 5 residents with a live-in home manager and that census at Twelve Meadows is eminently reasonable and will also produce very reasonable therapeutic benefits to those residents. Limiting occupancy to 2 persons is inadequate to provide effective recovery housing and it would impose a constraint on the development of abstinence social support ("abstinence" means remaining clean and sober). **There should not be any limit to the number of residents living in a recovery home as long as the dwelling can accommodate each resident's living needs without creating a sense of overcrowding.**

Limiting the number of residents would have considerable negative effects. It would deny access to prospective residents who need a recovery home, decrease a home atmosphere, decrease the likelihood of generalizing social skills in everyday situations, increase the potential for individual residents to physically and emotionally isolate, decrease personal accountability for one's behavior, decrease the likelihood of identifying with peers and connecting with abstinence social support, increase stress and fears associated with finances of recovery home living and negatively impact its therapeutic atmosphere, and would make the recovery home inaccessible to those who need it due to high costs.

It is also my opinion, based on my experience and research described in this paper, that substance use disorders are life-threatening mental disorders, even among those who are in recovery because the effects of relapse are typically devastating and at times fatal. Substance use disorders are unique mental disorders because their effects go well beyond the use of a substance, impairing several important areas of functioning (e.g., employment/vocational, mental/emotional, financial, social/familial, recreational, health) that can take years to correct for some and a lifetime of dedication to maintain. Recovery requires a complete lifestyle change that usually includes: replacing social networks made up of drinking/drugging associates with supportive and drug-free friends; developing a capacity to earn a wage through legal and consistent employment; developing a mastery of activities of daily living that most adults take for granted; establishing a balance between work, family/social, and recreational activities while simultaneously keeping recovery a priority. This is quite a tall order. Although persons early in their recovery lack balanced lifestyles and suffer from various functional deficits, interventions help these persons develop basic living skills to overcome such deficits. Nonetheless, some persons recovering from substance use disorders suffer from a major impairment in that they themselves cannot stay abstinent and engage in their recovery unless they are engaged within a recovery home for an indefinite period of time.

1

For these persons, recovery homes are necessary community-based interventions that typically exist in single-family homes located within single-family neighborhoods, and they are necessary to facilitate residents' community reintegration. Recovery homes are instrumental in helping their residents overcome their functional impairments while supporting their efforts toward ongoing abstinence (i.e., remaining "clean and-sober"). For instance, the immediate access to abstinence social support through the use of a roommate during sleeping hours (and the abstinence-based support in common areas of a dwelling) is crucial in helping one overcome substance related cravings. Research has shown recovery homes produce unparalleled therapeutic benefits for their residents with positive, second-order effects upon their neighboring communities. These benefits are associated with having more residents and greater lengths of stay in these homes. Recovery homes provide residents with round-the-clock social support for abstinence that I believe, and scientific research published in peer-reviewed academic journals establish, is key to their success. For the reasons explained in this paper it is my opinion that the therapeutic benefits of recovery homes are related to one's social integration developed within these homes. I have visited many recovery homes and I have systematically examined recovery homes over the years thus I have a basis for my opinion.

**Date: February 16, 2021**
**Opinion:**

My name is John M. Majer, Ph.D., and I am a Professor of Psychology at Harry S. Truman College, Chicago, IL. I also serve as a Consultant with the Center for Community Research at DePaul University. I have over 30 years of experience working with persons recovering from substance use disorders in the capacity of a clinician and researcher, and I am highly familiar with the recovery home model of treatment. I appreciate the opportunity to present my expert opinion, and it is my opinion that recovery homes for persons recovering from substance use disorders, such as the Twelve Meadows recovery home, are necessary community resources that provide therapeutic benefits for their residents; a disabled population that cannot maintain abstinence by independent living. The best situation for a recovery home is a single-family home located in a single-family neighborhood, with a maximum census of what the dwelling can accommodate without imposing a sense of crowding among its residents.

To be clear, all persons in recovery from substance use disorders (SUD) have various needs and impairments that could be met by a variety of accessible services, settings, and interventions. No one approach to recovery has been established as being 100% effective, reflecting the great challenge in effectively helping persons with SUD whose needs for staying "clean and sober" and engaging in their recovery are diverse. Recovery homes are necessary interventions for some in recovery whereas others can engage in their recovery and maintain abstinence without living in a recovery home. Generally speaking, substance use disorders are characterized by impairment of function, usually across several important life areas such basic hygiene, nutrition, and health; emotional balance and rational decision making; employment; finances; social and family ties; recreational activities; and living in a safe and stable environment. For some, the chronic use of substances over time retards or prevents the development of important skills necessary for autonomous living, and it takes considerable time for such persons in recovery to develop the ability to function holistically that many of us in society seem to take for granted. Impairment

2

across these areas eventually result in seeking help, especially when one reaches a state of desperation. Those who are fortunate enough to see through their denial of having an alcohol/drug problem typically seek services, and I have never met a person who sought treatment for a substance use disorder not meet diagnostic criteria.

Not having a safe and supportive living environment is an additional challenge for some persons recovering from SUD. Unfortunately, such settings are not available to all seeking recovery. In my many years working with this population as both a clinician and a clinical-community researcher, I am convinced that some persons recovering from SUD *cannot* maintain abstinence and engage in their recovery without a recovery home. Recovery homes are not merely a place to live for these individuals; they are essential for such persons recovering from SUD to connect with their abstinence and recovery. And for this segment of the population of persons recovering from SUD, not having access to recovery homes increases their risk of death because of the devastating effects of relapse for this population. Simply put, persons with SUD have a most serious debilitating mental disorder placing them at great risk for injury and death, and recovery homes are effective, community-based interventions that are supported by science and a number of professional organizations. The growing number of recovery homes over the past 20 years is evidence that they are, indeed, necessary.

