## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| LAKE-GEAUGA RECOVERY CENTERS, INC., *et al.*, | ) ) | Case No. 1:20-cv-02405 |
| | ) | Judge J. Philip Calabrese |
| Plaintiffs, | ) ) | |
| | ) | Magistrate Judge |
| v. | ) | William H. Baughman, Jr. |
| | ) | |
| MUNSON TOWNSHIP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiffs Lake-Geauga Recovery Centers, Inc. and Fair Housing Resources Center, Inc. filed suit against Munson Township, the members of the Township's Board of Zoning Appeals, and its zoning inspector alleging that Defendants apply local zoning laws to discriminate in violation of federal and State laws against the clientele of the former, who as relevant here are women in recovery from drug and/or alcohol addiction. For their part, Defendants maintain they are merely enforcing facially neutral zoning laws in a non-discriminatory fashion. In addition to money damages, Plaintiffs seek a preliminary injunction under Rule 65(a) so that they may operate a sober-living residence in Munson Township.

Following briefing, the Court held a hearing on Plaintiffs' motion for a preliminary injunction on March 9 and 10, 2021. For the reasons that follow, the Court GRANTS IN PART Plaintiffs' motion and makes the following findings and orders pursuant to Rule 65(a) and Rule 65(d)(1) and (2).

## FINDINGS OF RELEVANT FACTS

Plaintiff Lake-Geauga Recovery Centers, Inc. provides a full range of services to people recovering from drug and alcohol addiction. (ECF No. 1, ¶ 2, PageID #2; *id.*, ¶ 22, PageID #6; *see also* Ex. 27.) Lake-Geauga's services include early intervention, education, outpatient treatment, group counseling, and residential treatment. (Ex. 27.) According to Melanie Blasko, president and chief executive officer of Lake-Geauga Recovery Centers, the organization's mission is to provide "lifelong recovery from addiction through education, prevention and treatment, regardless of ability to pay." (ECF No. 30, PageID #831.)

In September 2019, Lake-Geauga Recovery Centers purchased a four-bedroom house, known as Twelve Meadows, in Munson Township in Geauga County, Ohio. (ECF No. 1., ¶ 5, PageID #3.) Lake-Geauga bought this particular house because of the open floor plan, large bedrooms, and its one-and-a-half-acre parcel, which Lake-Geauga finds conducive to recovery as those with addiction transition from treatment programs to daily life. (ECF No. 30, PageID #843–44, 894.) The organization intends to use the house to provide a sober-living facility for five women who are residents of Lake or Geauga counties upon their completion of a thirty-day primary treatment program. (ECF No. 1., ¶ 5, PageID #3; *see also id.*, ¶¶ 26 & 27, PageID #7; *id.*, ¶ 33, PageID #9.) In addition, a house manager lives at the residence. (*Id.*, ¶ 5, PageID #3.) The house manager is also a person in recovery. (ECF No. 30, PageID #802.)

At the preliminary injunction hearing, the evidence showed that recovery housing is "effective in producing positive outcomes for persons with substance use

disorders." (ECF No. 30, PageID #802.)  Indeed, Defendants do not dispute that Lake-Geauga Recovery Centers does important work and does it well.  (ECF No. 30, PageID #880, 912.)  Beyond that, the evidence provided an overview of the context in which organizations provide recovery and addiction services.  In particular, the National Alliance of Recovery Residences, a national organization that seeks to increase access to recovery housing for people with substance use disorders, recognizes four levels of support for recovery housing.  (*Id.*, PageID #776.)  Residents in a Level II recovery home, like Twelve Meadows, focus on learning to live in long-term recovery, and recovery housing is a "critical component" of the continuum of care persons recovering from addiction receive, which can increase their odds of sustaining recovery over the long term.  (*Id.*, PageID #779.)

Lake-Geauga Recovery Centers receives funding from, among other sources, Medicaid and the Geauga Board of Mental Health & Recovery Services, which applied for a grant from the Ohio Department of Mental Health and Addiction Services for Twelve Meadows.  (ECF No. 1, ¶ 28, PageID #8; *id.*, ¶ 40, PageID #11.)  The grant will reimburse Lake-Geauga Recovery Centers in the amount of $334,561 for expenses and operating costs related to Twelve Meadows.  (ECF No. 16, PageID #183.)  Receipt of the funds may be tied to or contingent to some degree on Lake-Geauga Recovery Centers' compliance with grant funding conditions, including providing housing for five recovering adult women at Twelve Meadows.  (*Id.*)  However, the evidence at the hearing was not entirely clear on this point.  (*See* ECF No. 31, PageID #1067–68.)  During the preliminary injunction hearing, Ms. Blasko

testified that Lake-Geauga Recovery Centers purchased the property for Twelve Meadows out of the organization's reserve funds and that grants may replenish those funds.  (ECF No. 30, PageID #845, 883.)

Danielle Gray, Executive Director of Ohio Recovery Housing, the Ohio affiliate for the National Alliance of Recovery Residences, testified that Twelve Meadows received certification as a Level II recovery house through 2022 and that she participated in that certification effort.  (*Id.*, PageID #774, 788.)  Although certified, Twelve Meadows does not have a license from the State of Ohio to operate as a residential facility for persons with disabilities.  (ECF No. 19-3; PageID #321.)