## Background Information and Qualifications

Presently, I am a full Professor of Psychology at Harry S. Truman College and a Consultant for the Center for Community Research at DePaul University, in Chicago, Illinois. I received my BS degree in psychology from Bowie State University in 1990, *magna cum laude*, and my MA degree in counseling psychology from the same institution in 1993. In addition, I received my MA and Ph.D. degrees in clinical psychology, with an emphasis in community psychology, on scholarship from a highly competitive, American Psychological Association accredited program ("Scientist/Practitioner" model) at DePaul University in 2004. I have quite a bit of research experience in the field of psychology, mostly involving persons with substance use disorders and recovery homes. This includes over 30 first author publications, contributing to the application of a National Institutes of Health (NIH) R01 grant application that was funded for 2.8 million dollars to examine a participatory action research approach to women's substance use disorder treatment (which I later served as a consultant for this five-year project), serving on editorial boards for academic journals, and mentoring students in addition to supervising their research projects and serving on theses and dissertation committees. Most of my scholarly works involve empirically-based investigations in which I took the lead role. My experiences in designing and executing investigations have resulted in the collection of hard-to-access community-based data in addition to the construction and analysis of databases. Prior to my current position, I was a full-time Research Associate at DePaul's Center for Community Research where I co-wrote a number of NIH R01 grant applications.

I have made just under 100 professional presentations at conferences and I have over 18 years teaching experience with undergraduate and graduate students. In particular, I have taught courses relevant to persons recovering from substance use disorders including abnormal psychology; alcoholism, drug addiction and recovery; cultural issues in psychology, research and

3

statistical methods in the behavioral sciences, and community-based, service learning courses on mental health problems in contemporary society. I have taught a number of graduate level courses in counseling, including group counseling. I have assisted several students with their master's theses and dissertations. In addition, I am a reviewer and editorial board member for several peer-reviewed (non-open access contingent) journals and I have created a research and applied statistics course that I've taught each semester for the past 8 years.

Furthermore, I have approximately 11 years of clinical work experiences in the areas of assessment and treatment of persons with substance use and other co-occurring disorders (i.e., those with "dual-diagnoses"), including the provision of clinical supervision among employees in addition to undergraduate students and advanced graduate clinical psychology students. As briefly described in my *curriculum vitae*, I have worked in a number of capacities and with various treatment modalities including residential care, often times requiring my community involvement and knowledge of residential resources. For instance, when employed with the Phipps Clinic of Psychiatry at Johns Hopkins Hospital in Baltimore, Maryland, part of my duties included routine community visits to local recovery homes. My frequent presence in the community ensured that my unit's community resource list was current, and it helped maintain crucial working relationships with recovery homes.

Overall, I am highly familiar with the population of persons recovering from substance use disorders, various treatment modalities for this population including recovery homes and inpatient programs, and I have met with many recovery home residents and others who live near and employ these residents. I have conducted a number of empirically-based investigations that have examined recovery homes, resulting in scholarly reports that have been published in competitive, peer-reviewed journals. Many of my investigations have resulted from taking a fieldwork approach; immersing myself in the communities that I'm observing as opposed to being informed solely by scholarly reports. Such an approach to inquiry provides a more direct understanding of phenomena. Thus, my opinion herein is grounded in my experiences with my previous professional employment, acumen developed from my training and research as a scientist, and familiarity with relevant scholarly literature.

**Evidence-based Appraisal of Recovery Houses**

The National Institutes of Drug Abuse principles of effective treatment (NIDA, 2018) makes very clear that no single treatment is appropriate for everyone: "Treatment varies depending on the type of drug and the characteristics of the patients. Matching treatment settings, interventions, and services to an individual's particular problems and needs is critical to his or her ultimate success in returning to productive functioning in the family, workplace, and society." This principle supports the notion that recovery homes are settings that provide a necessary intervention/service among those with SUD (to match their specific needs) in their attempts to recover and reintegrate in their communities. Such sentiment is embraced by the Substance Abuse and Mental Health Service Administration: "As recovery is unique to each individual, a range of housing options that support recovery and are both available and affordable is paramount" (SAMHSA, 2020). Thus, recovery homes are necessary and essential, depending on one's needs. Most scientific investigations on recovery homes have examined the

4

Oxford House model which is very similar to Twelve Meadows. Findings from the following scientific investigations are offered to describe some of the therapeutic benefits of abstinence-based recovery homes such as Twelve Meadows:

**Recovery homes vs. 12-step groups**. Recovery homes offer recovering persons unique support beyond what twelve-step groups like Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) can provide. For instance, my colleagues and I conducted a comparative analysis of cognitive resources among 42 Oxford House residents and 42 members of 12-step groups (AA,NA) who reported having never lived in Oxford House recovery homes (Majer, Jason, & Olson, 2004). Among participants abstinent less than six months, recovery home residents had significantly higher levels in their use of cognitive resources (i.e., optimism and self-efficacy for abstinence) than 12-step members. These findings are consistent with previous research that found living in recovery homes is significantly related to the use of cognitive resources, ongoing abstinence, and the use of active coping strategies (Majer, Jason, Ferrari, Olson, & North, 2003). Although recovery homes provide important cognitive resources to their residents beyond their involvement in 12-step groups, one longitudinal randomized clinical trial investigation (Majer, Jason, Aase, Droege, & Ferrari, 2013) found separate effects for 12-step involvement and being randomly assigned to an Oxford House recovery home (vs. a usual care condition). Participants in this investigation who were categorically involved in 12-step groups were 2.8 times more likely to remain completely abstinent at two-years, whereas participants who were randomly assigned to an Oxford House recovery home were 5.6 times more likely to remain completely abstinent at two years. Taken together, these investigations demonstrate that recovery homes provide therapeutic benefits beyond what is provided by involvement in 12-step groups.