### A.    Background on Munson Township's Zoning Resolution

Twelve Meadows sits within an area of Munson Township zoned R-1, for use as single-family homes.  (ECF No. 1, ¶ 44, PageID #12.)  Under Section 401 of the Munson Township Zoning Resolution, that classification aims for a density of one residential lot per two-and-a-half acres.  (ECF No. 19-1, PageID #251.)  As relevant here, an R-1 classification permits (a) one single-family dwelling, (b) a licensed residential facility as defined in Section 5123.19 of the Ohio Revised Code (relating to developmental disabilities), which allows three to sixteen adults, and (c) a type-B family day care and home as defined elsewhere in the zoning resolution.  (*Id.*)

Additionally, Munson Township defines a family for zoning purposes as two adults "though not related by blood, adoption, guardianship or marriage."  (*Id.*, ¶ 46, PageID #12.)  The applicable zoning law defines a family as:

> one (1) or more persons related by blood, adoption, guardianship or
> marriage, living and cooking together as a single housekeeping unit,

4

exclusive of live-in hired employees. A number of adult persons not exceeding two (2) living and cooking together as a single housekeeping unit though not related by blood, adoption, guardianship or marriage shall also be deemed to constitute a family, exclusive of live-in hired employees. A family shall not include any society, club, fraternity, sorority, association, lodge, federation, coterie, or a like organization; any group of individuals whose association is temporary or seasonal in nature; and any group of individuals who are in a group living arrangement as a result of criminal offenses.

(ECF 19-1, PageID #250.)  Under this definition of family, Twelve Meadows may not have more than two unrelated adults living there, plus the live-in house manager. (ECF No. 31, PageID #1026-27.)  This limitation forms the crux of the dispute between the parties.

### B.  Plaintiffs' Efforts to Obtain an Accommodation

In October 2019, after purchasing Twelve Meadows, Ms. Blasko received a letter from James Herringshaw, the zoning inspector for Munson Township, advising that the organization needed to apply for a zoning certificate.  (ECF No. 1., ¶ 58, PageID #15; Ex. 9.)

On November 1, 2019, Ms. Blasko called Mr. Herringshaw regarding the letter. (ECF No. 19-3, PageID #320.)  After a meeting and some additional communication back and forth (*see, e.g.*, ECF No. 30, PageID #946; Ex. 10), Lake-Geauga Recovery Centers applied on December 23, 2019 for a zoning certificate for Twelve Meadows (ECF No. 1., ¶ 62, PageID #16; Ex. 11).  Mr. Herringshaw denied the application the same day (though he dated it later).  (*Id.*, ¶ 63, PageID #16; Ex. 12; ECF No. 30, PageID #996.)  On Mr. Herringshaw's advice, Ms. Blasko appealed the denial by seeking a variance, also on December 23, 2019.  (*Id.*, ¶ 67, PageID #17; Ex. 13; ECF

No. 30, PageID #865, 867.)  She did so on a form titled both notice of appeal and variance request, which Mr. Herringshaw handed to Ms. Blasko.  (Ex. 13; ECF No. 30, PageID #868.)

As Munson Township and Lake-Geauga Recovery Centers sparred over the zoning for Twelve Meadows, Plaintiff Fair Housing Resource Center, Inc. got involved in the dispute.  (*Id.*, ¶ 83, PageID #21.)  Fair Housing Resource Center engages in education and advocacy to promote fair housing in Lake, Geauga, and Ashtabula counties.  (*Id.*, ¶ 4, PageID #3; ECF No. 30, PageID #738–39, 755.)  The organization opened an investigation.  (Id., ¶ 85, PageID #21.)  It also provided assistance and resources to Lake-Geauga Recovery Centers to assist in addressing issues that might arise in a community forum.  (*Id.*, ¶ 87; ECF No. 30, PageID #746–47.)

## C. Proceedings at the Board of Zoning Appeals

Following a public hearing on the request for a zoning variance for Twelve Meadows in July 2020, the Munson Township Board of Zoning Appeals voted unanimously to deny Lake-Geauga Recovery Centers a variance to operate Twelve Meadows.  (*Id.*, ¶ 99, PageID #25.)  Fair Housing Resource Center participated in the hearing.  (*Id.*, ¶ 95, PageID #23; ECF No. 30, PageID #747.)

At the request of the parties (ECF No. 31, PageID #1015), the Court reviewed a video of the hearing, which lasted more than four hours.  During the hearing, several residents of Munson Township expressed opposition to Twelve Meadows operating in their community.  They raised concerns regarding sewer runoff, traffic, and property values, as well as safety based on stereotypes of people recovering from

drug or alcohol addiction.  After the Board heard from residents, they took a brief recess to confer privately among themselves to decide whether they would grant the variance.  Plaintiffs argue that this private meeting violated Ohio's Open Meetings Act, though they have not asserted a separate legal claim to that effect in this proceeding—and the Court expresses no opinion on that argument.  (ECF No. 16; PageID #193.)

The parties contend that the other side misbehaved at the hearing—each side claims the other engaged in aggressive exchanges marked by frequent interruptions.  (*See, e.g.*, ECF No. 30, PageID #748–49, 872–73, 891.)  Based on its review of the video of the hearing, the Court finds that Dennis Pilawa, the Chair of the Board, and Patricia Kidd, the executive director of Fair Housing Resource Center, engaged in a heated exchange, with each interrupting the other and demonstrating frustration with the variance process.  Further, tensions ran high among members of the public who expressed opposition to the variance.  Beyond that, however, and in the context of a public forum on a matter of local controversy, the Court finds the parties' respective representations and contentions about the behavior of the other side excessive.  Notably, in denying Plaintiffs' request for an accommodation to allow Twelve Meadows to operate with five adult female residents as intended, Mr. Pilawa expressed his belief that the Board was being asked to find that the Township's zoning resolution was discriminatory on its face, which, in the Board's view, was the province of the courts and beyond the Board's authority.

7

In the run up to the hearing, yard signs began appearing in Munson Township opposing Twelve Meadows. (Ex. 1, 00045, 00046 & 00047.) In addition to appearing in the Township, a large sign opposing a variance was put up directly across from Twelve Meadows. (*Id.*; ECF No. 30, PageID #814.) Further, a neighbor placed a video surveillance camera directed at Twelve Meadows. (Ex. 1, 00048; ECF No. 30, PageID #814.)