**Recovery homes vs. usual care services**. Some of my colleagues (Jason, Olson, Ferrari, Majer, Alvarez, & Stout, 2007; Jason, Olson, Ferrari, & Lo Sasso, 2006) investigated the effects of communal living settings on important outcomes including recovering persons' abstinence. Seventy-five participants were randomly assigned to live in an Oxford House, whereas 75 participants were randomly assigned to receive regular aftercare services upon discharge from their inpatient treatment facility. After tracking each group for 2 years, those in the Oxford House condition compared to the usual care condition had lower rates of substance use (31.3% vs. 64.8%), higher monthly income ($989.40 vs. $440.00), and lower incarceration rates (3% vs. 9%). Staying in an Oxford House for 6 months or more was also a factor related to increased abstinence in this sample (Jason et al., 2007), and this six-month duration factor was also significantly related to increased abstinence outcomes in a national study on Oxford Houses (Jason, Davis, Ferrari, & Anderson, 2007) that also found larger house sizes predicted less aggressive and criminal behavior over time (Jason, Groh, Durocher, Alvarez, Aase, & Ferrari, 2008). Taken together, findings demonstrate recovery homes are very effective, suggesting that there are significant public policy benefits for recovery home residents, and that having more residents in a recovery home (larger house size) is an important therapeutic factor.

**Recovery home residents' community involvement**. Persons who are recovering from substance use disorders spend considerably less time engaging in risk behaviors and illegal activities, and more time supporting their communities. Over the years, policy officials, members of the media, and community members have asked my colleagues and me about the effects of

5

recovery homes on surrounding communities. In response to these concerns, a few of my colleagues (Jason, Schober, & Olson, 2008) became interested in collecting information to document residents' participation in their communities. Jason et al. (2008) explored whether the positive changes that occur among Oxford House residents have second-order, or "ripple" effects on their participation in neighborhood activities among 56 current and former residents who resided in various Oxford Houses throughout the United States. Residents spent on average 10.6 hours per month participating in their communities. There was a significant and positive correlation between residents' length of time living in Oxford Houses and their community involvement.

In addition, they found that residents' community involvement was a part of their recovery process, and that increases in residents' number of housemates who were involved in their community significantly predicted increased individual involvement in the community in a number of meaningful ways:

- 62.5% mentored others in recovery
- 45.0% administered and led support groups
- 56.1% educated their communities about recovery homes
- 35.8% educated their communities on recovery, in general
- 38.6% informed/advised agencies/local leaders on local initiatives
- 31.6% were involved in anti-drug campaigns
- 15.8% spoke at political events
- 29.8% attended public hearings/forums
- 31.6% worked with youth
- 29.8% were involved with fundraising
- 22.8% volunteered time with community organizations
- 84.2% believed Oxford House living increased their neighborhood involvement

**Neighbors' attitudes toward recovery homes**. Jason, Roberts, and Olson (2005) investigated the attitudes of community members toward recovery homes. Ninety-five percent of all neighbors who were approached agreed to participate in this study and they reported having lived in their houses on average for 8.3 years. Neighbors who lived next to 32 Oxford Houses versus those who lived a block away from 32 Oxford Houses were assessed regarding their attitudes toward substance abuse recovery homes and individuals in recovery. As expected, the vast majority of those living next to an Oxford House knew of the existence of these recovery homes, whereas most residents living a block away did not know of their existence. Results from interviews indicated that those neighbors who lived next to an Oxford House versus those residents a block away had significantly more positive attitudes toward recovery homes. These attitudes included the importance of recovering persons being able to live in residential neighborhoods, the importance of neighbors to provide a supportive environment to those in recovery, and favorable attitudes regarding an Oxford House on their block.

**Property values**. Another important finding was that there were no significant differences in housing prices among those living next to and those living a block away from Oxford Houses (Jason et al., 2005). In addition, those who knew of the existence of an Oxford House in their neighborhood reported that the values of their houses had actually increased by

6

7% over an average of three years. These findings suggest that the presence of recovery homes do not lead to reduced values for houses in these communities. I might mention that I conducted a property value analysis of residential homes in close proximity to a recovery home that housed over 18 residents (in another legal matter about 12 years ago) and I found that property values were not affected by the presence of this recovery home. I have never heard of any instance where property values were negatively affected by the existence of a recovery home.

Furthermore, findings from Jason et al. (2005) are consistent with research that has shown that staffed group homes do not have a negative impact on the attitudes of neighbors (Cook, 1997; Wahl, 1993), or the economic values of neighboring homes (Ryan & Coyne, 1985). In the literature, it appears that group homes generally do not have a negative impact on communities (Cook, 1997) and group homes may actually increase property values in their neighborhoods (Aamodt & Chiglinksy, 1989). Community members frequently expect to have more problems with group homes than actually occur (Cook, 1997; McConkey, Walsh, & Conneally, 1993), and those who live closer to these facilities tend to have more favorable attitudes (Gale, Ng, & Rosenblood, 1988).