Since the hearing, Lake-Geauga Recovery Services has used Twelve Meadows consistent with the applicable zoning provisions. For a time, the organization had two adult women living there along with the live-in house manager. (ECF No. 30, PageID #839.) Within the last two months, however, the women have moved out, leaving only the house manager. (*Id.*, PageID #822.) Ms. Blasko explained that prospective residents do not want to live at Twelve Meadows because they feel unwelcome in Munson Township and that word has spread in the recovery community of the Township's handling of the situation. (*Id.*, PageID #838, 881.) Based on her decades of experience working with local communities in providing addiction and recovery services, Ms. Blasko testified that this problematic reputation will abate over time as Twelve Meadows operates successfully without incident. (*Id.*, PageID #895–96; *see also id.*, PageID #856–60.) The Court finds that testimony reliable and credible.

## STATEMENT OF THE CASE

Plaintiffs filed suit against Munson Township, the five members of its board of zoning appeals, and its zoning inspector. (ECF No. 1., ¶¶ 15-21, PageID #5–6.)

Broadly, Plaintiffs maintain that federal and State law require Defendants to allow Lake-Geauga Recovery Centers to operate Twelve Meadows as a sober living facility notwithstanding its local zoning laws.  (*Id.*, ¶ 7, PageID #4.)  Specifically, Plaintiffs assert claims under:  (1) the Fair Housing Act; (2) the Americans with Disabilities Act; (3) the Rehabilitation Act; and (4) Chapter 4112 of the Ohio Revised Code. Plaintiffs seek a preliminary injunction, which Defendants oppose.  (*Id.*, ¶¶ 111–34; PageID #27–32.)

The Court held a hearing on the motion for a preliminary injunction on March 9, 2021.  (Minutes of Proceedings, Mar. 10, 2021; ECF No. 30.)  The Court heard testimony from the following fact witnesses: James Gillette, Patricia Kidd, Rosemary Scribben, Melanie Blasko, and Jim Herringshaw.  Danielle Gray testified as an expert for Plaintiffs.  Dr. Kevin Trangle testified as an expert witness for Defendants.  The Court also admitted the testimony of Dr. John Majer, which was previously recorded and submitted to the Court.  (*See* ECF No. 28.)

Further, the Court admitted Plaintiffs' Exhibits 2 through 31, including Exhibit 30A.  The exhibits included excerpts of the Munson Township Zoning Resolution, correspondence between the parties, the applications and appeals Plaintiffs filed with Munson Township, expert reports, and the transcript of the hearing of the Munson Township Board of Zoning Appeals from July 29, 2020 (which was submitted as part of Exhibit 1).  As mentioned, the Court also reviewed the video of the hearing at the board of zoning appeals.  With respect to Plaintiffs' Exhibit 1, the Court considered pages 39 through 48, which were discussed during the

testimony.  Finally, on March 10, 2021, the Court heard closing arguments from counsel.  (Minutes of Proceedings, Mar. 10, 2021; ECF No. 31.)

## JURISDICTION

Because of the limited jurisdiction of the federal courts, the Court has an independent obligation to examine its own jurisdiction to ensure it has the authority to proceed.  *See, e.g.*, *Nikolao v. Lyon*, 875 F.3d 310, 315 (6th Cir. 2017) (citations and quotations omitted).  Standing presents a "threshold determinant[] of the propriety of judicial intervention."  *Warth v. Seldin*, 422 U.S. 490, 517–18 (1975).  An organization may have standing to assert claims directly on its own behalf or as the representative of its members.  *Id.* at 511.

## I.    Article III Standing

"[A]t an irreducible minimum, Article III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant" and that "the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision."  *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 542 (1986) (cleaned up).  As the parties invoking federal jurisdiction, Plaintiffs have the burden of showing that they have standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

In this case, Lake-Geauga Recovery Centers claims it will not receive the $334,561 in grant money if it cannot provide housing for five women at Twelve Meadows.  (ECF No. 16, PageID #183.)  At the hearing, the evidence on this point

was more equivocal.  (ECF No. 30, PageID #845, 883.)  Given that testimony, the Court does not base its determination of standing for Lake-Geauga Recovery Services on that financial consideration.  But the organization has sustained some financial loss (unrelated to the grant) that suffices to confer standing on its own behalf.

Also, the organization argues that, as a result of Defendants' actions, it has had to forego operating Twelve Meadows as a sober living home for five women as planned, which has frustrated its mission to provide support to persons recovering from addiction.  (ECF No. 1, PageID #25; ECF No. 30, PageID #822, 839.)  More important than the financial consequences to it, Lake-Geauga Recovery Centers claims the loss to "five recovering women of a solid and structured support system to maintain sobriety" if it cannot operate Twelve Meadows constitutes a redressable injury.  (ECF No. 16, PageID #183–84.)  These injuries suffice to confer representational standing on Lake-Geauga Recovery Centers under Article III.

Turning to the Fair Housing Resource Center, the organization claims injury from the investigation it opened into the dispute between Lake-Geauga Recovery Centers and Munson Township and the pre-litigation assistance it provided to Lake-Geauga Recovery Centers to address issues that might arise at a community forum.  (ECF No. 1, ¶¶ 85, 87, PageID #21.)  Additionally, the organization avers that, absent Defendants' allegedly discriminatory conduct, it would have devoted its scarce time and resources to other activities.  (*Id*., ¶ 105, 108, PageID #26.)

In many respects, this claimed injury has the feel of manufactured standing—that Fair Housing Resource Center has standing because, consistent with its mission,

11

it wishes to litigate this dispute along with Lake-Geauga Recovery Centers, the real party in interest.  But the Sixth Circuit follows a more forgiving path when assessing standing.  For a housing organization at least, costs relating to pre-litigation investigation and the sorts of activities in which Fair Housing Resource Center engaged can form the basis for standing.  *See Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 577 (6th Cir. 2013); *Fair Hous. Council, Inc. v. Village of Olde St. Andrews*, 210 F. App'x 469, 475 (6th Cir. 2006) (citations omitted).  Therefore, the Court concludes that Fair Housing Resource Center has standing.