**Recovery Home Living Among Women**

The need for substance use disorder treatment among women has been well documented and few women have had access to effective treatments for some time (Substance Abuse and Mental Health Services Administration [SAMHSA], 2007). Although their prevalence rates of substance use disorders have been less compared to men for over the past decade (SAMHSA, 2004), women consistently report more problems with and experience more health-related consequences from substance use (Green, 2006); accounting for their high rates of (costly) emergency room and hospitalization admissions (Rockett, Putnam, Jia, Chang, & Smith, 2005). Without adequate resources to meet their needs (e.g., housing, continued substance use disorder treatment, access to physical and mental health services), their risk for health problems increases (Aidala, 2006).

**HIV-risk.** One recent investigation among persons exiting inpatient treatment for substance use disorders found high levels of psychiatric problem severity and gender (women) were significantly related to greater HIV-risk sexual behaviors (Majer, Komer, & Jason, 2015). In a related investigation (Majer, Glantsman, Palmer, & Jason, 2015), HIV-risk sexual behavior was found to be related to significant decreases in an important cognitive resource that sustains ongoing recovery; abstinence self-efficacy. Taken together, these findings demonstrate that women recovering from substance use disorders, especially those with co-occurring mental disorders, are at risk for engaging in behaviors that threaten their health in addition to substance use relapse.

**Safe and supportive housing.** The threat of harm is accentuated by the lack of stable and supportive housing available to women recovering from substance use disorders (Kim & Crutchfield, 2004). Stable housing is an effective component to reducing risk for contracting and transmitting HIV/AIDS (Holtgave et al., 2007), as HIV/AIDS risk behaviors are highly associated with homelessness severity (Stein, Dixon, & Nyamathi, 2008). One multi-site evaluation investigation found when housing status changed from being unstable to stable for at-

risk persons, they were less likely to use hard drugs and share needles, and were less likely to engage in unprotected sex (Aidala, Cross, Stall, Sumartojo, & Harre, 2005).

In addition, without supportive (and abstinence-based) housing, relapse is likely as women often return to stressful family situations, other high-risk environments (e.g., abusive partners), or homelessness upon inpatient treatment completion. Having access to safe and affordable home environments is crucial, and having more women living in these homes would generate sufficient income to sustain these homes and prevent their closure (Harvey, Mortensen, Aase, Ferrari, & Jason, 2013). Lack of shared resources, such as financial contributions in particular, make recovery homes precarious, and substance use is greater among residents in such recovery homes compared to those living in stable recovery homes (Chavira & Jason, 2017). In addition, defraying the costs of recovery home living by maximizing the number of residents within recovery homes make recovery homes affordable and thus accessible to those who need them. Supportive housing has been identified as a key factor in treatment for women with substance use problems (Mandell & Werner, 2008; Polcin, Korcha, Bond, & Galloway, 2010), and recent investigations have demonstrated various therapeutic benefits (in addition to sustained abstinence) of recovery home living for women are related to increased social support and duration of stay within recovery homes.

For instance, Brereton, Alvarez, Jason, Stevens, Dyson, and McNeilly (2014) found the more women felt their individual needs were met by residential peers with whom they reciprocated such support, the more likely they were to have experienced more days of paid work. Women living in recovery homes for 6 months or more (compared to those staying less than 6 months) reported more days of employment, higher incomes, and more total income (Belyaev-Glantsman, Jason, & Ferrari, 2009). These findings are consistent with those from a national investigation of recovery home residents (Gomez, Jason, Contreras, DiGangi, Ferrari, 2014) that found significant increases in employment, school, and vocational training in relation to greater lengths of stay in recovery homes. However, having more residents in recovery homes increased these women's social networks which was found to significantly increase their length of stay (Brereton et al., 2014).

Developing social networks among fellow residents is more likely to occur the longer residents stay within a recovery home (Jason & Stevens, 2017), as research evidence (Jason, Stevens, Ferrari, Thompson, & Legler, 2012) has demonstrated social connections among recovery home residents increase the likelihood of ongoing abstinence. In other words, residents connect with each other, and in turn they stay longer in their recovery home and remain abstinent.

Thus, there is ample evidence in the literature to support the notion that increases in the number of residents is necessary to achieve therapeutic outcomes in recovery homes. For this segment of the population of persons recovering from SUD who are at high risk for relapse because they cannot stay sober by independent living, a limitation to the number of residents living at Twelve Meadows would undermine the therapeutic benefits of recovery home living. In my experience, recovery homes that are approximately the same size of Twelve Meadows host 6-8 residents. To achieve the therapeutic benefits of recovery home living, Twelve Meadows should be permitted to house 6 residents. Therefore, the proposal by Lake-Geauga Recovery

8

Centers for 5 recovering residents to live at Twelve Meadows is eminently reasonable and justified.

Limiting the number of residents living in a recovery home would impose a constraint on the development of abstinence social support that takes time to develop (Buchanan & Latkin, 2008; Litt, Kadden, Kabela-Cormier, & Petry, 2009; Majer, Callahan, Stevick, & Jason, 2016; Zywiak et al., 2009). In addition, because recovery home residents report identity issues that make it difficult to identify/connect with peers (Majer et al., 2002), increasing the number of residents in a recovery home is likely to increase the diversity of peers within the home which would facilitate individual residents' ability to identify and thus connect with the abstinence social support within the recovery home. Limiting Twelve Meadows to only two residents would eradicate the abstinence social support generated in recovery homes that has been demonstrated as being a therapeutic catalyst in the scientific literature, and thereby prevent residents a reasonable accommodation for recovery home living in the community.