## II.    Prudential Standing

Beyond the demands of Article III, prudential considerations may bar a person or entity from asserting claims on behalf of others.  *Warth*, 422 U.S. at 500–01.  "[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Id.* at 499 (citations omitted).  This doctrine serves to restrain the exercise of a federal court's jurisdiction where other institutions may have greater competence to address the questions presented and judicial intervention may not be necessary to protect individual rights.  *Id.* at 500.

Here, the Court determines that prudential considerations do not limit the exercise of its jurisdiction with respect to the claims Lake-Geauga Recovery Centers advances.  Again, the circumstances involving the Fair Housing Resource Center present a closer question.  Because of the broad mission of the Fair Housing Resource

Center and the frequency with which the organization participates in litigation, its claims have the feel of the sort of generalized grievances the prudential standing doctrine seeks to redress.  Given the approach the Sixth Circuit takes to standing more broadly, however, the Court determines that principles of prudential standing do not limit Fair Housing Resource Center's involvement in this case.

## ANALYSIS

When a party seeks a preliminary injunction, a district court balances the following factors:  (1) the movant's likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without an injunction; (3) whether the injunction would cause "substantial harm" to others; and (4) whether the public interest is served.  *See Wilson v. Williams*, 961 F.3d 829, 836 (6th Cir. 2020); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  As the movants, Plaintiffs bear "the burden of justifying such relief."  *Wilson*, 961 F.3d at 837 (citing *American Civ. Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015)).

## I.     Likelihood of Success on the Merits

The Court addresses the merits of each of Plaintiffs' claims to assess the likelihood of success on each.  Additionally, although cases interpreting and applying various fair housing statutes tend to analyze them together, the Court does not favor such an approach because each statute serves a different purpose and uses different language to effect its purpose.  Accordingly, the Court addresses the likelihood of

13

success on the merits of each statute in turn.  The Court does so mindful that the parties have preserved their right to a jury trial on the various claims at issue.

### I.A.   The Fair Housing Act

Under the Fair Housing Act, it is unlawful to discriminate in the terms and conditions of housing because of a handicap of any person residing in a dwelling or associated with such a person.  *See generally* 42 U.S.C. § 3604(f).  Under the Act, municipalities must make reasonable accommodations to those with handicaps in their municipal zoning practices.  *Id.* § 3604(f)(3)(B); *Howard v. City of Beavercreek*, 276 F.3d 802, 806 (6th Cir. 2002) (citations omitted).  Plaintiffs allege numerous violations of this statute and argue that Defendants' conduct discriminates against handicapped persons by effectively making Twelve Meadows unavailable to women as a sober-living environment as they live with addiction or by limiting the number of women the organization may serve at Twelve Meadows.

But the statute expressly excludes those struggling with addiction to illegal drugs.  The Fair Housing Act defines a handicap *not* to include "current, illegal use of or addiction to a controlled substance."  42 U.S.C. § 3602(h).  The residents of Twelve Meadows, as persons actively recovering from drug and/or alcohol addiction, likely fall within this exclusion from the Fair Housing Act.  In their various briefs, Plaintiffs cite no controlling authority that the Fair Housing Act applies, notwithstanding the express statutory exclusion Congress enacted.  In the Court's view, the authorities on which Plaintiffs rely argument either conflate the analysis under the Fair Housing Act with the coverage of other statutes or fail at the task of

14

reading the plain language of the statute.  Therefore, the Court determines that Plaintiffs have not demonstrated a likelihood of success on the merits of their claims under the Fair Housing Act.

### I.B.    The Rehabilitation Act

Plaintiffs claim that Defendants, as recipients of federal funding, discriminated against them in violation Section 504 of the Rehabilitation Act.    In relevant part, the statute provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).  Under the statute, the term "program or activity" means

> (A)    a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
>
> (B)    the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government.

29 U.S.C. § 794(b)(1).

Plaintiffs maintain that Munson Township is a sub-recipient of a federal grant from the Environmental Protection Agency to the State of Ohio, subjecting the political subdivision to Section 504's non-discrimination provision.  (ECF No. 16, PageID #206.)   On the face of the statute, however, the prohibition against discrimination in Section 504 extends to participation in, denial of benefits of, discrimination "under any program or activity."  Use of the word "under" limits the

reach of the Rehabilitation Act.  In other words, to avail themselves of the statute, Plaintiffs would have to show that the alleged disability discrimination at issue arises in connection with the federal grant Munson Township received.  Similarly, subsections (A) and (B) confirm that Section 504 reaches only the particular program receiving federal funds.  No evidence before the Court ties Twelve Meadows to any particular federal grant funds Section 504 covers.

Without any nexus between the grant Plaintiffs identify and the discrimination they allege, Plaintiffs effectively argue that taking any amount of federal money opens up all of a local government's programs and activities to Section 504 of the Rehabilitation Act.  This reading of the statute sweeps too far.  It also ignores Sixth Circuit precedent, under which the *relevant* program must receive federal funds to fall within Section 504.  *Doherty v. Southern Coll. of Optometry*, 862 F.2d 570, 573 (6th Cir. 1988).  Because Plaintiffs fail to make any showing tying federal assistance to the particular discrimination they allege, they are not likely to succeed on this claim.

### I.C.    The Americans with Disabilities Act

Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132. Under the ADA, a "disability" means "a physical or mental impairment that substantially limits one or more of the major life activities."  *Id.* § 12102(1)(A).