Much of what I've read in scholarly articles touches upon what I have learned anecdotally through interviews with women living in recovery homes. The vast majority of women I've interviewed reported historic and/or current mental health issues, and a history of being victimized by violent assaults including domestic violence, rape, sexual molestation, and physical abuse as children. Some have reported specific dual-diagnoses. In my interviews, these women reported having immediate access to social support in their recovery home was necessary for their abstinence, and some stated that the social support within their recovery homes was life-saving.

These women strongly believe that having more (women) residents in their home benefited them individually, adding to a greater sense of support in their home. In addition, these women were very clear in discussing the dangers of not having a large number of women in their recovery homes. For instance, a smaller number of residents would make it easier for some to isolate physically and emotionally, not contribute to the home's sense of community, and thus engage in the relapse process that inevitably results in recurrent substance use. Permitting Twelve Meadows to house as many residents as the dwelling could accommodate without imposing a sense of crowding, which I believe would be six residents, would provide a sorely needed resource.

In conclusion, the women living at Twelve Meadows would experience the benefits of recovery home living that has been documented in empirically based research investigations if they are permitted six residents (in addition to the house manager). I know of no recovery home that is limited to only 2 residents.

**Group Dynamics Among Recovery Home Residents**

I took undergraduate coursework in the area of group dynamics, graduate coursework and training in the areas of group counseling for my MA degree in counseling psychology, and group psychotherapy coursework and training for my MA and PhD degrees in clinical psychology and earned excellent grades in all coursework. I have taught a number of graduate level courses in

9

counseling with an emphasis in group counseling. In addition, I have clinical experiences in conducting groups among persons recovering from substance use disorders thus I believe my opinion regarding group dynamics is well informed.

Groups can be powerful vehicles for promoting change, according to Gerald Corey, Ph.D., one of the leading experts on the topic of groups. Groups are essentially social microcosms whereby the therapeutic factor of change lies in the group when it produces a representative sample of interpersonal conflicts that members confront in their daily lives (Corey, 1990, p. 15). Although homogeneous group membership (i.e., when groups consist of members who have a shared mission, such as recovery from substance use disorders) creates a necessary bond for identification and group cohesion, groups that consist of a variety of members (e.g., based on various ages, ethnicities, and backgrounds) such as residents living in the recovery homes increase the representativeness of their social microcosm that in turn enables individuals to experiment with new behavior and receive diverse sources of feedback that enhance their problem-solving skills (Corey, p. 87). Therefore, increasing the number of residents to the maximum that a dwelling can accommodate is necessary to produce a therapeutic milieu to engender sober and productive living for a few reasons.

First, on a community level, having six residents instead of two residents provides therapeutic benefit to the community by providing more prospective residents access to this valuable community resource. Although the number of recovery homes have increased over the decades, with an estimated 17,943 recovery homes in the U.S. (Jason, Wiedbusch, Bobak, & Taullahu, under review), the increasing demand for them indicates that they are a much needed community resource.

Second, the number of residents should be considered in relation to the physical setting in order to promote a home atmosphere, and six residents would achieve this given the size of Twelve Meadows' dwelling. People are invested in, and protective, respectful, appreciative, etc. of, their homes, and homes are considered by them to be safe havens. Infusing Twelve Meadows with six residents would most likely create a home like atmosphere for this single-family home whereas limiting the number of residents would detract from this atmosphere that is recommended by the National Alliance for Recovery Residences (NARR, 2015).

Third, increasing Twelve Meadows' census from two to six would make the recovery home more representative of the community. This would likely increase the generalization of newly developed social skills in everyday situations across social contexts outside of the recovery home and be instrumental toward residents' community reintegration.

Fourth, having six residents living at Twelve Meadows would decrease the potential for individual residents to isolate physically and emotionally within the dwelling, and increase personal accountability among residents. Many recovery home residents have told me having a balance of residents that prevents isolating and encourages accountability was a key factor in helping them stay clean/sober.

Fifth, more residents in a recovery home increases the likelihood of finding common ground with fellow residents. Folks with SUD struggle with identifying with peers, especially in early

10

recovery as most recovery home residents find themselves to be upon admission. So, having more residents increases the diversity of the house census thereby increasing the likelihood a resident will connect/identify with a fellow peer. Identification is key to connecting to social support, and often, outsiders assume that merely being "in recovery" is sufficient grounds for identifying with a fellow resident; which is typically not the case for those early in their recovery.

Sixth, having more residents within a recovery home helps diffuse costs associated with recovery home living that in turn reduces 1) financial stressors among individual residents and, 2) fears the recovery home will close because it is not capable of meeting its overhead. The economic realities of shared living are important considerations that directly and indirectly have an effect on the therapeutic atmosphere of a recovery home. For instance, if a recovery home is limited in terms of its census it is prone to compromise admission and eviction criteria out of economic need (i.e., admit prospective residents who are poor fits, not evict residents who disrupt the therapeutic milieu). Such compromises are a major threat to the therapeutic atmosphere, and typically result in the closing of a recovery home. In addition, recovery home residents face the difficult task of developing occupational skills and paying their own way in society through legal means. For some, working a menial job for minimum wage and paying one's way is a most stressful challenge, so defrayed costs of recovery home living helps counter this stressor.