16

Further, drug addiction and alcoholism are "impairments" under the ADA.  *See MX Group, Inc.,* 292 F.3d 326, 336 (6th Cir. 2002) (citing *Regional Econ. Cmty. Action Program, Inc. v. City of Middletown*, 281 F.3d 333, 344 (2d Cir. 2002)).  And the text of the statute contemplates that the ADA protects individuals participating in drug rehabilitation programs, who are no longer using drugs.  42 U.S.C. § 12210(b).  Plaintiffs maintain that Defendants violated the ADA by intentionally discriminating and by failing to make reasonable accommodations for their clientele, whom the ADA defines as disabled.  The Court considers each theory of liability in turn.

### I.C.1. Intentional Discrimination

To establish a prima facie case of intentional discrimination under Title II of the ADA, a plaintiff must show that:  (1) she has a disability; (2) she is otherwise qualified; and (3) she was excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of her disability.  *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015) (citation omitted).  That is, the plaintiff must show that the defendant took action because of the plaintiff's disability—in other words, the "[p]laintiff must present evidence that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive."  *Id.*  Once a plaintiff makes a prima facie case of discrimination, the burden shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for its challenged action.  *Id.*  If the defendant demonstrates such a reason, the

17

plaintiff must then present evidence allowing a jury to find that the defendant's explanation is a pretext for unlawful discrimination.  *Id.*

### I.C.1.a. Prima Facie Case

Plaintiffs claim Defendants intentionally discriminated against them in violation of the ADA by (1) enforcing the zoning resolution's definition of "family," which Plaintiffs argue is discriminatory on its face because it does not permit more than two unrelated adults with a disability to live together in the R-1 District; (2) requiring Lake-Geauga Recovery Centers to obtain a zoning certificate and then denying the application for the certificate; (3) instructing Lake-Geauga Recovery Centers to file a "Notice of Appeal Variance Request" form instead of instructing it to file a different form appealing the decision of the zoning inspector; (4) subjecting Lake-Geauga Recovery Centers to a "discriminatory and unnecessary" hearing before the board of zoning appeals; (5) ignoring Lake-Geauga Recovery Centers' request to overturn the interpretation of the zoning resolution the zoning inspector, Mr. Herringshaw; (6) refusing to consider Lake-Geauga Recovery Centers' request that it treat the hearing before the board of zoning appeals as an appeal of Mr. Herringshaw's decision to refuse a reasonable accommodation; and (7) holding two illegal public meetings in violation of Ohio's Open Meetings Act.  (ECF No. 16, PageID #204–05.)

On Plaintiffs' first argument (ECF No. 16, PageID #201; ECF No. 22, PageID #399), Defendants counter that the zoning resolution only states that no more than two unrelated adults may live together and that the zoning resolution does not

18

mention disability at all (ECF No. 19, PageID #234).  Therefore, Defendants argue, the zoning resolution does not discriminate on its face.  The Court agrees.  The zoning resolution's definition of "family" precludes groups of three or more unrelated adults from living together—regardless of whether they include those with disabilities or not. (ECF No. 19-1, PageID #250.)  Federal courts have found that zoning ordinances which do not specifically exclude protected classes of citizens are not discriminatory on their face.  *See 431 E. Palisade Ave. Real Estate, LLC v. City of Englewood*, 977 F.3d 277, 285 (3d Cir. 2020).

As for Plaintiffs' other arguments (ECF No. 16, PageID #199), Defendants point out that they took neutral, generally applicable procedural steps to process and handle Plaintiffs' zoning requests, as they have in other cases not involving those the law treats as disabled.  (ECF No. 19, PageID #236.)  While the record of the hearing in July 2020 reveals that some Munson Township residents expressed opposition to having persons with disabilities reside at Twelve Meadows, Plaintiffs point to no such statements or behavior on the part of Defendants.  That is, based on the evidence and the record before the Court, Plaintiffs are unlikely to prevail on their claim of facial discrimination because they will likely not carry their burden of establishing discrimination because of disability, as they must as part of their prima facie case.

### I.C.1.b. Non-Discriminatory Justification and Pretext

Because Plaintiffs fail to show they are likely to succeed on threshold elements of their prima facie case to support their discrimination claim, the Court need not proceed through the balance of the analysis.  However, the Court briefly addresses

one other aspect of Plaintiffs' evidence and argument. While the record supports Plaintiffs' contention that several, perhaps many, Munson Township residents voiced opposition to Twelve Meadows, there is no evidence that members of the board of zoning appeals expressed animus in making their decision or harbored any of their own. Nor does the record contain evidence that any other official acted on any such animus. In the absence of such evidence, the Court determines that Plaintiffs have not met their burden of demonstrating they are likely to succeed in showing that Defendants intentionally discriminated against them in violation of the ADA.

### I.C.2. Reasonable Accommodation

Plaintiffs also argue Defendants violated the ADA by failing to make reasonable accommodations in the Munson Township zoning resolution that were necessary to avoid discrimination against persons with disabilities. (ECF No. 16, PageID #200–01.) Under the regulations interpreting Title II, "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modification is necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity." 28 C.F.R. § 35.130(b)(7). Therefore, an accommodation on the part of the entity only needs to be "reasonable." *Johnson v. City of Saline*, 151 F.3d 564, 571 (6th Cir. 1998).

"[A]n accommodation is reasonable unless it requires 'a fundamental alteration in the nature of a program' or imposes 'undue financial and administrative burdens.'" *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996) (quoting

*Southeastern Community College v. Davis*, 442 U.S. 397, 410, 412 (1979)). Additionally, cost to the defendant and benefit to the plaintiff merit consideration. *Id.* (citing *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995)). Overall, reasonableness balances the needs of the parties. *United States v. Village of Palatine, Ill.*, 37 F.3d 1230, 1234 (7th Cir. 1994). "[A]t a minimum [proving necessity requires a] showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." *Id.* (quoting *Bronk*, 54 F.3d at 429.)