Seventh, lowering the costs by increasing residents within a recovery home makes recovery homes affordable and thus accessible to those who need them. Unnecessarily limiting the number of residents within a dwelling would limit the availability of, and access to, abstinence social support that is crucial for sustaining recovery. This is particularly evident in the fact that all residents are typically *not* in the recovery home at all times, and having more residents living in the recovery home increases the likelihood of access to social support. For instance, a major benefit of recovery homes is that residents typically share bedrooms, which provides social support at crucial times (e.g., in the middle of the night, especially when a resident awakes from a nightmare). Many persons recovering from substance use disorders experience post-acute withdrawal symptoms (PAWS), which in essence consist of various symptoms (e.g., disrupted sleep, changes in diet, disrupted mood) related to adjusting back to their bodies' natural circadian rhythms. I believe the effects of PAWS can last up to 18 months into one's abstinence and these natural changes toward health often times induce periodic cravings. This is complicated among those who have experienced trauma in their lives. Thus, the immediate access to abstinence social support through the use of a roommates (by way of shared bedrooms) during sleeping hours, in addition to the abstinence-based support in common areas during the wakeful hours, is crucial in helping one overcome PAWS-related cravings. For these reasons moreover theoretical and empirical support provided in this report, it is my opinion that recovery homes such as Twelve Meadows must increase the number of residents to the maximum of what their dwelling can accommodate without imposing a sense of overcrowding, and I believe that number is six. Having more residents in recovery homes provides more opportunities for shared resources and recovery support through social embeddedness that has been demonstrated to sustain recovery and improve quality of life in a recent investigation (Jason, Stevens, Light, & Doogan, 2019). Therapeutic benefits associated with having more residents living in a recovery home in terms of increased social networks and lengths of stay (Brereton et al., 2014), involvement in community

11

activities (Jason, Olson, & Schober, 2008), and less aggressive and criminal behaviors (Jason et al., 2008) have been documented.

Overall, scientific research has demonstrated the therapeutic benefits of recovery home social microcosms are contingent upon a (large) census that is necessary to meet the residents' various needs and produce therapeutic benefits to sustain their ongoing recovery and community reintegration. The therapeutic qualities of communal-living settings transform a housing setting into a home environment for these residents recovering from substance use disorders. Having a shared mission, congruent values, and reciprocal relationships provide a cohesive sense of community among residents.

### Characteristics of the Twelve Meadows Recovery Home

Although for various reasons I was not able to tour Twelve Meadows and interview residents prior to the preparation of this report, I was able to collect data on house characteristics by perusing Zillow.com and speaking with Ms. Melanie Blasko, LPC-S, LICDC-CS, the President and CEO of Lake-Geauga Resources, Inc., the owner and operator of Twelve Meadows. The Twelve Meadows recovery home qualifies as a Level II recovery home according to the standards outlined by the National Alliance on Recovery Residences (NARR, 2011), and it is a single-family home located in a single-family neighborhood. It includes a house manager who helps residents by monitoring house policy/procedures and engaging residents in their recovery. House rules create structure for this recovery home where residents attend weekly in-house meetings. Residents are screened for admission, subject to breathalyzer and urine drug screens during their stay, and encouraged to attend self-help (e.g., AA/NA) and/or treatment services (e.g., outpatient treatment) in the community. Residents pay their own rent and contribute their share of house chores. Twelve Meadows is an alcohol/illicit drug-free recovery home where drinking/using drugs is grounds for immediate eviction.

Twelve Meadows sits on 1.5 acres of land, consisting of four bedrooms and two full bathrooms, a common area den, living room, kitchen, and dining room, with approximately 2,382 square feet of living space. This is more than adequate to accommodate six residents (plus the house manager) according to the NARR standards for recovery homes (NARR, 2015), and thus highly unlikely to produce a sense of overcrowding among residents. It has a single car garage and plenty of space on the property for parking. Although most residents living in recovery homes typically do not have automobiles, and it is unlikely six residents and the house manager of Twelve Meadows would all have their own car, the property could easily accommodate parking space on the premises without imposing upon the community should this remote possibility occur.

### Conclusions

Overall, it is my expert opinion that abstinence-based recovery homes, such as those operated as Twelve Meadows is operated, benefit not only the individual recovering person but also one's community. I have had the privilege of meeting many recovery home residents over the years,

12

both in their homes and at professional conferences. Over the past 25 years I have visited various recovery homes located in the Mid-Atlantic, Northeast, Southern, and Midwest regions of the country, western Canada (British Columbia), and Middlesboro, UK. I found residents to be very cordial, polite, and highly respectful of their living environments and communities. Taken together, my clinical experiences with this population, experiences with visiting a variety of recovery homes, scientific investigations and scholarly sources, and what I have learned anecdotally from recovery home residents inform me that it is necessary to have recovery homes situated in safe residential neighborhoods, with at least two residents sharing a bedroom (more if the room can accommodate them) in order to treat those persons with substance use disorders who cannot stay abstinent otherwise. Increased lengths of stay, and maximizing the number of residents to what a dwelling can accommodate without creating a sense of overcrowding will create a therapeutic environment based on abstinence social support that results in therapeutic benefits necessary for treating a life-threatening, mental disorder. I know of no empirical basis to support the claim that having fewer residents in a recovery home promotes therapeutic benefits, and I have never heard of any recovery home consisting of only two residents (with/without a staff member). If anything, such limits are contraindicated according to the scientific literature.

I reserve the right to supplement this report based upon disclosure of additional facts and information in this case.

Signed: _____          Date: 2/16/'21
John M. Majer, Ph.D.