### I.C.2.a. Reasonable Accommodation

Plaintiffs argue that their requested accommodation—allowing up to five unrelated women living in the same home—is reasonable because it does not impose an undue financial or administrative burden on Munson Township. (ECF No. 16, PageID #201–02.) Courts, including the Sixth Circuit, accept that exceptions or variances to local zoning ordinances may be a reasonable accommodation. They articulate this principle most clearly in cases arising under the Fair Housing Act. *See, e.g.*, *Smith & Lee Assocs.*, 13 F.3d 920, 924 (6th Cir. 1993) (noting that courts have found that the reasonable accommodation provision in the Fair Housing Amendments Act applies to municipal zoning variance procedures); *see also Oxford House-Evergreen v. City of Plainfield*, 769 F. Supp. 1329, 1344 (D.N.J. 1991) (holding that, on a preliminary injunction motion, a municipality's refusal to grant zoning approval for congregate living home despite zoning for single-family residence likely violated the Fair Housing Act). Because courts frequently treat claims under the Fair

Housing Act and the ADA together, it is likely the Sixth Circuit would apply this same analysis to requests for accommodations under the ADA.  The Court, at least, has located no authority to the contrary.  Indeed, even as they argued that Plaintiffs' requested accommodation is neither reasonable nor necessary, Defendants conceded at the hearing that exceptions to zoning ordinances can be a reasonable accommodation.  (ECF No. 31, PageID #1036–37.)

Under Munson Township's zoning laws, five unrelated persons may live together in an R-1 zoning district if they do so in a licensed residential facility. Further, the record shows that until recently three unrelated people resided at Twelve Meadows, including two recovering from addiction and one house manager. It is doubtful that two additional residents at Twelve Meadows pose an undue financial, administrative, or resource burden to Munson Township, neighbors, or the surrounding community.  Based on these facts and the record before the Court, Plaintiffs are likely to prevail in carrying their burden that their proposed accommodation is reasonable.

### I.C.2.b. Necessary Accommodation

Plaintiffs also argue their requested accommodation is "necessary" to ensure that the prospective residents of Twelve Meadows "have the right to choose to live in single-family neighborhoods in Munson Township and are not excluded from the American mainstream."  (*Id.*, PageID #202.)  In response, Defendants point to the fact that Twelve Meadows is already home to two persons and argue that Plaintiffs have not met their burden of showing that the prospective residents of Twelve

Meadows may "only successfully recover if they reside within a Level II Recovery House, or that they may only successfully recover living with three other occupants as opposed to one other occupant."  (ECF No. 19, PageID #239.)

But Plaintiffs are not required to show that the prospective residents of Twelve Meadows must live with a particular number of other recovering addicts to meet the "necessary" requirement under Sixth Circuit law.  Rather, this element is satisfied where a plaintiff shows that "but for the accommodation, [the disabled person] likely will be denied an equal opportunity to enjoy the housing of their choice."  *Howard v. City of Beavercreek*, 276 F.3d 802, 806 (6th Cir. 2002) (analyzing necessity under the Fair Housing Act).  The record reflects that but for Plaintiffs' requested accommodation, prospective residents of Twelve Meadows will be denied an opportunity to enjoy the housing of their choice.

During the hearing, each side presented testimony and evidence regarding the necessity of Plaintiffs' requested accommodation under federal law.  In many respects, the parties' respective positions involve a battle of the experts.

i.

Plaintiffs rely on the testimony of Dr. John Majer.  Although he did not testify at the hearing, Plaintiffs submitted his testimony by video, which the Court reviewed. Dr. Majer is a licensed clinical psychologist with over 25 years of experience working with persons with mental health and addiction issues.  (ECF No. 25-1, PageID #567–71.)  Much if not all of his experience comes from so-called Oxford Houses, congregate living homes located in residential communities that provide sober living

23

and other recovery environments throughout the United States and Canada.  (ECF No. 25, PageID #508.)  In Dr. Majer's opinion, there is a particular need in society for "recovery house living" among women with substances abuse disorders.  (*Id*., PageID #494.)  He cited evidence "to support the notion that increases in the number of residents is necessary to achieve therapeutic outcomes in recovery homes" and that to achieve such benefits, Twelve Meadows "should be permitted to house 6 residents." (ECF No. 25-2, PageID #599.)

For their part, Defendants presented the testimony of Dr. Kevin Trangle, a licensed physician with a private medical practice in addiction medicine, among other things.  (ECF No. 30, PageID #899.)  He is board certified in occupational medicine and has experience working with various companies to establish drug-free workplace policies and procedures.  (*Id*., PageID #900–01.)  Also, he also owns a recovery house and previously served as the medical director of other recovery homes.  (*Id*., PageID #902.)  Dr. Trangle opined that, although he is a proponent of recovery housing in general, Twelve Meadows can be successful with only two individuals and a house manager residing there.  (*Id*., PageID #234.)  Dr. Trangle also testified that there is no "magic number" of residents that would make Twelve Meadows more or less successful in assisting people with substance abuse disorders.  (*Id*., PageID #916.)

On the whole, the Court discounts the competing testimony of both Dr. Majer and Dr. Trangle.  They are litigation experts, hired to give their respective opinions, so the Court takes the testimony of each with a grain of salt.  Further, neither were particularly familiar with Twelve Meadows.  In fact, there is no evidence either has

visited Twelve Meadows or done much to give opinions grounded in the particular facts and circumstances of this case beyond what the respective party who retained each preferred.

ii.