**Data used to inform my opinions:**

Aamodt, M. G., & Chiglinksy, M. (1989). A meta-analytic review of the effects of residential homes on neighborhood property values and crime rates. *Journal of Police and Criminal Psychology, 5,* 20-24.

Aidala, A. (2006). Inequality and HIV: The role of housing. *Psychology and AIDS Exchange, 34,* 1-8.

Aidala, A, Cross, J., Stall, R., Sumartojo, E., Harre, D (2005). Housing status and HIV risk behaviors: Implications for prevention and policy. *AIDS & Behavior, 9,* 251-265.

Belyaev-Glantsman, O., Jason. L. A., Ferrari, J. R. (2009). The relationship of gender and ethnicity to employment among adults residing in communal-living recovery homes. *Journal of Groups in Addiction & Recovery, 4,* 92-99. doi: 10.1080/15560350802712462.

Brereton, K. L., Alvarez, J., Jason, L. A., Stevens, E. B., Dyson, V. B., & NcNcilly, C. (2014). Reciprocal responsibility and social support among women in substance use recovery. *International Journal of Self-Help & Self-Care, 8,* 239-257. doi: 10.2190/SH.8.2.f.

Buchanan, A. S., & Latkin, C. A. (2008). Drug use in the social networks of heroin and cocaine users before and after drug cessation. *Drug and Alcohol Dependence, 96*, 286-289. doi:10.1016/j.drugalcdep.2008.03.008

Chavira, D. & Jason, L. A. (2017). The impact of limited housing opportunities for formerly incarcerated people in the context of addiction recovery. *Journal of Addictive Therapy, 1*, 2. PMCID: PMC5507072.

Cook, J. R. (1997). Neighbors' perceptions of group homes. *Community Mental Health Journal, 33*, 287-299.

Corey, G. (1990). *Theory and practice of group counseling (3rd ed)*. Brooks/Cole: Pacific Grove, CA.

Gale, C., Ng, C. F., Rosenblood, L. (1988). Neighborhood attitudes toward group homes for persons with mental handicaps. *Mental Retardation & Learning Disability Bulletin, 16*, 7-26.

Gomez, D., Jason, L. A., Contreras, R., DiGangi, J., & Ferrari, J. R. (2014). Vocational training and employment attainment among substance abuse recoverying individuals within a communal living environment. *Therapeutic Communities, 35*, 42-47. doi:10.1108/TC-03-2014-0008.

Green, C. A. (2006). Gender and use of substance abuse treatment services. *Alcohol Research & Health, 29*, 55-62.

Harvey, R., Mortensen, J., Aase, D., Ferrari, J. R., & Jason, L. A. (2013). Factors affecting the sustainability of self-run recovery homes in the United States. *International Journal of Self Help Care, 7*, 99-109. doi:10.2190/SH.7.1.g.

Holtgrave, D. R., Briddell, K., Little, E., Bendixen, A. V., Hooper, M., Kidder, D. P., et al. (2007). Cost and threshold analysis of housing as an HIV prevention intervention. *AIDS and Behavior, 11*, doi: 10.1007/s10461-007-9274-z.

Jason, L. A., Davis, M. I., Ferrari, J. R., & Anderson, E. (2007). The need for substance abuse after-care: longitudinal analysis of Oxford House. *Addictive Behaviors, 32*, 803-818. doi: 10.1016/j.addbeh.2006.06.014

Jason, L. A., Groh, D. R., Durocher, M., Alvarez, J., Aase, D. M., & Ferrari, J. R. (2008). Counteracting "Not in My Backyard": The positive effects of greater occupancy within mutual-help recovery homes. *Journal of Community Psychology, 36*, 947–958.

Jason, L. A., Olson, B. D., Ferrari, J. R., & Lo Sasso, A. T. (2006). Communal housing settings enhance substance abuse recovery. *American Journal of Public Health, 91*, 1727-1729.

Jason, L. A., Olson, B. D., Ferrari, J. R., Majer, J. M., Alvarez, J., & Stout, J. (2007). Moderators

14

of a randomized longitudinal outcomes study of substance abuse communal housing. *Addiction, 102,* 1114–1121.

Jason, L. A., Roberts, K., & Olson, B. D. (2005). Attitudes toward recovery homes and residents: Does proximity make a difference. *Journal of Community Psychology, 33,* 529-535.

Jason, L. A., Schober, D., & Olson, B. D. (2008). Community involvement among residents of second-order change recovery homes. *Australian Community Psychologist, 20,* 73–83.

Jason, L. A., & Stevens, E. (2017). The reliability and reciprocity of a social network measure. *Alcoholism Treatment Quarterly, 35,* 317-327. doi:10.1080/07347324.2017.1355220.

Jason, L.A., Stevens E., Ferrari, J.R., Thompson, E., Legler, R. (2012). Social networks among residents in recovery homes. *Advances in Psychology Study, 1,* 4-12.

Jason, L. A., Stevens, E. B., Light, J. M., & Doogan, N. J. (2019). An empirically-based theory of relationships among social embeddedness, economic viability, learned recovery skills, and perceived quality of life in recovery homes. *Alcoholism Treatment Quarterly.* Online: doi: 10.1080/07347324.2019.1633977

Jason, L. A., Wiedbusch, E., Bobak, T. J., & Taullahu, D. (under review). Estimating the number of substance use disorder recovery residences in the United States. Manuscript submitted for publication.