Additionally, Plaintiffs rely on the testimony of Danielle Gray.  Ms. Gray has a master's degree in public health, is certified in public health by the National Board of Public Health Examiners, and has served as the executive director of Ohio Recovery Housing since 2017, the Ohio affiliate of the National Alliance of Recovery Residences.  (*Id.*, PageID #764, 766.)  In her current role, Ms. Gray implements nationally recognized standards for recovery homes and with the Ohio Department of Mental Health and Addiction Services drafted the procedures and guidelines to implement those national standards in Ohio; occasionally, she advises in other States on those standards as well.  (*Id.*, PageID #766–67, 770.)  Further, she participated in certification of Twelve Meadows according to those standards.  (*Id.*, PageID #774.)

Based on her experience and knowledge of recovery resources throughout the State, Ms. Gray testified that "there is a need for recovery housing in the State of Ohio and Geauga County and Munson Township."  (*Id.*, PageID #781.)  Further, she opined that the proposed size for Twelve Meadows, a house manager and five adult women, was necessary.  (*Id.*, PageID #783.)  On cross-examination, while Ms. Gray acknowledged there are no hard and fast numbers for the size of facilities to improve the success rate for a sober-living residence like Twelve Meadows, she remained consistent that there are no such facilities in Ohio with just two residents.  (*Id.*,

25

PageID #785.)  In fact, in her professional experience, she has not seen a recovery residence with just two residents and a house manager.  (*Id.*)

Based on her knowledge and experience, the Court credits Ms. Gray's testimony above that of the other experts the parties proffered and finds it credible and persuasive.   Notwithstanding what may appear, at first blush, to be contradictions with the opinions of Dr. Trangle, his testimony endorses Plaintiffs' position in key respects.  First, Dr. Trangle acknowledged the importance of having as many people treated through recovery housing as possible.  (*Id.*, PageID #906.) Although Dr. Trangle testified that recovery housing is a small portion of the solution to addiction, and that Twelve Meadows alone will not solve the problem of treating persons in recovery, this argument has no bearing on the specific dispute.  Nor does it provide a permissible basis on which to deny an otherwise reasonable and necessary accommodation.

Second, Dr. Trangle testified that a larger facility will necessarily have more challenges (*id.*, PageID #244), but that testimony related to the size of some other Lake-Geauga recovery homes that house as many as 16 people (Ex. 27).  Despite that opinion, Dr. Trangle testified that Lake-Geauga Recovery Centers does a good job of providing a variety of treatment options.  (*Id.*, PageID #907.)  Overall, this opinion supports a facility of the size proposed for Twelve Meadows.

*     *     *

Taking the testimony of these competing experts together, Plaintiffs are likely to succeed on their claim that the requested accommodation is necessary.  Ms. Gray

26

testified that there is not just a general need, but one that is geographically particularized.  She provides this opinion based on her experience with recovery houses throughout Ohio (and other States) but also on her familiarity with the proposed service area and Twelve Meadows in particular.  Indeed, the record establishes that recovery houses of the size Defendants are prepared to allow under their zoning resolution do not appear to exist in the State of Ohio.

### I.D.    Section 4112.02(H) of the Ohio Revised Code

In addition to their federal causes of action, Plaintiffs bring a claim under Section 4112.02(H) of the Ohio Revised Code, alleging Defendants failed to provide Plaintiffs a reasonable accommodation under Ohio law.  "Disability," as used in Chapter 4112, means "a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment, or being regarded as having a physical or mental impairment."  Ohio Rev. Code § 4112.01(A)(15).  Under Ohio law, drug or alcohol addiction constitutes a "physical or mental impairment" qualifying as a disability.  Ohio Rev. Code §§ 4112.01(A)(13) & 4112.01(A)(16)(a)(iii).

When interpreting this statute, the Ohio Supreme Court looks to federal regulations and case law interpreting the ADA.  *City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St. 3d 569, 573, 1998-Ohio-410, 697 N.E.2d 204, 206.  Indeed, Defendants acknowledge that courts within the Sixth Circuit apply the same standard to reasonable accommodations claims made under the ADA and

Section 4112.02(H).  (ECF No. 19, PageID #238.)  Because Plaintiffs' claim under State law involves the same set of facts and circumstances that give rise to their reasonable accommodation claim under the ADA, the Court's analysis of this claim mirrors that under the ADA, and there is no reason to reach a different result regarding this claim under Ohio law.

## II.    **Irreparable Harm**

Plaintiffs argue they need not demonstrate irreparable harm because federal courts routinely presume irreparable harm upon a demonstration of likelihood of success on the merits in a housing and civil rights case such as this.  For this proposition, Plaintiffs rely on several cases from other Circuits.  (ECF No. 16, PageID #210.)  Many, but not all, of these claims involve claims of race discrimination under the Fair Housing Act.  *See, e.g.*, *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984).  Although other district courts within the Sixth Circuit have followed this line of cases, the Sixth Circuit has not adopted this presumption, and the Court declines to do so on the facts presented.

Further, Plaintiffs maintain that they need not show irreparable harm because the statutes at issue provide for injunctive relief and, in such circumstances, "irreparable injury need not be shown."  (ECF No. 16, PageID #16.)  For this proposition, Plaintiffs cite *Jordan v. Greater Dayton Premier Management*, 9 F. Supp. 3d 847, 862 (S.D. Ohio 2014), involving a claim of housing discrimination brought by a blind person under the Fair Housing Act, the ADA, and the Rehabilitation Act.  In turn, the *Jordan* Court relied on *Illinois Bell Telephone Co. v. Illinois Commerce*

*Commission*, 740 F.2d 566, 571 (7th Cir. 1984), where the court affirmed the issuance of an injunction enforcing compliance with an order of the Federal Communications Commission and allowing an intrastate rate increase to take effect. The Sixth Circuit has not adopted this approach to injunctions. *See United States v. Edward Rose & Sons*, 384 F.3d 258, 264 (6th Cir. 2004). Therefore, the Court will not presume irreparable harm based on the statutory availability of injunctive relief.