Kim S., & Crutchfield C. (2004). An evaluation of substance abuse aftercare program for homeless women with children using confounding variable-control design. *Journal of Drug Education, 34,* 213-233. Retrieved from http://www.baywood.com/journals/previewjournals.asp?id=0047-2379.

Litt, M. D., Kadden, R. M., Kabela-Cormier, E., & Petry, N. M. (2009). Changing network support for drinking: Network support project 2-year follow-up. *Journal of Consulting and Clinical Psychology, 77,* 229-242. doi:10.1037/a0015252

Majer, J. M., Callahan, S., Stevick, K., & Jason, L. A. (2016). Social influences of abstinence self-efficacy among justice involved persons. *Journal of Social Work Practice in the Addictions, 16,* 252-265. doi: 10.1080/1533256X.2016.1200054

Majer, J. M., Glantsman, O., Palmer, J., & Jason, L. A. (2015) Predictors of abstinence self-efficacy: Examining the roles of HIV-risk sexual behavior and incarceration histories among ex-offenders. Journal of Social Service Research, 41, 39-48. doi: 10.1080/01488376.2014.935559

Majer, J. M., Jason, L. A., Aase, D. M., Droege, J. R., & Ferrari, J. R. (2013). Categorical 12-step involvement and continuous abstinence at two-years. *Journal of Substance Abuse Treatment, 44,* 46-51. doi:10.1016/j.jsat.2012.03.001

15

Majer, J. M., Jason, L. A., Ferrari, J. R., Olson, B. D., & North, C. S. (2003). Is self-mastery always a helpful resource? Coping with paradoxical findings in relation to optimism and abstinence self-efficacy. *American Journal of Drug and Alcohol Abuse, 29, 385-400.* doi: 10.1081/ADA-120020520

Majer, J. M., Jason, L. A., Ferrari, J. R., Venable, L. B. & Olson, B. D. (2002). Social support and self-efficacy for abstinence: Is peer identification an issue? Journal of Substance Abuse Treatment, 23, 209-215.

Majer, J. M., Jason, L. A., & Olson, B. D. (2004). Optimism, abstinence self-efficacy, and self-mastery: A comparative analysis of cognitive resources. *Assessment, 11, 57-63.* doi: 10.1177/1073191103257139

Majer, J. M., Komer, A. C., & Jason, L. A. (2015). Psychiatric severity and HIV-risk sexual behaviors among persons with substance use disorders. Journal of Dual Diagnosis, 11, 3-11. doi: 10.1080/15504263.2014.990802.

Mandell, K., & Werner, D. (2008). *Guidance to states: Treatment standards for women with substance use disorders.* The National Association of State Alcohol and Drug Abuse Directors Retrieved from http://www.nasadad.org/resource.php?base_id=1482

McConkey, R., Walsh, P. N., & Conneally, S. (1993). Neighbours' reactions to community services: Contrasts before and after services open in their locality. *Mental Handicap Research, 6,* 131-141.

National Alliance for Recovery Residences (NARR) (2011). *Recovery Residence Quality Standards.*

National Alliance for Recovery Residences (NARR) (2015). *Recovery Residence Quality Standards.* St. Paul; MN. Retrieved from: https://narronline.org/wp-content/uploads/2015/10/National-Recovery-Residence-Quality-Standards-Oct-7-2015.pdf

National Institute on Drug Abuse (NIDA). (2018). *Principles of Drug Addiction Treatment: A Research-Based Guide.* Retrieved from https://www.drugabuse.gov/publications/principles-drug-addiction-treatment-research-based-guide-third-edition/principles-effective-treatment.

Polcin D. L, Korcha R., Bond J., & Galloway G. (2010). What did we learn from our study on sober living house and where do we go from here? *Journal of Psychoactive Drugs, 42,* 425-433. Retrieved from http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3057870. [PubMed: 21305907]

Rockett, I. R., Putnam, S. L., Jia, H., Chang, C. F., & Smith, G. S. (2005). Unmet substance abuse treatment need, health service utilization, and cost: A population-based emergency department study. *Annals of Emergency Medicine, 45,* 118-127.

16

Ryan, C., Coyne, A. (1985). Effects of group homes on neighborhood property values. *Mental Retardation, 23*, 241-245.

Substance Abuse and Mental Health Services Administration (SAMHSA, 2020). *Affordable Housing Models and Recovery*. Rockville; MD. Retrieved from https://www.samhsa.gov/homelessness-programs-resources/hpr-resources/affording-housing-models-recovery

Substance Abuse and Mental Health Services Administration (SAMHSA; 2007). *The NSDUH Report: Substance Use Treatment among Women of Childrearing Age*. Rockville, MD.

SAMHSA (2004). DHHS Publication No. SMA 04–3964, NSDUH Series H-25. Rockville, MD. *Results from the 2003 National Survey on Drug Use and Health: National findings*.

Stein, J. A., Dixon, E. L., & Nyamathi, A. M. (2008). Effects of psychosocial and situational variables on substance abuse among homeless adults. *Psychology of Addictive Behaviors, 22*, 410-416. Doi: 10.1037/0893-164X.22.3.410.

Wahl, O. (1993). Community impact of group homes for mentally ill adults. *Community Mental Health Journal, 29*, 247-259.

Zywiak, W. H., Neighbors, C. J., Martin, R. A., Johnson, J. E., Eaton,  C. A., & Rohsenow, D. J. (2009). The Important People Drug and Alcohol interview: Psychometric properties, predictive validity, and implications for treatment. *Journal of Substance Abuse Treatment, 36*, 321-330. doi: 10.1016/j.jsat.2008.08.001