For irreparable injury, Plaintiffs point in briefing to Lake-Geauga Recovery Centers' potential loss of a significant grant if they are unable to operate Twelve Meadows as proposed. This loss of funding will prevent the organization from acquiring and operating Twelve Meadows. (ECF No. 16, PageID #212.) At this point, the record regarding the availability of the grant and its potential loss is somewhat muddy. Whatever the case, this sort of financial harm presents the sort of injury traditionally redressed with an award of money damages after a finding of liability. *See, e.g.*, *National Viatical Inc. v. Universal Settlements Int'l*, 716 F.3d 952, 957 (6th Cir. 2013). The Court finds that this claimed loss of grant funding, should it come to pass, may be compensated within the meaning of the law through an award of damages.

But that shifts the focus to what may be the real harm from this dispute. Instead of providing a sober living facility for five women at Twelve Meadows, Lake-Geauga Recovery Centers presently can serve only two. Plaintiffs point out that such harm is not compensable. (ECF No. 16, PageID #212.) Defendants counter that no person will actually lose housing absent a preliminary injunction because no

29

women recovering from addiction currently reside at Twelve Meadows other than the house manager.  Further, Defendants argue that Munson Township's zoning allows two recovering women to reside at Twelve Meadows with the house manager.  (ECF No. 19, PageID #244–45.)  On balance the Court agrees with Plaintiffs that the lost opportunity to provide a sober living environment for up to five women—and three additional women beyond the two allowed—in an already under-served demographic in an area with a demonstrated need for such services constitutes an irreparable injury.    Therefore, the Court finds that Plaintiffs sufficiently demonstrated irreparable harm in the absence of an injunction.

## III.    Substantial Harm to Others and the Public Interest

Defendants concede that residences designed for people recovering from drug and/or alcohol addiction, otherwise known as Level II recovery residences, are permitted in Munson Township's R-1 zoning district—just not in the numbers Plaintiffs prefer—and argue their zoning laws constitute reasonable regulations. (ECF No. 19, PageID #245.)  Further, they point to those zoning laws and their application as written as advancing the public interest.    (*Id.*, PageID #236.) Defendants justify application of the zoning laws by seeking to ensure utility service and by appealing to the general police power.  (*Id.*, PageID #247.)

Although Defendants and the general public have an interest in enforcement of the law, this dispute requires resolving which applicable law must yield to the other when in conflict, the local zoning laws or the ADA.  According to the record, the rationale for upholding the limitation of the local zoning laws based on utility usage

presents little public interest or substantial harm based on these facts, particularly because Level II facilities may operate within the same zoning classification. Further, Defendants fail to demonstrate how these same concerns do not apply to families of five or more who live in Munson Township.  In the Court's view, Plaintiffs have shown that considerations of the public interest and harm to others tilt in their favor.  Finally, Plaintiffs also demonstrated that the public interest would be better served if more residents of Lake and Geauga Counties recovering from alcohol and/or drug addiction had the opportunity for a sober living environment, for which there is a critical and demonstrated need.

**BALANCING THE EQUITIES**

Based on the foregoing analysis, the Court turns to balancing the considerations for issuance of a preliminary injunction.  Plaintiffs have shown they are likely to succeed on the merits on their claim under the ADA and the parallel provision of State law that Defendants denied them a reasonable accommodation. With respect to irreparable harm, the Court does not consider the financial harm Plaintiffs claim; still, they have shown that some women who Lake-Geauga Recovery Centers would otherwise be able to serve would lose that opportunity and that this harm cannot otherwise be remedied at the end of the litigation.  Finally, the remaining factors tip in Plaintiffs' favor as well.

Issuance of an injunction is an equitable remedy.  A fundamental principle of equity is that one cannot invoke a court's equitable power without clean hands. *Sutter v. U.S. Nat'l Bank (In re Sutter),* 665 F.3d 722, 729 (6th Cir. 2012).  For this

reason, the Court considers an additional factor on the facts and circumstances of this case. Defendants make the point that Plaintiffs filed this suit and seek a preliminary injunction because Lake-Geauga Recovery Centers performed inadequate due diligence, acquiring a property not in fact zoned for its intended use. Had the organization acquired a house a few streets away in a different township, this dispute may have been avoided. That is true as far as it goes. But Ms. Blasko testified that, even with the zoning issue, Lake-Geauga Recovery Centers would have proceeded with the acquisition of Twelve Meadows because of the tight housing market, its suitability for use as a recovery home for adult women, the need for such recovery options, and the likelihood that community attitudes would not pose a barrier within a reasonable period of time. (ECF No. 30, PageID #894–96.)

Nor does this equitable principle change the governing legal regime. However, it does weigh in the Court's balancing of the equitable factors for issuing an injunction. In the Court's view, Plaintiffs come into equity with clean hands. A mistake does not change that determination, particularly one made in good faith. *TRW Title Ins. Co. v. Sec. Union Title Ins. Co.*, 153 F.3d 822, 829 (7th Cir. 1998) (citations omitted). Indeed, based on the evidence at the hearing, the Court finds that Ms. Blasko and Lake-Geauga Recovery Centers acted in good faith. Weighing this consideration along with the factors for issuance of a preliminary injunction, and considering each factor separately and the record as a whole, the Court determines that Plaintiffs have carried their burden to justify the issuance of a preliminary injunction.

32

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** Plaintiffs' Motion for Preliminary Injunction.  Therefore, pursuant to Rule 65(a) and Rule 65(d)(1) & (2), the Court orders Defendants to allow Lake-Geauga Recovery Centers to operate Twelve Meadows as a sober-living home for up to five unrelated adult women, plus one live-in house manager, pending entry of a final judgment in this action.

      **SO ORDERED.**

Dated:  March 19, 2021

_____
         J. Philip Calabrese
         United States District Judge
         Northern District of Ohio